BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Senior Counsel
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br>Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.<br>Defendants. | Civil Action No. 2:20-cv-02415<br><br>**UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION TO ENTER CONSENT DECREE**<br><br>**Date:** October 26, 2020<br>**Time:** 1:30 p.m.<br>**Location:** Telephonic<br>**Judge:** Hon. Philip S. Gutierrez |

## TABLE OF CONTENTS

UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ENTER CONSENT DECREE ..... 1

I. BACKGROUND ..... 2

A. The Government Parties and Claims ..... 3

B. The Refugio Incident ..... 4

C. The Refugio Incident Response ..... 4

D. Line 901 and Its Risks ..... 4

E. The Refugio Incident Investigation ..... 5

F. Integrity Management Regulations ..... 5

II. THE CONSENT DECREE TERMS ..... 6

A. Civil Penalties ..... 6

B. Natural Resource Damages ..... 6

1. The NRDA Cooperative Process ..... 6

2. The DARP's Public Process ..... 7

3. The DARP's Conclusions ..... 7

4. The DARP's Restoration and Human Use Projects ..... 8

5. Plains' $22.325M NRD Payment will fund DARP Projects ..... 9

C. Injunctive Relief (Section IX) ..... 9

1. PHMSA's Expanded Investigation of Plains' Operations ..... 10

2. The IR Recognizes Federal and State Enforcement Authorities 10

3. The IR ..... 11

III. STANDARD FOR ENTRY ..... 17

IV. DISCUSSION ... 18
A. The Consent Decree is Procedurally Fair ... 18
B. The Consent Decree is Substantively Fair and is Reasonable ... 19
V. THE PUBLIC COMMENTS DO NOT DISCLOSE FACTS OR INFORMATION THAT MILITATE AGAINST APPROVAL OF THE CONSENT DECREE ... 21
A. Injunctive Relief ... 22
B. Natural Resource Damages ... 23
C. Penalties ... 24
VI. CONCLUSION ... 25

# TABLE OF AUTHORITIES

## Federal Cases

*Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519 (5th Cir. 2008) ........ 20

*Kelly v. Thomas Solvent Co*., 717 F. Supp. 507, 517 (W.D. Mich. 1989) (citing *United States v. Hooker Chem. & Plastic Corp*., 607 F. Supp. 1052 (W.D. N.Y.), *aff'd*, 776 F.2d 410 (2d Cir. 1985)) ........ 20

*Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615 (9th Cir. 1982) ........ 18

*SEC v. Randolph*, 736 F.2d 525 (9th Cir. 1984) ........ 18, 21

*Speed Shore Corp. v. Denda*, 605 F.2d 469 (9th Cir. 1979) ........ 17, 18

*Tull v. United States*, 481 U.S. 412 (1987) ........ 20

*United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409 (6th Cir. 1991) ........ 18

*United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826 (5th Cir. 1975 ........ 18

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79 (1st Cir. 1990) ........ 18, 19

*United States v. Charles George Trucking*, 34 F.3d 1081 (1st Cir. 1994) ........ 19

*United States v. Coeur d'Alenes Co.*, 767 F.3d d873 (9th Cir. 2014) ........ 17

*United States v. Davis* 261 F.3d 1 (1st Cir. 2001) ........ 19

*United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741 (9th Cir. 1995) ........ 18

*United States v. North Carolina*, 180 F.3d 574 (4th Cir. 1999) ........ 20, 21

*United States v. Oregon*,
913 F.2d 576 (9th Cir. 1990) .................... 17
*United States v. Pac. Gas & Elec.*,
776 F. Supp. 2d 1007 (N.D. Cal. 2011) .................... 17, 19
*United States v. Rohm & Haas*, 721 F. Supp. 666 (D.N.J. 1989) .................... 20

**Federal Statutes**

33 U.S.C. § 1251 .................... 3
33 U.S.C. § 1321 .................... 25
33 U.S.C. § 2701 .................... 3
33 U.S.C. § 2706 .................... 7
49 U.S.C. § 60101 .................... 3
49 U.S.C. § 60120 .................... 24
49 U.S.C. § 60122 .................... 24

**Federal Regulations**

15 C.F.R. § 990.14 .................... 7
15 C.F.R. § 990.25 .................... 21
40 C.F.R. § 19.4 .................... 25
49 C.F.R. § 195.452 .................... 5
85 Fed. Reg. 15815 .................... 2
85 Fed. Reg. 17599 .................... 2

**Other Authorities**

California Fish and Game Code § 2014 .................... 3
California Fish and Game Code § 5650 .................... 3
California Fish and Game Code § 5650.1 .................... 3, 24
California Fish and Game Code § 12016 .................... 3
California Government Code § 8670.1 .................... 3

California Government Code § 8670.66 .............................................................. 24
California Government Code § 51010 .................................................................. 3
California Water Code § 13350 ............................................................................ 3
California Water Code § 13385 ....................................................................... 3, 24

**UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ENTER CONSENT DECREE**

The United States respectfully submits this Memorandum of Law in Support of the United States' Motion to Enter Consent Decree ("United States' Memorandum"). Specifically, the United States requests the Court to enter the Consent Decree lodged on March 13, 2020 (ECF Docket Number ("DN") 6-1 ("Consent Decree" or "CD"). The CD resolves the civil claims of co-plaintiffs the United States and State of California entities ("State") (jointly, "Governments") against Plains Pipeline, L.P. and Plains All American Pipeline, L.P. (jointly, "Plains") for violations of federal Pipeline Safety Laws ("PSLs") and their liability for the May 19, 2015, discharge of approximately 2,934 barrels of crude oil from Plains' Line 901 pipeline ("Line 901")[1] located near Refugio State Beach and Santa Barbara, California ("Refugio Incident").

The CD resolves the Governments' civil claims and requires Plains to: 1) pay $24M in penalties; 2) pay $22.325M in natural resource damages ("NRD"); and 3) implement significant injunctive relief ("IR") to improve Plains' nationwide pipeline system, in addition to modifying operations related directly to the Refugio Incident. During the course of settlement negotiations, the Governments secured Plains' reimbursement of approximately $10M in NRD assessment ("NRDA") costs and $4.26M for the United States Coast Guard's ("USCG") removal costs.

---

[1] The United States understands that other Refugio Incident litigation may include disputed issues concerning the volume of released Line 901 oil. The Court is not required to make a "volume" finding for purposes of granting the United States' Motion to Enter Consent Decree. The Line 901 volume did not provide the basis for the injunctive relief or most of the monetary payments required under the CD, including the natural resource damages payment, and the penalties paid for PSLs and State law violations. The Line 901 volume only provided the basis for the penalty paid under EPA's authorities. This topic is discussed in Section V.C of the United States' Memorandum, and in the United States' response to public comments numbered four and five. *See*, Ex. 1.

Excluding the value of unquantified but substantial IR, the settlement and reimbursed costs are valued in excess of $60M. CD *passim*.

The United States published a notice of the Consent Decree in the Federal Register thereby commencing a 30-day public comment period. 85 Fed. Reg. 15815 (March 19, 2020). A second Federal Register notice extended the comment period an additional 30 days through May 20, 2020. 85 Fed. Reg. 17599 (March 30, 2020). Declaration of Mr. Bradley R. O'Brien ("O'Brien Dec.") is included as Exhibit ("Ex.") 3, ¶2. After evaluating the three received public comments, the United States supports the Consent Decree as being fair, reasonable, and in the public interest and respectfully requests its entry by the Court. *See*, Exs. 1, 2, 3.

## I. BACKGROUND

Before discussing the genesis of the Governments' Complaint and Consent Decree, the United States notes the United States' Memorandum focuses substantially on the Refugio Incident; however, the United States' claims and the resulting CD terms extend significantly beyond the Refugio Incident and address Plains' national operations. These nationwide terms sprung from an investigation by the United States Department of Transportation ("USDOT"), Pipeline and Hazardous Materials Safety Administration ("PHMSA") that focused initially on the Refugio Incident but expanded to include Plains' operations generally as PHMSA determined that broader relief is needed. Hoidal Dec. Ex. 4, ¶12.[2]

For that reason, the IR described in Appendix ("App.") B of the Consent Decree is far reaching and directed toward improving Plains' compliance for its entire 6,000-mile crude oil pipeline transmission system, including the Control Room located in Texas that controls Plains' domestic operations. Butler Dec. Ex. 5, ¶5.[3] Additionally, the CD includes a $14.5M penalty for Plains' violations of

[2] The declaration of Mr. Chris Hoidal ("Hoidal Dec.") is included as Ex. 4.

[3] The declaration of Ms. Karen Butler ("Butler Dec.") is included as Ex. 5.

the PSLs that are not wholly dependent upon the Refugio Incident. 49 U.S.C. §§ 60101 *et seq*. Therefore, while the Consent Decree terms that relate to the Refugio Incident are very important, the Court should recognize that the CD also contains terms that are directed toward preventing future violations of the PSLs and therefore to increase public safety and environmental protection throughout Plains' expansive crude oil transmission pipeline system. Hoidal Dec. Ex. 4, ¶17.

**A. <u>The Government Parties and Claims</u>**

The United States' civil action is brought on behalf of PHMSA; the United States Environmental Protection Agency ("EPA"); the United States Department of the Interior ("DOI"); and the United States Department of Commerce, National Oceanic and Atmospheric Administration ("NOAA"). The State agencies' action is brought on behalf of the State Department of Fish and Wildlife ("CDFW"); the State Lands Commission ("CSLC"); the State Department of Parks and Recreation ("CDPR"); the State Regional Water Quality Control Board, Central Coast Region ("RWQCB"); the University of California Regents ("UC"); and the Office of the State Fire Marshal ("OSFM").

The Governments' claims are described in the Complaint and resolved by the CD. These claims include penalties, NRD and NRDA costs, IR, and response costs, and are brought, as applicable, under the PSLs and two other federal statutes: the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*., and the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2701 *et seq*.; and a number of State authorities: the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act ("Lempert-Keene"), California Government Code §§ 8670.1 *et seq*.; the California Fish and Game Code ("CAFG") §§ 2014, 5650, 5650.1, and 12016; the Porter-Cologne Water Pollution Control Act ("Porter-Cologne"), California Water Code §§ 13350 and 13385; and the Elder California Pipeline Safety Act of 1981 ("State Elder Pipeline Act"), California Government Code §§ 51010 *et seq*.

**B. The Refugio Incident**

On May 19, 2015, Plains' Line 901 ruptured resulting in the release of approximately 2,934 barrels of crude oil. Line 901's oil travelled across Refugio State Beach and entered the Pacific Ocean. Hoidal Dec. Ex. 4, ¶6. The Refugio Incident caused widespread oiling of the Pacific Ocean and other areas and adversely impacted natural resources and human uses. Cullen Dec. Ex. 6, ¶5.[4]

**C. The Refugio Incident Response**

Federal, State, and local authorities responded to the Refugio Incident, including the USCG issuing Plains an Order for Removal, Mitigation or Prevention of a Substantial Threat of Oil Discharge. Order No. 2015-01-FPN A 15017. Christensen Dec. Ex. 7, ¶1.[5] Two days after the Refugio Incident, PHMSA issued a Corrective Action Order, as amended ("CAO"). CAO CPF No. 5-2015-5011H. The CAO required Plains to shut down Line 901 and address safety concerns. The CAO also required Plains to address Line 903, a similar buried insulated pipeline that receives Line 901 product that was also shut down. Hoidal Dec. Ex. 4, ¶7.

**D. Line 901 and Its Risks**

Line 901 is a 10.7 mile buried insulated pipeline that runs parallel to the Pacific Ocean and transports crude oil to the Gaviota Pumping Station. There are few buried insulated pipelines like Line 901 operating in the United States because similar pipelines are known to be susceptible to external corrosion and failure due to trapped moisture under the coating (tape wrap over insulation). The term used to describe this increased risk is "corrosion under insulation" or "CUI." Hoidal Dec. Ex. 4, ¶8. Plains operates three CUI lines in the State of California: Line 901, Line 903, and newer Line 2000. Because each line is constructed with similar CUI risks, the IR applies to Lines 901, 903, and 2000. *Id.*, ¶9; CD Apps. B, D.

---

[4] The declaration of Mr. Thomas Cullen, Jr. ("Cullen Dec.") is included as Ex. 6.

[5] The declaration of Ms. Shellee Christensen ("Christensen Dec.") is included as Ex. 7.

**E. The Refugio Incident Investigation**

PHMSA regulates the design, construction, and operation of most oil and natural gas pipelines in the United States. Therefore, PHMSA conducted a failure investigation to determine the proximate and contributory causes of the Refugio Incident and issued these findings in a Failure Investigation Report ("FIR") issued on May 19, 2016. The Executive Summary of the FIR is included as Ex. 8. Hoidal Dec. Ex. 4, ¶10. The complete FIR will be provided upon Court request.

The FIR determined, *inter alia*, the proximate cause of the Refugio Incident was external corrosion that thinned Line 901's wall leading to its rupture. Contributory causes attributed to Plains and described in the FIR include, in part: 1) ineffective protection against external corrosion; 2) failure to detect and mitigate external corrosion, including a failure to develop and implement an adequate Integrity Management Program ("IMP") required by PHMSA's regulations, particularly the failure to identify CUI as a risk-driving threat; and 3) lack of timely detection and response to the Refugio Incident, including an inadequate oil spill response plan that failed to identify the culvert near the rupture that served as a pathway directly to the Pacific Ocean. FIR *passim*; Hoidal Dec. Ex. 4, ¶11.

**F. Integrity Management Regulations**

The Integrity Management ("IM") regulations are one of PHMSA's most critical comprehensive performance-based regulations that apply to pipelines that affect or could affect "High Consequence Areas" or "HCAs" and impose special responsibilities and requirements on Plains. *See, e.g.*, 49 C.F.R. § 195.452. IM is based on the concept that certain geographic areas known as HCAs are either highly populated or contain environmentally sensitive areas (*e.g.*, oceans or drinking water sources) that warrant a higher standard of operator care to ensure that they do not suffer the consequences of incidents such as crude oil spills. Lines 901, 903, and 2000 are defined by the PSLs as operating within HCAs. Hoidal Dec. Ex. 4, ¶13.

The IM regulations found in 49 C.F.R. § 195.452 require each hazardous

liquid pipeline operator to identify HCAs along its pipeline routes and to create its own IMP that addresses the unique risks of each pipeline segment. The operator must prioritize segments based on its risks and conduct integrity assessments of each segment at prescribed intervals through the use of in-line inspection ("ILI") tools or "pigs," or other prescribed assessment techniques. The operator must analyze "all available information about the integrity of the entire pipeline and the consequences of a failure" and remediate within certain timelines any defects or "anomalies" in the pipe that could reduce the integrity of the pipeline. *Id.*, ¶14.

The IM process is ongoing, and an operator must not only develop "preventive and mitigative measures" ("P&M") to identify additional protective measures for HCAs, but also continually monitor its IMP and improve its effectiveness. Each operator must document each step and record how information is analyzed and decisions are made to carry out the program. *Id.*, ¶15.

## II. <u>THE CONSENT DECREE TERMS</u>

There are two distinct categories of claims resolved in the Consent Decree: 1) Claims relating to Plains' regulatory violations of the PSLs and the State Elder Pipeline Act; and 2) Claims relating directly to the Refugio Incident. The resolution of these claims is addressed in the CD as described below.

### A. <u>Civil Penalties</u>

Plains is required to pay a $24M penalty that is allocated among the United States and State agencies as follows: 1) $14.5M to PHMSA; 2) $9.45M to be shared among EPA ($5.925M), RWQCB ($2.5M), and CDFW ($1.025M); and 3) an additional $50,000 to CDFW. CD Section V.

### B. <u>Natural Resource Damages</u>

Plains is required to pay $22.325M for NRD. CD ¶12. The Trustees were previously reimbursed by Plains for approximately $10M in NRDA costs. CD ¶13.

#### 1. <u>The NRDA Cooperative Process</u>

The NRDA was a cooperative process ("Cooperative Process") between the

trustees ("Trustees") and Plains.[6] *See*, 15 C.F.R. § 990.14(c) ("Trustees must invite the responsible parties to participate in the natural resource damage assessment described in this part.") The Trustees and Plains jointly collected data, conducted studies, and held expert discussions to find common ground and identify areas of disagreement. Anderson Dec. Ex. 9, ¶8.[7] Ultimately, the Trustees quantified the natural resource injuries, NRD including human use losses, and developed a Draft Damage Assessment Restoration Plan ("DARP") published on April 22, 2020. 33 U.S.C. 2706(c). The DARP Executive Summary is included as Ex. 10. Anderson Dec. Ex. 9, ¶9. The complete DARP will be provided upon Court request.

2. <u>The DARP's Public Process</u>

The public participates in the NRDA process by providing input and formal comment. For example, the Trustees periodically updated the public through newsletters and hosted an initial public meeting on January 20, 2016, to inform the public of the NRDA and to solicit input on potential restoration and other projects. The Trustees considered public input when selecting the DARP's preferred restoration projects described below. *Id*., ¶8.

Following the DARP's release, the Trustees published a notice inviting public participation in two "virtual" meetings held on May 13, 2020, during which the Trustees summarized the DARP contents, responded to questions, and solicited public comment. The Trustees also provided the public until June 8, 2020, to provide additional written comments. After the DARP is finalized through the Trustees' administrative process, the Trustees will begin planning, implementing, and monitoring selected projects. *Id*., ¶14.

3. <u>The DARP's Conclusions</u>

The Trustees conclude in the DARP that the Refugio Incident caused the

---

[6] The Trustees are DOI, NOAA, CDFW, CDPR, CSLC, and UC. CD ¶K.
[7] The declaration of Dr. Michael Anderson is included as Ex. 9.

following natural resource injuries and human use losses: 1) *Shoreline Habitats* (approximately 1,500 acres); 2) *Fish and Subtidal Habitats* (approximately 2,200 acres); 3) *Birds* (558 birds estimated killed); 4) *Mammals* (156 pinnipeds, including seals and sea lions; and 76 cetaceans, including long-beaked common dolphins, estimated injured or killed); and 5) *Human Uses* (Over 140,000 recreational user-days lost in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County, and lost education opportunities at the UC Santa Barbara Coal Oil Point Natural Reserve ("UCSB COPNR")). *Id.*, ¶10.

4. <u>The DARP's Restoration and Human Use Projects</u>

The Trustees "scaled" viable projects to offset the injuries caused by the Refugio Incident. *Id.*, ¶9. The current projects proposed by the Trustees to offset the Refugio Incident and described in the DARP include:

a) *Shoreline Habitat ($5.5M)* (Remove Ellwood Seawall to restore sandy beach and subtidal habitats, restore black abalone populations, and restore sand dune habitats);

b) *Fish and Subtidal Habitats ($6.1M)* (Restore abalone populations, restore eelgrass beds in Refugio Cove, and extend kelp restoration offshore Goleta Beach);

c) *Birds ($2.2M)* (Enhance brown pelican nesting and roosting habit, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers at UCSB COPNR);

d) *Marine Mammals ($2.3M)* (Increase the capability to respond to and rehabilitate sick and injured marine mammals in Santa Barbara and Ventura Counties, and expand the capacity to respond to dolphins and whales entangled in fishing gear in the Santa Barbara Channel;

e) *Human Use ($3.9M)* (Implement projects for camping and shore-based recreation from Gaviota State Park to El Capitan State Beach, for coastal recreation in Santa Barbara, Ventura, and Los Angeles Counties, and

benefiting education at UCSB COPNR); and

f) *Trustees' Planning and Oversight ($2.3M).*

*Id*., ¶11.

5. <u>Plains' $22.325M NRD Payment will fund DARP Projects</u>

The Trustees "scaled" Plains $22.325M NRD payment by determining the scale of restoration required and the monies necessary to fund a suite of restoration projects that will restore the injured resources and compensate for interim losses and lost human uses. The Trustees determined that Plains' $22.325M NRD payment is sufficient to fund the preferred DARP projects. *Id*., ¶9. The Trustees further determined that Plains' NRD payment will fund at least 87 percent of the Trustees' estimated value of lost human uses (*e.g*., camping, recreational fishing) described in the DARP. However, the resulting $3.9M allocated for human-use-related projects is reasonable and within the range of values that the Trustees deemed plausible given data uncertainties. Zafonte Dec. Ex. 11, ¶¶5, 6.[8]

While the DARP is not final, and the Trustees must consider public comments before it can be finalized, including recommendations to select alternative Tier 2 projects or other projects, the process is subject to certain constraints. Notably, the Trustees must select the most cost effective projects when two or more projects are equally preferable based on OPA regulatory factors, including the extent each restoration alternative will meet the Trustees' goals and objectives in returning the injured natural resources and services to baseline and/or compensating for interim losses. For this reason, the Trustees believe that even if the selected projects in the final DARP differ from the current suite of preferred projects, there will be adequate funding available. Anderson Dec. Ex 9, ¶15.

**C. <u>Injunctive Relief</u>**

To resolve the Plaintiffs' IR claims, Plains must make national system-wide

[8] The declaration of Dr. Matthew Zafonte is included as Ex. 11.

changes and abide by strict requirements for Lines 901, 903, and 2000.

1. <u>PHMSA's Expanded Investigation of Plains' Operations</u>

Because PHMSA's Refugio Incident investigation discovered Plains' non-compliance with the PSLs, PHMSA expanded its investigation to include Plains' national operations. PHMSA completed the investigation and identified numerous PSL violations across Plains' unified 6,000 mile domestic crude oil pipeline system - that is based upon one generic Integrity Management Plan - the core PSL plan that defines how Plains should operate. Similarly, many of Plains' daily operations (*e.g.*, leak detection, shutting down lines that are releasing oil) are centralized - a single Control Room located in Midland, Texas, remotely controls Plains' entire domestic operations, including Lines 901, 903, and 2000. Hoidal Dec. Ex. 4, ¶12; Butler Dec. Ex. 5, ¶5. Therefore, the Consent Decree's IR terms are comprehensive to address Plains' nationwide operations and pipeline safety violations.

2. <u>The IR Recognizes Federal and State Enforcement Authorities</u>

The IR recognizes PHMSA's authority over Plains' *interstate* systems, OSFM's authority over Plains' California *intrastate* lines, and that Line 901 was an interstate line at the time of the Refugio Incident but subsequently became an intrastate line. The IR also reflects that other agencies such as EPA, CDFW, and RWQCB are authorized to enforce certain pipeline and spill response laws.

Notwithstanding the joint enforcement authorities, App. B of the CD reconciles the required IR into one document for ease of implementation and to reflect overlapping agency interests. Article I (California-Specific Provisions) of CD App. B describes the California intrastate IR that will be overseen primarily by OSFM. Article II (Company-Wide Provisions on Regulated Pipelines) of CD App. B describes the interstate or national-scope provisions that will be overseen primarily by PHMSA. The limited crossover between Articles I and II and the interests of other agencies (*e.g.*, EPA) are reflected in the individual provisions; for example, Emergency Response and Oil Spill Response Plans apply to both California

intrastate and national interstate lines, and the required information must be provided to all agencies (defined in the IR as "Governments"). *See, e.g.*, CD App. B, ¶13A, B.

App. D (Remaining Corrective Actions from PHMSA's CAO) of the Consent Decree is the exception to combining the IR into CD App. B. As described in Section I.C. (Refugio Incident Response) of the United States' Memorandum, PHMSA issued Plains a CAO requiring Plains to take steps to ensure the safety of Lines 901 and 903. Because Lines 901 and 903 are now intrastate lines under OSFM jurisdiction, CD App. D identifies the remaining original CAO requirements that Plains will complete under OSFM oversight. Upon CD entry, PHMSA's CAO is closed and the remaining CAO obligations are merged into the Consent Decree. CD App. D, ¶1.

3. <u>The IR</u>

The United States' Memorandum will generally describe the IR terms; however, the IR is technical and detailed and CD Apps. B and D are the primary operative documents.

a. *Article I (California-Specific Provisions) of CD App. B*

Article I of CD App. B generally describes the California intrastate IR that will be overseen primarily by OSFM and, in part, includes the following:

- <u>State Waiver for Lines 901, 903, and 2000</u>. Due to the limited effectiveness of cathodic protection, Plains is required to obtain a State Waiver of compliance with unmet standards prior to re-starting Line 901 and operational/non-operational segments of Line 903. Plains must apply for a State Waiver for Line 2000. CD App. B, Article I, ¶1.
- <u>Replacement, Restart, or Abandonment of Lines 901 and 903</u>. Plains must, under specified conditions, (*e.g.*, the cost of replacing the pipelines must be economically viable) replace existing Line 901 and segments of Line 903 with non-insulated pipe. Prior to commencing operations on replaced Lines 901 or 903 segments, Plains must test for pipeline

interference, conduct a close interval and surveys, and based on the surveys place additional cathodic-protection stations at locations. CD App. B, Article I, ¶2.

- Third-Party Analysis of Line 2000 ILI Data. Plains must retain a third-party consultant to review and analyze ILI or "pig" data for Line 2000. The consultant will review all Line 2000 ILI results and reports, review Plains' processes for analyzing data, analyze Plains' implementation of ILI assessment, and evaluate ILI vendor specifications. The consultants' findings and recommendations will be provided to OSFM and PHMSA. CD App. B, Article I, ¶3.
- Integrity Management. For operating segments of Lines 901, 903, and 2000, Plains is required to amend its IMP as needed and implement the following measures: a) in addition to other criteria, remediate metal loss anomalies that have an ILI reported depth of 40 percent or greater wall loss; b) for validation, analyze a sample of additional anomalies between 10 percent and 40 percent wall loss; c) re-run the ILI tool if it fails to record data for 5 percent or more of the external and/or internal surface area; d) integrate data in the P&M process, including ILI data, dig and repair data, corrosion data, operational data, emergency response data, and leak detection evaluation measures. The improvements relate to ILI criteria, data integration, emergency response data, and leak detection evaluation. Plains is required during the first two years after entry of the Consent Decree to conduct at least two ILI's using different tools and compare both runs, and after the first two years, alternate ILI tools. CD App. B, Article I, ¶4A.
- Valves. For operating segments of Lines 901, 903, and 2000, and for new pipeline segments replacing those lines, Plains is required to conduct Emergency Flow Restriction Device ("EFRD") analyses to include

consideration of swiftness of leak detection and pipeline shutdown capabilities, valve placement and method of actuation. Plains must, where practical, confirm that check valves that are necessary for the safe operation of the pipeline are in good working order. CD App. B, Article I, ¶5.

- Risk Analysis. For operating segments of Lines 901, 903, and 2000, Plains is required to submit a risk analysis. CD App. B, Article I, ¶6.
- Leak Detection. For any operating segments of Lines 901, 903, and 2000, Plains must confirm it installed a Computational Pipeline Monitoring Real Time Transient Model. CD App. B, Article I, ¶7.

b. *Article II (Company-Wide Provisions on Regulated Pipelines) of CD App. B*

Article II of CD App. B generally describes the national-scope provisions that will be overseen primarily by PHMSA and, in part, includes the following:

- Integrity Management. Plains is required to: a) modify its IMP to provide Interim Review of each relevant pipeline segment to determine whether new conditions or information could significantly impact previously or newly identified threats, and then take appropriate P&M measures; b) modify the IMP to provide new forms for P&M measures or actions to be taken based upon the Interim Review, and allow an Integrity Engineer to recommend P&M measures; c) revise the P&M Recommendation form to expand its scope to include a narrative explanation that at a minimum reflects the basis for a recommendation, the risk to be addressed, the intended goal, and the anticipated completion date; and d) document P&M measures recommended but not implemented. CD App. B, Article II, ¶9.
- Valves and Operations and Maintenance. Plains is required to: a) conduct EFRD analyses for applicable pipelines; and b) develop and implement procedures to document valve failure, adjust surge analyses

and emergency response plans, timely communicate to the Control Room, and verify personnel qualifications. Plains is required to make all repairs necessary to keep valves in good working order and improve valve maintenance recordkeeping. CD App. B, Article II, ¶10.

- Leak Detection. Plains is required to: a) create a list of regulated mainline pipelines to identify which specified rupture-detection methods are used for each line, and implement at least one rupture-detection method; b) conduct annual controller training on the attributes and benefits of specified methods of leak detection; c) analyze the use of accumulated deviation rolling time period longer than 24 hours; d) develop a written procedure for the selection of leak detection methods; e) hold periodic feedback meetings to identify potential improvements to leak detection; and f) provide a procedure to identify, record, and track through resolution when Control Room instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values due to scheduled or unplanned maintenance activities. CD App. B, Article II, ¶11.
- Control Room Management. For Lines 901 and 903, prior to resuming operations on segments not in service or commencement of replacement lines, Plains must: a) complete point-to-point verification reviews of all components of its Supervisory Control and Data Acquisition ("SCADA") system, including displays, alarm set-point values, and alarm log descriptors; b) update piping and instrumentation diagrams, software, manuals, and operating procedures; c) confirm that all Lo-Lo and Hi-Hi SCADA alarms configured as critical safety alarms for pressure and flow and the alert notification are accurate; d) update the Control Room Management Plan and Control Center General Procedures and other information to reflect current operating conditions; e) for Line 2000,

confirm that control console alarm descriptors are accurate; and f) implement the Control Room Management Plan and Control Center General Procedures described in Paragraph 23(a) of the Consent Decree. CD App. B, Article II, ¶12.

- Emergency Response and Oil Spill Response Plans. Plains will review and update the Bakersfield District Response Zone Plan, including identifying culverts along rights-of-way, potential receptors, and procedures to assure environmental protection from oil spills. Nationally, Plains is required to: a) survey rights-of-way for all applicable mainline pipelines to identify culverts and ensure the relevant emergency response plans reflect culvert locations and address potential containment and recovery techniques; b) provide employee spill response and Control Room personnel emergency response training; c) notify PHMSA and OFSM of organized drills and provide after-action reports that include a discussion of "lessons learned"; and d) include Control Room management in after-action or "hot wash" activities designed to identify areas of improvement after a release. CD App. B, Article II, ¶13.
- Safety Management System ("SMS"). Plains is required to implement its SMS based upon American Petroleum Institute recommended practices. Plains must retain a third party to assess its conformance with this requirement. CD App. B, Article II, ¶14.
- Drug and Alcohol Programs. Plains must review and revise its drug and alcohol plans to comply with federal standards for post-accident and random drug and alcohol testing. Plains is required to document all post-accident drug and alcohol tests and document the reasons for a test not being timely administered. CD App. B, Article II, ¶15.

c. *CD App. D (Remaining Corrective Actions from the PHMSA CAO)*

CD App. D describes the remaining original CAO requirements that Plains will complete under OSFM oversight and, in part, includes the following:

- Line 901 Shutdown. Plains cannot operate Line 901 until authorized. CD App. D, ¶1a.
- Restart Plan for Line 901. If Plains seeks to restart Line 901, Plains must submit a Restart Plan for OSFM approval. If approved, the Restart Plan will be incorporated into the Consent Decree and include: a) documented completion of mandated actions, and a management of change plan to ensure that modifications are incorporated into Plains' operations; b) adequate patrolling; c) sufficient surveillance; d) a day-light restart that includes advance notice to local emergency response officials; e) Control Room enhancements, including advanced leak detection capabilities, updated alarm set-point values of pressures and flows, modification of alarm priority/severity system, and emergency shutdown programming; f) additional safety valves; g) additional pressure sensors; h) ILI requirements; and i) a corrosion protection plan. CD App. D, ¶1b.
- Return to Service of Line 901. If OSFM approves the Restart Plan, operating pressure restrictions apply. CD App. D, ¶1c.
- Line 903 Shutdown. Plains cannot operate relevant Line 903 segments without OSFM authorization. CD App. D, ¶1e.
- Restart Plan for Line 903. If Plains seeks to restart the operative 903 segments, Plains must submit a Restart Plan for OFSM approval, which will be incorporated into the Consent Decree. CD App. D, ¶1f.
- Line 903 Return to Service. If OSFM approves the Restart Plan, operating pressure restrictions apply. CD App. D, ¶1g.

d. *Material Changes to IMP and Control Room Procedures*

The IR negotiations extended over a significant period of time and included numerous in-person meetings and conference calls involving technical and

management representatives of Plains, PHMSA, OSFM, and other agencies. To the extent these discussions identified recommended improvements to Plains' operations, Plains periodically revised its IMP and Control Room plans and procedures to incorporate these proposed modifications. Hoidal Dec. Ex. 4, ¶16; Butler Dec. Ex. 5, ¶6. To ensure the newly added provisions are maintained, Paragraphs 22 and 23 of the CD require notice be given to PHMSA if Plains intends to materially change these provisions. CD ¶¶22, 23.

## III. STANDARD FOR ENTRY

The decision to approve a proposed consent decree is committed to the discretion of the district court. *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). A court should approve entry of a consent decree when the decree is "fundamentally fair, adequate and reasonable," and "conform[s] to applicable laws." *Id.* This standard requires an examination of whether the proposed decree is substantively and procedurally fair. *See, United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 877 (9th Cir. 2014). In considering substantive fairness, the district court "does not determine whether 'the settlement is one which the court itself might have fashioned, or considers ideal.'" *United States v. Pac. Gas & Elec.*, 776 F. Supp. 2d 1007, 1025 (N.D. Cal. 2011) (citation omitted). Rather, "[t]he court need only be satisfied that the decree represents a reasonable factual and legal determination." *Oregon*, 913 F.2d at 581 (citation omitted) (internal quotation omitted). The procedural fairness prong is generally met if the consent decree is the product of good faith, arm's-length negotiations that were "fair and full of adversarial vigor." *Pac. Gas & Elec.*, 776 F. Supp. 2d at 1025 (citation omitted).

Several additional principles guide the Court's analysis of the proposed Consent Decree in this matter. First, "[i]t is well recognized that settlement agreements are judicially favored as a matter of sound public policy." *Speed Shore Corp. v. Denda*, 605 F.2d 469, 473 (9th Cir. 1979). This presumption in favor of settlement "is particularly strong where a consent decree has been negotiated by the

Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991) (citation omitted). In this case, PHMSA is the preeminent federal pipeline regulator; EPA is charged with environmental protection, including spill response; and NOAA and DOI are designated natural resource Trustees responsible for NRDA activities. These agencies possess expertise and should be accorded deference for the claims resolved in the Consent Decree. *See also, SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) (a court "should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment.")

In addition to deferring to agency expertise, courts reviewing consent decrees should be sensitive to the "resources consumed by the federal agencies in negotiating these decrees, as well as the chance justly to finalize a matter that otherwise would burden agencies and courts . . . ." *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 851 (5th Cir. 1975); *see also, Speed Shore Corp.*, 605 F.2d at 473 ("Settlement agreements conserve judicial time and limit expensive litigation") (citation omitted).

Finally, in reviewing a consent decree involving federal agencies, a district court "must refrain from second-guessing the Executive Branch." *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 746 (9th Cir. 1995) (citation omitted); *see also, Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982) ("Neither the district court nor this court is empowered to rewrite the settlement agreed upon by the parties.… In short, the settlement must stand or fall as a whole.")

## IV. DISCUSSION

### A. The Consent Decree is Procedurally Fair

This Court's review of the CD requires analysis of both procedural and substantive fairness. *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86-88

(1st Cir. 1990) ("To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance.") *Id*. at 86. As occurred in the Refugio Incident negotiations, the "procedural integrity" required of the governments is to have "conducted negotiations forthrightly and in good faith." *Id.*

Because the negotiations were conducted at arm's-length and in good faith, the CD is procedurally fair. *See, Pac. Gas & Elec.*, 776 F. Supp. 2d at 1025 (a consent decree shown to be the product of good faith, arm's-length negotiations is "presumptively valid.") The cooperative assessment began immediately after the Refugio Incident and penalties, NRD, and IR were negotiated during the following approximately four years. The parties were represented by experienced counsel; the negotiations included Plains' management; and the parties were aided by personnel with sufficient expertise to meaningfully analyze the complex technical elements of the proposed settlement. The mediated negotiations were concluded under the Honorable John Leo Wagner, Ret. O'Brien Dec. Ex. 3, ¶4. *See e.g., Cannons Eng'g Corp.*, 899 F.2d at 84 ("That so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance.") The CD is procedurally fair.

**B. <u>The Consent Decree is Substantively Fair and is Reasonable</u>**

The Consent Decree is also substantively fair and is reasonable. As the First Circuit stated in *Cannons*, "[s]ubstantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." 899 F.2d at 87; *see also, United States v. Davis* 261 F.3d 1, 23 (1st Cir. 2001) ("A finding of procedural fairness may also be an acceptable proxy for substantive fairness, when other circumstantial indicia of fairness are present"); *United States v. Charles George Trucking*, 34 F.3d 1081, 1087-89 (1st Cir. 1994). In reviewing substantive fairness, the court need only

determine whether a proposed consent decree reflects a reasonable compromise of the litigation. *United States v. Rohm & Haas*, 721 F. Supp. 666, 685 (D.N.J. 1989). Factors considered by courts in reviewing consent decrees for fairness include "the strength of the plaintiffs' case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved." *Kelly v. Thomas Solvent Co.*, 717 F. Supp. 507, 517 (W.D. Mich. 1989) (citing *United States v. Hooker Chem. & Plastic Corp.*, 607 F. Supp. 1052, 1057 (W.D. N.Y.), *aff'd*, 776 F.2d 410 (2d Cir. 1985)).

Here, the Consent Decree's $24M penalty achieves the statutory purpose of punishing Plains for its non-compliance and deterring further violations. The penalty amount is consistent with the statutes and commensurate with the severity, nature, and number of violations. Thus, the penalty is substantively fair and reasonable. *See, e.g.*, *Tull v. United States*, 481 U.S. 412, 422–423 (1987) (CWA penalties are to punish and deter); *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 531 (5th Cir. 2008) (CWA penalty in consent decree "represents the federal government's discretionary resolution of the level of penalty needed.")

Plains is also required to pay $22.325M in NRD, in addition to approximately $10M in NRDA costs already reimbursed by Plains. The $22.325M NRD payment will fully fund projects that will restore the injured natural resources, compensates the public for the value of human use losses, and covers the Trustees' costs to conduct restoration planning and implementation. The proposed projects are significant and located within the area affected by the spill. The projects include removing the Ellwood Seawall, restoring abalone populations along the Gaviota coast, restoring kelp offshore of Goleta Beach, improving brown pelican nesting colonies on Anacapa Island, implementing conservation actions for western snowy plovers at UCSB COPNR, and increasing the ability to recover and rehabilitate distressed marine mammals in Santa Barbara and Ventura Counties. Thus, the NRD terms are also substantively fair and reasonable. *United States v. North*

*Carolina*, 180 F.3d 574, 581 (4th Cir. 1999); 15 C.F.R. § 990.25 (Trustees are authorized to settle NRD claims "… at any time, provided that the settlement is adequate in the judgment of the trustees to satisfy the goal of OPA and is fair, reasonable, and in the public interest.")

As is described in more detail in subsection 3, above, the IR mandates that Plains improve the operations of its three California CUI crude oil pipelines – Lines 901, 903, and 2000. Further, Plains must implement IR that modifies its national operations, including Plains' Control Room, and substantially increases public safety and environmental protection throughout Plains' approximate 6,000 mile crude oil transmission pipeline system. CD Apps. B, D; Hoidal Dec. Ex. 4, ¶17. Thus, the IR serves the objectives of the PSLs, CWA, the State Elder Pipeline Safety Act, Lempert-Keene, and other statutes, and is substantively fair and reasonable in light of the facts and circumstances of this case. *See, Randolph*, 736 F.2d at 529; *North Carolina*, 180 F.3d at 581 ("a district court should be guided by the general principle that settlements are encouraged.")

## V. THE PUBLIC COMMENTS DO NOT DISCLOSE FACTS OR INFORMATION THAT MILITATE AGAINST APPROVAL OF THE CONSENT DECREE

The United States received three public comments that focused primarily on three topics: 1) because of Plains' poor safety record, the injunctive relief should require additional safeguards to protect the environment and public safety, including upon a potential Line 901 re-start; 2) the civil penalties are likely too low and may be based on a smaller estimate of the oil spill volume; and 3) the NRD claims should not be resolved until the administrative DARP is finalized, and the NRD settlement amount is likely too low. *See*, Exs. 2, 3.

After evaluating the public comments as described in a responsive summary ("Responsive Summary"), the United States determined that the Consent Decree is fair, reasonable, and in the public interest. *See*, Ex. 1. While the Responsive

Summary and the Consent Decree provide greater detail, below is a summary of the United States' response to the public comments.

**A. <u>Injunctive Relief</u>**

The Consent Decree's IR properly addresses the violations alleged in the Complaint and are found in CD Section IV, including Apps. B and D. CD App. B IR is detailed and protective of human health and the environment and applies to Plains' nation-wide operations (including California pipelines) under the supervision of PHMSA and/or OSFM. CD App. D IR contains additional requirements overseen by OSFM that govern the potential restart of Line 901 and relevant portion of Line 903, should Plains seek such approval. *See supra* Section II.C.; CD Apps. B, D; Ex. 1.

Article II of CD App. B imposes extensive obligations if Plains seeks OSFM approval to re-start Lines 901 or applicable Line 903 segments. As a threshold matter, Plains is required receive an OSFM waiver from the State regulatory requirements that Plains cannot meet. If OSFM approves the pipeline re-start, Plains must replace segments of Lines 901 and 903 with non-insulated pipe if cost effective to do so. Article I requires, *inter alia*, for any replacement segments, Plains shall test for potential pipeline interference, conduct a close interval and interference survey, and establish additional cathodic-protection stations. Plains is further obligated to retain a third party consultant to review and prepare a report of the important ILI data, and to conduct additional ILI runs to evaluate pipeline weaknesses. Plains must improve multiple facets of its IMP. Article I further requires valves analyses, risk analyses, and improvements in leak detection. *See supra* Section II.C.3.a.; CD App. B; Ex. 1.

Article II of CD App. B includes comprehensive requirements governing Plains' nation-wide operations. Article II, in part, requires Plains to modify its nation-wide IMP, incorporate document recommendations for P&M measures, improve valve operation and maintenance, improve leak detection methods, improve

Control Room operations, and update emergency and oil spill response plans. *See supra* Section II.C.3.b; CD App. B; Ex. 1.

App. D of the Consent Decree contains the remaining CAO requirements that will be enforced by OSFM. CD App. D imposes additional obligations for restarting Line 901 (if it occurs), including submitting a Restart Plan, for OSFM approval, that includes adequate patrolling, surveillance, day-light restarting, Control Room enhancement, advanced leak detection capabilities, updated alarm set-point values of pressures and flows, modification of alarm priority/severity systems, emergency shutdown programming, additional safety valves and pressure sensors, ILI requirements, and a corrosion protection plan. CD App. D, ¶1b. CD App. D further requires that Plains cannot restart applicable Line 903 segments without OFSM approval, an approved Plan for Restart, and operating pressure restrictions. *See supra* Section II.C.3.c.; CD App. D; Ex. 1.

The detailed IR provisions governing the potential restart of Lines 901 and 903 and Plains' nation-wide operations are strong indications of the comprehensive and protective nature of the CD IR requirements. Moreover, PHMSA's and OSFM's pipeline safety experts concur that the IR requirements are sufficient to protect public health and the environment. *See*, Ex. 1; Hoidal Dec. Ex. 4; Butler Dec. Ex. 5; Declaration of James Hosler included as Attachment A to Exhibit 1. For these reasons, the Court should not be persuaded by public comments questioning whether additional IR requirements are necessary.

**B. <u>Natural Resource Damages</u>**

The $22.325M NRD payment is an appropriate settlement amount. As a threshold matter, State and federal NRD experts followed the appropriate regulations to collect data and conduct studies to evaluate the extent of injury and to determine damages. Using the data collected, the Trustees quantified the injuries to habitat, birds, mammals, and the lost human uses. The Trustees then "scaled" viable projects that are commensurate with the injuries. The experts

determined that the $22.325M NRD settlement will fund projects that will fully address impacts caused by the Refugio Incident. *See supra* Section II.B.; Anderson Dec. Ex. 9; Ex. 1.

The Trustees sought public input at key points in the damage assessment process. The Trustees must consider public comments before finalizing the DARP, including recommendations to select alternative projects. However, the Trustees must select the most cost effective projects when two or more projects are equally preferable based on factors set forth in OPA regulations. Accordingly, even if future projects are modified, the $22.325M NRD settlement amount is sufficient to fund these projects. Thus, the comments that the proposed NRD settlement amount may or may not be adequate or that the settlement needs to await the end of the administrative DARP process should be rejected. *Id.*

**C. <u>Penalties</u>**

The $24M penalty is an appropriate resolution of the United States' and the State's claims. The primary objection raised by the public comments is that the $24M penalty may not properly account for the volume of oil spilled. As a preliminary matter, the oil volume is not relevant (*i.e.*, a factor) for the majority of the Governments' penalty claims. PHMSA's $14.5M penalty results from separate violations of the PSLs - PHMSA's allocated penalty is not determined by oil volume. The PSLs penalty factors include the nature and gravity of the violations, culpability, and history of violations. 49 U.S.C. §§ 60120(a), 60122. Further, $14.5M is the second largest civil penalty recovered by PHMSA in conjunction with a pipeline oil spill. Ex. 1.

Similarly, the payment to State agencies RWQCB and CDFW are not volume dependent but are based on elements such as the number of days of violations. *See*, Government Code §§ 8670.66(a)(3), 8670.66(b); California Fish and Game Code § 5650.1; and California Water Code § 13385. Therefore, of the $9.45M penalty shared among EPA and the State agencies, EPA's penalty payment

alone is based in part upon the volume of discharged oil, and fits squarely within EPA's enforcement discretion and CWA penalty authorities. 33 U.S.C. § 1321(b)(7) and (b)(7)(D). *Id*.

EPA's CWA penalty claim authority ranges from up to $2,100 per barrel of oil discharged to up to $5,300 per barrel if the release is the result of gross negligence or willful misconduct. 33 U.S.C. § 1321(b)(7) and (b)(7)(D); 40 C.F.R. § 19.4 (inflation-adjusted penalties). In this case, EPA's potential statutory maximum penalty based upon the volume released from Line 901 (using 2,934 barrels from PHMSA's FIR) without gross negligence or willful misconduct is up to $6.16M. With gross negligence or willful misconduct, EPA's potential statutory maximum penalty claim increases to up to $15.55M. Resolution of this penalty claim without the expenditure of resources and the uncertainties inherent in litigating the factors of volume discharged and level of culpability, among other issues, at EPA's shared $9.45M settlement penalty figure is favorable and appropriate. The $9.45M payment fits squarely within these CWA's penalty parameters.

In sum, the public comments did not disclose any fact or information that militates against CD entry. After evaluating the public comments, the United States supports the Consent Decree as being fair, reasonable, and in the public interest, and respectfully requests entry of the CD as a final judgment of the Court.

## VI. CONCLUSION

For the reasons stated above, and, in more detail, the Responsive Summary the United States respectfully requests the Court to enter the Consent Decree.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA:

August 19, 2020
Date

/s/ Bradley R. O'Brien
BRADLEY R. O' BRIEN
ANGELA MO