ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MICHAEL S. DORSI (CA Bar Number: 281865)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Tel: (415) 510-4400
E-mail: Michael.Dorsi@doj.ca.gov
*Counsel for Plaintiffs California Department*
*of Forestry and Fire Protection's Office of*
*State Fire Marshal*

*Additional counsel listed on following page*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, et al.,<br><br>                                    Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>                                    Defendants. | Case No. 2:20-cv-02415-SVW-SSCx<br><br>**CALIFORNIA PLAINTIFFS' EX PARTE EMERGENCY MOTION TO ENFORCE CONSENT DECREE**<br><br>Dept:        10A<br><br>Action Filed: Mar. 13, 2020<br>Judgment: Oct. 14, 2020 |

ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL T. ZARRO (CA Bar Number: 110171)
JAKE GOLD (CA Bar Number: 347131)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6327
E-mail: Michael.Zarro@doj.ca.gov
*Counsel for Plaintiff California Department of
Forestry and Fire Protection's Office of State Fire
Marshal*

JESSICA TUCKER-MOHL
Supervising Deputy Attorney General
MATTHEW STRUHAR (CA Bar Number: 293973)
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, California 95814-2951
Tel: (916) 210-7246
E-mail: Matthew.Struhar@doj.ca.gov
*Counsel for Plaintiff California Department
of Parks and Recreation*

**TABLE OF CONTENTS**

**Page**

Introduction ...................................................................................3

    A.    PHMSA and Plains Failed to Prevent the Refugio Oil Spill ......5

    B.    PHMSA Transferred Jurisdiction to OSFM, and This Court Entered a Binding Consent Decree.............................................6

    C.    Consistent with Its Jurisdiction, OSFM Issued State Waivers to Sable as Plains' Successor-in-Interest .......................................7

    D.    Sable Failed to Fully Comply with the State Waivers' Conditions.................................................................................8

    E.    Sable Sought and Obtained Letters from PHMSA Purporting to Preempt OSFM's Regulation of the Lines 324 and 325.............9

    F.    The State Court Rejected Sable's Preemption Theory .............10

Argument .....................................................................................13

    I.    Ex Parte Relief is warranted Given Sable's Actions to Restart the Pipeline in Violation of the Consent Decree.......................................13

    II.    Sable and the United States Have or are Poised to Violate the Consent Decree .......................................................................................13

    A.    Sable's Transportation of Crude Oil through the Pipelines Without OSFM Approval Would Violate the Consent Decree .................................................................................13

    B.    The United States' Permitting Orders by PHMSA and DPA Orders Violates the Consent Decree.......................................14

    C.    The Consent Decree Requires compliance with other laws .....15

        1.    Sable cannot lawfully operate Lines 324 and 325 Because Federal Law Conditions Operation on OSFM's Waiver of Compliance with Federal Regulations...........................15

            a.    Sable Needs a Waiver from OSFM, and Has None.............................................................16

# TABLE OF CONTENTS
## (continued)

**Page**

2.    Sable Cannot Lawfully Operate the Lines 324 and 325 Because Doing so Requires Trespassing in the State of California's Property ......................................................17

III.    No Circumstances the United States or Sable May Raise Excuses Their Violations ..................................................................18

A.    The DPA Does Not Excuse Compliance With the Consent Decree or State Law, and Does Not Displace the Court's Enforcement Power ..................................................................18

B.    DPA Order does not displace state law in an area where Congress preserved state power................................................21

C.    The Court should reject the United States' proposed interpretation of the DPA that gives it unlimited power...........21

## TABLE OF AUTHORITIES

**Page**

CASES

*Barclays Bank PLC v. Franchise Tax Bd. of California*
512 U.S. 298 (1994) ................................................................20

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*
489 U.S. 141 (1989) ................................................................20

*Cedar Point Nursery v. Hassid*
594 U.S. 139 (2021) ................................................................17

*Chamber of Com. of U.S. v. Reich*
74 F.3d 1322 (D.C. Cir. 1996) ................................................20

*Civic W. Corp. v. Zila Indus., Inc.*
66 Cal.App.3d 1 (1977) ...........................................................16

*Flores v. Rosen*
984 F.3d 720 (9th Cir. 2020) ..................................................14

*Golden State Bottling Co. v. Nat'l Labor Rels. Bd.*
414 U.S. 168 (1973) ................................................................12

*Hercules, Inc. v. United States*
1995 WL 495540 (U.S. Resp. Brief, 1995) ............................18

*Hercules, Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994) ..................................................18

*Hook v. Arizona Dep't of Corr.*
972 F.2d 1012 (9th Cir. 1992) ................................................11

*In re Dual–Deck Video Cassette Recorder Antitrust Litig.*
10 F.3d 693 (9th Cir. 1993) ....................................................11

*Learning Res., Inc. v. Trump*
147 S. Ct. 628 (2026) ..............................................................19

*McComb v. Jacksonville Paper Co.*
336 U.S. 187 (1949) ................................................................11

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*
501 U.S. 252 (1991) ................................................................................20

*Miller v. French*
530 U.S. 327 (2000) ................................................................................12

*Mission Power Eng'r Co. v. Continental Cas. Co.*
883 F.Supp. 488 (C.D. Cal. 1995) ...........................................................12

*Nehmer v. U.S. Dep't of Veterans Affairs*
494 F.3d 846 (9th Cir. 2007) ...................................................................11

*Penn Central Transportation Co. v. New York City*
438 U.S. 104 (1978) ................................................................................17

*Plaut v. Spendthrift Farm, Inc.,*
514 U.S. 211 (1995) ................................................................................17

*Printz v. United States*
521 U.S. 898 (1997) ................................................................................17

*Rufo v. Inmates of Suffolk Cnty. Jail*
502 U.S. 367 (1992) ................................................................................14

*Sparks v. City & Cnty. of San Francisco*
956 F.2d 1168 (9th Cir. 1992) ................................................................12

*United States v. Carmack,*
329 U.S. 230 (1946) ................................................................................18

*United States v. Vertac Chem. Corp.*
46 F.3d 803 (8th Cir. 1995) ....................................................................18

*West Virginia v. Env't Prot. Agency*
597 U.S. 697 (2022) ................................................................................18

*Walker v. City of Birmingham*
388 U.S. 307 (1967) ................................................................................12

iv

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Wyeth v. Levine*
555 U.S. 555 (2009) .................................................................................21

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952) .................................................................................20

*Zapon v. United States*
53 F.3d 283 (9th Cir. 1995) .....................................................................20

STATUTES

49 U.S.C.
§ 60101 ........................................................................................................6
§ 60101(a)(8)(B).......................................................................................20
§ 60101(a)(10) ..........................................................................................20
§ 60104(c)..............................................................................................6, 20
§ 60105 .......................................................................................................15
§ 60105(a)...................................................................................................6
§ 60119 .......................................................................................................10

50 U.S.C.
§ 4513 .........................................................................................................13
§ 4557 .........................................................................................................18
§ 4558(j) .....................................................................................................18

Cal. Civ. Code
§ 659 ...........................................................................................................16
§ 829 ...........................................................................................................16

California Vehicle Code
§ 21453 .......................................................................................................21

Penal Code
§ 487 ...........................................................................................................21

CONSTITUTIONAL PROVISIONS

U.S. Const. Article III § 2, cl. 1 ...............................................................20

# TABLE OF AUTHORITIES
## (continued)

Page

**COURT RULES**

FRCP 70 ..............................................................................................................11

FRCP 71 ..............................................................................................................12

**FEDERAL REGULATIONS**

49 CFR pt. 195 Appendix A ....................................................................................6

49 CFR § 195.452(h)(4)(iii)(H).............................................................................15

49 CFR § 195.563...............................................................................................5, 15

**OTHER AUTHORITIES**

https://www.whitehouse.gov/presidential-actions/2026/03/adjusting-
certain-delegations-under-the-defense-production-act/......................................11

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE that Plaintiff People of the State of California, ex rel. California Department of Forestry and Fire Protection's Office of the State Fire Marshal (OSFM) and California State Parks (State Parks, collectively California) will and do move, ex parte, for an emergency order enforcing the Consent Decree in this matter against Co-Plaintiff United States of America and third party Sable Offshore Corp and Pacific Pipeline Company (collectively Sable), successors in interest to defendant Plains All American Pipeline, LP's responsibilities under the Consent Decree.

California makes this Motion on the basis that (1) Sable assumed Plains' obligations under the Consent Decree by acquiring two onshore oil pipelines known as Lines 324 and 325 (previously known as Lines 901 and 903) and entering into the Assumption Agreement (Request for Judicial Notice (RJN), Exhibit E), and therefore is bound by the Consent Decree in this case, (2) this Consent Decree requires Sable to obtain approval from the State Fire Marshal prior to restarting the Lines 324 and 325 (ECF 6-1 at 80, 96), and (3) the United States, (a) through Department of Energy, on March 13, 2026, issued an order at Sable's request that purports to authorize and compel Sable to violate the Consent Decree, and (b) through other orders of the Pipeline and Hazardous Materials Safety Administration purportedly authorized Sable to do so. California seeks an emergency order enforcing the injunction in this case, requiring the United States and Sable to refrain from actions contrary to the Consent Decree, including but not limited to operating the Lines 324 and 325 prior to approval from the State Fire Marshal.

This Motion is supported by the following Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, the Declaration of Dena Bellman, the prior filings in this case, and any other supporting evidence that this Court may lawfully consider.

California further advises that pursuant to the Court's procedures, "opposing papers must be filed not later than 3:00 p.m. on the first business day succeeding the day the ex parte was served. If counsel are not going to oppose an ex parte application, they must inform the clerk at 213-894-2881." See https://apps.cacd.uscourts.gov/Jps/honorable-stephen-v-wilson

Dated:  March 16, 2026                          Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
ERIC M. KATZ
JESSICA TUCKER-MOHL
Supervising Deputy Attorney General


*/s/ Michael S. Dorsi*
MICHAEL S. DORSI
Deputy Attorney General
*Attorneys for People of the State of California, et al.*

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The parties to this case are subject to an existing final judgment of this Court, which binds Sable as the defendant's successor-in-interest. Yet at Sable's request, in an alarming series of orders, the federal Executive Branch has told the Defendant's successor-in-interest that it may not—and must not—comply with this Court's final judgment in this case. Those orders are an affront to the separation of powers and the rule of law, and they are invalid. Although the parties will soon be litigating requests to terminate or modify the Consent Decree that underlies this Court's final judgment, this Court should act immediately to make one thing clear: No party may violate this Court's Consent Decree without this Court acting first to give prior approval, and they certainly may not do so based on nothing more than the say-so of the Executive Branch. Because Defendant's successor-in-interest, Sable, has begun violating the Consent Decree, this Court should grant this emergency motion to enforce, and set a briefing schedule for orderly resolution of the parties' disputes.

The Consent Decree in this case resulted from a catastrophic oil spill in Santa Barbara County in 2015. An onshore oil pipeline that had lost 89% of the thickness of its pipe walls in places ruptured, releasing over 120,000 gallons of heavy crude oil onto Refugio State Beach and then into the Pacific Ocean.

At the joint request of the United States, agencies of the State of California, the University of California, and Plains All American Pipeline, L.P., this Court entered the Consent Decree, which sets the rules for remediation necessary before the restart of those onshore pipelines.

The Consent Decree dictates that to the California Department of Forestry and Fire Protection's Office of the State Fire Marshal, as the State of California's pipeline safety regulator, has the power and responsibility to determine if those onshore pipelines can safely restart despite their lack of compliance with federal

3

anti-corrosion regulations. The Consent Decree authorizes the State Fire Marshal to issue so-called "State Waivers" that would relieve the pipeline operator from federal regulations if the pipeline operator demonstrates that it has satisfied alternative safety conditions imposed by the State Fire Marshal. ECF 6-1 at 80-81, 96-102. The United States and California agencies asked this Court to enter the Consent Decree on the basis that the State Fire Marshal was a responsible agency that could be trusted to make sure the onshore pipelines were safely operated. ECF 28-1 at 16-20. This Court approved that Consent Decree and entered final judgment in 2020.

Rather than adhere to that Consent Decree or seek to modify it, the United States has sought simply to side step it. First, the United States Pipeline and Hazardous Materials Safety Administration (PHMSA) purported to displace the State Fire Marshal as the relevant pipeline safety regulator based on a novel theory that the onshore pipelines, along with a processing facility, are actually part of an offshore pipeline. Second, on March 13, 2026, the President issued an executive order delegating his authority under the Defense Production Act to the Secretary of Energy, who (at Sable's request) promptly issued an order invoking that Act to direct Sable to begin operating the pipelines immediately—which Sable sought in an effort to bypass all requirements to restart the pipeline, including requirements imposed by the Consent Decree. This came 10 days after the Secretary of Energy (again, at Sable's request) obtained an opinion from the U.S. Department of Justice that such an order could relieve Sable of its obligation to follow not only California law, but also the Consent Decree issued by this Court.

California asks this Court, on an emergency basis, to enforce the plain language of the Consent Decree currently in place in this case, and to reject the federal government's lawless contention that it may unilaterally excuse Sable from compliance with this Court's judgment. The Consent Decree expressly says that the pipeline operator must obtain State Waivers and Restart Plan approval from

4

California's State Fire Marshal, not any federal agency, before it may restart. This Court should issue an order mandating that, unless or until the Consent Decree is modified or terminated by this Court, Sable cannot restart and transport crude oil through the onshore pipelines, and any contrary order by any federal agency is stayed as inconsistent with the Consent Decree.

## BACKGROUND

### A.    PHMSA and Plains Failed to Prevent the Refugio Oil Spill

A series of pipelines carries crude oil and other hazardous liquids from offshore drilling platforms off the Santa Barbara Coast to a processing facility immediately onshore, where the liquids are separated and treated, and then placed into different onshore pipelines that run along the coast, across Santa Barbara County, and eventually to Kern County for further distribution.

On May 19, 2015, one of Plains' onshore pipelines ruptured, releasing over 2,900 barrels of crude oil into the environment along the Santa Barbara coast. ECF 6-1 at ¶ A. That pipeline (called Line 901 at the time, now Line 324), and a connecting onshore pipeline (then called Line 903, now Line 325), were taken out of service pending investigation and remediation. *Id*. ¶ C. Investigations determined that the Pipelines' system designed to prevent corrosion used a defective design that could not be remediated. ECF 28-1. Specifically, PHMSA's Failure Investigation Report ("Failure Report") determined that the proximate cause of the spill was external corrosion that thinned Line 324's wall to an extent where it ruptured—only *11 percent* of Line 324's wall thickness remained at the point of failure at the time of the rupture. *Id*. at 3; ECF 28-8 at 14.

Federal regulations require pipelines with metal exposed to the soil to be protected by a "cathodic protection system" that counteracts the corrosive electrical charge caused by that exposure. 49 C.F.R. § 195.563. However, the cathodic protection used to protect underground pipelines from corrosion is not effective when these underground pipelines are wrapped with insulation, as Line 324 was.

5

ECF 28-8 at 14.

Neither Plains, then operator of the Lines 324 and 325, nor PHMSA, then regulator of the Pipelines, had ensured that the necessary steps would be taken to address the ongoing corrosion of the Lines 324 and 325. The resulting Refugio Oil Spill marred and closed Santa Barbara's landmark beaches, killed hundreds of birds and mammals, impacted nearshore fish species, and closed fisheries entirely. The spill also impacted a wide variety of coastal habitats and species protected under federal and state laws.

### B.   PHMSA Transferred Jurisdiction to OSFM, and This Court Entered a Binding Consent Decree

The federal Pipeline Safety Act vests regulatory jurisdiction over interstate pipelines with PHMSA, while intrastate pipelines are subject to regulation by States. 49 U.S.C. §§ 60101, 60104(c), 60105(a) (no federal jurisdiction over intrastate pipelines for States with certifications). Pipelines subject to Federal Energy Regulatory Commission (FERC) tariffs are presumed to be interstate pipelines even if, in fact, they run only within a state. 49 CFR Part 195 App. A.

At the time of the 2015 oil spill, PHMSA asserted regulatory authority over Lines 324 and 325 based on Plains' tariffs filed with FERC. In early 2016, then-operator Plains Pipeline, L.P. cancelled its tariffs with FERC. On May 18, 2016, PHMSA re-designated the Lines 324 and 325 as intrastate, with the California Office of State Fire Marshal (OSFM) as the safety regulator. RJN, Exh. H (May 18, 2016 Letter).

After the Refugio Oil Spill, state and federal agencies engaged in efforts that culminated in the agreed-upon Consent Decree, filed in 2020 in this Court. ECF 6-1. Plains agreed to pay $22.325 million for the natural resource damages caused by the spill, which was in addition to the approximately $10 million it had already paid to federal and state agencies, and did not include the untold millions Plains had directly expended to address natural resource damage harm. ECF 6-1 at ¶¶ 12-13.

6

The Consent Decree also resolved claims by agencies including PHMSA and OSFM. To obtain approval by this Court, the United States and California presented OSFM as the agency that would be responsible for oversight of the Lines 324 and 325. This was consistent with the transfer of jurisdiction after Plains' cancellation of the FERC tariff.

Specifically, the Consent Decree required that, "Prior to restarting Line 901 [Line 324], Plains shall apply for a State Waiver [i.e., state approval] through the OSFM for the limited effectiveness of cathodic protection on Line 901 [Line 324]. Plains must receive a State Waiver from the OSFM prior to restarting Line 901 [Line 324]."[1] ECF 6-1 at 80.[2] This was consistent with the Pipeline Safety Act, which allows state regulators to adopt and enforce safety standards in addition to or more stringent than PHMSA's standards. The Consent Decree also assigns OSFM the power to approve a restart plan. *Id.* at 96. It also provided procedures for its modification and termination, *id.* at 58-60, as well as for the Court's retention of jurisdiction to enforce compliance with its terms, *id*. at 58.

This Court (Hon. Philip S. Gutierrez) signed the Consent Decree on October 14, 2020, reducing it to a judgment that binds all parties to this case. ECF 33.

**C.    Consistent with Its Jurisdiction, OSFM Issued State Waivers to Sable as Plains' Successor-in-Interest**

On February 14, 2024, Sable Offshore Corp acquired a 100% interest in Pacific Pipeline Company, which now owns and operates the Lines 324 and 325. As a condition of this acquisition, Sable agreed to be bound by the Consent Decree.

---

[1] Because the conditions are repeated for CA-324 and CA-325, to avoid duplication, this memorandum cites conditions in the Consent Decree and State Waivers only for line CA-324 (formerly 901). All cited conditions are the same for line CA-325 (formerly 903).

[2] Page citations to the Consent Decree refer to the blue page numbers at the top of the page, imposed by the ECF filing system, not the page numbers at the bottom.

RJN, Exh. E (Assumption Agreement). Sable applied for State Waivers on April 24, 2024, which OSFM issued on December 17, 2024. The State Waivers require that "All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated *prior to* restarting CA-324." RJN, Exhs. I ¶ 9, J ¶ 9 (emphasis added).

Neither Sable nor PHMSA objected to the terms of the State Waivers, and PHMSA provided its notices of non-objection to the State Waivers on February 11, 2025. In a state court challenge to the Waivers in 2025 by two non-governmental organizations, the Santa Barbara County Superior Court issued an injunction requiring that once Sable obtained all required approvals, it provide notice to the Court and all parties, and not restart until 10 days after that notice, to provide time to resolve any dispute as to completeness of those approvals. RJN, Exh. F.

**D.    Sable Failed to Fully Comply with the State Waivers'
Conditions**

In fall 2025, "OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart"—a critical requirement regarding measurement of the pipe thickness, which would ensure that corrosion of the pipe wall would not pose a future risk. RJN, Exh. K (OSFM Letter to Sable dated October 22, 2025). Condition 9 in the State Waivers dictates that "All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324." RJN, Exh. I ¶ 9, J ¶ 9, L. Sable responded the next day, disagreeing with OSFM's view because Sable asserted that the State Waivers did not require the repairs OSFM said its waivers required. RJN, Exh. L (Sable Letter). Sable has not, in any forum, indicated that it took additional actions in the five months since then in response to the deficiencies identified by OSFM.

/ / /

/ / /

**E.  Sable Sought and Obtained Letters from PHMSA Purporting to Preempt OSFM's Regulation of the Lines 324 and 325**

A month after OSFM informed Sable of its failure to comply with the State Waivers, Sable sent a letter to PHMSA requesting that PHMSA assume jurisdiction over the Lines 324 and 325. RJN, Exh. M (Nov. 26, 2025 letter to PHMSA). Despite the fact that Lines 324 and 325 run *intra*state—from the onshore processing facility to a distribution terminal in Kern County—and despite the fact that the lines were no longer governed by a federal tariff issued by FERC, Sable asked PHMSA to decree that the lines are actually *inter*state lines because the onshore processing facility is connected by other pipelines to federal waters offshore. That position ignored the fact that the offshore and onshore pipelines operate as two distinct systems, carrying entirely different products: The offshore pipelines carry an emulsion of oil, other hydrocarbons, sulphur, and water from the offshore oil platform to the processing facility, where petroleum products are separated and treated and stored, and then individual products enter a new onshore pipeline system to be transported onward to Kern County.

PHMSA gave Sable what it asked for with limited analysis. RJN, Exh. A-1. First, on December 17, 2025, after a decade of concurring that the State had jurisdiction over the intrastate onshore pipelines, PHMSA issued a letter asserting jurisdiction and purporting to preempt OSFM regulation. According to PHMSA, CA-324 and CA-325 are part of a single, larger pipeline facility that "transports crude oil from the [outer continental shelf] to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California." *Id*. Less than a week later, on December 22, PHMSA approved a restart plan for Lines CA-324 and CA-325. And the following day, December 23, PMHSA issued an Emergency Special Permit.[3] Although the

_____

[3] "Special Permit" is PHMSA's name for the federal analogue to OSFM's State Waivers.

Special Permit mirrored much of OSFM's State Waivers, PHMSA's Emergency Special Permit removed the critical requirement that OSFM had found Sable had not satisfied, concerning proper measurement of the pipe wall thickness. Sable's emergency permit expired 60 days later by operation of law, and PHMSA is currently in the notice and comment period before deciding whether to issue Sable a new special permit. FR Doc. 2026-03686 (Feb. 23, 2023).

### F.  The State Court Rejected Sable's Preemption Theory

On December 24, 2025, non-governmental organizations Environmental Defense Center (EDC), et al. filed a Petition for Review in the Ninth Circuit, challenging PHMSA's December 22 Restart Plan approval and December 23 Permit.[4] On January 23, 2026, California, by and through the Attorney General and OSFM, also filed a Petition for Review in the Ninth Circuit, challenging PHMSA's December 17, 22, and 23 orders purporting to federalize the Lines 324 and 325. RJN, Exh. A (Petition for Review). Briefing is underway in the Ninth Circuit in those direct challenges to PHMSA's actions.

In the state court case, Sable, in turn, raised federal preemption in a Motion for Reconsideration in Santa Barbara County Superior Court, seeking termination of the preliminary injunction in *Center for Biological Diversity v. CAL FIRE* and *Environmental Defense Center v. CAL FIRE*, Santa Barbara County Superior Court Case Nos. 25CV02244 and 25CV02247. Sable relied on PHMSA's December 2025 orders as the basis for its Motion for Reconsideration. The Santa Barbara County Superior Court denied Sable's motion on Friday, February 27, 2026, keeping its preliminary injunction in place. RJN, Exh. N.

### G.  The Energy Secretary's Order Under the Defense Production Act

On January 29, 2025, the President had issued an executive order declaring a national energy emergency. Executive Order 14156. On December 12, 2025, Sable

---

[4] 49 U.S.C. § 60119 provides that petitions for review of PHMSA orders shall be filed in federal appellate courts, not federal district courts.

sent a letter to the General Counsel for the United States Department of Energy requesting an order under the Defense Production Act to allow Sable to sidestep state and local requirements. 50 Op. O.L.C. (Mar. 3, 2026) (slip. op. at 3) (OLC Opinion). On March 3, 2026, the United States Department of Justice's Office of Legal Counsel issued a memorandum opinion in response to Sable's request. OLC Opinion. In it, the Office of Legal Counsel concluded that the President could issue an order under the Defense Production Act directing Sable to commence operating Lines 324 and 325 free from state environmental and property laws and any existing court orders. *Id*. On March 13, 2026, the President issued an Executive Order delegating certain of his authority under the Defense Production Act to the Secretary of Energy.[5] The same day the Secretary of Energy issued a "Pipeline Capacity Prioritization and Allocation Order" which provides, among other things, that "Sable is directed to immediately commence performance under contracts or orders for service … for hydrocarbon transportation capacity" through, among other facilities, Lines 324 and 325. RJN, Exh. Q. Sable did not request that this Court alter or lift its existing order—instead (according to its press release) it simply began transporting crude oil through Lines 324 and 325. RJN, Exh. P.

## LEGAL STANDARDS

Courts may issue further orders to obtain compliance with a court order. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 860 (9th Cir. 2007); *Hook v. Arizona Dep't of Corr.*, 972 F.2d 1012, 1014 (9th Cir. 1992); FRCP 70.

Enforcement requires disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply. *In re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). The contempt "need not be willful," and there is no good faith exception to the

---

[5] https://www.whitehouse.gov/presidential-actions/2026/03/adjusting-certain-delegations-under-the-defense-production-act/

requirement of obedience to a court order. *Id.* The moving party must demonstrate that the other party violated the court's order by "clear and convincing evidence," not merely a preponderance of the evidence. *Id.*

A party may not defend against the allegation of violation of a court order on the basis that the order is invalid. *Zapon v. United States*, 53 F.3d 283, 285 (9th Cir. 1995) (citing *Walker v. City of Birmingham*, 388 U.S. 307 (1967) ("Only in the rarest of situations do federal courts countenance a party's disregard of an existing court order….") If a party wishes to modify an injunction, it must seek that modification from a court *first*, while maintaining compliance with the court order.

The Court may extend injunctive relief against a third party to make its orders effective. FRCP 71. While orders against third parties sometimes implicate principles of fairness toward parties who are strangers to the case, that is not the case for successors in interest. *Golden State Bottling Co. v. Nat'l Labor Rels. Bd.*, 414 U.S. 168, 1979 (1973). Sable acquired Lines 324 and 325 from Plains, and expressly assumed the role of enjoined defendant under the Consent Decree when it executed the Assumption Agreement. RJN, Exh. E. Specifically, Sable agreed to be bound by Appendices B and D, which impose the State Waiver requirements. *Id.* at 4.

To obtain *ex parte* relief, the applicant must make two showings. First, they must, with evidence, "show that the moving party's cause will be irreparably prejudiced if the underlying motion is heard according to the regular noticed motion procedures." *Mission Power Eng'r Co. v. Continental Cas. Co.*, 883 F.Supp. 488, 492 (C.D. Cal. 1995). Second, "it must be established that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect." *Id.*

///

///

///

12

**ARGUMENT**

**I.**   **EX PARTE RELIEF IS WARRANTED GIVEN SABLE'S ACTIONS TO RESTART THE PIPELINE IN VIOLATION OF THE CONSENT DECREE**

Without ex parte relief to enforce the terms of the Consent Decree, Sable will continue to rely on the DPA Order to restart the Pipeline in violation of the Consent Decree thereby undermining the Consent Decree and bypassing the OSFM's authority to provide State Waivers and approve a Restart Plan. The DPA Order expressly requires Sable's immediate compliance with its directions. *See* RJN, Exh. Q (DPA Order, ¶ IV(B), (G)). And the DPA imposes criminal penalties on defense contractors who refuse to comply with any DPA order. *See* 50 U.S.C. § 4513. Having solicited the DPA Order, Sable welcomes that compulsion, and it is relying on the DPA Order's conflicting obligation as reason to ignore its obligations under the Consent Decree. Interim relief is thus necessary to ensure that Sable continues to comply with the Consent Decree until this Court has the opportunity to resolve whether that decree stands, or whether, as the federal government asserts, the Executive Branch may unilaterally declare that a party may not—and indeed must not—follow a final judgment of the court.

**II.**   **SABLE AND THE UNITED STATES HAVE OR ARE POISED TO VIOLATE THE CONSENT DECREE**

**A.**   **Sable's Transportation of Crude Oil through the Pipelines Without OSFM Approval Would Violate the Consent Decree**

Sable expressly agreed to be bound by the Consent Decree, meaning that Sable would need OSFM to issue the State Waivers and approve a Restart Plan before it can transport crude oil through the Lines 324 and 325. RJN, Exh. O; ECF 6-1 (Consent Decree) at 80 ("Plains must receive a State Waiver from the OSFM prior to restarting Line 901 [Line 324]."), at 96 ("Plains shall develop and submit . . . a written Restart Plan for Line 901 [Line 324] to the OSFM for review and approval."). The Consent Decree is an order of this Court and a final judgment.

13

ECF 33 (Order Entering Consent Decree), ECF 6-1 at 61 (Part XXVII. Final Judgment). The State Waivers are an essential component of the Consent Decree.

### B.    The United States' Permitting Orders by PHMSA and DPA Orders Violates the Consent Decree

The Orders by the Energy Secretary under the Defense Production Act and PHMSA under the Pipeline Safety Act are violations of the Consent Decree. The Consent Decree holds that the pipeline owner (first Plains, now Sable) may not restart until it receives a restart approval from OSFM. ECF 6-1 at 80-84. The DPA Order purports to void this requirement and orders Sable to violate the federal Consent Decree by prioritize and allocate production.

The United States, through its signatories from the United States Department of Justice and PHMSA, agreed to the Consent Decree. ECF 6-1 at 62-63. The Consent Decree is the final order of a court, and cannot be modified except through a motion made to this Court. *Flores v. Rosen*, 984 F.3d 720, 740–41 (9th Cir. 2020) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992); *Zapon v. United States*, 53 F.3d 283, 285 (9th Cir. 1995). That is because it is for *the Court* to say if its order need no longer be followed; it is not for the Executive Branch to say so. Allowing the Executive Branch to alter the effect of a court order by its own declaration would violate the separation of powers. See generally *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19 (1995) (Article III "gives the Federal Judiciary the power, not merely to rule on cases, but to decide them, subject to review only by superior courts in the Article III hierarchy—with an understanding, in short, that 'a judgment conclusively resolves the case' because 'a "judicial Power" is one to render dispositive judgments'"). And while "[p]rospective relief under a continuing, executory decree remains subject to alteration due to changes in the underlying law," *Miller v. French*, 530 U.S. 327, 344 (2000), that does not license parties to decide on their own that the law has changed, rather than seek relief from the court at issue.

On December 17, 2025, PHMSA purported to displace OSFM from jurisdiction over the Lines 324 and 325. RJN, Exh. A-1. PHMSA, rather than OSFM, approved a restart plan. RJN, Exh. A-2. And PHMSA issued an emergency special permit—a special permit is PHMSA's name for the authorization equivalent to a state waiver. RJN, Exh. A-3. All three of these orders separately violate—or at least conflict with—the Consent Decree by purporting to displace OSFM from its role under the Consent Decree.

### C.   The Consent Decree Requires Compliance with Other Laws

The Consent Decree provides that "[w]here any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants" must make reasonable efforts to obtain the permit or approval in a timely matter. ECF 6-1 at 30-31 (¶ 24). And the Consent Decree reserves the rights of all available remedies to enforce all provisions of the Consent Decree and of applicable law. *Id*. at 49 (¶ 74).[6]

#### 1.   Sable cannot lawfully operate Lines 324 and 325 because federal law conditions operation on OSFM's waiver of compliance with federal regulations

Federal law forms the basis for the Appendix B and D provisions in the Consent Decree, which require Sable to obtain, from OSFM, a waiver of federal regulations before Sable can act. In imposing these conditions, the parties and the Court relied on three shared understandings: (1) the Lines 324 and 325 are intrastate pipelines subject to state regulation, (2) the Lines 324 and 325 lack effective cathodic protection and therefore federal regulations prevent operation of the Pipelines absent a waiver, and (3) federal law authorizes OSFM, not any federal agency, to waive compliance with those regulations. 49 U.S.C. § 60105.

---

[6] This power is limited by paragraph 72, which provides that OSFM cannot bring claims for violations before January 28, 2019. *Id*. at 48 (¶ 72).

The Consent Decree is consistent with and follows from these shared understandings of the facts and law. Consistent with the Pipeline Safety Act, the Consent Decree requires Sable to obtain approval from the state regulator, OSFM, prior to restarting the Lines 324 and 325. ECF 6-1 at 80, 96. The Consent Decree has not been modified, and thus operates as a judgment that binds Sable and the United States alike. But Sable never completed the requirements of the State Waivers, and recently abandoned them. RJN, Exh. O.

### a.    Sable needs a waiver from OSFM, and has none

Lines 324 and 325 are buried pipelines that transport crude oil at high temperature. RJN, Exhs. I, J (OSFM State Waivers), A-3 (PHMSA Special Permit). These Pipelines are required by federal law to operate with a functional anti-corrosion. 49 CFR §§ 195.452(h)(4)(iii)(H), 195.563. After the Lines 324 and 325 failed and caused the Refugio Oil Spill, PMSA, OSFM, Plains, and all other parties acknowledged that the Lines 324 and 325 were not compliant with federal regulations and, because of their design, could not comply with federal regulations. ECF 1 at 44, ECF 28-9 at 14.

Because Sable cannot comply with federal regulations, it had three options. As explained in the Consent Decree, Sable could have (1) abandoned the Pipelines, (2) replaced the Pipelines, or (3) obtained permission from OSFM to operate the Pipelines out of compliance with federal regulations. ECF 6-1 at 80. Sable chose the third option, but it has now abandoned all efforts to obtain permission from OSFM; Sable never completed the requirements of the State Waivers, and recently abandoned them. RJN. Exh. O. Sable is free to make arguments why the Consent Decree should be modified to recognize PHMSA's jurisdiction instead—arguments that the State will oppose given the lack of any statutory or precedential support for PHMSA's sudden relabeling of these instrastate onshore pipelines as "interstate." But for present purposes, until and unless Sable has obtained a modification of the

16

Consent Decree, that judgment prohibits Sable from restarting without OSFM approval.

### 2. Sable cannot lawfully operate the Lines 324 and 325 because doing so requires trespassing in the State of California's property

California law prohibits trespass on government property. Cal. Civ. Code, § 829 (State Parks as fee owner has the right to the surface of the land at the Park and "everything permanently situated beneath it."); see also Cal. Civ. Code, § 659. This includes the subsurface transportation of crude oil across state land without an easement. *Id.*, see also *Civic W. Corp. v. Zila Indus., Inc.*, 66 Cal.App.3d 1, 16 (1977) ("The essence of [a] cause of action for trespass is an 'unauthorized entry' onto the land of another. Such invasions are characterized as intentional torts, regardless of the actor's motivation.").

Line CA-325, formerly line 901, passes through Gaviota State Park, property of Plaintiff California Department of Parks and Recreation. When it operated the Lines 324 and 325, Plains had an easement. The easement, entered into in 1986, was for a duration of 30 years. Declaration of Dena Bellman Exh. C. That easement expired in 2016, while the Pipelines were out of service. Without an easement, Sable has no right to cross Gaviota State Park. And State Parks recently informed Sable that, under present circumstances, it is not providing that permission. *Id.*

The United States cannot compel California State Parks to dedicate the state's resources—such as the state land in Gaviota State Park—to assist Sable in its transportation of oil. See *Printz v. United States*, 521 U.S. 898, 925 (1997) (federal government cannot commandeer state agencies). If Sable wanted to lawfully transport crude oil through Gaviota State Park, it was required to obtain an easement from State Parks. Nor can the federal government simply authorize such access for a private party—and certainly not without complying with the requirements imposed by the Takings Clause and congressional statutes. *Cedar*

17

*Point Nursery v. Hassid*, 594 U.S. 139, 140 (2021); *United States v. Carmack*, 329 U.S. 230, 243-246 (1946); cf. *PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482 (2021) (private party permitted to pursue eminent domain proceeding for easement across state land pursuant to express delegation in the Natural Gas Act).

**III. NO CIRCUMSTANCES THE UNITED STATES OR SABLE MAY RAISE EXCUSES THEIR VIOLATIONS**

**A. The DPA Does Not Excuse Compliance With the Consent Decree or State Law, and Does Not Displace the Court's Enforcement Power**

The Defense Production Act contains no provisions indicating that it displaces judicial power or state power preserved by Congress in other statutes, nor could it do so constitutionally. Nor does the Defense Production Act contain a general purpose delegation to preempt state or federal law. Rather, the Defense Production Act contains two specific provisions that might be understood as both preempting state laws and excusing noncompliance with federal court orders. First, the Act contains a shield against liability for damages or penalties. 50 U.S.C. § 4557. Two Courts of Appeals have concluded that this protects parties from liability for breach of existing *contracts* due to a firm's prioritization or allocation away from existing customers when ordered by the federal government. *See United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995) (citing *Hercules, Inc. v. United States*, 24 F.3d 188, 203–04 (Fed. Cir. 1994)). In its briefing at the Supreme Court, the United States defended the Federal Circuit's holding in *Hercules*, explaining that "the language and statutory context of Section 707 show that it protects contractors from claims arising out of a DPA order's displacement of work for other customers, not from tort liability to parties who claim to have been injured . . . ." Brief for Respondent United States, *Hercules, Inc. v. United States*, No. 94-818 (516 U.S. 417), 1995 WL 495540, at *34. That provision does not apply, because California does not seek damages or penalties, and does not allege a

breach of contract. Rather, California seeks an order enforcing the terms of the Consent Decree. The other potential source of preemption is the Act's explicit exemptions from certain state antitrust law provisions. 50 U.S.C. § 4558(j). That is not an issue here either.

The United States Department of Justice's Office of Legal Counsel recently released an opinion contending that the liability shield provision confers a broad, express preemption power that excuses compliance with both state law and federal judicial orders. Preemptive Effect of Defense Production Act Order on State Law, 50 Op, O.L.C. (Mar. 3, 2026) (slip. op. at 1, 9). The Opinion argues that "DPA's displacement of state regulatory law follows from the same principle" as the liability shield because "[s]tate regulation often accomplishes *ex ante* what private law accomplishes *ex post*." *Id.* at 13. This is not how statutory authorization works. Statutes confer only the powers they identify, not powers that are unmentioned. "[B]oth separation of powers principles and a practical understanding of legislative intent make [courts] 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022).

The recent decision by the United States Supreme Court invalidating tariffs imposed under the International Emergency Economic Powers Act (IEEPA) is instructive. There, the President claimed that the phrase "regulate importation" included the power to impose tariffs. There, the United States contended that imposing tariffs under IEEPA fell within "regulat[ing] . . . importation" because a tariff has the effect of altering the volume of imports, functionally similar to quotas and other import restrictions. Opening Brief for the United States, *Learning Res., Inc. v. Trump*, 147 S. Ct. 628, 644-45 (2026), 2026 WL 477534, at *11. The Supreme Court rejected this argument.[7] The Court explained that Congress uses

---

[7] Although the Court split into three groups, this holding is in Part II.B, which six of the nine justices joined. *Learning Resources*, 146 S. Ct. at 634.

different terms to confer different powers, and courts do not infer that Congress conferred a power based on some *functionally equivalent but different* power. Learning Res., 147 S. Ct. at 643. Although the OLC Opinion post-dates *Learning Resources* by 11 days, it does not mention *Learning Resources*, and is inconsistent with the majority opinion. Indeed, the OLC Opinion doubles down on the sweeping view of unilateral executive power that the Supreme Court had just rejected. The OLC Opinion adopts a view that when Congress confers a power on the Executive, the Executive can exercise other powers that have a functionally similar result. But *Learning Resources* rejects this logic, and this Court should too. 50 Op. O.L.C. (Mar. 3, 2026) (slip op. at 12–13). As the Supreme Court held in *Learning Resources*, Congress conferring power to regulate does not confer power to tax. And under the Defense Production Act, Congress conferring power to preempt *damages liability* via a DPA order does not confer power for an Executive Branch official to unilaterally excuse compliance with state regulations. *Congress*, of course, may preempt state laws, but nothing in the DPA delegates to the President or Cabinet Secretaries the power to do so by fiat.

Even more extraordinary, the OLC Opinion separately provided that a DPA order could constrain *this Court's* power to enforce the Consent Decree *in this case*. 50 Op. O.L.C. (Mar. 3, 2026) (slip op. at 20-22). That view is meritless. The Defense Production Act, like all statutes, operates pursuant to the Constitutional background principle which vests the nation's judicial power in the federal courts. U.S. Const. art. III § 2, cl. 1. The Defense Production Act contains no express usurpation of the judiciary's constitutional authority to enforce its own judgments, and an interpretation of a statute that would allow the Executive Branch to make Judicial Branch judgments essentially dead letters would run afoul of the separation of powers doctrine and thus should be avoided. See *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991) ("The ultimate purpose of this separation of powers is to protect the liberty and security of

the governed … the Court has been sensitive to its responsibility to enforce the principle when necessary.").

### B.  DPA Order does not displace state law in an area where Congress preserved state power

An order by the Executive Branch cannot preempt state law when Congress has *preserved* a state's sovereign authority. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (J. Jackson, concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . ."); *see also Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298, 330 (1994) (executive pronouncements of policy cannot invalidate "congressionally-condoned" state policy), *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996) (holding that when an executive action conflicts with a statute , the statute controls). "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67 (1989) (cleaned up). Here, Congress not only stood by and tolerated state power; it expressly preserved state jurisdiction over intrastate pipelines in the Pipeline Safety Act. 49 U.S.C. §§ 60101(a)(8)(B), (a)(10), 60104(c); *see* Part I, *supra*. In the regulation of intrastate pipelines, Congress disabled the federal government from regulating. The Secretary of Energy cannot override this with a vaguely-worded order under the uncertain terms of a different statute. And that is particularly so when the requirements to comply with a state agency's approval process are embodied in a *federal* court judgment, as here.

### C.  The Court should reject the United States' proposed interpretation of the DPA that gives it unlimited power

The DPA Order was issued on the heels of the OLC Opinion. The OLC

21

Opinion concludes that the President can, after making an unreviewable determination, preempt state law in any industry or area, with no judicially enforceable limits. There appears to be no limiting principle to the United States' position. *Any* matter of the State's civil or criminal code could be overridden by the Executive's unilateral decision that the state provision hinders the Executive's goal.

Such an approach runs contrary to the long-standing presumption against preemption. To find preemption, it must be "the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Here, Congress has not done so. The DPA authorizes the Executive to compel private parties to prioritize and allocate certain orders for goods and services. It is entirely consistent with that statute to understand it as applying only to orders for lawfully-produced goods and services.

California's interpretation of the DPA avoids this absurd result and comports with the presumption against preemption. The DPA provides only the preemption included in the text: the liability shield and the antitrust protection.

## CONCLUSION

The Court should issue an order enforcing the Consent Decree and ordering Sable not to restart or continue operating Lines 324 and 325 until and unless the terms of the Consent Decree are complied with or are modified by this Court after further briefing.

22

Dated: March 16, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
ERIC M. KATZ
JESSICA TUCKER-MOHL
Supervising Deputy Attorneys
General


*/s/ Michael S. Dorsi*
MICHAEL DORSI
Deputy Attorney General
*Counsel for Plaintiffs State of
California, et al.*

LA2019502930
39715108

23