# EXHIBIT A

**No. 25-8059**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ENVIRONMENTAL DEFENSE CENTER, GET OIL OUT!, SANTA BARBARA COUNTY ACTION NETWORK, SIERRA CLUB, SANTA BARBARA CHANNELKEEPER, CENTER FOR BIOLOGICAL DIVERSITY, and WISHTOYO FOUNDATION,

*Petitioners*,

v.

U.S. DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, in his official capacity as Secretary of the U.S. Department of Transportation, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, and PAUL ROBERTI, in his official capacity as Administrator of the Pipeline and Hazardous Materials Safety Administration,

*Respondents*.

---

**PETITIONERS' EMERGENCY MOTION FOR STAY PENDING APPEAL**
**RELIEF REQUESTED BY DECEMBER 26, 2025**

---

Linda Krop
lkrop@environmentaldefensecenter.org
Margaret M. Hall
mhall@environmentaldefensecenter.org
Jeremy M. Frankel
jfrankel@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622
*Attorneys for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

Julie Teel Simmonds
jteelsimmonds@biologicaldiversity.org
David Pettit
dpettit@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin Street, Suite 375
Oakland, CA 94612
Tel: (510) 844-7100
*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

EXHIBIT A

5

**CIRCUIT RULE 27-3 CERTIFICATE**

I hereby certify the following:

The relief requested by Petitioners in the emergency motion accompanying this certificate is for a stay, pending appeal, of orders issued by Respondent Pipeline and Hazardous Material Safety Administration (PHMSA), a federal agency within the United States Department of Transportation (DOT). The orders approve a Restart Plan (the "Approval") and Emergency Special Permit (ESP) for defective oil pipelines CA-324 and CA-325 (together, the "Pipeline System"), allowing them to return to service ten years after causing a catastrophic oil spill at Refugio State Beach Park in Santa Barbara County, California. The Approval and ESP allow the Pipeline System to operate despite its lack of protection from corrosion — the root cause of the 2015 oil spill — and its inability to meet federal pipeline safety standards.

The 120-mile Pipeline System passes through and/or has the potential to impact the following: beaches and nearshore habitat along the Gaviota Coast; three major rivers — the Santa Ynez, Sisquoc, and Cuyama — and perennial streams; major groundwater basins that provide public and domestic water supply; renowned parks and recreational areas, including Gaviota State Park and the Carrizo Plain National Monument; and a suburban neighborhood in Buellton, California. Restart of the Pipeline System in the manner authorized by the Approval and ESP present an immediate and substantial threat to each of these

EXHIBIT A

6

resources and areas. Petitioner organizations and their members have direct interests in these areas and are adversely affected by the Approval and ESP.

Restart of the Pipeline System is imminent, and may have even already occurred. Relief is needed as soon as possible, but no later than December 26, 2025, to prevent the risk of another catastrophic oil spill.

I could not have filed this motion earlier because the Approval was not issued until December 22, 2025, and the ESP was issued December 23, 2025. Today is the earliest possible date by which I could prepare and file the motion, along with the underlying Petition for Review.

Relief was not requested in a lower court because federal law requires that actions challenging orders issued by PHMSA be brought directly in the court of appeals for the District of Columbia or the circuit in which the petitioner resides. 49 U.S.C. § 60119(a). Nor was a stay first requested from PHMSA, since doing so would have been impracticable in light of the exigency of these circumstances, as explained in the below Motion.

On December 24, 2025, I notified the Ninth Circuit Court staff via voicemail and email about the filing of this motion pursuant to Circuit Rule 27-3. *See* Krop Declaration, ¶ 2. On that same day, I notified by email counsel for all interested parties of the filing of this motion, as listed below. (*Id*.)

EXHIBIT A
7

| | |
|---|---|
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th Floor<br>Century City, CA 90067 | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com<br>FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |

*/s/ Linda J. Krop*
Linda Krop

iii

EXHIBIT A
8

# TABLE OF CONTENTS

CIRCUIT RULE 27-3 CERTIFICATE ...................................................................i

TABLE OF CONTENTS...................................................................................iv

TABLE OF AUTHORITIES ..............................................................................v

MOTION.........................................................................................................1

INTRODUCTION ...........................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND .............................................2

STANDARD OF REVIEW ...............................................................................6

ARGUMENT ..................................................................................................7

   I.   Petitioners are Likely to Succeed on the Merits of their Petition....................7

      A.   Sable is not Entitled to Emergency Relief. ............................................7

      B.   The Approval and ESP Violate the PSA's Procedural and Substantive Requirements. ...................................................................................9

          1.   PHMSA Failed to Provide a Public Process and Statement of Reasons........................................................................................9

          2.   The Approval and ESP Violate the PSA Because They are Inconsistent with Pipeline Safety. ...................................................10

      C.   PHMSA Violated NEPA by Failing to Conduct Environmental Review.11

   II.   Petitioners and the Public Face Imminent and Irreparable Injury.................16

   III.   There is Comparatively Little Harm of a Stay to Others. ...........................18

   IV.   The Public Interest Lies in Ensuring Meaningful Public Participation, the Protection of Irreplaceable Resources, and Health and Safety. ....................19

   V.   Seeking a Stay from PHMSA Would Be Impracticable. .............................19

   VI.   The Court Should Require No Bond Or, At Most, a Nominal Bond. ...........20

CONCLUSION ................................................................................................20

CERTIFICATE OF COMPLIANCE...................................................................22

CERTIFICATE OF SERVICE ...........................................................................22

iv

EXHIBIT A

9

## TABLE OF AUTHORITIES

**Cases**

*Breeze Smoke, LLC v. U.S. FDA,*
 18 F.4th 499 (6th Cir. 2021)....................................................................................20

*City of Davis v. Coleman*,
 521 F.2d 661 (9th Cir. 1975)....................................................................................13

*High Sierra Hikers Ass'n v. Blackwell*,
 390 F.3d 630 (9th Cir. 2004)....................................................................................18

*Idaho Sporting Cong. v. Thomas*,
 137 F.3d 1146 (9th Cir. 1998)..................................................................................13

*Klamath Siskiyou Wildlands Ctr. v. Boody*,
 468 F.3d 549 (9th Cir. 2006)....................................................................................12

*League of Women Voters of the United States v. Newby*,
 838 F.3d 1 (D.C. Cir. 2016) .....................................................................................20

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
 886 F.3d 803 (9th Cir. 2018)....................................................................................18

*Nken v. Holder,*
 556 U.S. 418 (2009) ...................................................................................................7

*NRDC v. Morton,*
 337 F. Supp. 167 (D.D.C. 1971), *aff'd*, 458 F.2d 827 (D.C. Cir. 1972)...............20

*Save Our Sonoran, Inc. v. Flowers*,
 408 F.3d 1113 (9th Cir. 2005)..................................................................................18

*Van De Sande v. Van De Sande*,
 431 F.3d 567 (7th Cir. 2005)....................................................................................17

*Washington v. United States Dep't of Educ.*,
 No. 25-7157, 2025 WL 3486895 (9th Cir. Dec. 4, 2025)........................................7

*Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*,
 758 F.2d 669 (D.C. Cir. 1985) .................................................................................19

**Statutes**

42 U.S.C. § 4321 *et seq.*...............................................................................................2

42 U.S.C. § 4332(C)...........................................................................................12, 13, 16

42 U.S.C. § 4336(b)(2)..............................................................................................12, 16

EXHIBIT A
10

49 U.S.C. § 60101 *et seq.*.......................................................................................2

49 U.S.C. § 60102 .................................................................................................18

49 U.S.C. § 60118(c)(1)(A) ................................................................................9, 10

49 U.S.C. § 60118(c)(1)(B) .....................................................................................9

49 U.S.C. § 60118(c)(3)..........................................................................................10

49 U.S.C. § 60119(a) .............................................................................................. ii

49 U.S.C. § 60119(a)(3)...........................................................................................6

**Regulations**

49 C.F.R. § 190.341 ................................................................................................9

49 C.F.R. § 190.341(b) ...........................................................................................10

49 C.F.R. § 190.341(d) ...........................................................................................10

49 C.F.R. § 190.341(g) .............................................................................................8

49 C.F.R. § 195.563 .................................................................................................4

**Rules**

Fed. R. App. P. § 18(a)(1)......................................................................................20

Fed. R. App. P. § 18(a)(2)......................................................................................20

Fed. R. App. P. § 18(b) .........................................................................................20

EXHIBIT A
11

## MOTION

Pursuant to Federal Rules of Appellate Procedure 18 and Circuit Rule 27-3, Petitioners Environmental Defense Center, Center for Biological Diversity, Sierra Club, Santa Barbara County Action Network, Get Oil Out!, Santa Barbara Channelkeeper, and Wishtoyo Foundation (collectively, "Petitioners") respectfully move this Court to issue, on an emergency basis, a stay of Respondent Pipeline Hazardous Materials Safety Administration's (PHMSA) orders approving a Restart Plan (the "Approval") and Emergency Special Permit (ESP) for defunct oil pipelines CA-324 and CA-325 (the "Pipeline System"). *See* Krop Declaration (Decl.) ¶ 13, Exhibit (Exh.) L; Request for Judicial Notice (RJN), Exh. 22.

## INTRODUCTION

This case arises from the efforts of Sable Offshore Corp. and its wholly-owned subsidiary, Pacific Pipeline Company ("Sable"), to restart the defective Pipeline System that ruptured in 2015 at Refugio Beach State Park, causing one of the worst oil disasters in California history. The 120-mile system, which travels from the Gaviota Coast to Kern County, has been shut down since the 2015 spill.

By flaw of design, standard methods of corrosion prevention are ineffective on the Pipeline System, leaving it vulnerable to pervasive corrosion — the root cause of the 2015 oil spill. However, rather than abandoning or replacing the Pipeline System, Sable is attempting to simply restart it without fixing the underlying problem of inevitable corrosion.

1

EXHIBIT A
12

In a rushed, legally dubious, and politicized process, on December 17, PHMSA purported to take over regulatory jurisdiction from the California Office of the State Fire Marshal (OSFM) (for purposes of pipeline safety) and on December 22, authorized restart of the Pipeline System. Krop Decl. ¶ 13, Exh. L. On December 23, PHMSA further circumvented requirements for environmental review and public notice and comment by approving the ESP. In doing so, PHMSA blatantly violated the Pipeline Safety Act (PSA), 49 U.S.C. § 60101 *et seq.*, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* Restarting the Pipeline System would not only invite another oil disaster on the Central Coast, but all but ensure it. The Pipeline System has already ruptured once, *and the underlying cause of that rupture has not been corrected*.

In light of the above, Petitioners seek an emergency stay of the ESP and Approval, pending the resolution of their Petition. Such relief is necessary to prevent immediate and irreparable harm, to ensure public participation in PHMSA's decisions, and to maintain the status quo until the impacts of Sable's restart are subject to environmental review.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 19, 2015, the Pipeline System, then owned by Plains All American Pipeline, L.P. ("Plains"), ruptured near Refugio Beach State Park, releasing more than 120,000 gallons of crude oil into the surrounding environment. RJN, Exh. 1, p. 4.  The spill affected approximately 150 miles of the California coast. *Id*. at p.

2

EXHIBIT A
13

16. Thousands of acres of shoreline and subtidal habitat were destroyed, and an untold number of animals — including marine mammals — were injured or killed. *Id*. at p. 3. The spill also forced the closure of fisheries and beaches, costing local businesses hundreds of millions of dollars and causing an estimated 140,000 lost recreational user days between Santa Barbra and Ventura Counties. *Id*.

Following the spill, the Pipeline System was purged and shut down, the offshore oil field that it services ("Santa Ynez Unit" or "SYU") was idled, and production suspended indefinitely. Neither the Pipeline System nor the SYU — both recently purchased by Sable — have operated since 2015. Upon investigation, PHMSA determined that the 2015 rupture was the result of "progressive external corrosion." *Id*. at p. 14. Concerningly, PHMSA determined that, by flaw of design, cathodic protection — intended to prevent such corrosion — is ineffective on the Pipeline System, leaving it vulnerable to pervasive corrosion and, consequently, another rupture. *Id*.

In light of the Pipeline System's dangerous defects, few suspected that an operator would try to bring it back online. In 2017, the owner at the time proposed to build a *new* replacement system, ostensibly due to the risks of restarting the compromised system. Krop Decl. ¶ 3. However, now, Sable is attempting to restart the defective Pipeline System, disregarding a litany of environmental and safety concerns as it rushes to bring offshore drilling back to the Gaviota Coast. *Id.*

Because of the Pipeline System's extensive corrosion, in order to restart,

3

EXHIBIT A
14

Sable must obtain waivers that excuse compliance with requirements, specifically, "for the limited effectiveness of cathodic protection" on the Pipeline System. RJN, Exh. 4, App. B, p. 1; *see also* 49 C.F.R. § 195.563 (requiring cathodic protection).

The risks of operating the Pipeline System without effective cathodic protection have never been fully evaluated. However, an analysis prepared by OSFM found that operating without cathodic protection can increase the risk of a spill by as much as *five times*. *See* Krop Decl. ¶ 3, Exhibit A, p. 79. A separate agency analysis, discussed below, found that operating the Pipeline System could result in a spill *every year*, and a major rupture *every four*. *Id.* Indeed — the risk of a disaster is especially heightened immediately upon restart. Bodell Decl. ¶ 96.

We have already seen the devastation that this Pipeline System can wreak on coastal resources. However, it also threatens major rivers and groundwater sources, renowned parks and ecological reserves, and numerous endangered and special-status species. RJN, Exh. 15; RJN, Exh. 11, pp. 3-14, 3-31, 3-36-39, 4-34; Exh. 3, pp. 21-22. It also runs directly under a populated neighborhood in Buellton, California, complete with schools, parks, and dozens of homes. RJN, Exh. 15.

Despite these concerns, Sable sought and obtained the above-referenced waivers from OSFM, which has had exclusive regulatory authority over the Pipeline System since 2016. RJN, Exh. 5, p. 1; Exh. 8; Exh. 9. OSFM issued the waivers without inviting public comment, conducting environmental review, or providing any written justification for its decisions. Petitioners filed companion

4

lawsuits challenging those waivers in the Superior Court for the County of Santa Barbara, Case Numbers 25CV02244 and 25CV02247, which are still pending.[1]

As those lawsuits proceeded, Sable requested authorization from OSFM to restart the Pipeline System. Krop Decl. ¶ 8, Exh. F. The agency refused, citing that additional repairs are needed to ensure permanent remediation, per the State Waivers. Krop Decl. ¶ 9, Exh. G. Instead of making those repairs, Sable urged the federal government to intervene and circumvent OSFM's authority. *Id*. ¶ 10, Exh. H, I. On December 17, 2025, PHMSA purportedly seized jurisdiction over the Pipeline System from the State to fast-track Sable's restart efforts. *Id*. ¶ 11, Exh. J.

Shortly thereafter, on December 22, 2025, PHMSA issued a one-page cursory letter authorizing restart of the Pipeline System. *Id*. ¶ 13, Exh. L. In issuing the Approval, PHMSA failed to adhere to the process and standards the PSA and implementing regulations mandate for waivers. PHMSA also blatantly ignored its obligations under NEPA, namely by failing to conduct environmental review.

On December 23, PHMSA approved the ESP, allowing work to be conducted on sections of the Pipeline System. By issuing the ESP on an emergency basis, PHMSA again violated important requirements for environmental review and public notice and comment.

---

[1] Notably, the court in those matters conditionally granted a request from Petitioners for an injunction preventing restart of the Pipeline System — a request substantially similar to the motion now before this Court. That injunction remains in place, but, incredibly, has not deterred Sable from restarting.

5

EXHIBIT A
16

Given the unprecedented nature of the Approval and ESP, and the critical resources that this 120-mile Pipeline System can impact, the need for public comment, independent expert scrutiny, and environmental review is especially critical here. Instead, PHMSA has failed to ensure that the Pipeline System will be safe to operate. Bodell Decl. ¶ 32, 45-54. Operating the Pipeline System "will inevitably result in another failure," *id.* at ¶ 110, and poses a "potential imminent hazard . . . to life, property, and the environment," *id.* at ¶ 106.

Absent judicial intervention, nothing stands in the way of Sable relying on the flawed Approval and ESP to restart this Pipeline System and cause another disaster. Petitioners bring this Motion to prevent restart until and unless PHMSA conducts a thorough, public review of the safety and environmental risks posed by such action, and complies with all applicable laws, as described herein.

**STANDARD OF REVIEW**

Pursuant to 49 U.S.C. Section 60119(a), orders issued by PHMSA under the PSA — e.g., the Approval and ESP — must be challenged by filing a Petition for Review directly in the court of appeals for the circuit in which the petitioner(s) resides. Judicial review in such actions is conducted under the standards set forth in section 706 of the Administrative Procedure Act (APA). 49 U.S.C. § 60119(a)(3). The APA provides, in pertinent part, that a reviewing court shall set aside an agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure

6

EXHIBIT A
17

required by law." 5 U.S.C. § 706(a)(2)(A), (D).

When deciding a motion for a stay pending appeal, this Court considers: "(1) whether the stay applicant has made a strong showing that [the applicant] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder,* 556 U.S. 418, 434 (2009); *see Washington v. United States Dep't of Educ.*, 2025 WL 3486895, at *1 (9th Cir. Dec. 4, 2025) (applying the *Nken* factors).

## ARGUMENT

A stay pending appeal is necessary and appropriate under the above factors.

## I.      **Petitioners are Likely to Succeed on the Merits of their Petition.**

Petitioners raise several claims: (1) that the action does not qualify as an "emergency" pursuant to 49 U.S.C. Section 60118(c)(2)(A); 49 C.F.R. Section 190.341(g); (2) PHMSA failed to comply with the PSA by not providing a public process, statement of reasons, or an adequate pipeline safety determination or adhering to other requirements pertaining to Special Permits; and (3) PHMSA failed to comply with NEPA by not conducting environmental review.

### A.      **Sable is not Entitled to Emergency Relief.**

The ESP is the latest attempt by Sable (and now PHMSA) to avoid a legally-mandated process intended to provide transparency, meaningful analyses, and public input. To the extent Sable claims an emergency, it is entirely of its own making.

7

EXHIBIT A<br>18

In order to qualify for an ESP, Sable must demonstrate that the action is in the public interest, is not inconsistent with pipeline safety, and is necessary to address an actual or impending emergency involving pipeline transportation. *See* 49 U.S.C. Section 60118(c)(2)(A); 49 C.F.R. § 190.341(g). None of these factors apply here.

First, the action is not in the public interest. The ESP findings state that granting the ESP would "ensure uniform and continuous exercise of regulatory oversight" in that PHMSA, not OSFM, would oversee the permit. RJN, Exh. 23, p. 2. However, PHMSA concurred in the OSFM State Waivers. RJN, Exh. 6, 7. In any event, the pursuit of PHMSA oversight is not an emergency because the State Waivers exist, and PHMSA can consider Special Permits through the normal process. Moreover, the argument that granting the ESP will "reduce the need for anomaly digs and other field activities" (RJN, Exh. 23, p. 2) may be contrary to the public interest if they impair pipeline safety.

Second, the ESP is most certainly inconsistent with public safety, as described below. By issuing the permit on an emergency basis and circumventing environmental and public review, PHMSA lacks the requisite information to address existing concerns about the safety of the Pipeline System. The assertion of an emergency is nothing more than a blatant attempt by Sable to avoid making repairs that OSFM has deemed necessary to address public safety concerns. Krop Decl. ¶ 9, Exh. G.

Finally, there is no emergency requiring operation of the Pipeline System. The ESP references Executive Order 14156, which supports the production, transportation, and generation of domestic energy sources. RJN, Exh. 23, p. 3. Such emergency does not

8

EXHIBIT A
19

exist at all let alone here, where the Pipeline System and related production have been shut down for ten years. Another few months to comply with legal requirements for public and environmental review will not cause a national energy shortage.

**B.   The Approval and ESP Violate the PSA's Procedural and Substantive Requirements.**

Because there is no emergency, PHMSA must comply with the full requirements of the PSA before approving Special Permits. *See* 49 U.S.C. § 60118(c)(1)(A); 49 C.F.R. § 190.341. PHMSA must provide for a transparent public process, ensure pipeline safety, and conduct environmental review.

1.   <u>PHMSA Failed to Provide a Public Process and Statement of Reasons.</u>

PHMSA's action waives important pipeline safety standards requiring effective protection against external corrosion. RJN, Exh. 23. As required by the PSA, the Secretary can issue a waiver only "if the Secretary determines that the waiver is not inconsistent with pipeline safety." 49 U.S.C. § 60118(c)(1)(A). However, "[t]he Secretary may act on a waiver . . . *only after notice and an opportunity for a hearing*." 49 U.S.C. § 60118(c)(1)(B) (emphasis added); *see also* 49 C.F.R. § 190.341(d) ("Upon receipt of an application or renewal of a special permit, PHMSA will provide notice to the public of its intent to consider the application and invite comment."). Moreover, such waivers must include the "reasons for granting the waiver." 49 U.S.C. § 60118(c)(3).

Despite those clear statutory directives, PHMSA issued the waiver without

9

providing *any* sort of public notice or opportunity for public participation. In addition, it did not provide an analysis of reasons for, or effect of, granting the waiver; instead, the ESP findings focus entirely on whether Sable qualifies for emergency relief. There is no discussion of why Sable needs relief from the requirement for effective cathodic protection, or whether such relief is consistent with pipeline safety. RJN, Exh. 23.

Special permits also contain additional requirements, such as the submittal of an application at least 120 days prior to approval. *See* 49 C.F.R. § 190.341(b). Notably, PHMSA's longstanding practice is to publish notice in the federal register and solicit public comment before issuing a special permit. *See, e.g.,* RJN, Exh. 14. By failing to follow the PSA process for waivers, PHMSA failed to act "in accordance with the law" and "without observance of procedure required by law," warranting relief under 5 U.S.C. Section 706(a)(2)(A) and (D).

2. The Approval and ESP Violate the PSA Because They are Inconsistent with Pipeline Safety.

A waiver may only be issued where "the Secretary determines that the waiver is not inconsistent with pipeline safety." 49 U.S.C. § 60118(c)(1)(A). Here, the ESP does not include any explanation regarding consistency with pipeline safety. RJN, Exh. 22-23. The cause of the 2015 spill was progressive external corrosion of the Pipeline System, due to failure of the cathodic protection system. RJN, Exh. 2, p. 14. As noted above, agency review of restarting this defective Pipeline System determined that a spill is likely every year, and a rupture is likely every four years. Krop Decl. ¶ 13, Exh. A.

10

EXHIBIT A
21

Mr. Clayton Bodell, a pipeline safety expert previously in the employ of PHMSA, recently analyzed the current threats posed by potential restart of the Pipeline System and concluded that the waivers issued by OSFM "do not meet the minimum legal requirement that [they be] consistent with pipeline safety." Bodell Decl. ¶ 56. The failed coating and ineffective cathodic protection "remain unmitigated" and "will continue to pose a threat to the long-term integrity of [the Pipeline System]." *Id*. at ¶¶ 75, 66. Combined with the water environment near the pipeline, higher heat, and higher pressure cycles, the Pipeline System is vulnerable to stress crack corrosion. *Id*. at ¶¶ 90-96. Additionally, even with recent testing, given the ten years that the Pipeline System has been out of service "and the complexity of returning a pipeline to service after a decade of being out of service, it is possible that these pipelines experience a failure during restart operations or before Sable can receive an act on the results from the first required in-line inspection after restart…" *Id*. at ¶ 96. The Pipeline System is expected to continue to deteriorate, causing "a safety-related condition" and a "potential imminent hazard [] to life, property, and the environment." *Id.* at ¶ 106.  Accordingly, PHMSA failed to issue the Approval and ESP "in accordance with the law" and "without observance of procedure required by law," warranting relief under 5 U.S.C. Section 706(a)(2)(A) and (D).

## C.    PHMSA Violated NEPA by Failing to Conduct Environmental Review.

PHMSA blatantly ignored its obligations under NEPA by failing to prepare an Environmental Impact Statement (EIS). The cornerstone of NEPA is the requirement that each federal agency prepare, and circulate for public comment, a

11

EXHIBIT A

22

detailed EIS prior to undertaking any "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

If an agency is unsure whether an EIS is required, or if it claims the action will not have "a reasonably foreseeable significant effect," it must instead prepare an Environmental Assessment (EA), in which the agency either makes a "finding of no significant impact" or determines that an EIS is necessary. 42 U.S.C. § 4336(b)(2). Here, PHSMA prepared neither an EIS nor an EA.

PHMSA is required to prepare an EIS because the Approval and any waiver constitute major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). In fact, Secretarial Order DOT 5610.1C expressly recognizes special permits (i.e., waivers) as "major Federal actions" for purposes of NEPA. RJN, Exh. 16.

Whether an EIS is required turns on whether the action may have significant impacts. This is an exceedingly "low standard." *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006). To trigger the need for an EIS, a Petitioner "need not show that significant effects *will in fact occur*," but merely "raise[] substantial questions whether a project *may* have a significant effect." *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998) (emphasis added). An action "significantly affect[s] the quality of the human environment" if "the proposed project would materially degrade any aspect of environmental quality." *City of Davis v. Coleman*, 521 F.2d 661, 673-74 (9th Cir. 1975) (citing 42

12

EXHIBIT A
23

U.S.C. § 4332(C)). [2] Again, this standard "does not require the courts to determine whether a challenged project will in fact have significant effects," only that it *may* do so. *Id.*

The actions at issue may — and, invariably, *will* — cause at least two categories of significant effects: environmental degradation from (1) another oil leak or spill and (2) excavations or ground-disturbing activities conducted in order to operate, test, repair, and/or inspect the Pipeline System.

First, as discussed above, the County of Santa Barbara, relying on state agency analyses, explained that operating the Pipeline System without cathodic protection can generally increase the risk of a spill by as much as *five times*, and that operating without effective cathodic protection could result in a spill *every year*, and a major rupture *every four*. Krop Decl. ¶ 3, Exh. A, p. 79.

More recently, Mr. Bodell concluded that the Pipeline System poses a "potential imminent threat" to "life, property, and the environment." Bodell Decl. ¶ 106. Mr. Bodell determined that "[t]he Las Flores Pipeline System represents a continual and unresolved threat to the people and environment around it." Bodell Decl. ¶ 107. Because "[t]he contributory causes of the 2015 failure remain unaddressed", *id.* at ¶ 104, "any future operation under the Special Permits . . . will

---

[2] Whether an effect is considered "significant" was, for nearly fifty years, an inquiry guided by Council for Environmental Quality (CEQ) regulations. Effective April 11, 2025, all such regulations were repealed. As such, this Court must default to the "significance" test it applied pre-CEQ regulations, which was articulated in this case.

13

EXHIBIT A
24

inevitably result in another failure of the [Pipeline System]," *id.* at ¶ 110. Compounding this spill risk is that areas of severe corrosion on the Pipeline System identified by OSFM have yet to be repaired, potentially leaving the system vulnerable to failure. Krop Decl. ¶ 9, Exh. G.

The potential effects of a spill from the Pipeline System are well documented. The 2015 spill devastated thousands of acres of shoreline and subtidal habitat, killed an untold number of marine species, and shutdown fisheries and beaches to public use. RJN, Exh. 1, p. 4. That such impacts "materially degrade . . . environmental quality" is beyond dispute. *City of Davis*, 521 F.2d at 673–74.

However, the 2015 spill was just one possible scenario. The Pipeline System passes directly through the Santa Ynez River, Sisquoc River, and Cuyama River; dozens of creeks and drainages; six major groundwater basins that provide domestic and public water supply; renowned recreation and conservation areas, including Gaviota State Park and the Carrizo Plain National Monument; critical habitat for many species, like the California Red-Legged frog; and a suburban neighborhood in Buellton, California. Clauser Decl. ¶ 5, Att. 1-6; RJN, Exh. 15; Exh. 11, pp. 3-14, 3-31, 3-36-39, 4-34; Exh. 3, pp. 21-22. A spill affecting these areas or resources would likewise, under any standard, constitute a "significant effect." Notably, a spill in some inland areas of the route has the potential to be five times the size of the 2015 disaster. Krop Decl. ¶ 3, Exh. A, p. 78.

Second, it is Petitioners' understanding that the Pipeline System will require

14

EXHIBIT A
25

regular excavations both for repairs and to corroborate inspection results. *See* RJN, Exh. 8, 9, pp. 4, 10-11. The effects of such excavations have already been well-documented. Over the last year, Sable performed dozens of digs without requisite authorization from agencies, including the California Coastal Commission (CCC), leading to Cease-and-Desist Orders, several lawsuits, and **felony criminal charges** against the company. In a CCC proceeding that resulted in a historic $18M fine against Sable, the CCC found that excavations along the route caused significant damage to a number of sensitive habitat areas, including areas that support special-status species. *See* RJN, Exh. 3, pp. 18-24. The excavations included, among other things, the use of heavy equipment; grading and removal of major vegetation; and installation of fill material within wetlands. *See id.*

Because the above effects, directly attributable to PHMSA's actions, would "materially degrade . . . environmental quality," they are considered significant for purposes of NEPA. *City of Davis*, 521 F.2d at 673–74. Accordingly, PHMSA was required to prepare an EIS before issuing the Approval and Special Permits. 42 U.S.C. § 4332(C).

Moreover, even if PHMSA was unsure whether significant effects were to occur, or if it disagreed with Petitioners' assertions, it was nonetheless required to prepare an EA. *See* 42 U.S.C. § 4336(b)(2); *Kern v. U.S. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002). However, PHMSA failed to prepare *any* environmental document here, simply ignoring its obligations under NEPA. Accordingly,

15

EXHIBIT A
26

PHMSA failed to act "in accordance with the law" and acted "without observance of procedure required by law," warranting relief under 5 U.S.C. § 706(a)(2)(A) and (D).

## II.    Petitioners and the Public Face Imminent and Irreparable Injury.

Absent a stay, Petitioners face a substantial risk of irreparable harm from a possible oil spill, Pipeline System excavations, and the denial of their statutory rights to participate in the decision-making process.

As discussed above, the risk of an oil spill from the defective Pipeline System is not a speculative one: it has already ruptured once, and the root causes of that failure have not been corrected. Indeed, operating as currently envisioned "will inevitably result in another failure of the [Pipeline System]," Bodell Decl. ¶ 110, and poses a "potential imminent hazard . . . to life, property, and the environment," *id.* at ¶ 106.  The potential impacts of a spill are well-documented and result in both immediate and long-lasting effects. *See* RJN, Exh. 1, pp. 3-4, 6-8, 15-19, 22-23, 74, 78, 140.

Petitioners are non-profit organizations whose members frequent many areas along, and adjacent to, the 120-mile Pipeline System, including the Gaviota Coast, Gaviota State Park, Carrizo Plain National Monument, the Los Padres National Forest, Arroyo Hondo Preserve, and numerous public beaches, waters, and parks. As recounted in the declarations, many of these members regularly enjoy land and ocean-based recreational activities along the pipeline route; have a direct interest in

16

EXHIBIT A

27

ensuring the land, waters, and wildlife surrounding the Pipeline System remain protected; and could be directly impacted by ground or surface water contamination from a spill. *See* Miller Decl.; Bradshaw Decl.; Schmitt Decl., Ellenberger Decl; Katz Decl.; Morton Decl.; Lyons Decl; Hough Decl. The magnitude of harm that would come with another oil spill underscores that it is truly irreparable. *See Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) ("The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes."). This risk is exacerbated by PHMSA's waiver of normally required pipelines safety requirements for effective corrosion prevention.

Beyond the risk of a spill, excavations along the Pipeline System, including in sensitive areas and critical habitat for special-status species cause substantial environmental degradation. *See* Clauser Decl. ¶ 5, Att. 1, Exh. 3, pp. 18-24. They can also restrict public access to recreational areas for weeks at a time. RJN, Exh. 17; Trautwein Decl. ¶ 4, Exh. B. Thus, resuming operations of the Pipeline System would irreparably harm Petitioners and their members' interests in the environment and the wildlife that inhabit it. *See, e.g.*, *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 & n.4 (9th Cir. 2004) (recognizing irreparable injury from harm to vegetation in "environmentally sensitive areas"); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818–19 (9th Cir. 2018); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005).

17

EXHIBIT A
28

Finally, allowing restart without the requisite public process will irreparably impair Petitioners' rights to participate in PHMSA's decision-making process. If Sable is allowed to proceed with operations before this case is resolved, any subsequent NEPA or pipeline safety review would likely amount to nothing more than post-hoc rationalizations. Accordingly, absent a stay of the Approval and ESP, Petitioners face a substantial risk of imminent and irreparable harm.

## III.    There is Comparatively Little Harm of a Stay to Others.

On the other hand, a stay would cause comparatively little harm to PHMSA or Sable. PHMSA's jurisdiction is limited to matters of pipeline *safety*. *See* 49 U.S.C. § 60102. It does not authorize oil development, but merely regulates the safety aspects of oil pipelines once they have received the necessary discretionary federal, state, and/or local approvals to transport oil. *See id.* PHMSA does not direct energy policy, take policy positions on the need for oil development, or have a vested interest in seeing the Pipeline System operate. Accordingly, a stay would cause no cognizable harm to PHMSA.

As to Sable, a stay would temporarily delay its ability to develop offshore oil reserves. So, while a stay might, for a short period, push back Sable's timeline, it would not, by itself, cause any long-term loss in profits for the company. Accordingly, any harm to the company would be marginal, especially relative to the likely harm to Petitioners and the public of a rushed and ill-considered restart. Moreover, "[i]t is . . . well settled that economic loss does not, in and of itself,

18

EXHIBIT A
29

constitute irreparable harm." *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). Additionally, the Pipeline System has been shut-in *for over a decade*; pausing restart to ensure PHMSA has acted safely and lawfully is, in context, a minor imposition.

IV.    **The Public Interest Lies in Ensuring Meaningful Public Participation, the Protection of Irreplaceable Resources, and Health and Safety.**

The public bears the risks of the Approval and ESP, not Sable or PHMSA. The public has a substantial interest in ensuring, through a stay, that the many public lands, public trust resources, and water supply sources that the Pipeline System can impact are properly safeguarded from a spill. Relatedly, the public — especially those that frequent or reside in areas on or near the pipeline route — has a substantial interest in participating in PHMSA's decision-making *before* issuance of the Approval or a Special Permit.

Moreover, the public has an overriding interest in ensuring PHMSA complies with its statutory mandates before taking actions that may irreversibly impact the environment. Indeed, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted).

V.    **Seeking a Stay from PHMSA Would Be Impracticable.**

While "[a] petitioner must ordinarily move first before the agency for a stay pending review of its decision or order," the petitioner need not do so if "moving first before the agency would be impracticable." Fed. R. App. P. § 18(a)(1), (2).

19

Because seeking a stay from PHMSA would take an indefinite amount of time — possibly months — and restart of the Pipeline System is imminent, it would have been impracticable for Petitioners to pursue an agency stay. *See, e.g., Breeze Smoke, LLC v. U.S. FDA*, 18 F.4th 499, 503 (6th Cir. 2021) ("[S]eeking a stay from the FDA of its . . . order would have been impracticable because the order takes effect immediately and the FDA can take months to consider . . . a stay").

**VI.   The Court Should Require No Bond Or, At Most, a Nominal Bond.**

Should this Court grant Petitioners' requested stay, whether to impose a bond is left to its sound discretion. *See* Fed. R. App. P. § 18(b). If the Court sees fit to impose a bond, Petitioners respectfully request that any bond be for a nominal amount. Federal courts broadly recognize that a nominal bond is sufficient and appropriate to secure preliminary relief where public interest groups seek enforcement of environmental laws. *See, e.g., NRDC v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971), *aff'd*, 458 F.2d 827 (D.C. Cir. 1972) (setting $100 bond for preliminary injunction against large offshore oil lease sale).

CONCLUSION

For the reasons above, Petitioners request that this Court issue an emergency stay of the Approval and ESP, and restart of the Pipeline System thereunder, pending the resolution of their Petition for Review.

20

EXHIBIT A<br>31

Dated: December 24, 2025          Respectfully submitted,


                                  *s/ Linda J. Krop*
                                  Linda Krop
                                  Margaret M. Hall
                                  Jeremy M. Frankel
                                  ENVIRONMENTAL DEFENSE CENTER
                                  *Counsel for Petitioners Environmental*
                                  *Defense Center, Get Oil Out!, Santa*
                                  *Barbara County Action Network, Sierra*
                                  *Club, and Santa Barbara Channelkeeper*

                                  *s/ Julie Teel Simmonds*
                                  Julie Teel Simmonds
                                  David Pettit
                                  CENTER FOR BIOLOGICAL DIVERSITY
                                  *Counsel for Petitioners Center for*
                                  *Biological Diversity and Wishtoyo*
                                  *Foundation*


21

EXHIBIT A
32

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing motion was printed in a proportionally spaced font of 14 points and that, according to the word-count program in Microsoft Word, it contains 5,058 words, and is limited to 20 pages, in compliance with Federal Rule of Appellate Procedure 27(d)(2) and Circuit Rule 27-1(1).

## CERTIFICATE OF SERVICE

I hereby certify that on December 24, 2025, I caused a true and correct copy of the Emergency Motion for Stay Pending Appeal, the accompanying Request for Judicial Notice, and the accompanying Declarations of Linda Krop, Brady Bradshaw, Clayton Bodell, Tevin Schmitt, Maureen Ellenberger, Kara Clauser, Jeffrey Miller, Alex Katz, Michael Lyons, Edward Morton, and Ken Hough to be filed using the Appellate Electronic Filing system. I also caused the foregoing documents to be served on the following Respondents by third party commercial carrier Nationwide for delivery by December 26, 2025:

*Respondents*

Sean Duffy, Secretary of Transportation
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Paul J. Roberti, Administrator
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

EXHIBIT A
33

Office of Chief Counsel
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Pamela Bondi
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

I also emailed courtesy copies of the foregoing documents to applicants' counsel as follows:

| | |
|---|---|
| Duncan Joseph Moore<br>djmoore@paulhastings.com<br>Benjamin J. Hanelin<br>benjaminhanelin@paulhastings.com<br>Natalie C. Rogers<br>natalierogers@paulhastings.com<br>PAUL HASTINGS, LLP<br>1999 Avenue of the Stars, 27th<br>Floor<br>Century City, CA 90067 | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |
| Jeffrey D. Dintzer<br>Jeffrey.dintzer@alston.com<br>Matthew C. Wickersham<br>Matt.wickersham@alston.com<br>Garrett B. Stanton<br>Garrett.stanton@alston.com<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071 | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |
| Trevor D. Large<br>tlarge@flasllp.com<br>Victoria C. Diffenderfer<br>vdiffenderfer@flasllp.com | Attorneys for Sable Offshore Corp. and Pacific Pipeline Company |

23

EXHIBIT A
34

| FAUVER LARGE ARCHBALD & SPRAY<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101 | |

Then on December 26, 2025, after instructions from the clerk to re-file this motion and its accompanying documents with the Case Number provided (25-8059), I re-filed the motion and its accompanying documents with the Appellate Electronic Filing system.

Dated: December 26, 2025

*/s/ Julie Teel Simmonds*
Julie Teel Simmonds

EXHIBIT A
35