ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
ANGELA MO (CA Bar Number: 262113)
E-mail: angela.mo@usdoj.gov
Senior Counsel
STEFAN J. BACHMAN (DC Bar Number 90008649)
E-mail: stefan.bachman@usdoj.gov
Senior Attorney
Environmental Enforcement Section
United States Department of Justice
150 M Street, N.E., Room 2.900
Washington, D.C. 20002
Tel: (202) 353-5129
*Counsel for Plaintiff United States of America*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. et al.,<br><br>　　　　Defendants. | Civil Action No.<br><br>2:20-cv-02415-SVW-SSC<br><br>**UNITED STATES' OPPOSITION TO EX PARTE EMERGENCY MOTION TO ENFORCE CONSENT DECREE** |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.* Opposition to CA's Ex Parte Motion

## TABLE OF CONTENTS

I.    Introduction ..................................................................................................1

II.   Background ...................................................................................................1

    A.    In 2020, after years of negotiations, the United States and California filed a complaint against Plains and lodged a detailed consent decree resolving the alleged violations. .................1

    B.    Sable, a nonparty to the decree, acquired Lines 901 and 903 and has been complying with the consent decree requirements applicable to the lines. ..............................................3

    C.    PHMSA now has regulatory jurisdiction over Lines 901 and 903. ...........................................................................................4

    D.    Plains, the only defendant to the consent decree, submitted a request to terminate the decree in January 2026, and PHMSA has concluded it has satisfied the decree's requirements. ..............................................................................6

    E.    The Department of Energy ordered Sable to immediately prioritize transporting oil through the Santa Ynez Pipeline System, including Lines 901 and 903. ...............................6

III.  Argument ......................................................................................................7

    A.    California failed to follow basic requirements set forth in the Local Rules and the Federal Rules of Civil Procedure before seeking *ex parte* relief. ..................................................7

    B.    California fails to show it is entitled to *ex parte* relief. ....................8

1.    California seeks emergency relief despite knowing for months that Sable could potentially restart the lines. ...........9

2.    Even assuming that California did not create the urgency, California has not shown an imminent risk of spills from the lines that warrants ex parte relief. ...............10

3.    California cannot collaterally challenge the Defense Production Act Order and PHMSA's exercise of regulatory jurisdiction, especially when California has made no attempt to satisfy the stringent standard for preliminary injunctive relief. ..................................13

C.    The United States has complied with the Consent Decree. ...........14

1.    Sable is not a party to the Consent Decree. ..........................14

2.    PHMSA now has exclusive jurisdiction over the Lines. .......16

3.    The Defense Production Act Order preempts the Fire Marshal's state-law authority over the Pipelines. ..............17

4.    The United States intends to seek termination or modification of the Consent Decree. ...................................20

CONCLUSION..........................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Arredondo v. Univ. of La Verne*,
  2022 WL 3222376 (C.D. Cal. Aug. 2, 2022) ...................................................... 9

*Ass'n for Ret'd Citizens of Conn., Inc. v. Thorne*,
  30 F.3d 367 (2nd Cir. 1994) ...................................................... 16, 17

*Cal. Inst. of Tech. v. Broadcom Ltd.*,
  2023 WL 6370624 (C.D. Cal. Feb. 15, 2023) ...................................................... 9

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ...................................................... 20

*Cintron v. Vaughn*,
  2007 WL 4240856 (D. Conn. Nov. 29, 2007) ...................................................... 17

*Cruz v. Bondi*,
  146 F.4th 730 (9th Cir. 2025) ...................................................... 19

*Daniels v. Dixon*,
  2022 WL 3012535 (C.D. Cal. Jun. 9, 2022) ...................................................... 9

*Dean v. Health & Human Servs.*,
  2025 WL 2005442 (Jun. 16, 2025) ...................................................... 9

*Dueñas v. Amaro*,
  2021 WL 4786672 (C.D. Cal. May 20, 2021) ...................................................... 9

*Frew ex rel.* Frew *v. Hawkins*,
  540 U.S. 431 (2004) ...................................................... 16

*Gila River Indian Community v. Schoubroek*,
  145 F.4th 1058 (9th Cir. 2025) ...................................................... 17

*Horne v. Flores*,
  557 U.S. 433 (2009) ...................................................... 21

*In re Intermagnetics Am.*,
  Inc., 101 B.R. 191 (C.D. Cal. 1989) ...................................................... 10

*Johnson v. Tyson Foods*,
  Inc., 580 F. Supp. 3d 382 (N.D. Tex. 2022) ...................................................... 19, 21

*Keith v. Volpe*,
   960 F. Supp. 1448 (C.D. Cal. 1997) ................................................................ 21,22

*Kwon v. Safeco Ins. of Am.*,
   2023 WL 9420084 (C.D. Cal. Sept. 23, 2023) ...................................................... 9

*Learning Resources, Inc. v. Trump*,
   147 S. Ct. 628 (2026) ......................................................................................... 20

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
   478 U.S. 501 (1986) ........................................................................................... 16

*Mission Power Engineering Co. v. Continental Cas. Co.*,
   883 F. Supp. 488 (C.D. Cal. 1995) ........................................................... 9, 10, 11

*New York v. FERC*,
   535 U.S. 1 (2002) ............................................................................................... 20

*Nextel Commc'ns of Mid-Atlantic, Inc. v. Town of Hanson*,
   311 F. Supp. 2d 142 (D. Mass. 2004) ................................................................. 17

*Old Dominion Branch No. 496*, Nat'l Ass'n of Letter Carriers *v. Austin*,
   418 U.S. 264 (1974) ........................................................................................... 21

*Pasha v. Viscosi*,
   2020 WL 586821 (C.D. Cal. Feb. 5, 2020) ......................................................... 10

*Reed v. Tyson Foods, Inc.*,
   2021 WL 5107725 (W.D. Tenn. Nov. 3, 2021) ............................................... 19-20

*Segovia v. Finance*,
   2015 WL 12646502 (C.D. Cal. Jun. 2, 2015) ....................................................... 9

*Sheffield v. Fay Servicing, LLC*,
   2021 WL 6499933 (C.D. Cal. Dec. 6, 2021) ................................................. 10, 12

*Sierra Club v. North Dakota*,
   868 F.3d 1062 (9th Cir. 2017) ........................................................................... 16

*Sable Offshore Corp., et al. v. Quintero*,
   No. 2:26-cv-02739 (C.D. Cal.) ........................................................................... 12

*State of Calif. v. PHMSA et al.*,
   No. 25-508, consolidated with *Env'tl Def. Ctr. v. PHMSA*, No. 25-8059 (9th
   Cir.) ............................................................................................................. 6, 18-19

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ................................................................................ 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................. 15, 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) (Jackson, J., concurring) ...................................... 20

**Statutes**

49 U.S.C. § 60104 ............................................................................... 2, 18

49 U.S.C. § 60105(a) ......................................................................... 2, 4, 14

49 U.S.C. § 60112(a) ................................................................................ 13

49 U.S.C. § 60112(e) ................................................................................ 13

49 U.S.C. § 60118(c) and (d) ..................................................................... 3

49 U.S.C. §§ 60101 .................................................................................... 3

49 U.S.C. §§ 60104 .................................................................................... 2

50 U.S.C. § 4511(a) ................................................................................. 20

50 U.S.C. § 4511(c) ................................................................................. 20

50 U.S.C. § 4513 ..................................................................................... 21

50 U.S.C. § 4554 ..................................................................................... 20

50 U.S.C. § 4557 ..................................................................................... 21

**Other**

91 Fed. Reg. 8949 (Feb. 24, 2026) ...................................................... 6, 7

C.D. Cal. Local Rule 7-19.1 ..................................................................... 9

C.D. Cal. Local Rule 7-19.2 ................................................................... 14

Rule 11-6.2 ............................................................................................. 24

Rule 65 ................................................................................................... 14

Rule 65(b) .............................................................................................. 14

Rule 70 ............................................................................................. 14, 15

Rule 71 .............................................................................................. 14,15

## I.      Introduction

Yesterday, with no notice to its co-Plaintiff United States of America, California filed an ex parte motion seeking emergency relief under the Consent Decree. But there is no emergency, let alone any grounds for the extreme relief that California seeks. Moreover, California seeks this relief against Sable, which is not even a party to the Consent Decree or to this case. And California seeks this ex parte relief to collaterally attack a Defense Production Act order issued pursuant to delegated authority from the President of the United States. Not only is this inappropriate, but, indeed, the Defense Production Act Order preempts the Fire Marshal's state-law authority over the Lines.

As California is well aware, the United States plans to seek termination of the Consent Decree because the sole defendant to the Decree, Plains, has already satisfied its requirements. And in the alternative, the United States plans to seek modification of the Decree to reflect significant legal and factual developments, including PHMSA's assumption of exclusive regulatory jurisdiction over Lines 901 and 903 and the Department of Energy's order under the Defense Production Act. Rather than allowing that process to unfold, California asks this Court to reach beyond the parties and allow California's State Fire Marshal a roving commission to supervise the Lines. The Court should deny this radical and unsupported request.

## II.     Background

### A.    <u>In 2020, after years of negotiations, the United States and California filed a complaint against Plains and lodged a detailed Consent Decree resolving the alleged violations.</u>

In March 2020, the United States and California filed a complaint against Plains related to a 2015 oil release onto Refugio State Beach in Santa Barbara County from a pipeline then-owned by Plains and known as "Line 901." (Dkt. No. 1). The United States and California, on behalf of numerous agencies, including PHMSA and the California Fire Marshal, sought civil penalties and injunctive

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-1-

relief for Plains' alleged failures to comply with federal and state pipeline safety and environmental laws, damages for injuries to and destruction of natural resources, and damages for lost revenues caused by the release. (*Id.* at ¶¶ 2, 58–212). With the complaint, the United States and California lodged a Consent Decree proposing to resolve the alleged violations. (Dkt. No. 6). The Court entered the Consent Decree as a final judgment in October 2020. (Dkt. No. 33).

The Consent Decree is the product of extensive, arms-length negotiations among Plains, the United States, and California—all sophisticated parties with experienced environmental counsel and technical staffs. (Dkt. No. 6-1 at 5, ¶ S and Dkt. No. 28 at p. 19). Its provisions are detailed and carefully calibrated, requiring Plains to pay $24 million in civil penalties and $22.325 million in natural resource damages and to implement injunctive measures to bring Plains' operations into compliance with the law. (*See id.* at ¶¶ 8–10, 12, 21, 25, Appx. B, D).

Some of those measures are specific to the Lines at issue here: Line 901 (the pipeline segment that failed in 2015) and Line 903 (the pipeline segment located immediately downstream). (*E.g.*, Dkt. No. 6-1 at Appx. B ¶¶ 1–2). Both Lines were then owned by Plains and are now owned by Sable. The Consent Decree allocates responsibility for overseeing injunctive measures between the United States (through PHMSA) and the Fire Marshal based on the jurisdictional status of Lines 901 and 903 under the Pipeline Safety Act when the Decree was entered.

Under the Pipeline Safety Act, states can regulate *intrastate* pipelines if their regulatory programs satisfy certain requirements. 49 U.S.C. § 60105. In contrast, *interstate* pipelines fall under PHMSA's exclusive jurisdiction, and states are preempted from regulating them. 49 U.S.C. §§ 60104(c); 60105. At the time of the oil release, Plains operated Lines 901 and 903 as interstate pipelines subject to PHMSA's jurisdiction. (Dkt. No. 1 at ¶¶ 8–9.) Accordingly, it was PHMSA that issued a Corrective Action Order to Plains and a failure investigation report after the release. (*Id.* ¶¶ 34–35; Dkt. No. 6-1 at 1-2.)

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-2-

By the time the complaint and Consent Decree were filed, Plains was operating Lines 901 and 903 as intrastate pipelines subject to the Fire Marshal's jurisdiction. (Dkt. No. 1 at ¶¶ 8–9.). As a result, the Consent Decree generally provides that the United States (through PHMSA) oversees compliance with obligations applicable to companywide operations. (*See* Dkt. No. 6-1 at ¶ 31 and Appx. B, Art. II). Meanwhile, the Decree provides that the Fire Marshal oversees compliance with obligations applicable to Lines 901 and 903, including remaining obligations from PHMSA's Corrective Action Order that were now "subject to the sole regulatory oversight of [the Fire Marshal]." (*Id.* at Appx. D, ¶ 1; *see also id.* at ¶ 33 and Appx. B, Art. I).

If Plains chose to restart the Lines while the Decree was in effect, the Decree required Plains to first apply for and receive state waivers from the Fire Marshal to manage the risk of corrosion from the limited effectiveness of cathodic protection on the Lines (*id.* at Appx. B ¶ 1.A and B), to submit restart plans to the Fire Marshal for review and approval at least 60 days in advance (*id.* at Appx. D ¶ 1.b and f), to obtain the Fire Marshal's authorization to operate (*id.* at Appx. D ¶ 1.a and e), and to submit a final report to the Fire Marshal for review and approval (*id.* at Appx. D ¶ 1.j). These requirements, derived from PHMSA's Corrective Action Order, are beyond those found in federal and state pipeline safety laws and apply to Lines 901 and 903 only because of the obligations imposed in the Decree.

**B.** **Sable, a nonparty to the Decree, acquired Lines 901 and 903 and has been complying with the Consent Decree requirements applicable to the Lines.**

After a series of corporate transactions transferring ownership from Plains, Sable now owns Lines 901 and 903. Through an assumption agreement entered into by Pacific Pipeline Company and Sable Offshore Corp., Sable agreed contractually to be bound by certain provisions of the Consent Decree and Appendices B and D that are specifically applicable to the Lines. Seeley Decl. at

¶ 7 and Ex. 1 at ¶ 1 (assumption agreement). Sable also agreed contractually to take such actions as were required for Pacific Pipeline Company to comply with the Consent Decree. Seeley Decl., Ex. 1 at ¶ 2. The parties, however, have not sought to modify the Consent Decree to add Sable or any other entity as a party, nor has the Court modified the Decree to add any party.

Consistent with the Decree obligations that it contractually assumed, Sable applied for and received state waivers to restart the Lines on December 17, 2024 (*see id.* at Appx. B ¶ 1.A and B), and submitted a restart plan for the Lines to the Fire Marshal for review and approval on September 11, 2025 (*see id.* at Appx. D ¶ 1.b and f).

In October 2025, the Fire Marshal informed Sable that the state waivers required Sable to, before any restart, repair metal loss anomalies detected during in-line inspections showing a depth of 40% or greater wall loss, including tool tolerance (akin to the inspection tool's margin of error). Seeley Decl. at Ex. 3 at 2. Sable disagreed with the Fire Marshal's reading of the requirement. It maintained, in part, that the repair requirement applied to anomalies detected *after* restart, and that it had complied with the Consent Decree's requirement to repair anomalies meeting the 40% threshold without including tool tolerance. *Id.* at Ex. 4 at 1–3. To date, the Fire Marshal has neither approved nor disapproved the restart plans.

**C.    PHMSA now has regulatory jurisdiction over Lines 901 and 903.**

In November 2025, Sable notified PHMSA that it intended to operate the Lines as part of a single pipeline system comprising the Santa Ynez Pipeline System, transporting crude oil produced on the Outer Continental Shelf to the Pentland Station in Kern County. *See* Seeley Decl., Ex. 3 at 1. After receiving that notification, PHMSA initiated a jurisdictional audit of the pipeline system. *Id.* The audit consisted of a multi-day, onsite inspection of the pipeline system that involved reviewing Sable's written procedures and records and observing the onshore and offshore portions of the pipeline system. *Id.* Representatives of the

Fire Marshal participated in the audit, and PHMSA reviewed program inspections conducted by the Fire Marshal. *Id.*

Based on the results of the audit, PHMSA concluded that Lines 901 and 903, as pipeline segments that constitute the Las Flores Pipeline, are part of Sable's interstate Santa Ynez Pipeline System. *Id.* at ¶ 8 and Ex. 3 at 2–3. On December 17, 2025, PHMSA notified Sable and the Fire Marshal that Lines 901 and 903 fall under PHMSA's regulatory oversight. *Id.* at ¶ 8 and Ex. 3 at 3.

Following the change in regulatory jurisdiction, Sable requested an emergency special permit (the federal equivalent of a state waiver) from PHMSA, and on December 23, 2025, PHMSA issued the 60-day emergency special permit. Seeley Decl. at Ex. 5. PHMSA also approved the restart plan for the Lines. *Id.* at ¶ 9 and Ex. 4. Sable then applied for a non-emergency special permit from PHMSA. *Id.* at ¶ 12 and Ex. 6. PHMSA has posted a draft special permit, *id.* at ¶ 13 and Ex. 7, and a 30-day period for the public to submit comments on it will end on March 26, 2026. 91 Fed. Reg. 8949 (Feb. 24, 2026). Sable has informed PHMSA that it will continue to comply with the conditions of the emergency special permit until PHMSA has made a determination on the application for a special permit.[1]

On January 23, 2026, California filed a petition for review in the Ninth Circuit Court of Appeals challenging PHMSA's jurisdiction over the Lines, PHMSA's approval of the restart plan, and the emergency special permit. *State of Calif. v. PHMSA et al.*, No. 25-508, consolidated with *Env'tl Def. Ctr. v. PHMSA*, No. 25-8059 (9th Cir.). The case will be fully briefed by June and will be calendared for argument in July. *Id.* at Dkt. No. 39.1.

---

[1] Letter from Sable to PHMSA (Feb. 13, 2026), at https://downloads.regulations.gov/PHMSA-2026-0464-0001/attachment_1.pdf.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-5-

**D.**     **Plains, the only defendant to the Consent Decree, submitted a request to terminate the Decree in January 2026.**

Like its transfer provisions, the Consent Decree contains detailed, carefully delineated termination provisions. (Dkt. No. 6-1 at ¶¶ 100–02). The controlling language permits Plains to send a termination request to the United States and California "[a]fter Defendants have: (a) operated under [the] Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of [the] Consent Decree." (*Id.* at ¶ 100). "Defendants" is defined in the Decree to mean Plains (*id.* at p. 9), and all provisions in the termination section are specific to Plains, the United States, and California—and those parties alone. (*See id.* at ¶¶ 100–02). On January 14, 2026, five years and three months after the Decree's effective date, Plains sent the United States and California a request to terminate the Consent Decree. PHMSA has concluded it has satisfied the Decree's requirements.

**E.**     **The Department of Energy ordered Sable to immediately prioritize transporting oil through the Santa Ynez Pipeline System, including Lines 901 and 903.**

Under the command of U.S. Northern Command (USNORTHCOM), California military installations support U.S. Indo-Pacific Command (USINDOPACOM) and other DoW requirements worldwide. These installations "sit at the vanguard of U.S. forces with direct facing to potential nuclear adversaries such as North Korea, Russia, and the People's Republic of China (PRC) and transnational terrorist organizations in the Philippines, Malaysia, and Middle East" and require fuel access sufficient to enable their ships and planes to

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-6-

reach designated theaters and threats within 72 hours.[2]  The Secretary determined that rapid and reliable regional fuel supply for these forces is therefore critical to national security and military readiness and that the restart of the pipeline is essential to these needs. Accordingly, on March 13, 2026, the Department of Energy issued an order under the Defense Production Act directing Sable immediately to prioritize and allocate pipeline transportation services for hydrocarbons from the Santa Ynez Unit (SYU) through the SYPS; to commence performance under contracts or orders for services for hydrocarbon transportation capacity in the SYPS from the point of production in the SYU through the SYPS; and to prioritize these contracts and orders over other non-SYPS hydrocarbon transportation contracts or orders.

### III.    Argument

**A.    <u>California failed to follow basic requirements set forth in the Local Rules and the Federal Rules of Civil Procedure before seeking ex parte relief.</u>**

The Court should deny California's ex parte application because it fails to comply with Local Rule 7-19.1. This is not a technical defect. The Rule is a safeguard integral to the fairness of ex parte proceedings, where the opposing party is afforded little meaningful opportunity to respond.

Ex parte motions are "inherently unfair" and "pose a threat to the administration of justice" because "the parties' opportunities to prepare are grossly unbalanced." *Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F. Supp. 488, 490 (C.D. Cal. 1995). For this reason, the Local Rules require a moving party to make reasonable, good faith efforts to contact all other parties before

---

[2] *California Energy & Fuel Policies: A Clear and Present Threat to National Security and Force Readiness?*, (Oct. 10, 2025), https://ad32.asmrc.org/wp-content/uploads/2025/10/CA-Impact-on-Force-Readiness.pdf.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-7-

seeking ex parte relief. *See Dueñas v. Amaro*, 2021 WL 4786672, at *1 (C.D. Cal. May 20, 2021) (finding party did not comply with Local Rule 7-19.1 because it failed to notify defendants' counsel that it would be filing an ex parte application). These requirements are not mere box-checking exercises—they exist to protect the rigor of the adversarial process—and courts in this District often deny ex parte applications that fail to comply with Rule 7-19.1. *Dean v. Health & Human Servs.*, 2025 WL 2005442, at *2 (Jun. 16, 2025); *Cal. Inst. of Tech. v. Broadcom Ltd.*, 2023 WL 6370624, at *2 (C.D. Cal. Feb. 15, 2023); *Kwon v. Safeco Ins. of Am.*, 2023 WL 9420084, at *1 (C.D. Cal. Sept. 23, 2023); *Segovia v. Finance*, 2015 WL 12646502, at *1 (C.D. Cal. Jun. 2, 2015).

Here, the parties have regularly communicated about the status of Sable's pipelines and the United States' plans to file a motion to terminate the Consent Decree. (*See* Dkt. No. 36). As discussed in the section below, the issues addressed in California's motion have been known since late November 2025. Yet California did not contact the United States before filing its ex parte motion and did not file until after business hours. California's motion therefore fails to meet the basic requirements of Local Rule 7-19.1. The Court can—and should—deny the motion for this reason alone. *E.g.*, *Dean*, 2025 WL 2005442, at *2; *Cal. Inst. of Tech*, 2023 WL 6370624, at *2; *Daniels v. Dixon*, 2022 WL 3012535, at *8 (C.D. Cal. Jun. 9, 2022).

### B.    California fails to show it is entitled to ex parte relief.

An ex parte application is "solely for extraordinary relief and [is] rarely justified." *Arredondo v. Univ. of La Verne*, 2022 WL 3222376, at *2 (C.D. Cal. Aug. 2, 2022) (citing *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 490 (C.D. Cal. 1995)). For the Court to grant ex parte relief, "a moving party must present evidence to show that the moving party's cause will be 'irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures' and that 'the moving party is without fault in creating the crisis that

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-8-

requires ex parte relief, or that the crisis occurred as a result of excusable neglect.'" *Sheffield v. Fay Servicing, LLC*, 2021 WL 6499933, at *1 (C.D. Cal. Dec. 6, 2021); *see also Pasha v. Viscosi*, 2020 WL 586821, at *2 (C.D. Cal. Feb. 5, 2020) (denying ex parte application where the plaintiff "appears to have resorted to ex parte practice as a result of missing the deadline to file a regularly noticed motion"); *In re Intermagnetics Am., Inc.*, 101 B.R. 191, 193 (C.D. Cal. 1989) (holding that ex parte "applications are not intended to save the day for parties who have failed to present requests when they should have").

### 1. California seeks emergency relief despite knowing for months that Sable could potentially restart the Lines.

California cannot establish that it "is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect." *Mission Power*, 883 F. Supp. at 492. The prerequisite events for restarting the Lines occurred months, not days, ago. Beginning in late November through mid-to-late December 2025, PHMSA reviewed the status of the Las Flores Pipeline), made its jurisdictional determination, approved Sable's restart plan, and issued an emergency special permit. (Dkt. No. 43 at 9 (describing events beginning with Nov. 26 letter from Sable to PHMSA and ending with PHMSA issuing an emergency special permit on Dec. 23)). The Fire Marshal's representatives even accompanied PHMSA on the December 9–11 onsite inspection to review the Las Flores Pipeline's jurisdictional status. (Dkt. No. 43-1 at Page ID # 539 (Ex. A-1)).

California's knowing delay in "enforcing the Consent Decree" undercuts its claim to emergency relief. That alone justifies denial of its ex parte application. *Mission Power* warned of how ex parte requests "pose a threat to the administration of justice," calling out situations where "the moving party's papers reflect days, even weeks, of investigation and preparation; the opposing party has perhaps a day or two . . . . The goal often appears to be to surprise opposing

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-9-

counsel or at least to force him or her to drop all other work to respond on short notice." *Mission Power*, 883 F. Supp. at 490.

That has happened here. California's filing is robust: a 22-page brief, a request for judicial notice of 20 documents, and a declaration attaching three documents. It therefore defies belief that California had no time to inform counsel for all the parties about its forthcoming ex parte application (see section I, *supra*), much less that California had no time to proceed with a regularly noticed motion.

California had ample notice—well before the Defense Production Act Order or before Sable's restart of the Lines—that the Lines could realistically be restarted. It knew, even with an injunction issued by the Santa Barbara County Superior Court, that Sable could restart the Lines (albeit with 10 days' notice). (*See* Dkt. No. 43 at 8). Yet, some three months later, and only *after* oil has begun flowing through the Lines, does California speed to the courthouse with sirens blaring. This emergency of California's own making should not be rewarded, especially not with a directive as drastic as ordering the shutdown of Lines that are actively and safely flowing. *See* Declaration of Dustin Hubbard ("Hubbard Decl.") at ¶ 15 (no signs of release or other safety issues from oil in the restarted Lines).

### 2. Even assuming that California did not create the urgency, California has not shown an imminent risk of spills from the Lines that warrants ex parte relief.

California spills much ink arguing that there has been a violation of the Consent Decree. Even assuming that California could establish violations of the Consent Decree, ex parte relief is still unjustified. California does not show how it will be "irreparably prejudiced" if its motion is heard according to regular noticed motion procedures. *Sheffield*, 2021 WL 6499933, at *1. Its evidence is thin. The injuries it purports to suffer are that oil will be transported through Line 901, on property owned by the California Department of Parks and Recreation, without a valid easement. (Dkt. No. 43 at 17). Therefore, California argues, restarting the

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-10-

Lines results in trespass or an unlawful taking. (*Id.*) Absent a showing of an imminent risk of spills from Line 901 as a result of the alleged trespass or taking, there is no irreparable prejudice to California from its motion being heard on a non-ex parte basis. *Zappia v. World Sav. F.S.B.*, No. 14CV1428-WQH-DHB, 2014 WL 12479975, at *3 (S.D. Cal. Nov. 25, 2014) (denying ex parte TRO where plaintiff does not claim the alleged trespasser is causing physical damage to property or diminishing market value); *United States v. Libby, McNeill & Libby*, 98 F. Supp. 601 (D. Alaska 1951) (denying preliminary injunction where alleged trespass could be redressed by payment of money); *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 202 (2019) (post-taking compensation is available); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) (equitable relief unavailable to enjoin taking because suit for compensation may be brought subsequently).Moreover, Sable has filed suit against the California Department of Parks and Recreation regarding the easement. *Sable Offshore Corp., et al. v. Quintero*, No. 2:26-cv-02739 (C.D. Cal.) (filed March 13, 2026). To the extent that California has suffered an injury to a state property interest, it may pursue its rights under that suit.

California's motion also seeks affirmation from the Court on its legal and policy disagreements with the federal government. However, those disagreements present no emergency. As explained above in section I.A, *supra*, the change from state to federal regulatory jurisdiction over the Lines occurred by mid-December, undermining any claim that actions that offend its claim to authority over the Lines (e.g., PHMSA approving safe restart conditions rather than OSFM) requires emergency relief.

Irreparable prejudice is a particularly high hurdle for California given that the Lines have already been restarted under PHMSA's direct supervision and in accordance with the cautious procedures set forth in Sable's restart plan—and no spills have occurred. PHMSA pipeline safety experts have been onsite with Sable

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-11-

during the restart of the Lines, beginning the morning after the Defense Production Act Order was issued. Hubbard Decl. ¶ 14. As of today, Line 901, which runs almost 11 miles from Las Flores to the Gaviota pump station, has been "filled with oil and pressurized without any signs of release or other safety issues." *Id.* ¶¶ 8-19. Line 903 also has oil present "without any signs of release or other safety issues." *Id.* ¶ 19. The valve sites are monitored for possible releases by onsite personnel and continuous flyovers. *Id.*

Restart has been undertaken carefully and gradually in phases over the course of several days, and PHMSA will continue to oversee the process. *Id.* ¶¶ 9, 14-18. As provided for in the restart plan, each portion of the system must be brought up to operating pressure in stages, where pressure must be held for a minimum of two hours before proceeding to a higher pressure. *Id.* ¶ 9. Line pressures are monitored for any fluctuation that could indicate a problem holding pressure. *Id.* Aircraft flyovers patrol the line for any indications of a leak. *Id.* If there is an issue with the pressure holding, the pipeline must be shut in and the reason for the pressure drop must be investigated and corrected. *Id.* ¶ 10. For additional safety and for coordination with local emergency response officials, restart must be initiated during daylight hours. *Id.* ¶ 11. Within seven working days after steady-state operation is achieved, Sable must run a sophisticated robotic device known as a smart pig to inspect the inside of the line. *Id.* ¶ 12.

Based on PHMSA's oversight of the restart process, Sable has complied and continues to comply with the restart plan. *Id.* ¶ 20; *see also id.* ¶¶ 14-18 (describing restart activities day by day). Importantly, PHMSA has the authority to order the immediate shutdown of the line if PHMSA determines that it is or would be hazardous to life, property, or the environment. *Id.* ¶ 21; *see* 49 U.S.C. § 60112(a) and (e).

California's alarmist and erroneous statements about Sable's compliance imply that the Lines are at imminent risk of spills. But its statements must be

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-12-

assessed in light of the actual evidence. Indeed, based on PHMSA's thorough review of documentation and information from Sable, Sable has complied with the Consent Decree's injunctive relief requirements that have accrued to date. Declaration of Rod M. Seeley ("Seeley Decl.") at ¶ 17; *see also id.* at ¶¶ 18-70 (paragraph by paragraph review of injunctive relief requirements).

> **3. California cannot collaterally challenge the Defense Production Act Order and PHMSA's exercise of regulatory jurisdiction, especially when California has made no attempt to satisfy the stringent standard for preliminary injunctive relief.**

California alleges that the United States violated the Consent Decree through the Secretary of Energy's issuance of the Defense Production Act Order and through PHMSA's actions and orders pursuant to its authority under the federal Pipeline Safety Act. (Dkt. No. 43 at 14-15, 18-22). California's full-throated arguments about constitutional separation of powers and Executive Branch authority (*see id.* at 18-22) make clear that the relief California seeks would effectively enjoin the Defense Production Act Order and PHMSA's regulatory authority under the guise of enforcing the Consent Decree.

As explained in the next section, these acts are not violations of the Consent Decree at all. But more significantly, by couching its disagreements with the Secretary of Energy and PHMSA as narrowly enforcing a judgment or order under Rules 70 and 71, California avoids making any showing that it is entitled to preliminary injunctive relief under Rule 65. Yet, the collateral attack on the Order and PHMSA's authority is apparent from the fact that California could have chosen to assert only a violation by Sable to justify an order by the court to shut down the Lines. Instead, California needlessly chose to allege that the United States has violated the Consent Decree. If its order to "enforce the Consent Decree" is granted, California will have succeeded in frustrating the federal

government's exercise of authority under the Defense Production Act and the Pipeline Safety Act through a simple showing under Rule 70 or 71.

This is the improper forum for litigating California's objections. California may challenge the Order in front of the appropriate court, and California already has a pending action in the Ninth Circuit Court of Appeals challenging PHMSA's actions and orders. (*See* Dkt. No 43 at 10). It should not be allowed to use the Consent Decree as a backdoor for challenges that are properly decided by other courts.

Moreover, California cannot meet the standard for a temporary restraining order or preliminary injunction to enjoin the Defense Production Act Order and PHMSA's exercise of authority. The standard for issuing a TRO and a preliminary injunction are substantially identical. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Either is "an extraordinary remedy that may only be awarded upon a clear slowing that the Petitioner is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). For a TRO to issue, the moving party must demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) a TRO is in the public interest. *See id.* at 20. Having failed to even attempt to meet these elements, California's request for injunctive relief should be denied.

## C.    <u>The United States has complied with the Consent Decree.</u>

The United States has complied with the Consent Decree and acted pursuant to federal statutory delegations under both the Pipeline Safety Act and the Defense Production Act. California's contrary arguments (Mot. 13-17) lack merit and some of the issues are already being litigated before the Ninth Circuit.

### 1.  Sable is not a party to the Consent Decree.

California's requested emergency relief is fundamentally flawed because Sable is not a party to the Consent Decree. Nor is the Consent Decree a license for

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-14-

open-ended supervision of Lines 901 and 903 and Sable's future performance of contractual obligations.

The Consent Decree's plain terms and structure reflect a boundary between the obligations that Sable assumed under an assumption agreement and the standard for future judicial oversight. With limited exceptions, a Consent Decree may not impose duties or obligations on a non-consenting third party. *Sierra Club v. North Dakota*, 868 F.3d 1062, 1067 (9th Cir. 2017) (citation omitted). A party must specifically choose to subject itself to a court's supervision as opposed to contractual remedies, *see Local No. 93*, 478 U.S. at 523, and it is the voluntary nature of the agreement that predicates the court's authority. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 439 (2004) (noting that state officials had accepted a decree's enforcement remedy when the officials asked the court to approve the decree); *Ass'n for Ret'd Citizens of Conn., Inc. v. Thorne*, 30 F.3d 367, 370 (2nd Cir. 1994) (finding no basis to extend the terms of a negotiated consent decree to a nonparty, even if the nonparty's actions may frustrate the court's order).

Here, Sable never agreed to become a party to the Consent Decree or to be bound by provisions that do not specifically apply to Lines 901 and 903, like the consent to jurisdiction. (Dkt. No. 6-1 at ¶¶ 3, 100); *see also* Seeley Decl. at Ex. 1 ¶ 1 (agreeing only "to be bound by those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the Assets"). In the Decree, the parties anticipated a future transfer of Lines 901 and 903 but chose to establish only a contractual framework for the transferee to implement the Decree's provisions applicable to those Lines. (*See* Dkt. No. 6-1 at ¶¶ 88–89 (requiring only that Plains provide documentation of transferee's agreement)). This reflects an allocation of responsibility between the transferee's contractual obligations and Plains' judicial obligations. That is, the parties did not structure the Decree to subject the transferee to the Court's jurisdiction. The Decree's continued operation therefore cannot serve as a backstop for Sable's performance of its

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-15-

contractual obligations to Plains—not because the backstop is insufficient, but because it does not exist.

As the Ninth Circuit recently affirmed, federal courts typically lack jurisdiction to enforce a consent decree judgment against nonparties, even when good reasons exist to do so. *See Gila River Indian Community v. Schoubroek*, 145 F.4th 1058, 1071–75 (9th Cir. 2025); *see also Thorne*, 30 F.3d at 370. Yet California asks the Court to ignore this rule, placing Sable and the United States in an untenable position. Because Sable is not a party to the Consent Decree and is not even a party to this lawsuit, it has no obvious recourse to seek termination or modification under the Decree's terms.

For these reasons, the Court lacks jurisdiction to enforce the Decree directly against Sable. *See Gila River*, 145 F.4th at 1073–74 (rejecting argument that the All Writs Act allowed the district court to protect its judgment from threats by nonparties); *Nextel Commc'ns of Mid-Atlantic, Inc. v. Town of Hanson*, 311 F. Supp. 2d 142, 149 n.5 (D. Mass. 2004) (neither a motion to enforce a consent decree nor a motion for contempt can be granted against a nonparty); *Cintron v. Vaughn*, 2007 WL 4240856, at *14 (D. Conn. Nov. 29, 2007) (a nonparty to a consent decree cannot be held in contempt). Nor should the Court allow California to use the Decree as an open-ended mechanism to supervise Sable's contractual performance.

**2.  PHMSA now has exclusive jurisdiction over the Lines.**

As of December 2025, PHMSA has exclusive regulatory jurisdiction over Lines 901 and 903. That authority preempts and eliminates the California Fire Marshal's role over the safety and operation of the Lines. *See* 49 U.S.C. § 60104. So California should not be allowed to use the Consent Decree to give the California Fire Marshal regulatory authority that it no longer has. Nor can California collaterally attack PHMSA's actions in this case.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-16-

In 2025, PHMSA reclassified the Lines as interstate as part of the Santa Ynez Pipeline System, subject to PHMSA's exclusive jurisdiction. The preemption provision in the Pipeline Safety Act prohibits a state authority from "adopt[ing] or continu[ing] in force safety standards for interstate pipeline facilities or interstate pipeline transportation." *See* 49 U.S.C. § 60104. Yet the Fire Marshal seeks to use the Consent Decree to do just that for Lines 901 and 903. The Court should not construe the Decree's provisions to permit what federal law does not allow: California's continuing and open-ended regulation of an interstate pipeline.

Contrary to California's argument (Mot. at 15), PHMSA's orders do not violate the Consent Decree. PHMSA acted lawfully under its Pipeline Safety Act authority, and California's arguments are merely an impermissible collateral attack on those distinct agency actions. To the extent California disputes PHMSA's exclusive regulatory jurisdiction over the Lines, this is not the proper forum to resolve that issue. California has petitioned for review of PHMSA's decision in the Ninth Circuit Court of Appeals, challenging PHMSA's jurisdiction over the Lines, PHMSA's approval of the restart plan, and the emergency special permit. *State of Calif. v. PHMSA et al.*, No. 25-508, consolidated with *Env'tl Defense Ctr., et al. v. PHMSA*, No. 25-8059 (9th Cir.). The case will be fully briefed by June and will be calendared for argument in July. *Id.* at Dkt. No. 39.1.

### 3. The Defense Production Act Order preempts the Fire Marshal's state-law authority over the Pipelines.

California improperly uses its ex parte emergency motion to cast doubt on the validity of the Defense Production Act Order. But California has not even properly challenged the legality of the Order, which has preemptive force over the Fire Marshal's state-law authority.

At the outset, the presumption of regularity attaches to the issuance of the Order. Absent clear evidence to the contrary, the Court should therefore assume that the Secretary "properly discharged [his] official duties." *Cruz v. Bondi*, 146

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-17-

F.4th 730, 739 (9th Cir. 2025) (citation omitted). And the Secretary of Energy has determined that the Order is necessary to address energy shortages and to reduce national security risks posed by adversarial dependence on imported oil. (Dkt. 43-1, Ex. Q at 1-2). The Order issued under the President's authority granted by Congress in the Defense Production Act, and California cannot collaterally attack the Order in this case.

In all events, California is wrong about the preemptive force of the Order. Under settled principles of federal preemption, a valid Defense Production Act order may preempt conflicting state law. *See Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 389 (N.D. Tex. 2022) (holding that a Defense Production Act order requiring meat facilities to remain open during the COVID-19 pandemic preempted state tort law); *see also Reed v. Tyson Foods, Inc.*, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021) ("Because the purpose of the [Defense Production Act] cannot otherwise be accomplished while allowing states to implement their own, potentially inconsistent policy decisions for meat and poultry processor operations during the COVID-19 pandemic, the state law must yield." (cleaned up)); DOJ OLC Opinion, Preemptive Effect of Defense Production Act Order on State Law, Mar. 3, 2026, https://www.justice.gov/olc/media/1429671/dl?inline.

California incorrectly focuses on whether the Defense Production Act delegates express *preemption* authority to the President and his delegees. *See* Mot. at 18-19 (arguing that the Defense Production Act "contains two specific provisions that might be understood as both preempting state laws and excusing noncompliance with federal court orders"). But that's the wrong question. California does not (and cannot) dispute that the Defense Production Act "authorize[s]" the President (and his delegees) to issue orders implementing the statute. *See* 50 U.S.C. § 4511(a), (c); *id.* § 4554(a) ("the President may prescribe such regulations and issue such orders as the President may determine to be

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-18-

appropriate to carry out this chapter").[3] And Executive Branch orders that carry out congressionally delegated authority not only have "the force and effect of law," but have long "been held to pre-empt state law under the Supremacy Clause." *Chrysler Corp. v. Brown*, 441 U.S. 281, 295-96 (1979); *New York v. FERC*, 535 U.S. 1, 18 (2002) (recognizing that a federal agency "acting within the scope of its congressionally delegated authority" may preempt state law (citation omitted)). Indeed, because the Defense Production Act order was issued "pursuant to an express … authorization of Congress," the President's power to preempt "is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). That power does not turn on whether Congress explicitly mentioned "preemption" when it authorized the President to act. *See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974); *see also Johnson*, 580 F. Supp. 3d at 389.[4] Moreover, willful failure to comply with a Defense Production Act order is subject to criminal penalties, 50 U.S.C. § 4513, and the Act likewise provides immunity from liability for persons who comply with an order under the Act, 50 U.S.C. § 4557.

Accordingly, the Defense Production Act order directing Sable to immediately begin operating the pipelines can—and does—preempt California's attempt to forestall operation pending approval from the State Fire Marshal. *See Johnson*, 580 F. Supp. 3d at 389 (holding that state tort law was preempted because

---

[3] Because the Defense Production Act clearly delegates authority to the President and his delegees to issue orders, California's reliance on *West Virginia v. EPA*, 597 U.S. 697 (2022), and *Learning Resources, Inc. v. Trump*, 147 S. Ct. 628 (2026), is misplaced.

[4] Contrary to California's assertion, *see* Mot. at 18, the Act broadly precludes liability beyond contracts. 50 U.S.C. § 4557.

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-19-

it "undermine[d] the President's statutory authority" under the Defense Production Act and thus conflicted with federal law).

In all events, Sable *must* comply with the Defense Production Act Order to operate Lines 901 and 903, making compliance with the State Fire Marshal's separate regulatory oversight legally impermissible and factually impossible. The company cannot meet both the Fire Marshal's heightened requirements for restarting the Lines and the Order's directive to immediately operate the Lines to promote the national defense and to maximize domestic energy supplies. *See* Seeley Decl at Ex. 10 at 3; 50 U.S.C. § 4511. This conflict between federal and state directives also satisfies the grounds for modification—an issue that the United States will raise in its forthcoming motion. *Cf. Horne*, 557 U.S. at 464–65 (changes in law and federal policy may warrant modification); *Keith v. Volpe*, 960 F. Supp. 1448, 1465 (C.D. Cal. 1997) (changes in building codes warranted modification).

### 4. The United States intends to seek termination or modification of the Consent Decree.

Because the United States has determined that Plains has complied with the Consent Decree, the United States plans to seek termination of the Consent Decree, or at a minimum, modification. The United States informed California of this plan, yet California still sought ex parte emergency relief that assumes the Consent Decree should be enforced against Sable.

In January 2026, Plains, the only defendant to the Consent Decree, submitted a request to terminate the Decree. Like its transfer provisions, the Consent Decree contains detailed, carefully delineated termination provisions. (Dkt. No. 6-1 at ¶¶ 100–02). The controlling language permits Plains to send a termination request to the United States and California "[a]fter Defendants have: (a) operated under [the] Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of [the] Consent Decree." (*Id.* at ¶ 100). "Defendants" is defined in the Decree to mean Plains (*id.* at

p. 9), and all provisions in the termination section are specific to Plains, the United States, and California—and those parties alone. (*See id.* at ¶¶ 100–02).

In January 2026 five years and three months after the Decree's effective date, Plains sent the United States and California a request to terminate the Consent Decree. And PHMSA has concluded that it has complied with the Decree's requirements.

Because Plains has complied with the Consent Decree, the United States plans to move to determinate the Decree. The Consent Decree establishes a clear termination standard: Plains (the only defendant subject to the Consent Decree) may seek termination after five years and three months of operating under the Decree and complying with the Decree's requirements. The Court need not look any further to terminate the entire Decree.

Alternatively, the United States will ask the Court to modify the Consent Decree. When the parties negotiated the Decree, Lines 901 and 903 were classified as intrastate, making the Fire Marshal's regulatory control over them workable and legally appropriate. That foundation was displaced when the Lines were reclassified as interstate and the Department of Energy issued a Defense Production Act order instructing Sable to restart them.

The Consent Decree states that the Fire Marshal has "sole regulatory oversight" over the Decree's requirements for restarting Lines 901 and 903 (Dkt. No. 6-1 at Appx. D ¶ 1; *see also id.* at Appx. B ¶ 1.A and B) because the Lines were classified as intrastate at the time of filing. The complaint, filed at the same time as the Decree, also recognized that the Fire Marshal had jurisdiction at the time because of the Lines' intrastate status. (Dkt. No. 1 ¶¶ 8–9 (describing the change from interstate to intrastate in 2016), ¶¶ 201–202 ("As intrastate pipelines, Lines 901, 903, and 2000 are subject to the regulatory authority of the OSFM.")). Both documents merely articulated the then-current regulatory status of the lines. Since entry of the Decree, Lines 901 and 903 have been reclassified as interstate as

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-21-

part of the Santa Ynez Pipeline System, subject to PHMSA's exclusive jurisdiction, and the Department of Energy has issued a Defense Production Act order instructing Sable to immediately restart the Lines.

### CONCLUSION

For the foregoing reasons, California's request for emergency relief should be denied.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


/s/ Stefan J. Bachman
STEFAN J. BACHMAN (DC Bar Number 90008649)
E-mail: stefan.bachman@usdoj.gov
Senior Attorney

/s/ Angela Mo
ANGELA MO (CA Bar Number: 262113)
E-mail: angela.mo@usdoj.gov
Senior Counsel
Environmental Enforcement Section
United States Department of Justice
150 M Street, N.E., Room 2.900
Washington, D.C. 20002
Tel: (202) 353-5129

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-22-

## Certificate of Compliance with Local Rule 11-6.2

The undersigned, counsel of record for Plaintiff the United States of America, certifies that this brief contains 6,994 words, which complies with the word limit of L.R. 11-6.1.

3/17/2026          /s/ Stefan J. Bachman

STEFAN J. BACHMAN
Senior Attorney
Environmental Enforcement Section
United States Department of Justice

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P* Opp. to CA Ex Parte Motion

-23-