ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
STEFAN J. BACHMAN (DC Bar Number 90008649)
Email: stefan.bachman@usdoj.gov
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Email: angela.mo@usdoj.gov
Senior Counsel
Environmental Enforcement Section
United States Department of Justice
150 M Street, NE, Room 2.900
Washington, DC 20002
Tel: (202) 598-9566 (Bachman)
*Counsel for Plaintiff United States of America*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. *et al.*,<br><br>Defendants. | Civil Action No. 2:20-cv-02415-SVW-SSC<br><br>**UNITED STATES' NOTICE OF MOTION TO TERMINATE OR MODIFY THE CONSENT DECREE, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**Date and time: June 1, 2026, 1:30 p.m.** |

## NOTICE OF MOTION AND
## MOTION TO TERMINATE OR MODIFY THE CONSENT DECREE

Please take notice that Plaintiff the United States of America hereby moves to terminate or alternatively to modify the Consent Decree entered in this case (*see* Dkt. Nos. 6-1 and 33) pursuant to the terms of the Consent Decree and for the reasons set forth in the United States' memorandum of points and authorities below. In support of its motion, the United States attaches the following exhibits:

- **Exhibit A:** Joint Stipulation Between Plaintiff United States and Defendants Plains All American Pipeline, L.P. and Plains Pipeline, L.P. to Terminate the Consent Decree

- **Exhibit B:** Declaration of Rod M. Seeley, Acting Deputy Associate Administrator for Field Operations for the Office of Pipeline Safety of the Pipeline and Hazardous Materials Safety Administration (PHMSA) and supporting exhibits 1 through 10

- **Exhibit C:** Declaration of Dustin Hubbard, Director of the Western Region for PHMSA's Office of Pipeline Safety and supporting exhibit 1

The United States' motion will be heard on June 1, 2026, at 1:30 p.m., or as soon thereafter as it may be heard, by the Honorable Judge Stephen V. Wilson of the United States District Court for the Central District of California.

Defendants stipulate to termination of the Consent Decree. But co-Plaintiff, the State of California, opposes this motion. As stated in the attached declaration of Stefan J. Bachman (**Exhibit D**), counsel for the United States and counsel for California held a Local Rule 7-3 conference by videoconference on March 3, 2026, and by telephone on March 18, 2026, but were unable to reach a resolution that eliminates the necessity for a motion and hearing. Further, all the parties in this case and nonparty Sable Offshore Corp. stipulate and agree that the meet and confer requirements of Local Rule 7-3 have been met. (Dkt. No. 48 ¶ 1). A proposed order is attached.

## MEMORANDUM OF POINTS AND AUTHORITIES

### TABLE OF CONTENTS

I.      Introduction......................................................................................................1

II.     Background ......................................................................................................3

    A.   After years of negotiations to resolve alleged violations, the
        United States and California settled with Plains by entering into a
        Consent Decree...........................................................................................3

    B.   Sable, a nonparty to the Decree, acquired the Segments and
        contractually agreed to be bound by the Consent Decree
        requirements applicable to the Segments.................................................5

    C.   PHMSA now has regulatory jurisdiction over the Segments. ..............6

    D.   Plains, the only defendants to the Consent Decree, submitted a
        request to terminate the Decree in January 2026. ................................7

    E.   Following an order from the Department of Energy to
        immediately prioritize transporting oil through the Santa Ynez
        Pipeline System, Sable has restarted the Segments. ...........................7

    F.   California challenges Sable's restart of the Segments.........................8

    G.   The proposed order would terminate the Consent Decree...................9

III.    Argument.........................................................................................................9

    A.   The Court should hew to the plain language of the Consent
        Decree and terminate the agreement. ...................................................10

        1.   Plains has met the standard for termination.............................10

        2.   The Consent Decree is not a license for open-ended
            supervision of Sable's performance of contractual
            obligations..................................................................................12

        3.   The Segments have been safely restarted. ...............................14

    B.   In the alternative, the Court should modify the Consent Decree to
        substitute PHMSA as the regulator for the Segments.........................15

        1.   The Segments' reclassification and the Defense
            Production Act order are significant changes in fact and
            law under Rule 60(b)(5)............................................................16

        2.   Separately, the Segments' reclassification and the Defense
            Production Act order are extraordinary circumstances
            under Rule 60(b)(6)...................................................................21

CONCLUSION...................................................................................................22

i

## TABLE OF AUTHORITIES

**Cases**                                                                Page(s)

*Ala. Disabilities Advoc. Program v. Walley*,
   475 F. Supp. 2d 1118, (M.D. Ala. 2007)....................................................................10

*Ass'n for Ret'd Citizens of Conn., Inc. v. Thorne*,
   30 F.3d 367 (2d Cir. 1994) ...................................................................... 12, 13

*Bellevue Manor Assocs. v. United States*,
   165 F.3d 1249 (9th Cir. 1999) ................................................................ 16, 18

*Buck v. Davis*,
   580 U.S. 100 (2017) ........................................................................................21

*Bynoe v. Baca*,
   966 F.3d 972 (9th Cir. 2020)...........................................................................21

*Ctr. For Biological Diversity v. Burgum*,
   2025 WL 821660 (D. Mont. Feb. 21, 2025)...................................................22

*De Malmanche v. Glenrock Asset Mgmt. Assocs., L.P.*,
   2010 WL 2541495 (S.D.N.Y. Jun. 22, 2010)..................................................22

*First Beverages, Inc. of Las Vegas v. Royal Crown Cola Co.*,
   612 F.2d 1164 (9th Cir. 1980) ........................................................................22

*Frew ex rel. Frew v. Hawkins*,
   540 U.S. 431 (2004) ........................................................................................12

*Gila River Indian Cmty. v. Schoubroek*,
   145 F.4th 1058 (9th Cir. 2025)........................................................................13

*Grier v. Goetz*,
   402 F. Supp. 2d 876 (M.D. Tenn. 2005) .........................................................10

*Hall v. Haws*,
   861 F.3d 977 (9th Cir. 2017)...........................................................................21

*Holland v. N.J. Dept. of,*
   *Corrs.*, 246 F.3d 267 (3d Cir. 2001)................................................................16

*Hook v. State of Ariz.*,
   120 F.3d 921 (9th Cir. 1997) ..................................................................... 16, 19

*Horne v. Flores*,
   557 U.S. 433 (2009) ................................................................................. 16, 19

*Keith v. Volpe,*
   *(Keith I)*, 784 F.2d 1457 (9th Cir. 1986) .........................................................18

*Keith v. Volpe,*
   *(Keith II)*, 960 F. Supp. 1448 (C.D. Cal. 1997)......................................... 19, 20

*King v. Greenblat*,
   52 F.3d 1 (1st Cir. 1995) .................................................................................18

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
   478 U.S. 501 (1986) ....................................................................................9, 12

*Nehmer v. U.S. Dep't of Veterans Affairs*,
   494 F.3d 846 (9th Cir. 2007) ...........................................................................10

*Nextel Commc'ns of Mid-Atl., Inc. v. Town of Hanson*,
   311 F. Supp. 2d 142 (D. Mass. 2004)..............................................................13

*Olympic Pipe Line Co. v. City of Seattle*,
   437 F.3d 872 (9th Cir. 2006) ...........................................................................18

*Rufo v. Inmates of Suffolk County Jail*,
   502 U.S. 367 (1992) ..................................................................... 16, 17, 19, 20

*Shakman v. City of Chicago*,
   426 F.3d 925 (7th Cir. 2005) ...........................................................................11

*Sierra Club v. North Dakota*,
   868 F.3d 1062 (9th Cir. 2017).........................................................................12

*Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*,
   564 F.3d 1115 (9th Cir. 2009) .........................................................................11

*Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*,
   364 U.S. 642 (1961) ................................................................................. 18, 19

*Thompson v. U.S. Dep't of Housing & Urban Dev.*,
   404 F.3d 821 (4th Cir. 2005)...........................................................................17

*United States v. Armour & Co.*,
   402 U.S. 673 (1971) ........................................................................... 10, 11, 12

*United States v. Asarco Inc.*,
   430 F.3d 972 (9th Cir. 2005)............................................................... 10, 17, 20

*United States v. Swift & Co.*,
   286 U.S. 106 (1932) .........................................................................................16

*United States v. Westlands Water Dist.*,
   134 F. Supp. 2d. 1111 (E.D. Cal. 2001)..........................................................10

*Washington v. Moniz*,
   2015 WL 12643792 (E.D. Wash. May 11, 2015) .............................................17

**Statutes**

49 U.S.C. § 60104......................................................................................................18
49 U.S.C. § 60104(c) ...................................................................................................4
49 U.S.C. § 60105........................................................................................................4
49 U.S.C. § 60112(a) .................................................................................................14
49 U.S.C. § 60112(e) .................................................................................................14
49 U.S.C. § 60121......................................................................................................15
50 U.S.C. § 4513........................................................................................................19

iii

**Rules**

Fed. R. Civ. P. 60(b)(5)................................................................................. 15, 16
Fed. R. Civ. P. 60(b)(6)................................................................................. 15, 21

**Regulations**

49 C.F.R. § 190.341 ...........................................................................................6
49 C.F.R. § 195.304 ..........................................................................................14
49 C.F.R. § 195.452(h) .....................................................................................14
49 C.F.R. § 195.452(j) .......................................................................................14

**Other Authorities**

91 Fed. Reg. 8949 (Feb. 24, 2026) ...................................................................7
91 Fed. Reg. 13698 (Mar. 20, 2026).................................................................7

## I.      Introduction

The United States' motion first presents the Court with a single, straightforward question: Should the Court terminate the Consent Decree entered in this action (Dkt. Nos. 6-1 and 33) now that the Defendants have met the Decree's standard for termination?

The answer is yes. The Consent Decree resolved alleged violations of federal and state environmental and pipeline safety laws stemming from a 2015 release of crude oil from a pipeline segment that ruptured in Santa Barbara County, California. The parties to the Consent Decree are two Plaintiffs, the United States and California, and two Defendants, Plains All American Pipeline, L.P. and Plains Pipeline, L.P. (together, "Plains"). There are no other parties. The Decree unambiguously states that Plains may seek termination after complying with the Decree's requirements and operating under the Decree for at least five years and three months. The United States has reviewed Plains' compliance with the Decree's terms and determined that Plains has met this standard. The Decree's plain text establishes that the agreement should now terminate.

California disagrees and wants to use the Decree to supervise the future actions of a nonparty, Sable.[1] Having not been the subject of the United States' and California's underlying enforcement action, Sable contractually assumed certain Decree obligations in 2024 when it acquired the Santa Ynez Pipeline System, which includes two pipeline segments covered by the Decree ("the Segments"). Acting pursuant to delegated authority under the Defense Production Act, the Secretary of Energy recently ordered Sable to restart the Santa Ynez Pipeline System to advance national security interests. Sable has since safely and gradually filled the Segments with crude oil under the direct supervision of the federal Pipeline and Hazardous Materials Safety Administration ("PHMSA").

---

[1] "Sable" refers collectively to Sable Offshore Corporation and its subsidiary Pacific Pipeline Company.

1

California argues the Consent Decree should remain in force, ostensibly to address alleged safety and environmental concerns with the Segments. But those concerns are unfounded. Since acquiring the Segments, Sable has made repairs to address the cause of the 2015 oil release. And PHMSA, the federal agency with expertise in pipeline safety, has determined the Segments can be safely restarted and is overseeing that process. So why is California really opposed to terminating the Decree? Because it wants a California state agency, the Office of the State Fire Marshal ("Fire Marshal") to regulate interstate Segments that are subject to PHMSA's sole and exclusive federal jurisdiction. California's position conflicts with federal law and does not serve the purposes of the Decree. Because Plains has complied with the Consent Decree, the Court should adhere to the Decree's plain terms and terminate it.

If the Court declines to terminate the Decree, the United States' motion presents the Court with a second question: Should the Court *modify* the Decree to reflect recent changes in fact and law?

This answer is also yes. Two significant changes have occurred since the Decree's entry, both of which render its continued operation without modification unworkable, against the public interest, and impermissible. First, the jurisdictional status of the Segments has changed. The Decree authorized the Fire Marshal to oversee compliance with certain obligations because the Segments were classified as *intrastate* at the time of entry. The Segments have since been reclassified as *interstate* following Sable's acquisition and are now subject to PHMSA's sole and exclusive jurisdiction. Second, the Secretary of Energy determined that crude oil must be transported through the Segments to advance national security interests and ordered Sable to do so. The Fire Marshal's role has been overtaken by events and now conflicts with the federal government's sole and exclusive authority to regulate the Segments. To resolve that conflict, the Court should modify the

Consent Decree to substitute PHMSA as the regulator, conforming the Decree's text to the current legal reality.

## II.    Background

A.    <u>After years of negotiations to resolve alleged violations, the United States and California settled with Plains by entering into a Consent Decree.</u>

In March 2020, the United States and California filed a Complaint against Plains related to a 2015 oil release onto Refugio State Beach in Santa Barbara County from a corroded pipeline segment then-owned by Plains and known as "Line 901." (Dkt. No. 1). The United States and California, on behalf of numerous agencies including PHMSA and the Fire Marshal, sought civil penalties and injunctive relief for Plains' alleged failures to comply with federal and state pipeline safety and environmental laws, damages for injuries to and destruction of natural resources, and damages for lost revenues caused by the release. (*Id.* ¶¶ 2, 58–212). With the Complaint, the United States and California lodged a Consent Decree proposing to resolve the alleged violations. (Dkt. No. 6). The Court entered the Decree as a final judgment on October 14, 2020. (Dkt. No. 33).

The Consent Decree is the product of extensive, arm's-length negotiations among the United States, California, and Plains—all sophisticated parties with experienced environmental counsel and technical staffs. (Dkt. No. 6-1 at 5, ¶ S and Dkt. No. 28 at p. 19). Its provisions are detailed and carefully calibrated, requiring Plains to pay $24 million in civil penalties and $22.325 million in natural resource damages and to implement injunctive measures to bring Plains' operations into compliance with the law and require compliance with measures beyond the minimum legal requirements. (*See id.* ¶¶ 8–10, 12, 21, 25, Appx. B, D).

Some of those measures are specific to the two pipeline segments at issue here: Line 901 (the pipeline segment that failed in 2015) and Line 903 (the pipeline segment located immediately downstream). (*E.g.*, Dkt. No. 6-1 at Appx. B ¶¶ 1–2).

3

Both Segments were then owned by Plains and are now owned by Sable.[2] The Consent Decree allocates responsibility for overseeing injunctive measures between the United States (through PHMSA) and the Fire Marshal based on the Segments' jurisdictional status under the Pipeline Safety Act at the time of entry.

Before 2016, including when the release occurred, Plains operated the Segments as interstate pipelines subject to PHMSA's jurisdiction. (Dkt. No. 1 ¶¶ 8–9); *see also* 49 U.S.C. § 60104(c) (states preempted from regulating interstate pipelines). Accordingly, it was PHMSA that issued a Corrective Action Order to Plains and a failure investigation report. (Dkt. No. 1 ¶¶ 34–35; Dkt. No. 6-1 at 1-2). But by the time the Complaint and Consent Decree were filed, Plains was operating the Segments as intrastate pipelines subject to the Fire Marshal's jurisdiction. (Dkt. No. 1 ¶¶ 8–9); *see also* 49 U.S.C. § 60105 (certified state programs may regulate intrastate pipelines). As a result, the Consent Decree generally provides that the United States (through PHMSA) oversees compliance with obligations applicable to companywide operations. (*See* Dkt. No. 6-1 ¶ 31 and Appx. B, Art. II). Meanwhile, the Decree provides that the Fire Marshal oversees compliance with obligations applicable to the Segments, including remaining obligations from PHMSA's Corrective Action Order that were, after entry of the Decree, "subject to the sole regulatory oversight of [the Fire Marshal]." (*Id.* at Appx. D, ¶ 1; *see also id.* ¶¶ 25, 33, and Appx. B, Art. I).

If Plains chose to restart the Segments while the Decree was in effect, Plains had to receive state waivers from the Fire Marshal to manage risks of corrosion, submit restart plans for the Fire Marshal's approval, obtain the Fire Marshal's authorization to operate, and submit a final report to the Fire Marshal. (*Id.* at Appx. B ¶ 1.A and B, Appx. D ¶ 1.a, b, e, f, and j). These requirements, derived from

---

[2] Lines 901 and 903 are now referred to as CA-324 and CA-325 and constitute the Las Flores Pipeline. Seeley Decl. ¶ 7.

4

PHMSA's Corrective Action Order, go beyond those found in federal and state pipeline safety laws and apply to the Segments only because of the Decree.

> **B.    Sable, a nonparty to the Decree, acquired the Segments and contractually agreed to be bound by the Consent Decree requirements applicable to the Segments.**

Over two years ago, Sable acquired the Segments and agreed contractually to be bound by provisions of the Consent Decree specifically applicable to the Segments. Ex. B, Declaration of Rod M. Seeley ("Seeley Decl.") ¶¶ 6–7 and Ex. 1 ¶ 1 (assumption agreement). No party, however, has sought to modify the Consent Decree to add Sable as a party.

Sable acquired the Segments intending to restart them. Consistent with the Decree obligations it contractually assumed, Sable received state waivers for the Segments on December 17, 2024, and submitted a restart plan to the Fire Marshal for approval on September 11, 2025.

In October 2025, ten months after issuing the state waivers, the Fire Marshal informed Sable that the waivers required Sable to repair metal loss anomalies detected during in-line inspections[3] showing a depth of 40% or greater wall loss, including tool tolerance (akin to the inspection tool's margin of error), before restarting the Segments. *Id.* at Ex. 3 at 2. Sable disagreed with the Fire Marshal's reading of the waivers. It maintained, in part, that the 40%-plus-tool-tolerance threshold in the waivers applied only to anomalies detected *after* restart. Sable also maintained that it had complied with the Decree's requirement to repair anomalies meeting the 40% threshold without consideration of tool tolerance. *Id.* at Ex. 4 at 1–3. To date, the Fire Marshal has neither approved nor disapproved the restart plan.

---

[3] An in-line inspection means running a sensor-equipped tool through the pipeline to collect critical data, like wall thickness, to detect corrosion, cracks, dents, and metal loss.

C.    PHMSA now has regulatory jurisdiction over the Segments.

In November 2025, Sable notified PHMSA that it intended to operate the Santa Ynez Pipeline System as a single pipeline system transporting crude oil produced on the Outer Continental Shelf to the Pentland Station in Kern County, California. *See* Seeley Decl., Ex. 5 at 1. Sable further advised PHMSA that it had determined that operating the Santa Ynez Pipeline System in that configuration would make the entire pipeline system, including the Segments, an interstate pipeline facility under the Pipeline Safety Act. *See id.* Sable asked PHMSA whether it agreed with that determination. *See id.*

Soon after, PHMSA initiated a jurisdictional audit of the Santa Ynez Pipeline System. *Id.* The audit consisted of a multi-day, onsite inspection that involved reviewing Sable's written procedures and records and observing the onshore and offshore portions of the pipeline system. *Id.*; Ex. C, Declaration of Dustin Hubbard ("Hubbard Decl.") ¶ 6. Representatives of the Fire Marshal participated in the audit, and PHMSA also reviewed program inspections the Fire Marshal had previously conducted. Seeley Decl., Ex. 5 at 1.

Based on the audit, PHMSA agreed with Sable's determination that the Segments, as pipeline segments that constitute the Las Flores Pipeline, are part of a single interstate pipeline system (*i.e.*, the Santa Ynez Pipeline System). *Id.* ¶ 11 and Ex. 5 at 2–3. On December 17, 2025, PHMSA notified Sable and the Fire Marshal that the Segments fall under PHMSA's regulatory oversight. *Id.* ¶ 11 and Ex. 5 at 3.

Following PHMSA's acknowledgment of the change in regulatory jurisdiction, Sable requested an emergency, 60-day special permit (the federal equivalent of a state waiver, *see* 49 C.F.R. § 190.341). PHMSA granted that request and approved the restart plan for the Segments. Seeley Decl. ¶¶ 12–13 and Exs. 6–7. Sable then applied for a non-emergency special permit. *Id.* ¶ 14 and Ex. 8. PHMSA has posted a draft special permit, *id.* ¶ 15 and Ex. 9, and is currently

6

receiving public comments through April 3, 2026. 91 Fed. Reg. 8949 (Feb. 24, 2026); 91 Fed. Reg. 13698 (Mar. 20, 2026). Sable will continue to comply with the conditions of the emergency special permit until PHMSA has decided on its application for a special permit.[4]

D.      Plains, the only defendants to the Consent Decree, submitted a request to terminate the Decree in January 2026.

The Consent Decree contains detailed, carefully delineated termination provisions. (Dkt. No. 6-1 ¶¶ 100–02). The controlling language permits Plains to send a termination request to the United States and California "[a]fter Defendants have: (a) operated under [the] Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of [the] Consent Decree." (*Id.* ¶ 100). "Defendants" is defined in the Decree to mean Plains (*id.* at p. 9), and all provisions in the termination section are specific to Plains, the United States, and California—and those parties alone. (*See id.* ¶¶ 100–02).

On January 14, 2026, five years and three months after the Decree's effective date, Plains sent the United States and California a request to terminate the Consent Decree. The United States has confirmed that Plains meets the standard for termination. Plains has paid all amounts due under the Decree and has complied with its injunctive relief obligations. *See* Seeley Decl. ¶¶ 72–74. Plains also stipulates to termination of the Decree. Ex. A.

E.      Following an order from the Department of Energy to immediately prioritize transporting oil through the Santa Ynez Pipeline System, Sable has restarted the Segments.

Military installations in California support U.S. Indo-Pacific Command and other United States military requirements worldwide. The Secretary of Energy has determined that rapid and reliable regional fuel supply for these forces is therefore

---

[4] Letter from Sable to PHMSA (Feb. 13, 2026), at https://downloads.regulations.gov/PHMSA-2026-0464-0001/attachment_1.pdf.

critical to national security and that the restart of the Santa Ynez Pipeline System is essential to these needs. Accordingly, on March 13, 2026, the Secretary issued an order under the Defense Production Act directing Sable to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the Santa Ynez Unit[5] through the Santa Ynez Pipeline System. Seeley Decl., Ex. 10 at 3. Soon after, Sable initiated the process of restarting the Segments. PHMSA pipeline safety experts have been onsite and in regular communication with Sable to supervise the restart and to ensure compliance with the detailed procedures set forth in the restart plan. Hubbard Decl. ¶¶ 14–31. The Segments have now been filled with oil and pressurized without any indications of a release or other safety issues. *Id.* ¶ 32. PHMSA will continue to supervise the restart until Sable fully executes the restart plan and the Segments achieve steady-state operations. *Id.* ¶ 33.

>    F.    California challenges Sable's restart of the Segments.

On multiple fronts, California is challenging the restart of the Segments and PHMSA's authority to oversee the Segments' safety. In January, California petitioned the Ninth Circuit to review PHMSA's "interstate" determination, approval of the restart plan, and issuance of the emergency special permit. *State of Calif. v. PHMSA et al.*, No. 25-508 (9th Cir.). In February, California argued in a consolidated state court action brought by citizen groups that the state court should maintain an injunction against restarting the Segments unless Sable provides ten days' notice and confirms it received all necessary approvals. *Ctr. for Biological Diversity v. Calif. Dept. of Forestry & Fire Prot.*, No. 25CV02244 (Cal.) (California's 2/13/26 brief).

In this case, on March 16, 2026, California filed an ex parte emergency motion to stop restart. (Dkt. No. 43). The next day, the California Department of Parks and Recreation sued to keep Sable from transporting oil through a portion of

---

[5] The Santa Ynez Unit is an "offshore oil and gas unit located in Federal waters off the coast of California." Seeley Decl., Ex. 10 at 1.

the Segments crossing a state park. *Cal. Dep't of Parks & Recr'n v. Sable Offshore Corp. et al.*, No. 26CV01759 (Cal.). On March 23, California sued the Secretary of Energy to challenge the Defense Production Act order. *State of Calif. v. Wright*, No. 26-cv-02500-RS (N.D. Cal.). On March 27, following removal of its case to federal court, the California Department of Parks and Recreation moved for a preliminary injunction. Dkt. No. 23 in No. 2:26-cv-02946 (C.D. Cal.).

G. The proposed order would terminate the Consent Decree.

The United States' proposed order would terminate the Consent Decree. It would also direct that funds the U.S. Department of the Interior maintains in its Refugio Beach Oil Spill NRD Subaccount continue to be managed, invested, and spent as required under the Consent Decree. (*See* Dkt. No. 6-1 ¶¶ 14–17). Alternatively, should the Court choose to modify rather than to terminate the Decree, the United States' proposed order would terminate Plains and update the Decree to reflect changed circumstances that affect Sable's contractual obligations. Specifically, the proposed order would substitute "PHMSA" and "Special Permit" for "OSFM" and "State Waiver," respectively, in specified provisions of the Decree that apply to the Segments. The order would permit the Court to terminate the Decree upon written certification from the United States that Sable has completed all obligations that it contractually assumed.

## III. Argument

Consent decrees are the product of careful negotiations, and it is the agreement itself that defines the scope of the Court's authority. *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986) (citations omitted). Here, because Plains has met the Decree's negotiated standard for termination, the Court should terminate the agreement. California opposes and would extend the Decree beyond its intended lifespan so it can supervise Sable and—if past is prologue—shut down the Segments indefinitely *despite* Plains satisfying the termination standard. But the Decree does not allow a Plaintiff to

withhold consent to termination so it can supervise a nonparty or maintain a veto on operation of the Segments. Nor is the Decree a backstop to supervise a nonparty's contractual obligations. California's purported concerns for public safety and the environment are belied by the fact that Sable has already safely restarted the Segments under conditions as rigorous as those in the Decree and under governmental oversight.

But if the Court declines to terminate, it should modify the Decree to reflect significant changes in fact and law since entry.

### A. The Court should hew to the plain language of the Consent Decree and terminate the agreement.

#### 1. Plains has met the standard for termination.

Courts construe consent decrees using contract principles, discerning their meaning "within [their] four corners."[6] *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005). Plain and unambiguous language governs, *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 861 (9th Cir. 2007), and courts may not impose obligations beyond those negotiated by the parties. *See United States v. Armour & Co.*, 402 U.S. 673, 682–83 (1971). When a decree contains a termination clause, the terms of the clause set the standard for ending the agreement. *R.C. ex rel. the Ala. Disabilities Advoc. Program v. Walley*, 475 F. Supp. 2d 1118, 1124–25, (M.D. Ala. 2007); *see Grier v. Goetz*, 402 F. Supp. 2d 876, 936 (M.D. Tenn. 2005) (describing factors court should apply *absent* a termination clause).

Here, the Consent Decree establishes a clear termination standard: Plains (the only Defendants subject to the Consent Decree) may seek termination after five years and three months of operating under the Decree and complying with the

---

[6] Federal common law applies to interpretation of contracts when the United States is a party. *United States v. Westlands Water Dist.*, 134 F. Supp. 2d. 1111, 1135 (E.D. Cal. 2001).

Decree's requirements. The United States has concluded that Plains satisfied that standard, Ex. A, and California has identified no noncompliance by Plains to prevent termination. The Court need not look any further. The Decree's plain language reflects a bargain cabined by time, with the Plaintiffs securing compliance over a defined period and Plains securing predictability and an endpoint. *See Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1120 (9th Cir. 2009) (recognizing consent decree's 10-year expiration date based on its express terms). The Court should hold the parties to their bargain and terminate the Decree.

The Decree's separate transfer provision does not alter this conclusion. It allows Plains to transfer ownership of the Segments if the transferee assumes the Decree's applicable obligations. (Dkt. No. 6-1 ¶ 88). But it does not make the transferee a party to the Decree, nor does it modify the standard for termination. Having expressly provided in the Consent Decree for transfer of the Segments and for a future *contractual* relationship between Plains and a transferee, the parties also could have conditioned termination on the transferee's compliance—but they did not. By its plain terms, the termination standard focuses exclusively on Plains' compliance, and the transfer provision requires Plains to do one thing: secure an assumption agreement with the transferee. Plains did just that. Seeley Decl. ¶ 6. The text contains no additional requirements, and the Court should read none into it. *See Armour*, 402 U.S. at 682–83.

California disagrees, but without support. It would read into the Decree a right to withhold consent to termination for reasons beyond Plains' control— forcing Plains to continue complying with the Decree's extra-regulatory requirements despite its compliance. That reading is unsupported by the Decree's text and raises due process concerns. There is no basis for California to decline termination or for the Court to adopt California's reading. *Cf. Shakman v. City of Chicago*, 426 F.3d 925, 936 (7th Cir. 2005) (holding that district court abused its

11

discretion in declining to vacate consent decree based on *inter alia* the public interest and significant changes in law).

        2.     *The Consent Decree is not a license for open-ended supervision of Sable's performance of contractual obligations.*

California now wants to set aside the agreement that sophisticated parties reached after an extended period of careful negotiation and to rewrite the termination standard, all to continue imposing obligations on a nonparty whose conduct is not even the subject of the underlying enforcement action. The result would be to authorize the Fire Marshal's open-ended supervision of Sable's restart and operation of the Segments. But reading the Decree to add terms the parties never agreed to is precisely what the law disallows. *Armour*, 402 U.S. at 682–83.

The Consent Decree's structure reflects a boundary between the obligations Sable assumed under the assumption agreement and the standard for future judicial oversight and termination. With limited exceptions, a consent decree may not impose duties or obligations on a non-consenting third party. *Sierra Club v. North Dakota*, 868 F.3d 1062, 1067 (9th Cir. 2017) (citation omitted). A party must specifically choose to subject itself to a court's supervision, rather than simply agreeing to be bound by contractual remedies, *see Local No. 93*, 478 U.S. at 523, and it is the voluntary nature of the decree that predicates the court's authority. *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 439 (2004) (noting that state officials had accepted a decree's enforcement remedy when the officials asked the court to approve the decree); *Ass'n for Ret'd Citizens of Conn., Inc. v. Thorne*, 30 F.3d 367, 370 (2d Cir. 1994) (finding no basis to extend terms of a consent decree to a nonparty, even if the nonparty's actions may frustrate the court's order).

Here, Sable did not agree to become a party to the Consent Decree. Seeley Decl., Ex. 1 ¶ 1 (agreeing only "to be bound by those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the Assets"). Nor did Sable agree to be bound by provisions in the Decree that do not

specifically apply to the Segments, like the provisions on termination and consent to jurisdiction. (Dkt. No. 6-1 ¶¶ 3, 100). Having anticipated a future transfer of the Segments, the parties chose to establish only a contractual framework for implementing the provisions in the Decree applicable to a potential transferee. (*See* Dkt. No. 6-1 ¶¶ 88–89 (requiring only that Plains provide documentation of transferee's agreement)).

This reflects an allocation of responsibility between the transferee's contractual obligations and Plains' judicial obligations. That is, the parties did not structure the Decree to monitor the transferee's future performance or to subject the transferee to the Court's jurisdiction. And the parties certainly did not structure the Decree to permit either of those things after Plains has satisfied all its judicially enforceable obligations. The Decree's continued operation therefore cannot serve as a backstop for Sable's performance of its contractual obligations to Plains—not because the backstop is insufficient, but because the backstop does not even exist.

As the Ninth Circuit recently affirmed, federal courts typically lack jurisdiction to enforce a consent decree against nonparties, even when good reasons support doing so. *See Gila River Indian Cmty. v. Schoubroek*, 145 F.4th 1058, 1071–74 (9th Cir. 2025); *see also Thorne*, 30 F.3d at 370. California asks the Court to ignore this rule, placing Sable and the United States in an untenable position. Because Sable is not a party to the Consent Decree and is not even a party to this lawsuit, it has no obvious recourse to seek termination or modification. (*See* Dkt. No. 6-1 ¶ 80 (Decree "shall not be construed to create rights in, or grant any cause of action to, any third-party not party to" the Decree)). Nor is it clear what role the United States would play in the Consent Decree when PHMSA has already determined that Plains has fully complied with the Decree or what role the Court would play without jurisdiction to enforce the Decree directly against Sable. *See, e.g.*, *Nextel Commc'ns of Mid-Atl., Inc. v. Town of Hanson*, 311 F. Supp. 2d 142, 149 n.5 (D. Mass. 2004) (neither a motion to enforce a consent decree nor a motion

13

for contempt can be granted against a nonparty). The Court should not convert the Decree from a judicial vehicle for the United States and California to resolve Plains' alleged violations into a mechanism for California to supervise Sable's contractual performance beyond the life of the Decree.

> 3.     *The Segments have been safely restarted.*

California cannot credibly argue that the Consent Decree is needed to ensure environmental and pipeline safety. Consistent with applicable Consent Decree provisions, the state waivers, and PHMSA's emergency special permit, Sable has already made extensive repairs and improvements to the Segments to address the cause of the 2015 release and prevent recurrence. For example, Sable remediated all locations that had 40% or more metal loss. Seeley Decl., Ex. 2 at 4. When Sable restarted the Segments, as directed by the Defense Production Act order, it complied with the PHMSA-approved restart plan and acted under PHMSA's direct supervision. Hubbard Decl. ¶¶ 14–33. The length of the Segments—nearly 125 miles—have now been filled and pressurized "without any signs of release or other safety issues." *Id.* ¶¶ 6, 32. As important, PHMSA has authority to shut down the Segments if PHMSA determines operations are hazardous to life, property, or the environment. *Id.* ¶ 34; *see* 49 U.S.C. § 60112(a) and (e).

Sable has also agreed to continue operating the Segments under the stringent conditions of the emergency special permit and has asked PHMSA to make those conditions permanent. The conditions exceed PHMSA's regulatory standards and include additional requirements related to pressure testing, inspections, and repairs. *E.g., compare* Seeley Decl., Ex. 7 at 6, 8, 10 and Ex. 9 at 6, 8, 9 *with* 49 C.F.R. §§ 195.304, 195.452(j)(3), 195.452(h)(4)(i) (permit conditions that are more stringent than corresponding regulations). If the Decree is terminated, Sable will nonetheless need to comply with these conditions if PHMSA grants its request for a non-emergency special permit. Regardless of the outcome of its permit

application, Sable must comply with the requirements in the Pipeline Safety Act and PHMSA's regulations.

Finally, if Sable were to violate the special permit or the Pipeline Safety Act and corresponding regulations, PHMSA may bring an enforcement action. The Act also allows for private enforcement and injunctive relief in appropriate cases. 49 U.S.C. § 60121. Terminating the Consent Decree therefore will not compromise pipeline safety or environmental protection.

B.      In the alternative, the Court should modify the Consent Decree to substitute PHMSA as the regulator for the Segments.

Should the Court decline to terminate the Consent Decree outright, the Court should still terminate Plains from the Decree because "the judgment has been satisfied" by Plains, Fed. R. Civ. P. 60(b)(5), and modify the Decree to reflect significant changes in fact and law since its entry. When the parties negotiated the Decree, the Segments were classified as intrastate, making the Fire Marshal's regulatory control workable. That foundation was displaced when the Segments were reclassified as interstate and the Department of Energy mandated their restart.

Federal Rule of Civil Procedure 60(b) provides two possible bases for the Court to modify the Decree. Under Rule 60(b)(5), a court may relieve a party from a final judgment when "applying it prospectively is no longer equitable." Separately, Rule 60(b)(6) allows a court to relieve a party from a final judgment for "any other reason that justifies relief." To be sure, modification is an imperfect solution because there is no final judgment against Sable and Sable is not subject to the Court's jurisdiction. But absent termination and given the changed circumstances, the Court should at least update the Decree to conform it to the current factual and legal reality.[7]

---

[7] Although the Decree states that it may be modified only by the parties' signed agreement (Dkt. No. 6-1 ¶ 98), the Court retains inherent authority to modify the

15

*1.*        *The Segments' reclassification and the Defense Production Act order are significant changes in fact and law under Rule 60(b)(5).*

The Supreme Court made clear in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), that the standard for modifying a consent decree because "applying it prospectively is no longer equitable," Fed. R. Civ. P. 60(b)(5), is flexible, not rigid. 502 U.S. at 380. A party seeking modification need not demonstrate grievous wrong—it need only show that "a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Id.* at 393. This standard reflects the Court's recognition that consent decrees must remain responsive to the realities on the ground rather than calcify into permanent mandates untethered from present conditions. If the moving party meets its burden, the court must modify the consent decree considering the changed circumstances. *Horne v. Flores*, 557 U.S. 433, 447 (2009); *see also Hook v. State of Ariz.*, 120 F.3d 921, 924–25 (9th Cir. 1997) (district court abused its discretion when it denied motion to modify decree despite state showing significant factual and legal changes). Although *Rufo* specifically addressed institutional reform consent decrees, the Ninth Circuit applies *Rufo*'s flexible standard to all decrees. *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1255–57 (9th Cir. 1999).

A significant change in facts warranting modification occurs when new conditions "make compliance with the decree substantially more onerous," "when a decree proves to be unworkable because of unforeseen obstacles," or "when enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384. Factual changes actually anticipated by the parties generally do not provide a basis for modification, but parties are "not required to anticipate every exigency that could conceivably arise during the life of a consent

Decree. *See Holland v. N.J. Dept. of Corrs.*, 246 F.3d 267, 283 n.15 (3d Cir. 2001) (citing *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932)).

16

decree." *Id.* at 385. This distinction is critical: the focus is on what the parties actually contemplated, not what they theoretically could have foreseen. *See Thompson v. U.S. Dep't of Housing & Urban Dev.*, 404 F.3d 821, 828 (4th Cir. 2005) (citing *Rufo*, 502 U.S. at 385). In the Ninth Circuit, courts look to the text of the decree to evaluate whether the parties anticipated a change. *Asarco*, 430 F.3d at 976; *see Washington v. Moniz*, 2015 WL 12643792, at *8 (E.D. Wash. May 11, 2015). Finally, a court *must* modify a consent decree if, because of a change in federal law, compliance with its terms becomes "impermissible." *Rufo*, 502 U.S. at 388.

Here, significant and unanticipated changes in fact *and* law warrant modification. The Consent Decree states that the Fire Marshal has "sole regulatory oversight" over the Decree's requirements for restarting the Segments, (Dkt. No. 6-1 at Appx. D ¶ 1; *see also id*. at Appx. B ¶ 1.A and B), because they were classified as intrastate at the time of filing. (*See id.* ¶¶ 25 and Appx. D ¶ 1 (closing out PHMSA's Corrective Action Order and granting Fire Marshal the authority to oversee outstanding items from the order)). The Complaint also recognized that the Fire Marshal had jurisdiction at the time because of the Segments' intrastate status. (Dkt. No. 1 ¶¶ 8–9, 201–202). Both documents merely articulated the then-current regulatory status of the Segments.

But since then, the Segments have been reclassified as part of a single interstate pipeline system. The Department of Energy has also issued a Defense Production Act order requiring Sable to immediately resume transporting crude oil through the Segments. These events were not contemplated in the Consent Decree and for four reasons they render compliance with the Decree unworkable, detrimental to the public interest, and legally impermissible. *See Rufo*, 502 U.S. at 384, 388.

*First*, the preemption provision in the Pipeline Safety Act prohibits a state authority from "adopt[ing] or continu[ing] in force safety standards for interstate

pipeline facilities or interstate pipeline transportation." *See* 49 U.S.C. § 60104. Yet California seeks to use the Consent Decree to allow the Fire Marshal to exercise authority over the Segments. Absent termination or modification, Sable would be subject to conflicting obligations to PHMSA, as the interstate regulator, and the Fire Marshal, as the regulator under the Decree. This regulatory morass is precisely what the parties sought to avoid by originally identifying the Fire Marshal as the sole regulator for the then-intrastate Segments. Now that the legal status of the Segments has changed, the Court should update the Decree's terms to substitute the current regulator, PHMSA, for the Fire Marshal. *See Keith v. Volpe (Keith I)*, 784 F.2d 1457, 1462 (9th Cir. 1986) (courts should consider parties' original expectations when modifying consent decree); *cf. Bellevue*, 165 F.3d at 1254, 1257 (change in law created conflict between judgment and applicable legal standard justifying modification); *King v. Greenblat*, 52 F.3d 1, 5–6 (1st Cir. 1995) (statutory change transferring control of institution to another state agency may warrant modification). Indeed, leaving the Decree unmodified would permit what federal law does not allow: California's regulation of an interstate pipeline system. California has "no power to require of the [C]ourt continuing enforcement of rights" under the Decree that no longer align with the Segments' legal status. *See Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 652 (1961); *see also Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878–80 (9th Cir. 2006) (the Pipeline Safety Act preempted a city's unauthorized attempts to regulate pipeline safety).

   *Second,* because of the jurisdictional change, PHMSA has already approved the restart plan and has been onsite overseeing the restart. These are not box-checking exercises. PHMSA has deployed several pipeline safety inspectors to supervise gradual pressurization of the Segments during daylight hours. Hubbard Decl. ¶ 14. The inspectors have, among other things, monitored the Segments' pressure for any fluctuations that could indicate a problem, ensured Sable is

performing regular flyovers of the Segments, and conducted safety checks at valve and pump stations. *Id.* ¶¶ 15, 21, 31. Under PHMSA's supervision, Sable has safely filled the Segments with oil without incident. *Id.* ¶ 32. In contrast, the Fire Marshal has not been involved in the restart and thus the Decree's terms granting it oversight now lack practical utility. Modification is warranted when, as here, changes in the legal landscape alter the factual foundations on which a consent decree was based. *See Hook*, 120 F.3d at 924–25 (changes in sentencing legislation led to unforeseen prison growth and district court abused its discretion in denying motion to modify consent decree).

*Third*, Sable *must* comply with the Defense Production Act order to operate the Segments. *See* 50 U.S.C. § 4513 (criminal penalties for failure to comply). This makes compliance with the Fire Marshal's separate regulatory oversight legally impermissible and factually impossible. Sable cannot meet both the Fire Marshal's requirements for restarting the Segments (or its present demand to stop restart) and the Secretary's directive to immediately operate the Segments. This conflict between federal and state directives also satisfies the grounds for modification. *See Rufo*, 502 U.S. at 388 (consent decree *must* be modified if one or more obligations has become impermissible under federal law); *Horne*, 557 U.S. at 464–65 (conflicts between judgment and federal policy may warrant modification) (citing *Ry. Emps. v. Wright*, 364 U.S. 642, 651 (1961)); *Keith v. Volpe (Keith II)*, 960 F. Supp. 1448, 1465 (C.D. Cal. 1997) (changes in building codes warranted modification).

*Fourth*, the public interest supports modifying the Decree. The Secretary of Energy has determined that the Segments are needed to address energy shortages and to reduce national risks posed by adversarial dependence on imported oil. Seeley Decl., Ex. 10 at 1–2. And now that jurisdiction over the Segments has changed, the public is best served by a single regulatory agency overseeing their safe restart to ensure programmatic continuity—precisely what the parties sought

19

to implement in the Decree by granting the Fire Marshal oversight over the then-intrastate Segments. *Cf. Keith II*, 960 F. Supp. at 1465 (enforcing requirements would undermine decree's purpose and be against public interest). If the Decree is not modified, the Segments will remain subject to directly contradictory instructions from the Secretary and from this Court, and as this current dispute over termination shows, the Fire Marshal and PHMSA are at odds over whether the Segments may operate at all. This is an untenable position for Segments needed to address national security interests.

All of these factual and legal changes were unanticipated by the parties. This is evident from the Consent Decree's terms, which do not reveal any "expectation that [these] particular change[s] in factual circumstances might occur during the lifetime of the decree." *Asarco*, 430 F.3d at 982. While the Decree plainly recognizes the *past* change in regulatory jurisdiction that conferred the Fire Marshal with authority, it is silent on the possibility of *future* changes in regulatory jurisdiction. (*See, e.g.*, Dkt. No. 6-1 ¶¶ 25 and Appx. D ¶ 1 (conferring authority on Fire Marshal to oversee remaining requirements of PHMSA's Corrective Action Order)). The parties simply did not contemplate that regulatory jurisdiction would revert to PHMSA or that the Segments would become part of an interstate pipeline system. And the parties surely did not consider a Defense Production Act order to restart the Segments. There is no basis in the Decree's language for finding that the parties anticipated such changes, and certainly no credible argument that the parties anticipated that the Fire Marshal would maintain its oversight role in the Decree despite lacking authority to do so under federal law.

The United States' proposal—substituting PHMSA as the regulator in the Decree—is "suitably tailored" to address these jurisdictional and factual changes that have occurred since the Decree's entry. *Rufo*, 502 U.S. at 393. The modification would not eliminate any requirement from the Consent Decree. It simply conforms the Decree to the law and current facts, recognizing that

PHMSA—the federal regulator with expertise in pipeline safety—now has exclusive authority over the Segments.

   2. *Separately, the Segments' reclassification and the Defense Production Act order are extraordinary circumstances under Rule 60(b)(6).*

Rule 60(b)(6), which allows modification for "any other reason that justifies relief," is a catch-all provision that permits a court to consider "a wide range of factors" and amend a judgment in "extraordinary circumstances." *Buck v. Davis*, 580 U.S. 100, 123 (2017). Relief under Rule 60(b)(6) is authorized whenever "appropriate to accomplish justice." *Hall v. Haws*, 861 F.3d 977, 987 (9th Cir. 2017) (citation omitted). A motion for relief must be premised on a ground unavailable in subsections (b)(1) through (b)(5). *Bynoe v. Baca*, 966 F.3d 972, 979 (9th Cir. 2020).

The ongoing conflict presented by the Consent Decree's text and the significant factual and legal developments since the Decree's entry constitutes extraordinary circumstances warranting modification. Congress unambiguously asserted federal authority over interstate pipelines through the Pipeline Safety Act, and California should not be permitted to disregard that authority through the Decree. Moreover, operation of the Segments is now required to address national security interests, yet Sable cannot simultaneously comply with the Fire Marshal's instructions to stop, PHMSA's requirements, and the Defense Production Act order. The result is an unworkable regulatory conflict that this Court should resolve.

Leaving the Consent Decree unmodified would allow California to continue impeding the United States' lawful jurisdiction over the Segments—a pattern California has already established by challenging any action that does not follow its views of the Consent Decree or the Fire Marshal's authority. *See supra* at 8–9. The unaltered Decree would thus become an instrument for collateral attacks on federal authority, while leaving Sable mired in conflicting obligations. These

21

extraordinary shifts in the factual and legal landscape underlying the Decree justify modification. *See Ctr. For Biological Diversity v. Burgum*, 2025 WL 821660, at *2 (D. Mont. Feb. 21, 2025) (finding a significant factual change warranted modification); *De Malmanche v. Glenrock Asset Mgmt. Assocs., L.P.*, 2010 WL 2541495, at *4–5 (S.D.N.Y. Jun. 22, 2010) (relief warranted where operation of agreement was unworkable and posed an extreme hardship); *cf. First Beverages, Inc. of Las Vegas v. Royal Crown Cola Co.*, 612 F.2d 1164, 1172 (9th Cir. 1980) (post-trial decision finding companies' marketing restrictions unlawful was a new fact that may justify relief).

## CONCLUSION

For all these reasons, the Consent Decree should be terminated. But if the Court declines to terminate the Decree, it should modify it to substitute PHMSA for the Fire Marshal as the regulator of the Segments.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ Stefan J. Bachman*
STEFAN J. BACHMAN (DC Bar Number 90008649)
Email: stefan.bachman@usdoj.gov
Senior Attorney

*/s/ Angela Mo*
ANGELA MO (CA Bar Number: 262113)
Email: angela.mo@usdoj.gov
Senior Counsel
Environmental Enforcement Section
United States Department of Justice
150 M Street, NE, Room 2.900
Washington, DC 20002

22

Tel: (202) 598-9566 (Bachman)

## **Certificate of Compliance with Local Rule 11-6.2**

The undersigned, counsel of record for Plaintiff the United States of America, certifies that this brief contains 6,994 words, which complies with the word limit of L.R. 11-6.1.

3/30/2026                                    */s/ Stefan J. Bachman*
                                         STEFAN J. BACHMAN
                                         Senior Attorney
                                         Environmental Enforcement Section
                                         United States Department of Justice

23