ROB BONTA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL S. DORSI
Deputy Attorney General
E-mail: Michael.Dorsi@doj.ca.gov
State Bar No. 281865
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-3802
  Fax: (415) 703-1107

MICHAEL T. ZARRO
Deputy Attorney General
E-mail: Michael.Zarro@doj.ca.gov
State Bar No. 110171
  300 S. Spring Street, Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6347
  Fax: (916) 731-2128

*Attorneys for Plaintiffs*
*California Department of Parks and Recreation,*
*California State Lands Commission, and California*
*Department of Forestry and Fire Protection's Office of*
*State Fire Marshal*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>                              Plaintiffs, | 2:20-cv-02415 SVW-SSCx<br><br>**CALIFORNIA PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ENFORCE CONSENT DECREE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; OPPOSITION TO MOTION TO TERMINATE OR MODIFY CONSENT DECREE**<br><br>Date:         June 1, 2026<br>Time:         1:30 p.m.<br>Judge:        The Honorable Stephen V. Wilson<br>Action Filed: March 13, 2020 |

v.

PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,

Defendants.

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES.............................................2

INTRODUCTION ...................................................................................................2

BACKGROUND .....................................................................................................3

I.      PHMSA and Plains Failed to Prevent the Refugio Oil Spill ................4

II.     PHMSA Transferred Jurisdiction to OSFM, and This Court Entered a Binding Consent Decree ......................................................5

III.    Consistent with Its Jurisdiction, OSFM Issued State Waivers to Sable ..................................................................................................7

IV.     Sable Failed to Fully Comply with the Conditions of the State Waivers ...............................................................................................8

V.      Sable Sought and Obtained Letters from PHMSA Purporting to Preempt OSFM's Regulation of Lines CA-324/325 ...........................8

VI.     The State Court Rejected Sable's Preemption Theory ........................9

VII.    The Energy Secretary's Order Under the Defense Production Act and Sable's Restarting of the Pipeline .........................................10

LEGAL STANDARDS .........................................................................................11

ARGUMENT.........................................................................................................12

I.      Sable and the United States Are Violating the Terms of the Consent Decree ...................................................................................12

        A.      Sable's Transportation of Crude Oil Through the Pipelines Without OSFM Approval Violates the Consent Decree .............................................................................12

        B.      Federal Law Requires Sable to Obtain a Waiver of Compliance with Federal Regulations from OSFM Before It Operates Lines CA-324/325 .......................................13

        C.      Sable Needs a Waiver from OSFM, and Has None .................14

        D.      The United States Violated the Consent Decree .....................14

II.     The Consent Decree Applies to Sable .................................................15

III.    No Circumstances Excuse Past or Current Violations of the Consent Decree, and It Should Not Be Terminated or Modified Moving Forward .................................................................................19

        A.      Ninth Circuit Precedent Bars Modification of a Consent Decree Based on a Party's Own Actions................................19

        B.      The DPA Does Not Excuse Compliance with the Consent Decree, or Federal and State Law...........................................23

                1.      The DPA Does Not Displace Federal Law, Including a Consent Decree Entered Under Federal Law .................................................................................24

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

2.    The DPA Does Not Displace State Law in an Area Where Congress Preserved State Power ........................25

3.    The DPA Order Is Invalid Because It Does Not Prioritize or Allocate, and Does Not Comply with Department of Energy DPA Regulations .......................26

C.    The Consent Decree Cannot Be Terminated Because Lines CA-324/325 Are *Intra*state Lines ..................................28

IV.    Relief Is Warranted Given Sable's Restart of the Pipeline in Violation of the Consent Decree ..........................................................30

CONCLUSION ................................................................................................31

ii

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Association for Retired Citizens of Connecticut, Inc. v. Thorne 30*
F.3d 367 (2d Cir. 1994) ...................................................................................17

*Barclays Bank PLC v. Franchise Tax Bd. of California*
512 U.S. 298 (1994) .......................................................................................25

*Bates v. Pac. Mar. Ass'n.*
744 F.2d 705 (9th Cir. 1984) ..........................................................................16

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*
489 U.S. 141 (1989) .......................................................................................26

*Chamber of Com. Of U.S. v. Reich*
74 F.3d 1322 (D.C. Cir. 1996) ........................................................................25

*Consumer Fin. Prot. Bureau v. Howard Law, P.C.*
671 F.App'x 954 (9th Cir. 2016)......................................................................17

*Flores v. Rosen*
984 F.3d 720 (9th Cir. 2020) .....................................................................*passim*

*Golden State Bottling Co. v. Nat'l Labor Rels. Bd.*
414 U.S. 168 (1973) .........................................................................12, 16, 17, 18

*Hercules, Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994) ..........................................................................23

*Hercules, Inc. v. United States*
No. 94-818 (516 U.S. 417), 1995 WL 495540..................................................24

*Hook v. Arizona Dep't of Corr.*
972 F.2d 1012 (9th Cir. 1992)..........................................................................11

*In re Dual–Deck Video Cassette Recorder Antitrust Litig.*
10 F.3d 693 (9th Cir. 1993)..............................................................................12

*Jeff D. v. Otter*
643 F.3d 278 (9th Cir. 2011)............................................................................17

# TABLE OF AUTHORITIES
## (continued)

Page

*Learning Res., Inc. v. Trump*
147 S. Ct. 628 (2026) ...................................................................................24

*Loper Bright Enterprises v. Raimondo*
603 U.S. 369 (2024) .....................................................................................26

*McComb v. Jacksonville Paper Co.*
336 U.S. 187 (1949) .....................................................................................11

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*
606 U.S. 146 (2025) .....................................................................................27

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*
501 U.S. 252 (1991) .....................................................................................19

*Miller v. French*
530 U.S. 327 (2000) .....................................................................................15

*Monster Energy Co. v. Vital Pharms., Inc.*
No. EDCV 18-1882 JGB (SHKx), 2023 U.S. Dist. LEXIS 64630, at *49-50 (C.D. Cal. Apr. 12, 2023)........................................................................17

*Morton v. Ruiz*
415 U.S. 199 (1974) .....................................................................................27

*Nat'l Ass'n of Home Builders v. Norton*
340 F.3d 835 (9th Cir. 2003)........................................................................27

*Nehmer v. U.S. Dep't of Veterans Affairs*
494 F.3d 846 (9th Cir. 2007)..........................................................11, 20, 22, 24

*New Hampshire v. Maine*
532 U.S. 742 (2001) .....................................................................................18

*Plaut v. Spendthrift Farm, Inc.*
514 U.S. 211 (1995) .....................................................................................14

*Rufo v. Inmates of Suffolk Cnty. Jail*
502 U.S. 367 (1992) .....................................................................................19

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Sierra Club v. North Dakota*
    868 F.3d 1062 (9th Cir. 2017)..................................................................17

*Smith v. Sumner*
    994 F.2d 1401 (9th Cir. 1993)..................................................................16

*United States v. Vertac Chem. Corp.*
    46 F.3d 803 (8th Cir. 1995).................................................................23, 25

*Walker v. City of Birmingham*
    388 U.S. 307 (1967) ................................................................................12

*Wyeth v. Levine*
    555 U.S. 555 (2009) ................................................................................26

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952) ................................................................................25

*Zapon v. United States*
    53 F.3d 283 (9th Cir. 1995).................................................................12, 14

STATUTES

49 U.S.C.
    § 60101 .....................................................................................................5
    § 60101(a)(5) .....................................................................................29, 30
    § 60101(a)(8)(B).................................................................................26, 29
    § 60101(a)(10) ...................................................................................26, 29
    § 60101(a)(22) ...................................................................................29, 30
    § 60104(c)............................................................................................5, 26
    § 60105 ..........................................................................................13, 25, 28
    § 60105(a)..................................................................................................5
    § 60119 ..................................................................................................9, 28
    § 60119(a)(2) ...........................................................................................22

50 U.S.C.
    § 4511(a)..................................................................................................27
    § 4511(c)............................................................................................25, 27
    § 4557 .....................................................................................................23

**TABLE OF AUTHORITIES**
**(continued)**

Page

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article I .................................................................................................20

U.S. Const. Article III § 2, cl. 1 ................................................................................19

**COURT RULES**

FRCP
    60 ...........................................................................................................................19
    65 ....................................................................................................................16, 18
    70 ...........................................................................................................................11
    71 ............................................................................................................12, 16, 18

**OTHER AUTHORITIES**

10 C.F.R.
    § 217.20 ................................................................................................................27
    § 217.31 ................................................................................................................27
    § 217.50 ................................................................................................................28
    § 217.54(a) ............................................................................................................27
    § 217.54(b) ............................................................................................................27
    § 271.31 ................................................................................................................27
    § 271.51(f) ............................................................................................................27

49 C.F.R.
    § 195.452(h)(4)(iii)(H) .......................................................................................14
    § 195.563 ................................................................................................................5
    § 195.563 ..............................................................................................................14

Executive Order 14156 ............................................................................................10

https://www.justice.gov/olc/media/1429671/dl?inline ...........................................10

https://www.whitehouse.gov/presidential-actions/2026/03/adjusting-
    certaindelegations-under-the-defense-production-act/ .......................................11

https://www.whitehouse.gov/releases/2026/04/president-trump-
    delivers-powerful-primetime-address-on-operation-epic-fury/ .........................11

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE that Plaintiff People of the State of California, ex rel. California Department of Forestry and Fire Protection's Office of the State Fire Marshal (OSFM), California Department of Parks and Recreation (State Parks), and California State Lands Commission (SLC, collectively California) will and do move for an order enforcing the Consent Decree in this matter against Co-Plaintiff United States of America and third party Sable Offshore Corporation and Pacific Pipeline Company (collectively Sable), successors in interest to defendant Plains All American Pipeline, LP's responsibilities under the Consent Decree.

California makes this Motion on the basis that (1) Sable assumed Plains' obligations under the Consent Decree by acquiring two onshore oil pipelines known as Lines CA-324/325 and entering into the Assumption Agreement (Request for Judicial Notice (RJN), Exhibit E), and therefore is bound by the Consent Decree in this case, (2) this Consent Decree requires Sable to obtain approval from OSFM prior to restarting Lines CA-324/325 (ECF 6-1 at 80, 96), (3) Sable did not obtain OSFM approval before restarting, (4) actions by the United States to assume jurisdiction over Lines CA-324/325 and thereafter "command" Sable to commence operation are beyond Executive authority and may not be used to excuse compliance with the Consent Decree; and (5) therefore, the Court should issue an order requiring the United States and Sable to refrain from actions contrary to the Consent Decree, including but not limited to restarting or operating Lines CA-324/325 prior to approval from OSFM.

This Motion is supported by the following Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, the prior filings in this case, and any other supporting evidence that this Court may lawfully consider.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Following a catastrophic rupture of an oil pipeline that caused millions of dollars of damage to the Santa Barbara coastline, this Court entered a Consent Decree in 2020 that was agreed to by the federal government, California, and the pipeline operator. Among other things, that Consent Decree set out detailed conditions for any future restart of the pipeline. When it was signed by this Court, that Consent Decree became a final judgment of the federal court. It continues to bind the federal government, California, and the current pipeline operator (as successor-in-interest to the prior operator) to this day.

In a series of orders and opinions issued by the federal Executive Branch in December 2025 and March 2026, however, the federal government has taken the lawless position that the Executive Branch may excuse itself and the pipeline operator from compliance with this Court's judgment without first asking this Court to modify or vacate the Consent Decree. And in reliance on that position, the pipeline operator resumed pumping oil through the pipeline in March for the first time since it failed over a decade ago, without satisfying all terms of this Court's Consent Decree. The federal government and the pipeline operator's actions are an affront to the power of the courts to enforce and expect compliance with their judgments, and those actions should be firmly rejected.

The federal government and pipeline operator contend that their own actions are changed circumstances that authorize their unilateral decision not to follow this Court's Consent Decree. They point to orders by the federal Pipeline and Hazardous Materials Safety Administration (PHMSA) asserting jurisdiction over the pipeline, and an order of the Secretary of Energy under the Defense Production Act (DPA). But the federal government and Sable, which have spent months planning and executing their scheme to change the status quo, did not use that time to seek a modification of this Court's orders. As a party bound by the Consent

Decree, the federal government cannot create changed circumstances and then point to those same circumstances as reason to modify or terminate the Consent Decree. And neither the federal government nor the pipeline operator should be heard to seek modification or termination of the same Consent Decree that they recently willfully and intentionally chose to start violating. Parties should ask for permission not to follow federal court orders, not decide on their own to start violating orders first and then ask for forgiveness later. In all events, the PHMSA and DPA Orders do not—and constitutionally *could* not—supersede any terms of the Consent Decree.

This Court should order all parties to cease ongoing violations and come into immediate compliance with the Consent Decree, and also deny the motion to modify or terminate the Consent Decree.

## BACKGROUND

The Consent Decree in this case resulted from a disastrous oil spill in Santa Barbara County in 2015. A decades-old onshore oil pipeline that had lost much of its wall thickness to corrosion ruptured, releasing over 120,000 gallons of heavy crude oil onto Refugio State Beach and then into the Pacific Ocean.

At the request of the United States, agencies of the State of California, the University of California, and Plains All American Pipeline, L.P., this Court entered the Consent Decree, which sets the rules for remediation necessary before the restart of those onshore pipelines.

The Consent Decree dictates that the California Department of Forestry and Fire Protection's Office of the State Fire Marshal (OSFM), as California's pipeline safety regulator, has the power and responsibility to regulate Lines CA-324/325. Specifically, the Consent Decree authorizes OSFM to issue "State Waivers" that would relieve the pipeline operator from federal regulations if the pipeline operator demonstrates that it has satisfied alternative safety conditions imposed by OSFM. ECF 6-1 at 80-81, 96-102. The United States and California asked this Court to

3

enter the Consent Decree on the basis that OSFM was a responsible agency that could be trusted to make sure Lines CA-324/325 were safely operated. ECF 28-1 at 16-20. This Court approved that Consent Decree and entered final judgment in 2020.

The United States has decided to unilaterally circumvent that judgment, and to authorize Sable to violate it. First, at Sable's request, PHMSA purported to displace OSFM as the relevant pipeline safety regulator based on a novel theory that an offshore pipeline that transports an oil emulsion from an offshore oil platform to an onshore processing facility where the emulsion is treated and separated (Oil Emulsion Pipeline), the processing facility itself, and the onshore Lines CA-324/325 that transport oil from that processing facility to a facility in the Central Valley, are all actually a *single* pipeline, and an *interstate* one at that because the Oil Emulsion Pipeline begins in federal waters.[1] Second, on March 13, 2026, the Secretary of Energy issued an order invoking the Defense Production Act to direct Sable to begin operating Lines CA-324/325 *notwithstanding the Consent Decree* or any contrary law—an order that Sable requested from the Secretary of Energy in an effort to bypass the requirements imposed by the Consent Decree. Only after those orders (and after Sable began re-operating the pipelines) have the United States and Sable come to this Court.

I.    **PHMSA AND PLAINS FAILED TO PREVENT THE REFUGIO OIL SPILL**

The undersea Oil Emulsion Pipeline carries an emulsion of crude oil and other hazardous liquids from drilling platforms in federal waters off the Santa Barbara coast to the Las Flores Canyon processing facility immediately onshore. At that facility, the hydrocarbons, water, and sulfur products in the oil emulsion are separated and treated, and the oil is placed into different onshore intrastate pipelines (Lines CA-324/325) that run along the coast, across Santa Barbara County, and

---

[1] That order is currently under review in the Ninth Circuit, Case Nos. 25-8059, 26-508.

4

eventually to Kern County for further distribution.

In May 2015, one of the onshore pipelines ruptured, releasing over 120,000 gallons (2,900 barrels) of crude oil into the environment along the Santa Barbara coast. ECF 6-1 at ¶ A. That pipeline (then called Line 901, now Line CA-324), and a connecting onshore pipeline (then called Line 903, now Line CA-325), were taken out of service pending investigation and remediation. *Id*. ¶ C. Investigations determined the system designed to prevent corrosion used a defective design that could not be remediated. ECF 28-1. PHMSA's Failure Investigation Report (Failure Report) determined that the proximate cause of the spill was external corrosion that thinned Line CA-324's wall until it ruptured; only 11 percent of Line CA-324's wall thickness remained at the point of failure at the time of the rupture, *Id*. at 3, thirty years after Line CA-324 was put into service.

Federal regulations require pipelines with metal exposed to soil—like Lines CA-324/325—to be protected by a "cathodic protection system" that counteracts the corrosive electrical charge caused by that exposure. 49 C.F.R. § 195.563. However, cathodic protection is not effective when these underground pipelines are wrapped with insulation, as Line CA-324 was. ECF 28-8 at 14-15.

Neither Plains, then operator of Lines CA-324/325, nor PHMSA, then regulator of the Pipelines, ensured the necessary steps would be taken to address ongoing corrosion. The resulting Refugio Oil Spill marred and closed Santa Barbara's landmark beaches, killed birds and mammals protected by federal and state laws, and closed fisheries, causing serious economic harm to California's multi-billion-dollar coastal economy.

## II.   PHMSA TRANSFERRED JURISDICTION TO OSFM, AND THIS COURT ENTERED A BINDING CONSENT DECREE

The federal Pipeline Safety Act vests regulatory jurisdiction over *inter*state pipelines with PHMSA, while *intra*state pipelines are subject to regulation by states. 49 U.S.C. §§ 60101, 60104(c), 60105(a) (no federal jurisdiction over

intrastate pipelines for States with certifications). Pipelines subject to Federal Energy Regulatory Commission (FERC) tariffs have traditionally been presumed to be interstate pipelines.[2] 49 CFR Part 195 App. A. Because Lines CA-324/325 were originally planned to extend from California to Texas, they were initially designated as interstate and subject to FERC tariffs. Plans to extend the pipelines to Texas were abandoned and Plains cancelled its FERC tariffs, which caused PHMSA in May 2016 to re-designated Lines CA-324/325 as intrastate, with OSFM as the safety regulator. RJN, Exh. H (May 18, 2016 letter from PHMSA to OSFM).

Following the Refugio Oil Spill, state and federal agencies engaged in efforts that culminated in the Consent Decree, entered in 2020 by this Court. ECF 6-1. Plains agreed to pay over $22 million for the natural resource damages caused by the spill, which was in addition to the approximately $10 million it had already paid to federal and state agencies, and did not include the untold millions Plains had directly expended to address natural resource damage harm. ECF 6-1 at ¶¶ 12-13. The Consent Decree also resolved claims by the United States and California. To obtain approval by this Court, the United States and California agreed that OSFM would be the agency responsible for oversight of Lines CA-324/325.

Specifically, the Consent Decree required that, "Prior to restarting Line 901 [Line CA-324], Plains shall apply for a State Waiver [i.e., state approval] through the OSFM for the limited effectiveness of cathodic protection on Line 901 [Line CA-324]. Plains must receive a State Waiver from the OSFM prior to restarting Line 901 [Line CA-324]."[3] ECF 6-1 at 80.[4] This was consistent with the Pipeline

---

[2] California does not concede that the use of FERC tariffs to determine interstate status is consistent with the text of the Pipeline Safety Act. But in the absence of a current tariff, this issue is not presented in this case.

[3] Because the conditions are repeated for CA-324 and CA-325, this memorandum cites conditions in the Consent Decree and State Waivers only for line CA-324. All cited conditions are the same for line CA-325. Lines CA-324/325 extend from Santa Barbara County to Pentland in Kern County. The line designation switches from CA-324 to CA-325 at the Gaviota pump station in Santa Barbara County, California.

[4] Page citations to the Consent Decree refer to the blue page numbers at the

(continued…)

6

Safety Act, which allows state regulators to adopt and enforce safety standards in addition to or more stringent than PHMSA's standards. The Consent Decree also: (1) assigns OSFM the power to approve a Restart Plan, *id.* at 96; (2) provides procedures for modification and termination of the Consent Decree, *id.* at 58-60, and; (3) retains jurisdiction to enforce compliance with the Consent Decree's terms, *id*. at 58.

This Court (Hon. Philip S. Gutierrez) signed the Consent Decree on October 14, 2020, reducing it to a judgment that binds all parties to this case. ECF 33.

### III. CONSISTENT WITH ITS JURISDICTION, OSFM ISSUED STATE WAIVERS TO SABLE

Pacific Pipeline Company acquired Lines CA-324/325, and then in February 2024, Sable acquired a 100% interest in Pacific Pipeline Company, which now owns and operates Lines CA-324/325. As a condition of this acquisition, Sable agreed to be bound by the Consent Decree. RJN, Exh. E (Assumption Agreement). Sable applied for State Waivers in April 2024, which OSFM issued in December 2024. The State Waivers require that "*All* immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated *prior to* restarting CA-324." RJN, Exhs. I ¶ 9, J ¶ 9 (emphasis added).

Neither Sable nor PHMSA objected to the terms of the State Waivers, and PHMSA provided notice of non-objection to the State Waivers in February 2025. Two non-governmental organizations challenged the State Waivers in 2025 in Santa Barbara County Superior Court. That court issued an injunction requiring that once Sable obtained all required approvals, it provide notice to the court and all parties, and not restart until 10 days after that notice, to provide time to resolve any dispute. RJN, Exh. C.

top of the page, imposed by the ECF filing system, not the page numbers at the bottom.

## IV.   SABLE FAILED TO FULLY COMPLY WITH THE CONDITIONS OF THE STATE WAIVERS

In October 2025, "OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart." ECF 49-2 at 29-30 (OSFM Letter to Sable dated October 22, 2025). That unsatisfied condition concerned measurement of the pipe thickness—a critical requirement included to ensure that corrosion of the pipe wall, of the sort that caused the 2015 catastrophe, would not pose a future risk. Condition 9 in the State Waivers dictates that "All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324." RJN, Exh. I ¶ 9, J ¶ 9, L. Sable responded the next day, disagreeing with OSFM's view. Sable asserted that the State Waivers did not require the specific pre-restart repairs OSFM said they did. ECF 49-2 at 32-35 (Sable Letter). Sable has not, in any forum, indicated that it took additional actions in the five plus months since that letter in response to the deficiencies identified by OSFM.

## V.   SABLE SOUGHT AND OBTAINED LETTERS FROM PHMSA PURPORTING TO PREEMPT OSFM'S REGULATION OF LINES CA-324/325

A month after OSFM informed Sable of its failure to comply with the State Waivers, Sable sent a letter to PHMSA requesting that PHMSA assert jurisdiction over Lines CA-324/325. RJN, Exh. G (Nov. 26, 2025 letter to PHMSA). Despite the fact that Lines CA-324/325 run *intra*state—from the onshore processing facility in Santa Barbara County to a distribution terminal in Kern County—Sable asked PHMSA to decree the lines are *inter*state lines under the novel theory that the Offshore Emulsion Pipeline, the onshore Las Flores Canyon processing facility that the offshore pipelines empty into, and Lines CA-324/325 that then transport transformed products out of the Las Flores Canyon processing facility, are all a single pipeline facility. That position did not address the details of the three systems: The Offshore Emulsion Pipeline carries an emulsion of oil, other

8

hydrocarbons, sulfur, and water from the offshore oil platform to the Las Flores Canyon processing facility, where petroleum products are separated and treated and stored, before the separated oil portion is eventually transported to Kern County via Lines CA-324/325.

PHMSA gave Sable what it asked for, with limited analysis. RJN, Exh. A-1. First, in December 2025, after a decade of concurring that OSFM had jurisdiction over the intrastate onshore pipelines, PHMSA issued a letter purporting to preempt OSFM regulation. According to today's PHMSA, Lines CA-324/325 are part of a single, larger pipeline facility that "transports crude oil from the [outer continental shelf] to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California." *Id*. Less than a week later, PHMSA approved a restart plan for Lines CA-324/325 and issued an Emergency Special Permit.[5] Although the Emergency Special Permit mirrored much of OSFM's State Waivers, it removed the critical requirement that OSFM previously found Sable had not satisfied, concerning proper measurement of the pipe wall thickness and remediation prior to restart. Sable's Emergency Special Permit expired 60 days later by operation of law, and PHMSA is currently in the notice and comment period before deciding whether to issue Sable a new special permit. FR Doc. 2026-03686 (Feb. 23, 2026). Sable thus currently has *no* permit from either pipeline safety regulator.

## VI. THE STATE COURT REJECTED SABLE'S PREEMPTION THEORY

In December 2025, non-governmental organizations Environmental Defense Center (EDC), et al. petitioned for review in the Ninth Circuit, challenging PHMSA's Restart Plan approval and Permit issued earlier that month.[6] In January 2026, California, by and through the Attorney General and OSFM, also filed a Petition for Review in the Ninth Circuit, challenging PHMSA's December orders

---

[5] "Special Permit" is PHMSA's federal analogue to OSFM's State Waivers.

[6] 49 U.S.C. § 60119 provides that petitions for review of PHMSA orders shall be filed in federal appellate courts, not federal district courts.

purporting to federalize Lines CA-324/325. RJN, Exh. A (Petition for Review). Briefing is underway in the Ninth Circuit in those direct challenges to PHMSA's actions. Resolution of this motion, however, does not turn on the outcome before the Ninth Circuit.

In the Santa Barbara County Superior Court case (*Center for Biological Diversity v. CAL FIRE* and *Environmental Defense Center v. CAL FIRE*, Santa Barbara County Superior Court Case Nos. 25CV02244 and 25CV02247), Sable raised federal preemption in a Motion for Reconsideration, seeking termination of the preliminary injunction, relying on PHMSA's December 2025 orders. The Santa Barbara County Superior Court denied Sable's motion in February 2026, keeping its preliminary injunction in place. RJN, Exh. D.[7]

## VII. THE ENERGY SECRETARY'S ORDER UNDER THE DEFENSE PRODUCTION ACT AND SABLE'S RESTARTING OF THE PIPELINE

On Inauguration Day in January 2025, the President issued an executive order declaring a "national energy emergency." Executive Order 14156. In December 2025, Sable sent a letter to the General Counsel for the United States Department of Energy requesting an order under the Defense Production Act to allow Sable to sidestep federal, state, and local requirements. 50 Op. O.L.C. (Mar. 3, 2026) (slip. op. at 3), available at https://www.justice.gov/olc/media/1429671/dl?inline (OLC Opinion). On March 3, 2026, the United States Department of Justice's Office of Legal Counsel issued a memorandum opinion in response to the Department of Energy's request, which DOE had made at Sable's behest. *Id*. In it, the Office of Legal Counsel concluded that the President could issue an order under the Defense Production Act directing Sable to commence operating Lines CA-324/325 free from state and federal environmental and property laws, *and* without

---

[7] The Santa Barbara County Superior Court has another hearing set for April 17, 2026, addressing the continued effect of its preliminary injunction. California will provide an update about the result of this hearing in its reply brief, and expects that Sable will do the same.

regard to any existing court orders, including this Court's Consent Decree. *Id*. On March 13, 2026, the President issued an Executive Order delegating certain of his authority under the Defense Production Act to the Secretary of Energy.[8] That same day, the Secretary of Energy issued a "Pipeline Capacity Prioritization and Allocation Order" that provides, among other things, that "Sable is directed to immediately commence performance under contracts or orders for service … for hydrocarbon transportation capacity" through, among other facilities, Lines CA-324/325. ECF 49-2 at 362-65. Sable did not request that this Court modify or lift its existing Consent Decree. Instead, according to its press release, it simply began transporting crude oil through Lines CA-324/325, relying on one Executive Branch agency's legal opinion that another Executive Branch agency action could excuse it from complying with a final judgment of the Judicial Branch. RJN, Exh. K.

The President subsequently acknowledged, both in writing and in an address to the American people, that there is not in fact an oil shortage in the United States, stating, "To those countries that can't get fuel. . . I have a suggestion. Number one, buy oil from the United States of America; we have plenty. We have so much."[9] Rather than national security, increased oil production appears to be about increased revenue for oil companies.[10]

## LEGAL STANDARDS

Courts may issue further orders to obtain compliance with a court order. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 860 (9th Cir. 2007); *Hook v. Arizona Dep't of Corr.*, 972 F.2d 1012, 1014 (9th Cir. 1992); FRCP 70.

Enforcement is proper upon disobedience to a specific and definite court

[8] https://www.whitehouse.gov/presidential-actions/2026/03/adjusting-certaindelegations-under-the-defense-production-act/
[9] https://www.whitehouse.gov/releases/2026/04/president-trump-delivers-powerful-primetime-address-on-operation-epic-fury/.
[10] The White House (@WhiteHouse) X post March 12, 2026, "The United States is the largest Oil Producer in the World, by far, so when oil prices go up, we make a lot of money."

order by failure to take all reasonable steps within the party's power to comply. *In re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). The contempt "need not be willful," and there is no good faith exception to the requirement of obedience to a court order. *Id.* The moving party must demonstrate that the other party violated the court's order by "clear and convincing evidence," not merely a preponderance. *Id.*

A party ordinarily may not defend against the allegation of violation of a court order on the basis that the order is invalid. *Zapon v. United States*, 53 F.3d 283, 285 (9th Cir. 1995) (citing *Walker v. City of Birmingham*, 388 U.S. 307 (1967) ("Only in the rarest of situations do federal courts countenance a party's disregard of an existing court order….")). If a party wishes to modify an injunction, it must seek that modification from the court *first,* while maintaining compliance with the court order.

The Court may extend injunctive relief against a third party to make its orders effective. FRCP 71. While such orders sometimes implicate principles of fairness where third parties are strangers to the case, that is not the case for successors in interest. *Golden State Bottling Co. v. Nat'l Labor Rels. Bd.*, 414 U.S. 168, 179 (1973). Sable acquired Lines CA-324/325 from Plains, and expressly assumed the role of enjoined defendant under the Consent Decree when it executed the Assumption Agreement. RJN, Exh. E. Specifically, Sable agreed to be bound by Appendices B and D, which impose the State Waiver requirements. *Id.* at 4.

ARGUMENT

I.   **SABLE AND THE UNITED STATES ARE VIOLATING THE TERMS OF THE CONSENT DECREE**

A.   **Sable's Transportation of Crude Oil Through the Pipelines Without OSFM Approval Violates the Consent Decree**

Sable expressly agreed to be bound by the Consent Decree, meaning that Sable must obtain State Waivers and an approved Restart Plan from OSFM before it can transport crude oil through Lines CA-324/325. RJN, Exh. E (Assumption

Agreement); ECF 6-1 (Consent Decree) at 80 ("Plains must receive a State Waiver from the OSFM prior to restarting Line 901 [Line CA-324].”), at 96 ("Plains shall develop and submit . . . a written Restart Plan for Line 901 [Line CA-324] to the OSFM for review and approval."). The Consent Decree is an order of this Court and a final judgment. ECF 33 (Order Entering Consent Decree), ECF 6-1 at 61 (Part XXVII. Final Judgment). The State Waivers are an essential component of the Consent Decree.

Sable restarted Lines CA-324/325 on March 14, 2026, without obtaining and complying with State Waivers and a Restart Plan from OSFM, and therefore has been in violation of the Consent Decree for one month already.

**B.     Federal Law Requires Sable to Obtain a Waiver of Compliance with Federal Regulations from OSFM Before It Operates Lines CA-324/325**

Federal law forms the basis for the provisions in Appendix B and D of the Consent Decree, which require Sable to obtain, from OSFM, a waiver of federal regulations before Sable can restart the lines. When the parties agreed to these conditions and this Court adopted them, everyone shared three key understandings:

(1) Lines CA-324/325 are intrastate pipelines subject to state regulation,

(2) Lines CA-324/325 lack effective cathodic protection, so federal regulations prevent operation of the Lines CA-324/325 absent a waiver, and

(3) federal law authorizes OSFM, not any federal agency, to waive compliance with those regulations. 49 U.S.C. § 60105.

The Consent Decree is consistent with and follows from these shared understandings of the facts and law. Consistent with the Pipeline Safety Act, the Consent Decree requires Sable to obtain approval from the state regulator, OSFM, prior to restarting Lines CA-324/325. ECF 6-1 at 80, 96. The Consent Decree has not been modified, and operates as a judgment that binds Sable (as successor in interest) and the United States.

13

### C.   Sable Needs a Waiver from OSFM, and Has None

Lines CA-324/325 are underground pipelines that transport crude oil at high temperature. RJN, Exhs. I, J (OSFM State Waivers), A-3 (PHMSA Special Permit). Federal law requires them to operate with a functional anticorrosion system. 49 CFR §§ 195.452(h)(4)(iii)(H), 195.563. After Lines CA-324/325 failed and caused the Refugio Oil Spill, PHMSA, OSFM, Plains, and all other parties acknowledged that Lines CA-324/325 were not compliant with federal regulations and, because of their design, could not comply with federal regulations. ECF 1 at 44, ECF 28-9 at 14. All parties to the Consent Decree further agreed that OSFM approval would be required prior to any restart. ECF 6-1 at 80, 96.

But Sable has now abandoned all efforts to obtain permission from OSFM. Sable never completed the requirements of the State Waivers, and recently abandoned them. RJN. Exh. F. Because Sable did not obtain a modification or termination of the Consent Decree, that Decree prohibits Sable from restarting Lines CA-324/325 without OSFM approval.

### D.   The United States Violated the Consent Decree

The federal government's PHMSA Orders under the Pipeline Safety Act violate the Consent Decree, as does the federal government's reliance on the Defense Production Act to assert that requirements of the Consent Decree can be ignored.

The United States agreed to the Consent Decree. ECF 6-1 at 62-63. The Consent Decree cannot be modified except through a motion made to this Court. *Flores v. Rosen*, 984 F.3d 720, 740–41 (9th Cir. 2020) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992)); *Zapon v. United States*, 53 F.3d 283, 285 (9th Cir. 1995); see Legal Standards section, above. It is for *this Court* to say if its order need no longer be followed; it is not for the Executive Branch to say so unilaterally. Allowing the Executive Branch to alter the effect of a court order by its own declaration would violate the separation of powers. *See generally Plaut v.*

14

*Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19 (1995) (Article III "gives the Federal Judiciary the power, not merely to rule on cases, but to decide them, subject to review only by superior courts in the Article III hierarchy—with an understanding, in short, that 'a judgment conclusively resolves the case' because 'a "judicial Power" is one to render dispositive judgments'"). While "[p]rospective relief under a continuing, executory decree remains subject to alteration due to changes in the underlying law," *Miller v. French*, 530 U.S. 327, 344 (2000), that does not license parties to decide on their own that the law has changed; they must seek relief from the court.

In December 2025, PHMSA purported to displace OSFM from jurisdiction over Lines CA-324/325. RJN, Exh. A-1. PHMSA, rather than OSFM, approved a restart plan. RJN, Exh. A-2. And PHMSA issued an emergency special permit that contained laxer safety requirements than OSFM had imposed. RJN, Exh. A-3. As a result of PHMSA's orders, the United States has violated the Consent Decree by purporting to displace OSFM from its role under the Consent Decree.

## II.   THE CONSENT DECREE APPLIES TO SABLE

Sable incorrectly argues that it is not bound by the Consent Decree. ECF 53 at 10-12.[11] In February 2024, Sable acquired Pacific Pipeline Company, which now owns and operates Lines CA-324/325. As a condition of that acquisition, Sable agreed to be bound by the Consent Decree. RJN, Exh. E (Assumption Agreement). The United States recognizes that "Sable, a nonparty to the Decree, acquired the Segments and contractually agreed to be bound by the Consent Decree." ECF 49 at 11. However, the United States now argues the Consent Decree may be terminated without assuring Sable carries on the obligations because Plains is the only party that needs to comply. The United States cites no legal basis supporting the assertion that an entity may assume the terms of a consent decree as a matter of contract but

---

[11] Sable does not explain the basis on which it would have standing to submit an opening brief if it were in fact a non-bound non-party.

not be subject to court enforcement of those terms. Straightforward application of FRCP 65 and 71 dictates otherwise.

A consent decree is both a contract and a judicial act. *Smith v. Sumner*, 994 F.2d 1401, 1406 (9th Cir. 1993) ("Consent decrees have a dual nature"). Sable is in privity with parties to the Consent Decree by virtue of the Consent Decree's express language. ECF 6-1 at ¶ 4 ("[T]he obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree."). A consent decree may "be enforced against those to whom the business may have been transferred, whether as a means of evading the judgment or for other reasons." *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 176 (1973) (citing *Regal Knitwear Co*. v. *NLRB*, 324 U.S. 9, 14 (1945).) Under the principles established in *Golden State Bottling Co.,* a "bona fide purchaser" who acquires the enterprise at issue with knowledge of the outstanding obligations is considered in privity for purposes of Rule 65(d). *Id.* at 180. Sable acquired Lines CA-324/325 with full knowledge of the Consent Decree's binding requirements, of which Plains' (now Sable's) potential liability was a factor "reflected in the price" of the pipeline acquisition. *Id.* at 185. The Ninth Circuit has routinely held that absent express language in a consent decree precluding successor liability, a party on notice of its predecessor's obligation and who assumes the "continuity of operation" is bound by the terms of the consent decree. *Bates v. Pac. Mar. Ass'n.,* 744 F.2d 705, 709 (9th Cir. 1984).

Further, the United States' position that Sable is not bound runs counter to the negotiated terms of the Consent Decree. Specifically, the Consent Decree orders that the pipeline owner (first Plains, now Sable) may not restart until it receives Restart Approval from OSFM. ECF 6-1 at 80-84. Allowing Sable to assume control over pipeline operations and assume all of Plains' obligations without being subject

16

to the Consent Decree—one of Plains' most significant obligations—is nonsensical. "[D]efendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV 18-1882 JGB (SHKx), 2023 U.S. Dist. LEXIS 64630, at *49-50 (C.D. Cal. Apr. 12, 2023); *see also Jeff D. v. Otter*, 643 F.3d 278, 288 (9th Cir. 2011) ("A court considering termination of a consent decree in light of performance of its specific terms 'must also consider the more general goals of the decree which the terms were designed to accomplish'"). This is simply an attempt by the United States and Sable to sidestep the Consent Decree.

The United States incorrectly cites *Association for Retired Citizens of Connecticut, Inc. v. Thorne* for the proposition that there is "no basis to extend terms of a consent decree to a nonparty, even if the nonparty's actions may frustrate the court's order." 30 F.3d 367, 370 (2d Cir. 1994); ECF 49 at 18. But *Thorne* goes on to say that "a party that did [] agree to it" may be bound by it. Thorne, at 370. Again, Sable has agreed to be bound through the plain language of the Consent Decree, the Assumption Agreement, and Sable's statements to this Court. The Ninth Circuit has held that a consent decree is binding on those with "close affiliation with the enjoined party [] or its status as a successor to the enjoined party" after the consent decree has been issued. *Consumer Fin. Prot. Bureau v. Howard Law, P.C.*, 671 F.App'x 954, 955 (9th Cir. 2016); *see also Golden State Bottling*, 414 U.S. at 176. Because of Sable's agreement, this case does not resemble *Sierra Club v. North Dakota,* 868 F.3d 1062, 1067 (9th Cir. 2017), which concerned a party that objected to a consent decree and did not assume its obligations.

Sable, for its part, argues it is not bound by the Court-ordered operational requirements for Lines CA-324/325. Despite admitting that "Sable has contractually agreed to be bound by certain provisions of the Consent Decree" ECF

17

44 at 3. Sable claims the Consent Decree "expressly limits itself in relation to third parties." ECF 53 at 11. But as relevant here, the Consent Decree expressly does the opposite: the Consent Decree states that "the obligations of this Consent Decree apply to and are binding upon the Parties *and any successors, assigns . . ."* ECF 6-1 at ¶ 4. Sable is most certainly both and must answer to the Court. Based on the principles established in *Golden State Bottling*, Sable, as successor to Plains, must comply with the Consent Decree's injunction under FRCP 65. And the Court's order may be enforced against Sable pursuant to FRCP 71 regardless of how Sable characterizes its role in this litigation. FRCP 71 dd("When an order . . . may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party.").

Moreover, Sable's recent judicial admissions in other cases about these pipelines directly contradict its statements made to this Court and affirm Sable's status as a bound successor. Less than two weeks ago, Sable filed an Opposition to a Motion for Preliminary Injunction in a case involving Sable's trespass in Gaviota State Park when it restarted Line CA-325 without a new easement. In that filing, Sable essentially acknowledged its status and obligations under the Consent Decree. *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp. et al.*, C.D. Cal. Case No. 2:26cv02946, ECF 24 at 4 (filed Apr. 3, 2026) ("Sable subsequently pursued repair and maintenance of Segment CA-325 in accordance with the Consent Decree [] underst[anding] that the purpose of these maintenance and repair activities was to carry out work in accordance with the Consent Decree's requirements"); *see also id.* at 5 (complaining that State Parks imposed new regulatory requirements that Sable had "not discussed, let alone agreed to, in the Consent Decree."). Sable cannot now mischaracterize the effect of its privity status when convenient to the tactical needs of this litigation. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (party judicially estopped from making assertion contrary to position it took in other litigation). Because Sable has alleged that it has rights

18

under the Consent Decree in other matters, it should be judicially estopped from asserting here that it is not subject to the Consent Decree at all.

**III.   NO CIRCUMSTANCES EXCUSE PAST OR CURRENT VIOLATIONS OF THE CONSENT DECREE, AND IT SHOULD NOT BE TERMINATED OR MODIFIED MOVING FORWARD**

The Court should deny the United States and Sable's motion to modify or terminate the Consent Decree because they unilaterally took actions that plainly circumvented the Consent Decree and, in so doing, willfully violated it. As sophisticated litigants, they knew the proper course of action was to first petition the Court for relief, not act unilaterally and pray for forgiveness later. But even if the Court overlooks this willful and unexcused violation looking back, the Consent Decree should still not be modified or terminated moving forward.

The Defense Production Act and the Pipeline Safety Act—upon which the United States and Sable rely—operate consistent with the constitutional principle that vests the nation's judicial power in the federal courts. U.S. Const. art. III § 2, cl. 1. Neither the DPA nor the PSA supports the United States' extraordinary position—also articulated in a recent opinion from the U.S. Department of Justice—that an Executive Branch official may nullify with the stroke of his pen a Consent Decree previously approved by a federal judge. *See* OLC Opinion at 20-22. Any interpretation that either statute allows the Executive Branch to prevent the Judicial Branch from enforcing its own judgments would raise grave questions about violating the separation of powers. *See Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991).

**A.   Ninth Circuit Precedent Bars Modification of a Consent Decree Based on a Party's Own Actions**

The United States seeks a modification of the Consent Decree under Rule 60(b). "[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). The

United States points to two changed circumstances. ECF 49 at 8. First, the United States points to PHMSA's December 2025 reclassification of Lines CA-324/325 from *intra*state, subject to OSFM jurisdiction, to *inter*state, subject to PHMSA's jurisdiction.[12] *Id.* Second, the United States points to the Secretary of Energy's invocation of the Defense Production Act. *Id.* Both of these purported changed circumstances are actions *by the federal government itself* that purport to change the applicable legal landscape. Even assuming the PHMSA and DPA Orders were valid, the Ninth Circuit has flatly "reject[ed] the notion that the executive branch of the government can unilaterally create the change in law that it then offers as the reason it should be excused from compliance with a consent decree." *Flores v. Rosen*, 984 F.3d 720, 741 (9th Cir. 2020).[13] "[T]he substantive effect of such a holding"— allowing the Executive Branch to void a Consent Decree based on its own pronouncements— "would be to give the [Executive Branch] the right to unilaterally withdraw the jurisdiction of the district court and of this circuit." *Nehmer*, 494 F.3d at 860. And that would violate the separation of powers and be beyond the bounds of Executive power in Article I of the United States Constitution.

In *Flores*, the United States entered into a consent decree to address detention, release, and treatment claims by both accompanied and unaccompanied minors subject to immigration detention. *Flores*, 984 F.3d at 726-27. Without first seeking modification of the order from the District Court, the federal Department of

___

[12] Addressing the PHMSA orders, the United States alleges that Lines CA-324/325 "have since been reclassified as *interstate* . . . and are now subject to PHMSA's sole and exclusive jurisdiction." When the United States says the Pipelines "have since been reclassified," its use of the passive voice fails to hide that PHMSA, an agency of the United States that signed the Consent Decree, ECF 63 at 102, reclassified the Pipelines, and did so at the behest of Sable.

[13] The OLC Opinion states that "a DPA order might also constitute changed circumstances sufficient to require modification of the Consent Decree." OLC Opinion at 22. This argument is foreclosed, at least in the Ninth Circuit, because binding Ninth Circuit cases hold that federal agencies cannot create changed circumstances with their own orders. *Flores*, 894 F.3d at 741, *Nehmer*, 494 F.3d at 860. Neither the moving papers nor OLC Opinion addresses *Flores* or *Nehmer*.

20

Homeland Security (DHS) promulgated a final rule addressing immigration detention of minors that deviated from the stated terms of the decree as to accompanied minors, contending that it faced "operational difficulties . . . with respect to a state-licensing requirement" intended to ensure that parents and legal guardians would be housed together with their children. *Id.* at 730. Plaintiffs moved to enforce the *Flores* decree against DHS' implementation of the contrary regulation, and DHS moved to terminate the decree.

DHS contended that the issuance of its final rule constituted a "fundamental change" that justified termination of the *Flores* decree. *Flores*, 984 F.3d at 741. The Ninth Circuit rejected this argument, explaining that an agency of the Executive Branch cannot create changed circumstances by pronouncing its own new rule. *Id*. Where the federal government promulgated a rule inconsistent with the Consent Decree, it was the Court's role to reject that basis for relief.

The same is true here. The Consent Decree in this case gives OSFM the power and responsibility to receive applications for and issue State Waivers, and to approve or reject a restart plan for Lines CA-324/325. ECF 6-1 at 80, 96. PHMSA and the Department of Energy issued orders that the United States purports authorize or direct Sable to restart Lines CA-324/325 absent OSFM approval. ECF 49 at 12-14, 22-27 (United States' Brief). The PHMSA and Department of Energy orders usurp the rights of the State of California and OSFM, contrary to the terms of the Consent Decree. As explained in *Flores*, PHMSA's and the Department of Energy's own orders cannot lawfully form the basis for "changed circumstances" that would justify modification or termination of a consent decree.

The California agencies have preserved their rights by petitioning for direct review by the Ninth Circuit of whether PHMSA acted consistent with the Administrative Procedure Act when its asserted jurisdiction. But the venue for a direct review of the PHMSA orders does not deprive this Court of jurisdiction to hold that that unilateral action by the federal government cannot override the

Consent Decree.

*Nehmer* is on point. 494 F.3d at 853-54. In *Nehmer*, the plaintiff class and the Department of Veterans Affairs (VA) entered into a consent decree addressing claims by veterans and survivors suffering from diseases connected to the use of Agent Orange during the Vietnam War. *Id*. That consent decree required readjudication of veterans' claims when a disease was determined to be connected to Agent Orange. *Id*. Years after the Ninth Circuit confirmed that interpretation of the consent decree, the VA promulgated a final rule stating that the readjudication requirement did not apply to a particular leukemia based on the VA's interpretation of the Agent Orange Act. *Id.* at 854. As in *Flores*, the Ninth Circuit rejected the view that the agency could create changed circumstances based on its own regulations. *Id*. at 860.

The VA contended that the challenge could not be brought within the consent decree case because challenges to the relevant VA regulation were controlled by an exclusive review provision that routed such challenges to the Federal Circuit. *Id.* at 856 (citing 38 U.S.C. § 502). The Ninth Circuit explained that while such a provision governed facial challenges to VA regulations, it did not govern as-applied challenges, and an allegation that a party failed to comply with a consent decree is an as-applied challenge. *Id.* at 858. More, the Ninth Circuit explained that an executive agency cannot have the power, under the U.S. Constitution, to eliminate jurisdiction in one court and shift it to another. *Id.* at 860-61.

Under *Nehmer*, this Court can enforce its Consent Decree notwithstanding the pending direct challenges to the PHMSA Orders in the Ninth Circuit. Indeed, PHMSA's review provision states that "A remedy under paragraph (1) [direct review by a circuit court of appeal] is in addition to any other remedies provided by law." 49 U.S.C. § 60119(a)(2). That preserves this Court's power to review—and reject—the United States's position that PHMSA's unfounded assertion of jurisdiction allows the federal government to ignore the Consent Decree's

requirement that OSFM approve any restart of Lines CA-324/325. That is particularly true here, where the United States itself raises the PHMSA Orders in its motion to terminate or modify. The United States cannot invoke the PHMSA Orders to seek relief from the Court, then claim the Court cannot consider those Orders.

### B.     The DPA Does Not Excuse Compliance with the Consent Decree, or Federal and State Law

The Defense Production Act (DPA) contains no provisions indicating it displaces the federal court's power to enforce its own judgments or power preserved by Congress to California in other statutes.

The Office of Legal Counsel articulated two reasons the DPA Order should supersede the Consent Decree, but both are entirely meritless, and United States and Sable do not even attempt to rely on them. First, OLC contended the DPA's provision immunizing entities from "damages or penalties" (50 U.S.C. § 4557) also immunizes them from contempt for violating federal court orders. The United States and Sable take positions similar to the OLC Opinion, which asserts a maximalist view that a party subject to a DPA order cannot be subject to judicial enforcement because Section 4557 prohibits imposition of "penalties." No appellate court has agreed with this interpretation, and two federal courts of appeals have reached contrary conclusions. The Eighth Circuit and the Federal Circuit both concluded that Section 4557 only protects parties from liability when a firm's prioritization or allocation away from existing customers, ordered by the federal government, causes the firm to breach contracts with their existing customers. *See United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995) (citing *Hercules, Inc. v. United States*, 24 F.3d 188, 203–04 (Fed. Cir. 1994)). In its briefing at the Supreme Court in *Hercules*, the United States agreed, stating "the language and statutory context of Section 707 [50 U.S.C. § 4557] show that it protects contractors from claims arising out of a DPA order's displacement of work

23

for other customers, not from tort liability to parties who claim to have been injured . . . ." Brief for Respondent United States, *Hercules, Inc. v. United States*, No. 94-818 (516 U.S. 417), 1995 WL 495540, at *34. That provision does not apply in this case, because California does not seek damages or penalties due to a firm's prioritization or allocation away from existing customers. And Section 707 has nothing to say about federal courts' enforcement of their own final judgments. *See generally Learning Res., Inc. v. Trump*, 147 S. Ct. 628, 644-45 (2026) (Congress uses different terms to confer different powers, and courts do not infer that Congress conferred a power based on conferral of different power).

Second, OLC suggested the Consent Decree's "force majeure" clause could be triggered by the DPA Order. OLC Opinion at 21-22. But the force majeure clause applies only to an "event arising from causes beyond the control of Defendants". *Id.*; ECF 6-1 at 39 ¶ 44. Sable affirmatively sought both the PHMSA Orders and the DPA Order. No plausible reading of Paragraph 44 contemplates that Sable can create its own events, and then claim those events are beyond its control. In addition, the force majeure clause requires the party asserting force majeure to make "best efforts to fulfill the obligation." Sable did the opposite. Sable has not complied with OSFM State Waivers, and on February 26, 2026, Sable's outside counsel sent a letter to OSFM stating that it "relinquishes, surrenders, and abandons the State Waivers." Consistent with *Flores* and *Nehmer*, parties to a consent decree cannot make their own changed circumstances and then use those changes to justify modification of a consent decree.

### 1. The DPA Does Not Displace Federal Law, Including a Consent Decree Entered Under Federal Law

The United States and Sable contend that the Defense Production Act preempts California pipeline safety law. Even if that were true, it would make no difference because Sable is bound by *federal* pipeline safety law, also requiring Sable to obtain OSFM approval as laid out in the Consent Decree. Federal courts

24

have confirmed that the Defense Production Act does not shield defendants against federal law. *See United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995) (holding defendant liable under CERCLA). Sable is not in compliance, and because of the design defect in Lines CA-324/325, cannot come into compliance with federal law as it governs here, both through the Consent Decree *and* under the delegation to state enforcement agencies under the federal Pipeline Safety Act. ECF 6-1 at 80, 96 (Consent Decree provisions assigning waiver and restart to California), 49 U.S.C. § 60105 (Pipeline Safety Act provision authorizing only state to waive compliance with federal regulations for intrastate pipeline). The United States, by invoking the Defense Production Act, purports to displace OSFM's power to regulate Sable. But nothing in the Defense Production Act purports to displace federal judicial decrees, including this Consent Decree, nor federal pipeline safety law, which assigns that responsibility to California.[14] An order by the Executive Branch cannot preempt state authority when Congress has preserved that authority. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . ."); *see also Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298, 330 (1994) (executive pronouncements of policy cannot invalidate "congressionally-condoned" state action), *Chamber of Com. Of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996) (when an executive action conflicts with a statute, the statute controls).

### 2. The DPA Does Not Displace State Law in an Area Where Congress Preserved State Power

The United States and Sable contend that the Defense Production Act preempts California pipeline safety law. "The case for federal preemption is

---

[14] Of the DPA subsections invoked by the Secretary of Energy, only 50 U.S.C. § 4511(c) purports to operate "notwithstanding" other law, and there it is only "Notwithstanding any other provision of this chapter." The Pipeline Safety Act is not in the same chapter.

particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to 'stand by both concepts and to tolerate whatever tension there [is] between them.'" *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67 (1989). Here, Congress not only stood by and tolerated state power; it expressly preserved state jurisdiction over intrastate pipelines in the Pipeline Safety Act. 49 U.S.C. §§ 60101(a)(8)(B), (a)(10), 60104(c). In the regulation of intrastate pipelines, Congress disabled the federal government from regulating.

That a federal agency interpretation leads to preemption does not help the United States or Sable. To find preemption, it must be "the clear and manifest purpose of Congress[,]" not the clear and manifest purpose of the Executive Branch. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Federal "agencies have no special authority to pronounce on pre-emption absent delegation by Congress." *Id.* at 577. Even if there was ambiguity, an executive agency cannot use ambiguity as a basis to insert its judgment about the meaning of a statute. *See Loper Bright Enterprises v. Raimondo* (2024) 603 U.S. 369, 400–401 [Federal "agencies have no special competence in resolving statutory ambiguities. Courts do."].) The Secretary of Energy cannot override the intent of Congress with a vaguely worded order under the uncertain terms of a different statute. That is particularly so when the requirements to comply with a state agency's approval process are embodied not just in Congressionally condoned state law, but also in federal law and a federal court judgment, as here.

### 3. The DPA Order Is Invalid Because It Does Not Prioritize or Allocate, and Does Not Comply with Department of Energy DPA Regulations

The United States and Sable rely on the DPA Order to request modification or termination of the Consent Decree.[15] That reliance is misplaced. The DPA

---

[15] California is separately challenging the validity of the DPA order in another lawsuit. *State of California v. Wright*, C.D. Cal. Case No. 2:26cv03396-AH-BFM, (continued…)

authorizes prioritization and allocation—that is, performance of some orders before others or allocation of already-available resources to some buyers before others. *See* 50 U.S.C. § 4511(a), (c). An allocation order is "an official action to control the distribution of materials, services, or facilities;" it changes who gets delivery of limited resources; it is not an order to produce something not otherwise existing. 10 C.F.R. § 217.20. Similarly, a prioritization order changes which order is filled first, and does not direct more production overall. 10 C.F.R. § 217.31. The DPA Order issued here is neither an allocation nor a prioritization order. It instead purports to direct Sable to bring a new transport route online. The United States' position seems to be that the DPA authorizes the Executive Branch to displace state and federal statutes and judicial orders without limitation. That is contrary to the text of the DPA and would grant executive authority without a limiting principle. That is not what the Defense Production Act authorizes. This Court should reject that view in favor of the specific language of prioritization and allocation in the statutes.

Moreover, an agency action that is inconsistent with federal regulations—including its own—is unlawful. *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003) ("Having chosen to promulgate the *DPS Policy,* the FWS must follow that policy."); *see also Morton v. Ruiz*, 415 U.S. 199, 235 (1974). The DPA Order does not provide the procurement information required by the Department of Energy's regulations. For example, orders under the DPA must contain start and end dates. 10 C.F.R. §§ 271.51(f), 217.54(b). Orders must contain detailed descriptions of what is to be prioritized or allocated. 10 C.F.R. §§ 271.51(f), 217.54(a). They must use priority ratings (DO or DX). 10 C.F.R. § 271.31. The DPA Order does of these. Also, allocation orders must "be distributed

filed Mar. 31, 2026. The United States and Sable here rely on the DPA Order as a basis for the relief they seek. By doing so, they open the door to evaluate, in this case and in California's opposition to that motion, whether that order is valid. *See, generally*, *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 156 (2025).

equitably among the suppliers of the materials, services, or facilities being allocated," 10 C.F.R. § 217.50, but this order applies only to Sable.

Because the DPA Order is not a valid order it has no legal force. The Court should not consider it a defense to violation of—much less a cause to modify or terminate—the Consent Decree.

### C.   The Consent Decree Cannot Be Terminated Because Lines CA-324/325 Are *Intra*state Lines

The United States and Sable also rely on the PHMSA Orders as the basis for their motion to modify or terminate the Consent Decree. They must demonstrate not only that those orders exist, but that they are valid.

When a state authority has complied with the requirements of the Pipeline Safety Act, only the state agency, not PHMSA, can issue waivers for *intra*state pipelines in that state. 49 U.S.C. § 60105 ("the Secretary of Transportation may not prescribe or enforce safety standards and practices for an intrastate pipeline facility or intrastate pipeline transportation to the extent that the safety standards and practices are regulated by a State authority . . . ."). The Consent Decree is consistent with this statutory rule; the relief requested by the United States is not.

PHMSA contends that Lines CA-324/325 are interstate and it therefore has jurisdiction and OSFM does not. Because PHMSA took this position in an order, California made its initial challenge to that order at the Ninth Circuit Court of Appeals. 49 U.S.C. § 60119. As such, the question of interstate versus intrastate status is presently before the Ninth Circuit in the petitions for review challenging PHMSA's December 2025 orders. This Court need not decide that issue in order to enforce the Consent Decree. The Consent Decree has force and binds the United States regardless of any unilateral assertion of reclassification.

Indeed, the Consent Decree is premised on the intrastate status of Lines CA-324/325, which all parties, including the United States, until very recently agreed was the appropriate framework and understanding for these Pipelines. The Consent

28

Decree requires Sable to obtain approval from OSFM prior to restarting Lines CA-324/325. ECF 6-1 at 80, 96. The United States and Sable have been executing for months a plan to act counter to the Consent Decree; it was incumbent on them to use that time to seek to modify the Consent Decree through the appropriate channel, not to unilaterally alter the status quo. ECF 6-1 at ¶ 98 ("The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court."). Simply restarting Lines CA-324/325 was not the proper channel.

Importantly, and despite multiple agency orders and briefs in multiple cases, neither the United States nor Sable has yet articulated a basis for the determinations in the PHMSA orders. In the absence of any support for their assertion, the federal government's position on PHMSA's jurisdiction is unlikely to be sustained by the Ninth Circuit even if the federal government were not bound by the Consent Decree.

Lines CA-324/325 are properly *intra*state pipelines. Under the Pipeline Safety Act, an *inter*state pipeline facility transports hazardous liquid "between (i) a place in a State and a place outside that State; or (ii) places in the same State through a place outside the State." 49 U.S.C. § 60101(a)(8)(B). Conversely, an *intra*state pipeline facility means one that is not interstate. 49 U.S.C. § 60101(a)(10). In other words, a pipeline that transports hazardous liquid from a place within a state to another place within the same state without passing through another state is *intra*state. The relevant "facility" is lines CA-324/325 themselves. It does not include a processing facility, because processing is not "transportation." 49 U.S.C. § 60101(a)(5), (22).

Now PHMSA purports to redefine CA-324/325 as part of a larger pipeline facility that includes not just the undersea Oil Emulsion Pipeline and CA-324/325,

but also the processing facility between them. PHMSA's prior definition was correct, and its new definition is wrong. The Las Flores Canyon processing facility, between the Oil Emulsion Pipeline and Lines CA-324/325, is not a pipeline. *Id.* Sable's own court filings confirm the Las Flores Canyon processing facility separates and treats hydrocarbons and sulfur products. RJN, Exh. B (Kern County Complaint), ¶ 19. Lines CA-324/325 begin in Santa Barbara County, California, where it receives processed oil from the Las Flores Canyon processing facility, and end in Kern County, California, without passing through any other state. That is not the same pipeline—or even the same substance being transported—as the offshore Oil Emulsion Pipeline that carries a mixture of untreated, crude products from the oil platform in federal waters to the Las Flores Canyon processing facility. PHMSA's assertion that Lines CA-324/325 are interstate is contrary to the statutes.

The United States and Sable point to Sable's unification of ownership of the Offshore Emulsion Pipeline, the Las Flores Canyon processing facility, and Lines CA-324/325 to conclude that all three constitute a single pipeline, and therefore are all under federal jurisdiction. But they point to no statute, case, or analysis that unified ownership changes the definition of a pipeline. Relevant definitions show that ownership is irrelevant. 49 U.S.C. § 60101(a)(5), (22). For the United States and Sable's new definition to be consistent with the law, each component of the newly defined facility must fall within the definition of a hazardous liquid pipeline facility, as defined by the Pipeline Safety Act, and they do not.

**IV. RELIEF IS WARRANTED GIVEN SABLE'S RESTART OF THE PIPELINE IN VIOLATION OF THE CONSENT DECREE**

Sable and the United States relied on the DPA Order to restart Lines CA-324/325 in violation of state and federal statutes and the Consent Decree, and to continue operating the pipeline once restarted, thereby undermining the Consent Decree and bypassing OSFM's authority to provide State Waivers and approve a Restart Plan. Having solicited the DPA Order, Sable welcomes its compulsion for

"immediate" restart. *See* DPA Order, ¶ IV(B), (G). Sable is more than willing to read the word "immediate" in the DPA Order as permission to ignore any and all laws that might slow oil transport in any way. Sable is relying on the DPA Order as reason to ignore its obligations under the Consent Decree. Relief is necessary to bring Sable into compliance with state and federal law and the Consent Decree. The Executive Branch may not unilaterally declare that an order of the Judicial Branch can be disregarded.

Sable should be ordered to come into immediate compliance with the Consent Decree, including ceasing operation of Lines CA-324/325 until such time as it has complied with restart requirements consistent with the Consent Decree. The United States should be ordered to cease directing Sable to act in violation of the Consent Decree. The Court should deny the United States' motion to modify or terminate the Consent Decree.

## CONCLUSION

For the reasons stated, California's motion to enforce should be granted and the United States' motion to modify or terminate should be denied.

31

Dated:  April 13, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General

*/s/ Michael S. Dorsi*
MICHAEL S. DORSI
Deputy Attorney General
*Attorneys for Plaintiffs*
*California Department of Parks and*
*Recreation, California State Lands*
*Commission, and California Department*
*of Forestry and Fire Protection's Office*
*of State Fire Marshal*

LA2015500901

32

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this brief

contains  9,470 words, which [choose one]:

_  complies with the word limit of L.R. 11-6.1.

X  complies with the word limit set by court order dated [pending by

stipulation dated 3/31/2027].

Dated:  April 13, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California

/s/ Michael T. Zarro
MICHAEL T. ZARRO
Deputy Attorney General
*Attorneys for*

33