ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
STEFAN J. BACHMAN (DC Bar Number 90008649)
Email: stefan.bachman@usdoj.gov
Senior Attorney
Environmental Enforcement Section
United States Department of Justice
150 M Street, N.E., Room 2.900
Washington, D.C. 20002
Tel: (202) 598-9566
*Counsel for Plaintiff United States of America*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. *et al.*,<br><br>Defendants. | Civil Action No. 2:20-cv-02415-SVW-SSC<br><br>**UNITED STATES' MEMORANDUM IN REPLY TO CALIFORNIA'S OPPOSITION TO MOTION TO TERMINATE/MODIFY CONSENT DECREE AND OPPOSITION TO CALIFORNIA'S MOTION TO ENFORCE DECREE**<br><br>**Date and time: June 1, 2026, 1:30 p.m.** |

## Table of Contents

**I.     Introduction**................................................................................1

**II.    Argument**....................................................................................2

    **A.     The Consent Decree should be terminated.** ......................................2

        1.     California forfeited any argument that the Consent Decree's plain termination standard is unmet............................2

        2.     California presents no valid basis for continuing the Consent Decree now that Plains has met the termination standard. ...................................................................3

        3.     California's arguments against termination rest on the unsupported premise that Sable is Plains' legal successor or assign. ...............................................................4

        4.     California's aggressive reading of the Court's jurisdiction over nonparties is unmoored from the Consent Decree's text and structure............................................................7

        5.     California presents no evidence of an actual safety risk that would result from termination. ............................................9

        6.     California's allegations against PHMSA are unfounded and not a basis for denying termination of the Consent Decree. ...................................................................11

    **B.     Alternatively, the Consent Decree should be modified.**..................13

        1.     California divorces the doctrine governing consent decree modification from the purposes that justify it and focuses on the wrong events—the United States did not create the changes warranting modification.............................14

        2.     Regardless of California's views, Sable must comply with the Defense Production Act order.............................18

    **C.     Federal Rules of Civil Procedure 65 and 71 are inapplicable.**.......18

        1.     Neither Rule 65 nor Rule 71 authorize the Court to enforce the Consent Decree against nonparty Sable............................18

i

**2.** Rule 65 does not apply because Sable is not "in active concert or participation" with Plains. ........................................20

**3.** Rule 71 does not extend the Consent Decree to Sable. ............23

**D.** **California's other arguments lack merit.**..................................................24

**1.** California cannot collaterally attack PHMSA's and the Secretary's independent decisions in this lawsuit. ..................24

**2.** There is no basis to "enforce the Consent Decree against the United States. ...............................................................................25

**E.** **California has not sought to use the Decree's internal enforcement tools.**.................................................................................27

**III.** **Conclusion** ......................................................................................................28

**Table of Authorities**

Cases

*Ass'n for Ret'd Citizens of Conn., Inc. v. Thorne*,
   30 F.3d 367 (2d Cir. 1994) ..................................................................... 19, 23, 26

*Bates v. Pacific Marine Association*,
   744 F.2d 705 ........................................................................................... 22, 23

*Citizens for a Better Env't v. Gorsuch*,
   718 F.2d 1117 (D.C. Cir. 1983)...................................................................... 5

*Cornerstone Credit Union League v. Consumer Fin. Prot. Bureau*,
   791 F. Supp. 3d 720 (E.D. Tex. 2025) ........................................................... 5

*cPanel, LLC v. Asli*,
   719 F. Supp. 3d 1133 (D. Or. 2024).......................................................... 20, 21

*Cruz v. Bondi*,
   146 F.4th 730 (9th Cir. 2025).......................................................................25

*Ctr. For Biological Diversity v. Envtl. Prot. Agency*,
   847 F.3d 1075 (9th Cir. 2017).......................................................................24

*Cygnus Telecomms. Tech., LLC v. Worldport Comms., Inc.*,
   543 F. Supp. 2d 1113 (N.D. Cal. 2008)........................................................22

*Flores v. Rosen*,
   984 F.3d 720 (9th Cir. 2020).........................................................................17

*Frew ex rel. Frew v. Hawkins*,
   540 U.S. 431 (2004) ......................................................................................19

*Gila River Indian Community v. Shoubroek*,
   145 F.4th 1058 (9th Cir. 2025)......................................................................23

*Golden State Bottling Co. v. NLRB*,
   414 U.S. 168 (1973) ......................................................................................22

*Hansberry v. Lee*,
   311 U.S. 32 (1940) ..........................................................................................7

*Harmon v. San Diego Cnty.*,
   477 F. Supp. 1084 (S.D. Cal. 1979) ...............................................................7

*Headwaters Inc. v. U.S. Forest Serv.*,
   399 F.3d 1047 (9th Cir. 2005).......................................................................21

*Int'l Techs. Consultants, Inc. v. Pilkington PLC*,
   137 F.3d 1382 (9th Cir. 1998)................................................................. 25, 26

*Jeff D. v. Otter*,
   643 F.3d 278 (9th Cir. 2011).........................................................................13

*Local No. 93, Int'l Assoc. of Firefighters, AFL-CIO v. City of Cleveland*,
   478 U.S. 501 (1986) ............................................................................... passim

i

*Martin v. Wilks*,
  490 U.S. 755 (1989) ......................................................................................5, 6

*Metro. Housing Dev. Corp. v. Village of Arlington Heights*,
  616 F.2d 1006 (7th Cir. 1980) ...........................................................................5

*Mi Familia Vota v. Fontes*,
  111 F.4th 976 (9th Cir. 2024) ............................................................................5

*Nat'l Archives & Recs. Admin. v. Favish*,
  541 U.S. 157 (2004) .........................................................................................25

*Nehmer v. U.S. Department of Veterans Affairs*,
  494 F.3d 846 (9th Cir. 2007) ..................................................................... 16, 17

*Peterson v. Highland Music, Inc.*,
  140 F.3d 1313 (9th Cir. 1998) .........................................................................23

*Plaut v. Spendthrift Farm*,
  514 U.S. 211 (1995) .........................................................................................26

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
  442 F.3d 741 (9th Cir. 2006) .......................................................................7, 12

*Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement & Power Dist.*,
  39 F. Supp. 3d 1051 (D. Ariz. 2014) ............................................................ 21, 22

*Rufo v. Inmates of Suffolk County Jail*,
  502 U.S. 367 (1992) .........................................................................................14

*Sierra Club v. North Dakota*,
  868 F.3d 1062 (9th Cir. 2017) .........................................................................19

*Speed Shore Corp. v. Denda*,
  605 F.2d 469 (9th Cir. 1979) .............................................................................4

*Stitching Pensioenfonds ABP v. Countrywide Fin. Corp.*,
  802 F. Supp. 2d 1125 (C.D. Cal. 2011) ...........................................................2

*Stovall v. Jefferson Cnty. Bd. of Educ.*,
  164 F.4th 554 (6th Cir. 2026) .........................................................................27

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
  322 F.3d 1064 (9th Cir. 2003) .........................................................................21

*United Pub. Workers of Am. (C.I.O.) v. Mitchell*,
  330 U.S. 75 (1947) ...........................................................................................27

*United States v. Armour & Co.*,
  402 U.S. 673 (1971) .................................................................................. passim

*United States v. Chem. Found.*,
  272 U.S. 1 (1926) .............................................................................................25

*United States v. McInnes*,
  556 F.2d 436 (9th Cir. 1977) .............................................................................4

*Vanguards of Cleveland v. City of Cleveland*,
  753 F.2d 479 (6th Cir. 1985) ...........................................................................20

ii

Statutes

49 U.S.C. § 60104(c) ........................................................................................26
50 U.S.C. § 4502(a)(5) ......................................................................................16
50 U.S.C. § 4511 ...............................................................................................27
50 U.S.C. § 4513 ................................................................................... 16, 18, 27
50 U.S.C. § 4556 ...............................................................................................16

Rules

Fed. R. Civ. P. 65 .............................................................................................20
Fed. R. Civ. P. 65(d)(2) ............................................................................... 19, 20
Fed. R. Civ. P. 71 .............................................................................................19

Regulations

49 C.F.R. Part 195 ...........................................................................................12

Other Authorities

50 Fed. Reg. 15895 ..........................................................................................12
50 Fed. Reg. 15897 ..........................................................................................12
*Declaring a National Energy Emergency*,
    Exec. Order No. 14156 ..............................................................................15

iii

## I.    Introduction

As the United States explained in its opening brief (Dkt. No. 49), the Consent Decree is now ripe for termination. The only two Defendants to the Decree (Plains) fully complied with its terms for the required period of five years and three months. Because California fails to respond to that argument, it has forfeited any contrary position, and the Court should terminate the Decree. At any rate, California's arguments for extending the Consent Decree to Sable—the nonparty currently operating Segments 901/CA-324 and 903/CA-325 ("the Segments")—find no support in the Consent Decree's plain text and structure or applicable case law. And California's resort to Federal Rules of Civil Procedure 65 and 71 fares no better. Stepping back to see the big picture, the Consent Decree has fully served its purposes, and Sable has now safely restarted the Segments with close oversight by PHMSA. Because Plains has satisfied the Decree's plain terms, the agreement should be terminated.

Alternatively, the Consent Decree should be modified to account for recent significant changes in fact and law. *First*, the jurisdictional status of the Segments has changed from *intrastate* to *interstate*, and PHMSA now has sole and exclusive jurisdiction over them. *Second*, the Secretary of Energy has determined that crude oil must be transported through the Segments to advance national security interests and has ordered Sable to do so immediately. California misplaces its focus on the *decisions* by PHMSA and the Secretary of Energy, and in so doing, it impermissibly seeks to collaterally attack them. But modification of the Consent Decree is necessary because of the underlying changes in circumstances—the *interstate* nature of the Segments and the facts underlying the national security determination by the Secretary of Energy. No one should be surprised that a Consent Decree executed more than five years ago needs to be modified to account for these material changes.

1

Finally, California asks this Court to "enforce" the Consent Decree against nonparty Sable by shutting down the Segments, which restarted 44 days ago and are now safely transporting tens of thousands of barrels of oil per day from the Outer Continental Shelf. (*See* Dkt. No. 49-3 (Hubbard Decl.) ¶¶ 14, 32). California offers no support for the extreme relief it seeks, and its request reveals its true aim: to stop the Segments from transporting oil by any means—despite today's need for reliable sources of domestic energy to safeguard military readiness, particularly on the West Coast. The Court should follow the facts and the law to terminate or modify the Consent Decree.

## II.    Argument

### A.    The Consent Decree should be terminated.

California does not dispute that Plains has met the standard for termination of the Consent Decree. The Court need not look any further. The balance of California's argument against termination rests on a legally unsupported theory that Sable is Plains' successor or assign under Paragraph 4 of the Decree and pretextual concerns of pipeline safety rebutted by the record.

1.    *California forfeited any argument that the Consent Decree's plain termination standard is unmet.*

"[F]ailure to respond in an opposition brief to an argument put forward in an opening brief [generally] constitutes waiver or abandonment in regard to the uncontested issue." *Stitching Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) (collecting cases); *see also* Local Rule 7-9. California's opposition does not dispute, or even address, the United States' principal argument for terminating the Consent Decree: that the termination standard applies only to Plains, and Plains has met the standard. (*Compare* Dkt. No. 49 at Page Id # 1384–85 *with* Dkt. No. 55 at Page ID # 1922–37). California provides no evidence of any noncompliance by Plains to justify delaying termination. Nor does it dispute that Plains has operated under the Decree for the

required five-year-and-three-month period or that Plains will incur unnecessary compliance costs if the Decree continues. (*See* Dkt. No. 55 at Page ID # 1922–37; Dkt. No. 49-2 (Seeley Decl.) ¶¶ 72–74; Dkt. No. 52-1 (Hodgins Decl.) ¶¶ 3–8).

California's forfeiture of this issue is dispositive and should end the Court's inquiry. For the reasons set forth in the United States' opening brief, the Court should terminate the Consent Decree in its entirety and need not reach any of the arguments addressed below. (Dkt. No. 49 at Page ID # 1384–85). None of California's arguments bear on whether the termination standard has been met under the Decree's plain text. Even if, as California argues, Sable were Plains' successor, that would not change that the standard has been met. And even if, as California argues, the Court could enforce the Decree against Sable, that would not change that the standard has been met.

2. *California presents no valid basis for continuing the Consent Decree now that Plains has met the termination standard.*

Forfeiture aside, the Consent Decree's plain language does not give either the United States or California discretion to withhold consent to termination once Plains has shown the requirements for termination are met. Rather, the Decree is framed as an imperative: "If Plaintiffs agree that *the requirements for termination have been satisfied*, the Parties *shall* submit for the Court's approval a joint stipulation terminating the Consent Decree." (Dkt. No. 6-1 ¶ 100 (emphases added)). In short, the United States and California *must* stipulate to termination if Plains has satisfied the requirements for termination. This is the bargain the Parties struck, and the bargain to which all Parties, including California, must be held.

California's failure to present an argument that Plains has not satisfied the termination standard undermines any suggestion that California needs to continue the Decree for purposes of accountability. The Court should not permit California to maintain this pretense. Allowing California to disregard the negotiated language is inconsistent with the Decree's plain terms and fundamentally unfair to Plains.

(Dkt. No. 52 at Page ID # 1800 (no indication from Plaintiffs during Decree's term that Plains was not in compliance)). By withholding consent to termination, California forces Plains to continue complying with "onerous and administratively burdensome" obligations. (Dkt. No. 52-1 ¶ 10). For instance, Plains must continue to meet the Decree's reporting requirements and to perform certain company-wide injunctive measures. (Dkt. No. 6-1 ¶¶ 57, 91 & Appx. B Art. II (Company-Wide Provisions on Regulated Pipelines) Page ID # 179–86). And absent termination, those obligations will persist indefinitely.

When governments fail to adhere to commitments made in consent decrees, they undermine the "overriding public interest in settling and quieting litigation." *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977); *see also Speed Shore Corp. v. Denda*, 605 F.2d 469, 473 (9th Cir. 1979) ("Settlement agreements conserve judicial time and limit expensive litigation."). If defendants like Plains cannot rely on the government to uphold its end of a bargain, they will have less incentive to settle—particularly if they believe adjudication on the merits will provide a more definitive resolution. California should not be permitted to rewrite the Consent Decree to extend its terms beyond the bargained-for limits. *See United States v. Armour & Co.*, 402 U.S. 673, 682 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."). It cites no legal authority to do so, and none exists.

3.    *California's arguments against termination rest on the unsupported premise that Sable is Plains' legal successor or assign.*

Consent decrees operate on fundamentally different principles than standard court orders or injunctions because the decree's legal force derives from the parties' agreement to judicial oversight. *See Local No. 93, Int'l Assoc. of Firefighters, AFL-CIO v. City of Cleveland*, 478 U.S. 501, 522, 525 (1986) ("However, in addition to the law which forms the basis of the claim, the parties'

4

consent animates the legal force of a consent decree."). And consent to judicial oversight should be clear, not implied or imputed. *See Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (discussing standard for consent decree entry and noting there must be "valid consent by the concerned parties") (quoting *Metro. Housing Dev. Corp. v. Village of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980)) (collecting additional cases); *Cornerstone Credit Union League v. Consumer Fin. Prot. Bureau*, 791 F. Supp. 3d 720, 734 (E.D. Tex. 2025) ("And because 'consent animates the legal force of a consent decree,' the court may only enter the decree when all parties consent.") (quoting *Local No. 93*, 478 U.S. at 525).

The Consent Decree embodies that principle in its structure. It does two things: (1) it fully binds Plains and its "successors and assigns" (Paragraph 4), and (2) it separately allows Plains to sell the Segments to a third party "transferee" that agrees to contractually assume limited obligations specifically tied to the Segments (Paragraph 88). (Dkt. No. 6-1 ¶¶ 4, 88). Sable is a "transferee" under Paragraph 88 of the Consent Decree, not a "successor and assign" under Paragraph 4. (*See* Dkt. No. 49-2 (Seeley Decl.) ¶ 7 & Ex. 1). As such, Sable is not a party to the Consent Decree, and its conduct lies outside the Decree's scope and this Court's jurisdiction. (Dkt. No. 49 at Page ID # 1386–87) (describing the Decree's boundary between judicial and contractual obligations); *see Mi Familia Vota v. Fontes*, 111 F.4th 976, 983 n.3 (9th Cir. 2024) (affirming principle articulated in *Martin v. Wilks*, 490 U.S. 755, 762 (1989), that nonparties may not be bound by a judgment *in personam* in a litigation in which they were not joined).

California's theory—that Sable's acquisition of the Segments or execution of the assumption agreement automatically makes it Plains' full successor and assign under Paragraph 4 of the Decree and subject to judicial oversight—cannot be squared with the Decree's text. The Decree's separate successor-and-assign and transferee provisions must mean different things with different legal consequences.

But under California's theory, they collapse into one. If purchasing the Segments or signing the required assumption agreement automatically made Sable a "successor or assign" under Paragraph 4 of the Decree, the separate mechanism in Paragraph 88 allowing for a transferee's limited contractual assumption of only certain obligations would be superfluous.

California does not explain what exactly it believes the Decree's successor-and-assign provision requires. But the Court need not answer that question. It is enough that the Decree's structure establishes that the provision *must* require something more than simply purchasing the Segments or signing the required assumption agreement—and Sable did nothing more than that.

General principles of corporate successorship liability confirm this point. The universal rule is that when one company sells or transfers its assets to another company, the transferee does not assume the transferor's debts or liabilities. 15 Fletcher Cyclopedia of the Law of Corps. § 7122 (2025). Here, Plains sold the Segments to Pacific Pipeline in October 2022. (Dkt. No. 49-2 (Seeley Decl.) ¶ 6; Dkt. No. 52-1 (Hodgins Decl.) ¶ 6). Plains and Pacific Pipeline executed a Consent Decree assumption agreement, but there was no merger or continuity of ownership between Plains and Pacific Pipeline, nor did Pacific Pipeline assume Plains' general liabilities or consent to the Court's jurisdiction. (*See* Dkt. No. 49-2 (Seeley Decl.) ¶ 6; Dkt. No. 52-1 (Hodgins Decl.) ¶ 6), Ex. A (Moore Decl.) Attach. 1, PDF pp. 7–8.

When Sable acquired Pacific Pipeline from Mobil Pacific Pipeline Company in February 2024, Sable also executed a Consent Decree assumption agreement. (Dkt. No. 49-2 (Seeley Decl.) ¶ 7 & Ex. 1). Nothing in that agreement converted Pacific Pipeline or Sable from a mere asset purchaser of the Segments into Plains' successor or assign under Paragraph 4 of the Decree. (*Id.*) And certainly Sable did not consent to the Court's jurisdiction. (Dkt. No. 49 at Page ID # 1386–87 (discussing obligations Sable assumed); *Id.*). Rather, the assumption

6

agreement was narrowly tied to the Segments and reflected a limited *contractual* agreement to perform specific obligations, not acceptance of wholesale successor-and-assign liability under the Decree. (Dkt. No. 49 at Page ID # 1386–87). Extending judicial oversight to a nonparty on this record would impose obligations Sable never agreed to and exceed the bounds of due process. *See Local No. 93*, 478 U.S. at 529; *Harmon v. San Diego Cnty.*, 477 F. Supp. 1084, 1091 (S.D. Cal. 1979) (extending consent decree obligations to a nonparty would violate due process) (citing *Hansberry v. Lee*, 311 U.S. 32 (1940)).

To be sure, if the Parties intended to impose all the Decree's terms and requirements on a future transferee, they could have drafted the Decree to do so. *See* Ex. B ¶ 7[1] (example of a consent decree conditioning transfer of defendant's assets on modifying the decree to make its "terms and conditions" applicable to the transferee). But they did not. Only now, more than three years after Plains' sale of the assets and only in response to the United States' motion to terminate the Decree, does California argue Sable should be treated as a party.

4.    *California's aggressive reading of the Court's jurisdiction over nonparties is unmoored from the Consent Decree's text and structure.*

Nowhere in its brief does California squarely confront the limited nature of the Consent Decree provisions that Sable assumed. Contrary to California's assertions, the United States dedicated an entire section of its opening brief to explaining the structural boundary between Plains' *judicial* obligations under the Consent Decree and Sable's *contractual* obligations, including citing legal support for its position. (*Compare* Dkt. No. 49 at Page ID # 1386–87 *with* Dkt. No. 55 at Page ID 1922–23). California criticizes the United States' position, but without

---

[1] Exhibit B is a copy of a consent decree entered in *United States v. HOVENSA, LLC*, No. 1:11-cv-00006-RAM-EAH, Dkt. No. 5-1 (D.V.I. Apr. 10, 2011). The Court may take judicial notice of court filings and other matters of public record. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

analysis. (Dkt. No. 55 at Page ID # 1923–24). And it offers no coherent way to harmonize the Decree's transfer provisions with its provisions on termination and consent to jurisdiction. Rather, California summarily asserts that the Decree requires the "pipeline owner" to obtain the Fire Marshal's approval before restarting. (*Id.* at Page ID # 1923). But that goes too far. The Decree's text directly binds *Plains*, not all future "pipeline owners." (Dkt. No. 6-1 at App. B, Page ID # 173).

In all, California's positions leave critical analytical gaps. If, as California suggests, the Parties intended for a future transferee to be subject to the Court's jurisdiction, why does the Decree's text not include Paragraph 3 (jurisdiction) in the requirements a future transferee must assume? (Dkt. No 6-1 ¶¶ 3, 88). If, as California suggests, the Parties intended for a future transferee to be a "successor and assign," why does the Decree's text not include Paragraph 4 (successors and assigns) in the requirements a future transferee must assume, (*Id.* ¶¶ 4, 88), or provide for the transferee to sign an assumption agreement at all? And if, as California suggests, the Parties intended for termination of the Decree to depend on a future transferee's performance, why does the Decree's text limit the termination provision to Plains? (*Id.* at ¶ 100). California answers none of these questions.

As the United States explains in its opening brief, the Decree's plain terms provided for future judicial oversight of Plains' obligations and more limited contractual liability for the obligations Sable assumed. (Dkt. No. 49 at Page ID # 1386–87). This makes sense for three reasons. *First*, only Plains' conduct was the subject of the underlying enforcement action, so the Decree required only Plains to submit to the Court's oversight and jurisdiction. *Second*, Plains was not required to sell the Segments or other assets subject to the Decree to a single buyer. Given the possibility of multiple transferees, it would have been impractical for each transferee to become a party to the Decree, with the same rights and obligations as Plains, or with the ability to delay termination despite Plains' compliance. *Third*,

the arrangement made it easier to sell the assets, while preserving contractual remedies to compel performance. California may now wish that the Consent Decree made Sable a party, but every settlement contains compromises, and that is not the bargain the Parties—including California—struck here. *See Local No. 93*, 478 U.S. at 522 (recognizing that consent decrees are shaped by the parties' opposing purposes and bargaining power). The Decree's text and structure refute California's expansionist reading of its requirements. *See Armour*, 402 U.S. at 682.

     5.  *California presents no evidence of an actual safety risk that would result from termination.*

The evidence before the Court establishes that the Consent Decree may be terminated without creating undue risk to the public and the environment. *First,* the Western Region Director of PHMSA's Office of Pipeline Safety and Sable's President each attested to the Segments' safe restart and operation. (Dkt. No. 49-3 (Hubbard Decl.) ¶¶ 6–34; Dkt. No. 53-1 (Flores Decl.) ¶¶ 6–50). *Second*, Sable is complying with special permit conditions containing safety standards that are *more* protective than required under pipeline safety laws. (Dkt. No. 49 at Page ID # 1388). *Third*, despite California's insinuations, the condition of the Segments is nothing like what existed at the time of the 2015 release, when the wall thickness of Segment 901/CA-324 had fallen to 11 percent.[2] Sable has now remediated all locations with 40 percent or more metal loss. (Dkt. No. 45-1 at Page ID # 1000 (Pacific Pipeline Consent Decree Bi-Annual Report)). Sable has also repaired and upgraded the Segments, fixing over 200 sections, installing dozens of additional safety valves, and implementing enhanced leak detection and emergency response

---

[2] PHMSA, Failure Investigation Report (May 2016) at 13 (external corrosion measured at 89% depth), https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/PHMSA_Failure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf.

measures. (*Id.*; Dkt. No. 53 at Page ID # 1825–26; Dkt. No. 53-1 (Flores Decl.) ¶¶ 6–8). And as part of the restart plan approved by PHMSA, Sable successfully subjected the Segments to stand-up pressure tests. (Dkt. No. 49-3 (Hubbard Decl.) ¶¶ 9–10, 15, 21, 28, 31; Dkt. No. 53-1 (Flores Decl.) ¶¶ 26–28, 31, 34, 38). The record simply does not support California's suggestion of a serious risk of rupture or any failure by Sable to mitigate the risks underlying the 2015 release.

Rather than presenting evidence of an ongoing safety concern, California relies on a single "unsatisfied" condition of the state waivers that it construes as a concern. But that characterization is incomplete: California omits that Sable has already agreed to satisfy the condition after restart, and the condition appears in both the emergency and non-emergency special permits Sable has sought from PHMSA. (Dkt. No. 49 at Page ID # 1388). Condition 17(c) of the emergency special permit from PHMSA requires that "[a]ll internal or external metal loss anomalies that have an [In-Line Inspection] reported depth of 40% or greater wall loss, including tool sizing tolerance for depth," must be repaired within 180 days. (Dkt. No. 49-2 (Seeley Decl.) Ex. 7 at Page ID # 1455). Condition 17(c) of the draft special permit requires the same. (*Id.* Ex. 9 at Page ID # 1757). The sole putative "risk" that California identifies has therefore already been addressed by Sable and PHMSA.

Moreover, the Segments have already undergone extensive safety testing prior to restart, including strength and spike hydrostatic pressure tests (SHT) conducted in April and May 2025. (*Id.* Ex. 4 at Page ID # 1437, Ex. 8 at Page ID # 1472–73). Hydrostatic tests "demonstrate the structural integrity when the pipe passes the test" by detecting and removing "defects, such as corrosion pits or

cracks."[3] The SHT even "more effectively . . . removes or proves the absence of defects that could affect the serviceability of a pipeline."[4]

      6. *California's allegations against PHMSA are unfounded and not a basis for denying termination of the Consent Decree.*

California offers an inflammatory, baseless account of the circumstances surrounding Segment 901/CA-324's failure and the events leading up to PHMSA's acknowledgement of jurisdiction over the Segments. That portrayal is inconsistent with PHMSA's role as the federal expert in the field of pipeline safety and the Segments' historical status as interstate pipelines.

*First,* without support, California asserts that PHMSA is responsible for the 2015 release and asks the Court to accept that only the Fire Marshal and the state waivers can prevent another rupture. (*See* Dkt. No. 55 at Page ID # 1912). Both points are wrong. As the sole regulator of interstate pipeline facilities and pipeline transportation, PHMSA has expansive technical and regulatory expertise in administering the Pipeline Safety Act and its regulations. It was PHMSA that investigated the 2015 release, identified the causes, and developed the Corrective Action Order that forms the basis of the Decree's Appendix D. (Dkt. No. 1 ¶¶ 34–35).

*Second*, again without support, California criticizes PHMSA's actions leading up to its recognition of federal jurisdiction over the Segments. (Dkt. No. 55 at Page ID # 1909, 1915–16). But California omits key details. PHMSA's

---

[3] Michael Baker Jr., Inc., Pipeline Corrosion Final Report (2008) at PDF p. 35, https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/technical-resources/pipeline/gas-distribution-integrity-management/65996/finalreportpipelinecorrosion.pdf.

[4] Michael Baker Jr., Inc., Integrity Management Program: Spike Hydrostatic Test Evaluation (2004) at PDF p. 3, https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/technical-resources/pipeline/gas-transmission-integrity-management/65281/tto06spikehydrostatictestevaluationfinalreportjuly2004.pdf.

11

December 2025 recognition was consistent with its longstanding interpretation that "a pipeline originating on the [Outer Continental Shelf] will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC."[5] (Dkt. No. 49-2 (Seeley Decl.), Ex. 5 at Page ID # 1440 (citing Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15895, 15897 (Apr. 23, 1985), and 49 C.F.R. Part 195, App. A)). It also aligns with the Segments' traditional status, dating as far back as 1986, when the 903 Segment was classified as interstate by its then-owners (Celeron Pipeline Company) and federal, state, and county agencies. Ex. C.[6] That classification was based not on FERC tariffs (as California suggests) but on the Segment's connection to a larger pipeline system designed to transport oil from the Outer Continental Shelf.[7] *See id.* at PDF pp. 7 (1988 settlement agreement), 28 (1986 Final Development Plan), 380 (statement by county engineering consultant).

---

[5] California does not dispute in its brief that the Outer Continental Shelf portion of the Santa Ynez Pipeline System is interstate.

[6] Exhibit C is a copy of a 1988 settlement agreement and exhibits, which by its terms indicate it was filed and approved by the court in *Celeron Pipeline Co. of California v. County of Santa Barbara*, No. CV 87-02188 (C.D. Cal.). *See* Ex. C at PDF pages 7, 151–52. The Court may take judicial notice of court filings and other matters of public record. *Reyn's Pasta*, 442 F.3d at 746 n.6.

[7] Celeron and Santa Barbara County agreed that the County's jurisdiction over "Celeron's interstate pipeline" was "limited and partially preempted" (*id.* at PDF page 7 (1988 settlement agreement)) and that the Segment was designed to transport crude oil from the Outer Continental Shelf (*id.* at PDF page 28 (1986 Final Development Plan issued by the County)). In 1987, an engineering consultant retained by the County noted, "Because the Celeron pipeline in Santa Barbara is a part of the larger interstate All American Pipeline, it is subject to the jurisdiction of the Office of Pipeline Safety of the Department of Transportation." *Id.* at PDF page 380. There is no mention of FERC tariffs as the basis for deeming the Segment interstate.

California's narrative further omits that PHMSA does not, on its own initiative, perform routine jurisdictional audits to reassess and affirmatively "concur" with jurisdictional classifications. The jurisdictional status of the Segments had changed in 2024 when Sable acquired the Segments and associated offshore assets creating the Santa Ynez Pipeline System, but PHMSA had no reason to reassess the jurisdiction of the Segments until receiving Sable's request and supporting documentation. And after PHMSA confirmed the interstate classification, Sable did not rush to restart the Segments—it only restarted them months later, after receiving the Secretary of Energy's Defense Production Act order.

*        *        *

In sum, the record establishes that Plains has met the termination standard and the Consent Decree has achieved its objectives: securing Plains' compliance with the Decree's environmental and pipeline safety requirements for the full term of the Decree. *See Jeff D. v. Otter*, 643 F.3d 278, 288 (9th Cir. 2011) (stating that on a motion to terminate a court must consider the decree's general goals and basic purposes); (*see also* Dkt. No. 49 at Page ID # 1385). The Decree was a time-limited bargain, not a plan to supervise the Segments in perpetuity. The Segments are now safe to operate, and they will continue to meet legally enforceable and stringent conditions for repair, inspection, operation, and maintenance—beyond the life of the Decree.

**B.      Alternatively, the Consent Decree should be modified.**

California does not dispute that significant changes in fact and law have occurred since entry of the Consent Decree, or that PHMSA has authority to regulate interstate pipelines. California's objections to modification are untethered from the legal standard set forth in *Rufo* and do not provide a basis for the Court to deny the United States' request.

13

1.      *California divorces the doctrine governing consent decree modification from the purposes that justify it and focuses on the wrong events—the United States did not create the changes warranting modification.*

California's opposition ignores the central concern animating judicial limits on modifications to consent decrees. *Rufo v. Inmates of Suffolk County Jail* reflects a balance between responsiveness to real-world developments and the Court's concern that a party not use changed circumstances as a pretext for evading its bargained-for obligations. 502 U.S. 367, 380–88 (1992). But that concern is inapplicable here. The United States does not seek to reduce or eliminate any obligation it agreed to in the Consent Decree or any contractual obligation Sable assumed—it simply seeks to update the Decree's text to conform with present realities. (Dkt. No. 49 at 17–20).

California also mis-frames the modification issue by fixating entirely on PHMSA's *decision* to assert jurisdiction over the Segments and the Secretary of Energy's *decision* to issue an order to Sable under the Defense Production Act. (Dkt. No. 55 at Page ID # 1926–29). But the question here is not whether those specific decisions and implementing acts created significant and unanticipated changes to justify modification. The question is whether the altered factual circumstances those decisions *responded to* created significant and unanticipated changes to justify modification. They did.

*Change in Jurisdiction.* The Segments were historically treated as *interstate* and subject to PHMSA's sole and exclusive jurisdiction. *See supra* p. 12. That status changed only in 2016 when Plains canceled tariffs filed with the Federal Energy Regulatory Commission for providing interstate oil transportation services on the by-then-nonoperating Segments. (*See* Dkt. No. 1 at ¶¶ 8–9; Dkt. No. 6-1 at Page ID # 98, ¶ C). As the United States explained in its opening brief, and California does not dispute, provisions in the 2020 Consent Decree granting the

14

Fire Marshal regulatory oversight over the Segments rested entirely on the Segment's then-*intrastate* status. (Dkt. No. 49 at Page ID # 1378).

That foundation no longer exists. In 2024, Sable acquired the Segments that constitute the Las Flores Pipeline and other assets, including offshore pipelines transporting crude oil from the Outer Continental Shelf to processing facilities in California. (Dkt. No. 49-2, Ex. 5). That event brought the Segments and assets under common ownership operated as a single interstate pipeline system, the Santa Ynez Pipeline System. (*Id.* at Page ID # 1440). And *that event* was a significant, unanticipated change in fact that also changed the legal status of the Segments and warrants modification to the Consent Decree.

PHMSA's subsequent confirmation of the Segments' interstate status was a logical *consequence* of those changed ownership and operational circumstances—not their cause. And the actions PHMSA has since taken regarding the Segments flow from its long-running, sole and exclusive authority to regulate interstate pipelines under the Pipeline Safety Act—not recent regulatory changes. Put differently, the operative facts changed first, then PHMSA's reclassification of the Segments followed. Notably, California does not dispute that Sable's acquisition of the Segments and operation of the Segments as part of the Santa Ynez Pipeline System are significant, unanticipated changes or that the premise underlying the applicable provisions in the Consent Decree (intrastate status) has been overtaken by unanticipated events.

*Defense Production Act Order.* The Secretary of Energy's decision to issue an order to Sable under the Defense Production Act was similarly initiated by findings of changed factual circumstances not contemplated when the Parties negotiated the Decree. As the President has recognized, an "affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." *Declaring a National Energy Emergency*, Exec. Order No. 14156, § 1, 90 Fed. Reg. 8433 (Jan. 20, 2025). In the Defense

15

Production Act, Congress likewise acknowledged the tight nexus between the domestic energy supply and our national security, finding that "in order to ensure national defense preparedness, it is necessary and appropriate to assure the availability of domestic energy supplies for national defense needs." 50 U.S.C. § 4502(a)(5). With 32 military bases, California has the highest concentration of defense-related activities in the United States, and these bases require a rapid and reliable fuel supply.[8]

In March 2026, the Secretary of Energy determined that restart of the Santa Ynez Pipeline System, including the Segments, is essential to core national defense and security needs, which are threatened by energy shortages and reliance on foreign oil. (Dkt. No. 49-2, Ex. 10). *That* national security determination precipitated the Secretary's Defense Production Act order. The order itself altered the landscape such that Sable can no longer legally comply with both the Fire Marshal's directives under the Consent Decree and the Secretary's order. *See* 50 U.S.C. §§ 4513, 4556 (civil and criminal liability for failure to comply with a Defense Production Act order). But the order is not what created the need to address national security interests through the Defense Production Act—the order merely responded to that need.

The cases California relies on are a poor fit. *Nehmer v. U.S. Department of Veterans Affairs* was about whether the Department of Veterans Affairs may independently interpret the provisions of a consent decree to which it was a party to limit its own obligations. The decree was complicated, requiring the Department to issue rulemaking, re-adjudicate claims, and make retroactive payments for diseases determined to be service connected under the Agent Orange Act. 494 F.3d 846, 852–53 (9th Cir. 2007). In its rulemaking, the Department purported to interpret the decree to limit retroactive payments to veterans with service-

---

[8] California Military Installations and Operational Areas, Office of Governor, https://tinyurl.com/4bdzzwka, accessed Apr. 23, 2026.

16

connected diseases identified as such after the Act's original sunset date. *Id.* at 854. The Ninth Circuit rejected that approach, finding that interpreting decree requirements is a judicial function. *Id.* at 859.

*Flores v. Rosen* involved a complicated agreement that set standards for detainment of accompanied and unaccompanied minors in the custody of United States immigration officers and anticipated that its terms would be adopted into regulations, after which the agreement would terminate. 984 F.3d 720, 727 (9th Cir. 2020). Congress subsequently passed two new laws, the Homeland Security Act and the Trafficking Victims Reauthorization Act, restructuring immigration functions and making other changes. *Id.* at 728–30. Once issued, the regulations implementing the agreement did not fully align with the agreement's terms for treatment of accompanied minors, reflecting instead the Acts' changes to immigration laws. *Id.* at 729–30. The Ninth Circuit explained that the United States could not change the terms of the agreement (and effectively the standard for termination) by promulgating regulations inconsistent with the agreement. *Id.* at 741.

The issues here are not like *Nehmer* and *Flores*. The United States is not asking to limit its own obligations under the Decree or to eliminate any of the Decree's requirements. There is no rulemaking, and the authority the United States is exercising under the Pipeline Safety Act and the Defense Production Act is long established. Application of that authority to address external factual changes is what warrants modification. Unlike in *Nehmer*, the United States is not interpreting or otherwise dictating its views of the Consent Decree's requirements to the Court. And, unlike in *Flores*, the United States does not seek to modify the Decree's termination standard—it asks the Court to apply the standard as drafted. *Nehmer* and *Flores* are simply not this case.

2. *Regardless of California's views, Sable must comply with the Defense Production Act order.*

California improperly challenges the legal effect and validity of the Defense Production Act order but does *not* dispute that the order requires Sable's strict compliance. *See* 50 U.S.C. § 4513 (criminal penalties for failure to comply); (Dkt. No. 55 at Page ID # 1930–35). The mere existence of the order—and the fact that Sable must comply with the order *immediately*, regardless of the outcome of this present dispute or California's legal challenge to the order—suffices as a basis to modify the Consent Decree. (*See* Dkt. No 49 at Page ID # 1393). The Court should—without rendering any opinion about the order, which California has challenged in separate litigation (*see infra* p. 24)—recognize that the order has made it legally impermissible and factually impossible for Sable to comply with both the order and the Fire Marshal's demand to cease operations. (*See* Dkt. No 49 at Page ID # 1393); *see also infra* p. 24.

**C. Federal Rules of Civil Procedure 65 and 71 are inapplicable.**

California relies heavily on Rules 65 and 71 but fails to explain their limits to the Court. Those rules do not apply to voluntary consent decrees, and even if they did, they only apply in narrow circumstances: if a nonparty aided and abetted a violation of a court order or if a nonparty is "so identified in interest" with an enjoined party that it represents the same rights. California bears the burden of demonstrating that one of those exceptions applies, and it has failed to meet that burden.

1. *Neither Rule 65 nor Rule 71 authorize the Court to enforce the Consent Decree against nonparty Sable.*

California cites Rules 65 and 71 as the basis for this Court's jurisdiction to enforce Sable's limited, contractually assumed Consent Decree obligations. (Dkt. No. 55 at Page ID # 1922–23). Rule 65(d) limits the persons bound by an "injunction" or "restraining order" to only the parties; the parties' officers, agents,

servants, employees, and attorneys; and other persons who are in active concert or participation with any of them. Fed. R. Civ. P. 65(d)(2). Rule 71 provides that *if* an "order" may be enforced against a nonparty, then the procedure for enforcement is the same as for a party. Fed. R. Civ. P. 71.

The critical flaw in California's argument is that the Consent Decree is not the type of injunction, restraining order, or other order that should be enforced against a nonparty under Rules 65 and 71. The United States does not dispute that a court can enforce its orders as a general principle. But as the United States explained in its motion, consent decrees occupy a unique role in federal court— they generally may not be enforced against nonparties even where equitable considerations may otherwise favor doing so. (Dkt. No. 49 at Page ID # 1386–88 (citing *Sierra Club v. North Dakota*, 868 F.3d 1062, 1067 (9th Cir. 2017); *Local No. 93*, 478 U.S. at 523; *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 439 (2004); and *Ass'n for Ret'd Citizens of Conn., Inc. v. Thorne*, 30 F.3d 367, 370 (2d Cir. 1994)).

As both the United States and California recognize, courts understand that a consent decree is not purely a court order or a judicial disposition on the merits. (Dkt. No. 49 at Page ID # 1383–84; Dkt. No. 55 at Page ID # 1923). The Supreme Court has recognized the hybrid nature of consent decrees—part contract, part judgment—and explained that courts "do not treat consent decrees as judicial decrees in all respects and for all purposes." *Local No. 93*, 478 U.S. at 519. "More accurately . . . consent decrees have attributes both of contracts and of judicial decrees, a dual character that has resulted in different treatment for different purposes." *Id.* (citation modified). A court's authority to enter and modify a consent decree does not change the fact that the decree obligations "were created by agreement of the parties rather than imposed by the court." *Id.* at 523.

The distinction between voluntarily entered consent decrees and judicial decrees matters when evaluating the scope of a court's authority to enforce an

order against a nonparty. *See id.* at 521 (holding that consent decrees were not an "order of the court" for purposes of Civil Rights Act provision); *see also Armour*, 402 U.S. at 682 ("[T]he instrument must be construed as it is written, and not as it might have been written had the [party seeking enforcement] established his factual claims and legal theories in litigation."). Rule 65's text is expressly aimed at injunctions and restraining orders that are issued to a party by a court after litigation on the merits. *See* Fed. R. Civ. P. 65 (a)–(d) (referencing "preliminary injunctions," "temporary restraining orders," and "adverse party" throughout); *Vanguards of Cleveland v. City of Cleveland*, 753 F.2d 479, 486 (6th Cir. 1985) (finding case in which the court issued an injunction over a party's objection inapplicable because the case at hand "involves a consent decree and not an injunction"). And Rule 71 only covers the *procedure* for enforcing an order against a nonparty. It does not presume or establish that any order may be enforced against a nonparty in the first place—particularly when that order is a consent decree. California cites no cases in which a court has used Rule 65(d) or Rule 71 to enforce a consent decree against a nonparty. In contrast, the law is well established that courts generally may not impose consent decree obligations on a non-consenting third party. (*See* Dkt. No. 49 at Page ID # 1386).

      2.     *Rule 65 does not apply because Sable is not "in active concert or participation" with Plains.*

Even if Rule 65 applied to consent decrees, California's arguments for applying the Rule to continue and "enforce" the Decree against Sable are also incorrect. Though it does not expressly say so, California presumably is relying on Rule 65(d)(2)(C), which extends injunctions to certain "other persons" (*i.e.*, nonparties) "in active concert or participation" with a party bound by a court order. A party moving for relief under Rule 65(d)(2)(C) must show that the nonparty "aided and abetted the enjoined party in the unlawful conduct or . . . is legally identified with the defendant, i.e., in privity with the named defendant." *cPanel,*

*LLC v. Asli*, 719 F. Supp. 3d 1133, 1154 (D. Or. 2024) (cleaned up) (collecting decisions issued by the Ninth Circuit). California primarily focuses on the second of these options, privity, but fails to explain its contours to the Court or cite facts establishing that application of the Rule against Sable is appropriate.

"Privity . . . is a legal conclusion designating a person so identified in interest with a party to a former litigation that he represents the same right in respect to the subject matter involved." *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1052–53 (9th Cir. 2005) (cleaned up) (citations omitted). The concept is bound by due process, *see id.* at 1054, and applied in only narrow circumstances—for instance, when a nonparty substantially participated in the prior litigation or when its closely aligned interests were adequately represented in the prior litigation. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1082 (9th Cir. 2003) (citations omitted). Parallel legal interests alone are insufficient to establish privity between parties. *Headwaters*, 399 F.3d at 1054 (citation omitted).

None of the circumstances for extending a judicial order through privity apply here, and California has failed to meet its burden to show otherwise. Sable and Plains are entirely separate corporations with distinct ownership structures. (Dkt. No. 52 at Page ID # 1799; Dkt. No. 52-1 (Hodgins Decl.) ¶ 6). Sable did not exist when the Parties negotiated the Consent Decree, and its interests were therefore unrepresented in that process. Sable's only connection to the Decree is through a limited contractual arrangement that did not include any agreement to be bound by the Decree's provisions on jurisdiction. (Dkt. No. 49 at Page ID # 1386–87 (discussing limited obligations Sable assumed)). That attenuated relationship falls far short of what due process requires before decree obligations may be extended to a nonparty through privity. *See cPanel*, 719 F. Supp. 3d at 1154–55 (holding moving party failed to explain how interest of nonparty service providers was adequately represented); *Roosevelt Irrigation Dist. v. Salt River Project Agric.*

21

*Improvement & Power Dist.*, 39 F. Supp. 3d 1051, 1058–59 (D. Ariz. 2014) (holding a state political subdivision was not in privity with the state because there was no commonality of interests); *Cygnus Telecomms. Tech., LLC v. Worldport Comms., Inc.*, 543 F. Supp. 2d 1113, 1122–23 (N.D. Cal. 2008) (holding no privity between parties because moving party failed to show alter ego and no relationship between nonparty and bound party at time of consent judgment).

The cases that California cites cut against its Rule 65 argument and underscore why privity cannot be established here. *Golden State Bottling Co. v. NLRB* concerned the National Labor Relations Board's authority to enforce its orders against a corporate successor, not the extension of a judicial order to a nonparty. 414 U.S. 168, 176–78 (1973). The Supreme Court upheld the Board's authority where the successor acquired a bound company's entire business and continued operating it without interruption or material change in operations, employees, or supervision. *Id.* at 170–71. The successor even retained the former manager whose conduct had triggered the Board's order. *Id.* at 173. The Court anchored its analysis to a finding of a "continuing business enterprise." *Id.* at 180. The relationship between Plains and Sable bears no resemblance to a continuing business enterprise—the companies are entirely distinct corporations.

*Bates v. Pacific Marine Association* is equally inapposite. There, the Ninth Circuit applied the successorship doctrine to a consent decree entered against a longshoremen's association for Title VII civil rights violations, but on highly case-specific facts far different from those here. 744 F.2d 705, 707 (9th Cir. 1984). After entry of the decree, the owner of two shipping berths formed a new company to perform the identical stevedoring services previously provided by a bound association member, using the same facilities and equipment. *Id.* at 707. The new company then hired nearly all the bound member's employees who worked at the berth over other qualified applicants and in violation of the decree. *Id.* The court's analysis was driven by the continuity of operations and personnel between the

22

bound member and the new company and the need to remedy ongoing employment discrimination. *Id.* at 710. California points to no similar facts here.

Together, *Golden State* and *Bates* show that extending consent decree obligations to a nonparty demands tight operational and personnel continuity with a bound party equivalent to a continuing business enterprise—not a limited contractual relationship between two independently owned companies.

3. *Rule 71 does not extend the Consent Decree to Sable.*

California's reliance on Rule 71 fares no better. Even if Rule 71 could reach a nonparty to a consent decree, the nonparty would need to have either abetted a violation of the court's order or be legally identified with a bound party—the same standard required for application of Rule 65(d)(2)(C). *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998). As discussed above, California offers no evidence that Sable falls into either category. Nor could it. Plains has complied with the Decree, so there is no violation for Sable to abet, and a contractual relationship alone cannot satisfy the legal identity requirement. Otherwise, any company that contracts with a party subject to a consent decree would risk being bound by it.

California also misreads *Association for Ret'd Citizens of Connecticut v. Thorne*, which the United States relies on in its motion. *Thorne* makes clear that a court's authority to extend consent decree obligations to a nonparty is narrower than its authority to bind a nonparty to an order entered after full adjudication on the merits. 30 F.3d 367, 370 (2d Cir. 1994). California's heavily edited quotation actually reads in full: "The district court was therefore without authority to extend the agreement to DHS [a nonparty], a party that did not bargain for it or agree to it, simply on the grounds that DHS's compliance would help the parties implement the settlement." *Id.* Read in context, that passage undercuts—rather than supports—California's position. As *Thorne* and the Ninth Circuit's recent decision (which California does not address) in *Gila River Indian Community v. Shoubroek*,

23

145 F.4th 1058 (9th Cir. 2025), establish, enforcing consent decree obligations against a nonparty is generally not permitted. (Dkt. No. 49 at Page ID # 1387). California's reliance on Rule 71 concedes that Sable is a nonparty, and California does not—and cannot—dispute that Sable has never agreed to be bound by the Consent Decree's provisions on jurisdiction.

> **D.      California's other arguments lack merit.**
>
> 1.      *California cannot collaterally attack PHMSA's and the Secretary's independent decisions in this lawsuit.*

California improperly seeks to use the current dispute over Consent Decree termination or modification to collaterally attack PHMSA's and the Secretary's independent decisions. California's lengthy arguments on these issues, (Dkt. No. 55 at Page ID # 1930–37), make clear that its requested relief would effectively enjoin those decisions under the guise of Consent Decree enforcement—and obtain that result, if California has its way, through a simple showing under Rules 65 and 71. It may not do so. *See Ctr. For Biological Diversity v. Envtl. Prot. Agency*, 847 F.3d 1075, 1092 (9th Cir. 2017) (describing purposes behind collateral attack doctrine). California is already challenging PHMSA's decision in the Ninth Circuit and the Secretary's order in a separate action before this Court. *State of Cal. v. PHMSA et al., No. 25-508, consolidated with Envtl. Defense Ctr., et al. v. PHMSA*, No. 25-8059 (9th Cir. Filed ); *State of Cal. v. Chris Wright, et al.*, No. 2:26-cv-03396 (C.D. Cal. Mar. 30, 2026). Those are the proper venues to litigate those decisions—not here.

In all events, the United States' motion to terminate or modify the Consent Decree does not turn on the outcome of those separate cases. The Decree's termination standard is unrelated to PHMSA's assertion of jurisdiction and the Secretary's order, and that standard has been met. (Dkt. No. 49 at Page ID # 1384–85). Should the Court elect to modify, rather than terminate the Decree, it may do so now because a presumption of regularity attaches to PHMSA's and the

Secretary's actions. Absent clear evidence to the contrary, the Court should therefore assume that the Secretary and PHMSA "properly discharged their official duties." *Cruz v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2025) (citing *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926); *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004)).

      2.     *There is no basis to "enforce the Consent Decree against the United States.*

California cannot "enforce" the Consent Decree against its co-Plaintiff the United States because the United States has not violated any of the Decree's provisions. Moving to terminate after Plains has met the termination standard is fully consistent with the Decree's terms. PHMSA's decision to assert jurisdiction over the Segments and the Secretary's decision to issue a Defense Production Act order also do not violate any term of the Decree. *See Int'l Techs. Consultants, Inc. v. Pilkington PLC*, 137 F.3d 1382, 1387 (9th Cir. 1998) ("A consent decree in a private action imposes no more on the party to be bound than that party agreed to.") (citing *Armour*, 402 U.S. at 682). In fact, California has not identified any affirmative requirement in the Decree that the United States has not met. California has, however, failed to comply with the Decree itself by baselessly withholding its consent to termination. *See supra* pp. 3–4.

There is also no merit to California's arguments that the United States had any affirmative obligation to move to modify the Consent Decree or that its motion to modify the Decree was untimely. PHMSA concurred with the jurisdictional status change of the Segments only in December 2025, and the Defense Production Act order was issued on March 13, 2026. (Dkt. No. 49 at Page ID # 1380, 1382). The United States moved to modify the Consent Decree on March 30, 2026, a reasonable time after PHMSA's and the Secretary's actions responding to the underlying factual changes.

Further, contrary to California's assertions, the Executive Branch has acted within the scope of its authority. PHMSA, in the exercise of its authority under the Pipeline Safety Act, confirmed that the Segments fall under its jurisdiction. The Secretary of Energy, in the exercise of his delegated authority under the Defense Production Act, issued a Defense Production Act order to Sable. None of these acts are prohibited by the Decree. *See Int'l Techs.*, 137 F.3d at 1387. Nor are they examples, as California suggests, of the Executive Branch directing this Court to reopen a final judgment on the merits. (*See* Dkt. No. 55 at Page ID # 1921–22).

This is confirmed by reviewing *Plaut v. Spendthrift Farm*, a case California relies on. Unlike the retroactive legislation there that required courts to "reinstate" claims that had been dismissed as time barred, the United States is not "commanding" the Court here to take any action. *See Plaut*, 514 U.S. 211, 214–215, 228 (1995) (finding separation-of-powers violation where courts' final judgments were "legislatively rescinded" and "legislatively dissolved"). PHMSA's assertion of jurisdiction and the Secretary's order do not force the Court to undo the Consent Decree or constrain the Court's ability to decide legal disputes about those actions. And unlike in *Plaut*, the Decree is not a final judgment on the merits—it was voluntarily entered into by the Parties. (Dkt. No. 6-1 at 6 (stating that there has been no trial of any claims and no adjudication or admission of any issue of fact or law); *see also Plaut*, 514 U.S. at 228. As discussed above, a court's authority to extend consent decree obligations to a nonparty is narrower than if the obligation arose under a court order entered after a judgment on the merits. *Thorne*, 30 F.3d at 370.

It is actually California that seeks to enlist the Court in encroaching on the Executive Branch's exercise of its authorities. When Congress passed the Pipeline Safety Act, it tasked the Executive (PHMSA) with regulating interstate pipeline facilities and interstate pipeline transportation. 49 U.S.C. § 60104(c). Through the Defense Production Act, Congress authorized the President to issue orders

26

affecting the production and distribution of materials appropriate to promote the national defense. 50 U.S.C. § 4511. PHMSA and the Secretary of Energy (through authority delegated by the President) have properly exercised Congressionally delegated authorities. California should not be permitted to use the Decree to impede those authorities. Nor should the Court override that authority. *See generally United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 90 (1947) ("The Constitution allots the nation's judicial power to the federal courts. Unless these courts respect the limits of that unique authority, they intrude upon powers vested in the legislative or executive branches."); *Stovall v. Jefferson Cnty. Bd. of Educ.*, 164 F.4th 554, 559 (6th Cir. 2026) ("Separation of powers is a two-way street. Just as the elected branches of government—the President and Congress—may not trespass on the plenary powers of the other branches, the federal courts may not do the same.").

**E. California has not sought to use the Decree's internal enforcement tools.**

California asks the Court to immediately enjoin continued operation of the Segments. (Dkt. No. 55 at Page ID # 1938). But the United States and PHMSA are the federal Plaintiffs that pursued these claims and entered into this Consent Decree, and the United States strongly disagrees with California's request to enjoin operation of the Segments. That request—made in two short paragraphs—is utterly lacking in evidentiary and legal support, and it would undermine the national security interests identified by the Secretary of Energy. Nor has California established this Court's jurisdiction to grant this relief against nonparty Sable. And a court injunction to stop operation of the Segments would place Sable in the untenable position of violating the Defense Production Act order. *See* 50 U.S.C. § 4513 (criminal penalties for failure to comply).

Indeed, the only marginal issue that California has managed to identify is the Fire Marshal's view that one technical test should have been done *before* restarting

the Segments, rather than *after*. But the Segments now are safely and successfully restarted under PHMSA's close oversight, and performance of the test appears as a condition in both the emergency and non-emergency special permits Sable has sought from PHMSA. *Supra* p. 10. In other words, California has not identified any reason for the extreme injunctive relief that it seeks. Presumably California has not sought to invoke the Consent Decree's dispute resolution or penalty provisions because Sable is not a party to the Consent Decree and therefore, as discussed above, is not subject to those provisions.

Nor has California sought to explore less-extreme options that could resolve its concerns. Instead, it filed an ex parte application for an emergency order to enforce the Decree against the United States, its co-Plaintiff, and Sable. This underscores California's singular focus: shutting down the Segments at all costs, even though the Consent Decree is ripe for termination or modification.

**III.    Conclusion**

For all these reasons, the Court should (1) terminate the Consent Decree, or alternatively the Court should modify the Consent Decree, and (2) deny California's Motion to Enforce the Consent Decree.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

/s/ *Stefan J. Bachman*
STEFAN J. BACHMAN (DC Bar No. 90008649)
Email: stefan.bachman@usdoj.gov
Senior Attorney
Environmental Enforcement Section

28

United States Department of Justice
150 M Street, NE, Room 2.900
Washington, DC 20002
(202) 598-9566

### Certificate of Compliance with Local Rule 11-6.2

The undersigned, counsel of record for Plaintiff the United States of America, certifies that this brief contains 9,083 words and complies with the word limit set by court order on April 16, 2026 (Dkt. No. 56).

/s/ *Stefan J. Bachman*
STEFAN J. BACHMAN (DC Bar No. 90008649)
Email: stefan.bachman@usdoj.gov
Senior Attorney
Environmental Enforcement Section
United States Department of Justice
150 M Street, NE, Room 2.900
Washington, DC 20002
(202) 598-9566