LATHAM & WATKINS LLP
  Jessica Stebbins Bina (Bar No. 248485)
  *jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone:  +1 424.653.5500
Facsimile:  +1 424.653.5501

BABST CALLAND
  Nicholas McDaniel (*pro hac vice*)
  *nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone:  +1 202.853.3455
Facsimile:  +1 202.853.3491

HOLLAND & KNIGHT LLP
  James W. Noe (*pro hac vice forthcoming*)
  *jim.noe@hklaw.com*
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Telephone:  +1 202.469.5525

*Attorneys for Nonparties Sable Offshore Corp.
and Pacific Pipeline Company*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA; THE PEOPLE OF THE STATE OF CALIFORNIA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., <br><br> Defendants. | Case No. 2:20-cv-02415-SVW-SSCx <br><br> **NONPARTIES SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S COMBINED OPPOSITION TO MOTION TO ENFORCE AND REPLY IN SUPPORT OF THE UNITED STATES' MOTION TO TERMINATE CONSENT DECREE** <br><br> Date: June 1, 2026 <br> Time: 1:30pm <br> Courtroom: 10A <br> Judge: Hon. Stephen V. Wilson |

# **TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................1

II.     ARGUMENT ....................................................................................3

    A.   The Consent Decree should be terminated..........................................3

        1.   Under the plain language of the Consent Decree, the standard for termination has been met. ..............................3

        2.   Plains' and nonparty Sable's "substantial compliance" provides an additional, independent basis for terminating the Consent Decree. .................................5

    B.   California's motion to enforce the Consent Decree should be denied...................................................................................10

        1.   The Consent Decree is not enforceable against Sable because Sable is not a party. ........................................11

            a.   Sable is not a successor or in privity with Plains...................................................................12

            b.   The Consent Decree transfer provisions and the Assumption Agreement demonstrate that Sable is not a successor. ................................14

            c.   Sable is not estopped from taking the position that it is not a party. ........................................16

        2.   California's motion to enforce the Consent Decree ignores changed circumstances...........................................16

3.    The Defense Production Act Order independently warrants denial of injunctive relief. ........................................22

4.    California cannot meet its burden to prove lack of "substantial compliance" with the Consent Decree. ................25

5.    If Sable is subject to potential enforcement under the Consent Decree, then Sable must be afforded the due process for compliance disputes rather than an immediate contempt motion. ..............................................27

C.    All forward-looking safety measures are captured by the Pipeline Safety Act, the Special Permit, and PHMSA's continued regulatory oversight. .........................................29

D.    The Consent Decree is not the appropriate vehicle for California to pursue its all-out effort to stop the Santa Ynez Pipeline. ..............................................31

E.    The Court should not find Sable in contempt without an evidentiary hearing and opportunity to present evidence countering California's claim of noncompliance. .............................31

III.    CONCLUSION ...............................................................32

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Semiconductor, Inc. v. California Assignments LLC,*

  No. 12-CV-06138-LHK,

  2013 WL 5937968 (N.D. Cal. Oct. 30, 2013).................................... 12, 13, 14, 15

*Ass'n for Ret'd Citizens of Conn., Inc. v. Thorne*,

  30 F.3d 367 (2d Cir. 1994).................................................... 11

*Ass'n for Women in Sci. v. Califano*,

  566 F.2d 339 (D.C. Cir. 1977) ................................................ 23

*Bates v. Pac. Mar. Ass'n*,

  744 F.2d 705 (9th Cir. 1984)................................................. 15

*CFPB v. Howard L., P.C.*,

  671 F. App'x 954 (9th Cir. 2016) ........................................... 12

*Chairs v. Burgess*,

  143 F.3d 1432 (11th Cir. 1998)............................................ 22, 31

*Chrysler Corp. v. Brown*,

  441 U.S. 281 (1979)......................................................... 23

*Class Plaintiffs v. City of Seattle*,

  955 F.2d 1268 (9th Cir.1992)............................................... 12

*Coleman v. Newsom*,

    131 F.4th 948 (9th Cir. 2025) .......................................................... 21

*eBay Inc. v. MercExchange, L.L.C.*,

    547 U.S. 388 (2006) ................................................................ 10, 26

*Falstaff Brewing Corp. v. Miller Brewing Co.*,

    702 F.2d 770 (9th Cir. 1983) .................................................. 19, 22, 29

*Fla. Lime & Avocado Growers, Inc. v. Paul*,

    373 U.S. 132 (1963) ....................................................................... 23

*Flores v. Bondi*,

    803 F. Supp. 3d 1018 (C.D. Cal. 2025) ............................................. 5

*Flores v. Rosen*,

    984 F.3d 720 (9th Cir. 2020) ........................................................... 19

*Golden State Bottling Co. v. NLRB*,

    414 U.S. 168 (1973) ................................................................. 13, 15

*Hercules, Inc. v. United States*,

    24 F.3d 188 (Fed. Cir. 1994) .......................................................... 24

*Hercules, Inc. v. United States*,

    516 U.S. 417 (1996) ................................................................. 24, 25

*Herrlein v. Kanakis*,

  526 F.2d 252 (7th Cir. 1975) ..................................................................... 13

*In re Dual–Deck Video Cassette Recorder Antitrust Litig.*,

  10 F.3d 693 (9th Cir. 1993) ................................................................. 10, 16

*Jeff D. v. Otter*,

  643 F.3d 278 (9th Cir. 2011) .......................................................... 5, 27, 31

*Johnson v. Tyson Foods, Inc.*,

  580 F. Supp. 3d 382 (N.D. Tex. 2022) .................................................... 24

*Keith v. Volpe*,

  118 F.3d 1386 (9th Cir. 1997) .................................................................. 11

*Lab./Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth*,

  564 F.3d 1115 (9th Cir. 2009) .................................................. 5, 8, 9, 25, 26, 29

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,

  478 U.S. 501 (1986) .................................................................................. 11

*Movie Sys., Inc. v. MAD Minneapolis Audio Distributors, a Div. of Smoliak & Sons, Inc.*,

  717 F.2d 427 (8th Cir. 1983) .................................................................... 20

*Nehmer v. U.S. Dep't of Veterans Affairs*,

  494 F.3d 846 (9th Cir. 2007) .......................................................... 4, 20, 21

*NRDC. v. Train*,

510 F.2d 692 (D.C. Cir. 1974) ................................................................ 19

*NRDC v. U.S. Dep't of State*,

658 F. Supp. 2d 105 (D.D.C. 2009) .......................................................... 23

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,

418 U.S. 264 (1974) .................................................................................. 23

*Perez v. Discover Bank*,

74 F.4th 1003 (9th Cir. 2023) ................................................................... 16

*Peterson v. Highland Music, Inc.*,

140 F.3d 1313 (9th Cir.1998)........................................................ 11, 12, 31

*PLIVA, Inc. v. Mensing*,

564 U.S. 604 (2011). ................................................................................. 23

*R.C. ex rel. the Ala. Disabilities Advoc. Program v. Walley*,

475 F. Supp. 2d 1118, (M.D. Ala. 2007) ................................................... 5

*Rana v. Jenkins*,

113 F.4th 1058 (9th Cir. 2024) ................................................................. 16

*Rice v. Norman Williams Co.*,

458 U.S. 654 (1982)................................................................................... 23

*Rouser v. White*,

825 F.3d 1076 (9th Cir. 2016)..................................................................... 6

*Rufo v. Inmates of Suffolk Cnty. Jail*,

502 U.S. 367 (1992) ................................................................................... 20

*Sierra Club v. North Dakota*,

868 F.3d 1062 (9th Cir. 2017)............................................................... 10, 11

*Thompson v. Enomoto*,

915 F.2d 1383 (9th Cir. 1990)................................................................. 3, 20

*Turlock Irrigation Dist. v. FERC*,

903 F.3d 862 (9th Cir. 2018)................................................................. 14, 15

*United States v. Armour & Co.*,

402 U.S. 673 (1971) ..................................................................................... 5

*United States v. Asarco Inc.*,

430 F.3d 972 (9th Cir. 2005)........................................................................ 3

*United States v. ITT Rayonier, Inc.*,

627 F.2d 996 (9th Cir. 1980)...................................................................... 13

*United States v. PK Contractors Inc.*,

131 F.3d 150 (9th Cir. 1997)...................................................................... 14

*United States v. Rylander*,

   460 U.S. 752 (1983) .................................................................................. 19

*United States v. Vertac Chemical Corp.*,

   46 F.3d 803 (8th Cir. 1995) ....................................................................... 24

*Wells Benz, Inc. v. United States*,

   333 F.2d 89 (9th Cir. 1964) .................................................................... 6, 25

*Zamani v. Carnes*,

   491 F.3d 990 (9th Cir. 2007) ...................................................................... 4

*Zango, Inc. v. Kaspersky Lab, Inc.*,

   568 F.3d 1169 (9th Cir. 2009) ............................................................ 4, 8, 27

## STATUTES

50 U.S.C. § 4557 ................................................................................. 22, 24

49 U.S.C. § 60101 ..................................................................................... 17

## REGULATIONS

49 C.F.R. pt. 195, app. A ........................................................................... 16

## I.    **INTRODUCTION**

The United States' and California's dueling motions do not require answers to complicated questions about the separation of powers, the scope of federal pipeline safety jurisdiction, or energy emergencies and the lawfulness of the Defense Production Act Order.  Instead, the questions for this Court are much simpler: (1) Does the Consent Decree language provide for termination of the Decree?  And (2) Is contempt appropriate for Sable, when Sable is a nonparty and is safely operating the pipeline under federal orders that directly conflict with California's view of compliance requirements?

California's motion spends pages and pages describing the constitutional separation of powers, but it hardly addresses these two basic questions.  On termination, the Consent Decree includes clear, specific language—language that California entirely ignores—explaining that the Decree should be terminated after Plains has complied for a term of five years and three months.  Plains has complied for the required time, and California does not say otherwise.  Termination should be granted on this basis alone.

Termination is also appropriate because the Consent Decree has accomplished everything it set out to accomplish.  The purpose of the Consent Decree was to create a path for safe resumption of flow and future compliant operation of the pipeline.  That goal has been achieved.  The pipeline has now safely restarted without issue, and it will continue to be subject to enforceable federal requirements that will protect the public and the environment post-termination.  California presents zero evidence to the contrary.  In fact, the only disagreement between state and federal regulators regarding pipeline safety is about the timing of a narrow category of extra-protective repairs that go beyond the Consent Decree requirements.  PHMSA recognizes that these repairs—again, repairs that go well beyond the default safety rules and even beyond the Consent Decree criteria—should be carried out pursuant to an expedited

schedule after upcoming pipeline inspections.  California makes no argument and presents no evidence that PHMSA's and Sable's approach to these repairs is unsafe.

As for the second question, the Court should reject California's unfounded motion to find Sable in contempt of a Consent Decree Sable is not a party to.

First, Sable contractually agreed to follow certain Consent Decree provisions when it purchased the relevant pipeline segments in 2024.  Sable did not agree to be substituted as a defendant and is not a "successor" under the Consent Decree's terms, nor is it in privity with Plains.  Enforcement against a nonparty is not appropriate under these facts.

Second, California's enforcement motion ignores changed circumstances. The status of the pipeline segments has changed since Plains operated them in 2016. Unlike Plains, Sable now owns and operates the entire Santa Ynez Pipeline as a single continuous pipeline from platforms in federal waters to an endpoint in Pentland, California.  PHMSA is a co-plaintiff with California under the Consent Decree.  And PHMSA recently recognized the interstate status of the Santa Ynez Pipeline, which subjects the relevant pipeline segments to exclusive federal regulatory oversight by PHMSA.  The United States has explained that Sable "cannot rely" on the previously-issued state waivers and must look to PHMSA for a special permit and restart approval.

Third, the Defense Production Act Order directs Sable to immediately resume flow and operate the pipeline segments—a requirement that California says directly conflicts with its interpretation of the Consent Decree's requirements.  Sable is caught between two plaintiffs to a Consent Decree that it is not even party to.  On the one hand, California believes the State is the only possible regulator of the pipeline, with veto authority in perpetuity, and has ordered Sable to stop the flow of oil.  On the other hand, PHMSA has asserted exclusive federal jurisdiction and the Secretary of Energy has ordered Sable to immediately operate the pipeline or risk

CASE NO. 2:20-cv-02415-SVW-SSCx
OPPOSITION TO MOTION TO ENFORCE AND
REPLY IN SUPPORT OF MOTION TO TERMINATE

criminal penalties. California nonetheless would have this Court find Sable in contempt under these circumstances. And not only that, but California argues for contempt despite a total lack of harm to public safety or the environment. California is wrong and contempt is not proper given the Defense Production Act Order.

Fourth, California is wrong about the Consent Decree requirements themselves. Sable has substantially complied with any provision California claims has been violated. Sable met safety requirements and completed all necessary repairs.

Finally, the Consent Decree itself provides for stipulated penalties and a process for resolving disputes about compliance—not contempt. If the Consent Decree is enforceable against Sable (which it is not), at the very least Sable is afforded the process and other protections provided for in the Decree. California cannot cherry-pick the provisions of the Consent Decree that it likes while ignoring others. And California has not explained why it would be justified in bypassing the force majeure, dispute resolution, and stipulated penalties provisions.

In sum, Consent Decree termination is appropriate, and contempt is unfounded and unsupported. The Court should grant the United States' motion and deny California's motion.

## II.   **ARGUMENT**

### A.   **The Consent Decree should be terminated.**

*1. Under the plain language of the Consent Decree, the standard for termination has been met.*

California correctly acknowledges that the Consent Decree should be approached like a contract, interpreted based on its plain language and "within its four corners." *See United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005); *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990) ("In construing consent decrees, courts use contract principles."). The State articulates the correct standard

CASE NO. 2:20-cv-02415-SVW-SSCx
OPPOSITION TO MOTION TO ENFORCE AND
REPLY IN SUPPORT OF MOTION TO TERMINATE

but applies the wrong analysis. Despite the fact that the Consent Decree directly addresses termination requirements, California entirely ignores the operative language in its opposition to termination.

The Consent Decree itself says when it should be terminated:

> After Defendants [Plains] have: (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination . . . . If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

ECF No. 6-1 ¶100.

California ignores the termination provision because the language is fatal to its position. Termination follows when Plains, the only defendant, has operated in compliance with the Consent Decree for five years and three months. The United States and Plains have stipulated to Plains' compliance with the Consent Decree requirements for the relevant timeframe. *See* ECF No. 49-1, Ex. A. California does not dispute Plains' compliance. Indeed, by failing to raise any noncompliance by Plains as a bar to termination in its opposition brief, California has forfeited any such argument. *See Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) ("[A]rguments not raised by a party in an opening brief are waived."); *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

Because Plains has met the standard for termination under the plain language of the Consent Decree, the Decree must be terminated. *See Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 861 (9th Cir. 2007) (explaining that the plain language controls).

*2. Plains' and nonparty Sable's "substantial compliance" provides an additional, independent basis for terminating the Consent Decree.*

When a Consent Decree directly addresses the prerequisites for termination, that express termination standard is controlling. *See, e.g., R.C. ex rel. the Ala. Disabilities Advoc. Program v. Walley*, 475 F. Supp. 2d 1118, 1124–25, (M.D. Ala. 2007). The Ninth Circuit has explained that courts must respect a consent decree's "express expiration date," unless a party seeks to modify the decree—something California has not done here. *Lab./Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.* ("*Labor/Community Strategy Center*"), 564 F.3d 1115, 1120 (9th Cir. 2009). And courts are directed not to impose obligations beyond those negotiated by the parties. *See United States v. Armour & Co.*, 402 U.S. 673, 682–83 (1971).

California argues that the United States' and nonparty Sable's alleged noncompliance with the Consent Decree is reason to deny the termination motion.[1] California's argument ignores the plain language of the Consent Decree's termination requirements and should be rejected for this reason alone. But even under the default standard for terminating a consent decree—the standard that would apply absent a specific termination provision—California's opposition still fails and termination is appropriate.

Absent termination language, courts deciding whether to terminate a consent decree look to "the more general goals of the decree" and the defendant's "record of compliance." *See Jeff D. v. Otter*, 643 F.3d 278, 288 (9th Cir. 2011). "Because consent decrees have many of the attributes of ordinary contracts and should be construed basically as contracts, the doctrine of substantial compliance, or substantial performance, may be employed." *Flores v. Bondi*, 803 F. Supp. 3d 1018, 1029 (C.D. Cal. 2025) (cleaned up). Substantial compliance "impl[ies] something

---

[1] The United States does not have any obligations toward California under the Consent Decree, and California has not explained what provision of the Decree it thinks the United States (a co-plaintiff) is violating.

less than a strict and literal compliance with the contract provisions," *Wells Benz, Inc. v. United States*, 333 F.2d 89, 92 (9th Cir. 1964), and "doesn't require perfection." *Rouser v. White*, 825 F.3d 1076, 1081–82 (9th Cir. 2016).

Here, any alleged noncompliance—no matter how articulated by California—does not rise to a level that would negate substantial compliance and justify extending the Consent Decree beyond its term. Plains has substantially complied with the Consent Decree and there is no argument to the contrary. Sable, for its part, is diligently following all safety requirements imposed by PHMSA, consistent with all Consent Decree provisions. PHMSA is actively and robustly monitoring that compliance. *See* ECF No. 45-2 ¶¶14–33. Even under the most strained reading of the Consent Decree (*i.e.*, that nonparty Sable is a defendant judicially required to comply with the entire Consent Decree, and that California should retain supreme authority despite the interstate nature of the Santa Ynez Pipeline), Sable still has performed every action California wants it to perform, with a single insignificant exception.

The one compliance disagreement between Sable, PHMSA, and California is the *timing* of an additional round of potential repairs, beyond the over 200 performed by Sable already, and beyond the Consent Decree's requirements, based on an extra margin of error for "tool tolerance" during pipeline inspections. PHMSA is imposing this standard on a forward-looking basis, requiring Sable to run tests and complete these repairs in the near-term, over the coming months. California, through the Office of State Fire Marshal ("OSFM") (in a change from its original position) wanted an extra round of repairs completed before restart. Declaration of B. Lance Yearwood ("Yearwood") ¶¶10–11, 15; ECF No. 49-2, Ex. 3. This is the entire substantive disagreement between PHMSA and OSFM; there is no other reason for California's refusal to approve restart.

California is wrong about when these repairs are needed. The previously-issued state waivers do not require them pre-restart. Indeed, until October 2025, all parties understood and agreed that the additional round of anomaly repairs would only be triggered post-restart. *See* Yearwood ¶¶8–17. Only after the political winds shifted did California change its tune. And even then, after Sable sent California a detailed letter explaining the correct interpretation of the state waivers on October 23, 2025, California never responded. *See id.* ¶22.

California focuses on Condition 9, which refers to repairs of certain pipeline conditions, or anomalies, "listed in this state waiver," and suggests that repairs must be performed pre-restart. California claims that the anomalies "listed" in the waiver includes anomalies that were previously identified in earlier inspections, prior to issuance of the state waivers, applying California's tool tolerance margin of error. Sable's position is that anomalies "listed in this state waiver" refers to anomalies that will be identified by future inspections on a going forward basis. Other language in the state waiver is directly contradictory to California's position. For example, footnote 10, when describing the anomalies that supposedly must be repaired before restart, directs Sable to "temporarily reduce the operating pressure . . . until the indication is remediated or until otherwise authorized by OSFM." *See* ECF No. 43-1, Ex. I at 177 n.10. This requirement only makes sense if oil is flowing, which belies California's argument that oil *must not* be flowing at the time of the repairs. And under other provisions, California's retroactive application of the tool tolerance and repair criteria would have required Sable to take certain repair actions for "listed" anomalies before the state waivers were even issued—an impossibility. Importantly, Sable performed all anomaly repairs with the narrow exception of those that might be triggered by applying the additional margin of error. And even those repairs will be carried out in the near future, under the PHMSA special permit.

We know this narrow disagreement between PHMSA and OSFM about the repair timing is insignificant because, in over 50 pages of briefing and two separate filings to this Court, including an emergency motion, *California has not once attempted a showing that safety is threatened*. If California truly believed the pipeline segments were unsafe, California would have presented some argument or evidence to support that claim. It has not done so.[2] In fact, all evidence about safety is to the contrary. Sable has resumed flowing oil safely and in compliance with its restart plans and special permit. Declaration of J. Caldwell Flores ("Flores") ¶¶24, 30–42. Before resuming flow, Sable performed over 200 repairs on the pipeline segments and stress-tested them via a hydrostatic pressure test and a spike test, performed at high pressure. *Id.* ¶¶16–17; Yearwood ¶7. This pressure testing regime was specifically designed to detect any anomalies that might risk failure in operation. Flores ¶¶13–14. Collectively these efforts provide confidence that the line can be restarted and operated safely. During the restart process, PHMSA inspectors have been on-site to confirm safety and compliance. ECF No. 49-3, Ex. C ¶33. The pipeline segments have been operating for over a month without any safety or environmental issues, and Sable will complete an additional round of inspections soon. Flores ¶¶24, 42. These efforts more than satisfy the standard for substantial compliance. *See Labor/Community Strategy Center*, 564 F.3d at 1119–24.[3]

In the context of termination, the purpose of the Consent Decree is also important. The United States, California, and Plains entered into the Consent Decree after the 2015 spill to promote safety, ensure future compliance, and protect the

---

[2] California labels the pre-restart repairs as a "critical requirement," without any explanation or support. California has waived any opportunity to argue that California's preferred timing for these repairs is necessary from a safety standpoint. *See Zango*, 568 F.3d at 1177 n.8.

[3] Sable will complete any repairs triggered by the more protective criteria, accounting for tool tolerance. *See* ECF No. 49-2, Ex. 7 at 28, Special Permit condition j). Again, the only disagreement is about timing of the repairs.

environment.  The purpose of the Consent Decree was not to impose a jurisdictional fiat and vest eternal oversight and veto authority in the State of California's preferred pipeline regulator.  The Consent Decree's safety goals have been met.  And those goals are not frustrated when PHMSA, a co-plaintiff under the Consent Decree and the delegated federal agency for regulating pipeline safety, asserts authority over the pipeline and ensures Sable's full compliance with PHMSA requirements.  In reality, one of the Consent Decree's goals was to create a path for safe restart of the pipeline segments—a goal that California now wants to block.

*Labor/Community Strategy Center* is instructive.  There, as here, the Ninth Circuit had to evaluate competing requests to terminate and to enforce a consent decree.  Plaintiff argued that noncompliance with the consent decree (covering race discrimination in bussing) supported an extension of the decree beyond its expiration date and made a motion to that effect.  *See Labor/Community Strategy Center*, 564 F.3d at 1119–24.  The district court nonetheless terminated the consent decree and the Ninth Circuit affirmed because, even though the decree "was a less than perfect document," it "had served its purpose" and "the situation improved greatly" due to the decree.  *Id.* at 1121–23.  Here, the termination question is even simpler: the Consent Decree provides for termination under its own express terms, and California has not submitted a request to modify that termination language.  For this reason, termination should follow.  But even under a broader inquiry like the one undertaken in *Labor/Community Strategy Center*, termination is appropriate because the Consent Decree has served its purpose.  Plains and nonparty Sable have substantially complied with the Consent Decree provisions, and the pipeline is operating safely.

**B.    California's motion to enforce the Consent Decree should be denied.**

While styled as a motion to "enforce" the Consent Decree, what California actually seeks here is a finding of contempt against Sable and a permanent injunction forcing Sable to shut down the pipeline in direct contravention of a binding executive order.   California wholly fails to demonstrate either the legal requirements of contempt or meet its burden to obtain the extraordinary remedy of injunctive relief.

To prevail on its contempt motion, California must first show that Sable, as a nonparty, is properly subject to a motion to enforce the Consent Decree.  *See Sierra Club v. North Dakota*, 868 F.3d 1062, 1067 (9th Cir. 2017).   California then bears the burden to show "(1) that [Sable] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *In re Dual–Deck Video Cassette Recorder Antitrust Litig.,* 10 F.3d 693, 695 (9th Cir. 1993).[4]

To obtain injunctive relief, California must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

California's motion fails to leave the starting gate because the Consent Decree cannot be judicially enforced against Sable.  But even assuming the motion should be entertained, California has not met its burden to prove that contempt is proper, given the changed circumstances of PHMSA's assertion of jurisdiction, Sable's

---

[4] California tiptoes around calling its motion a motion for contempt.  But the State recognizes that it bears the burden under a clear and convincing evidence standard. *See* ECF No. 55 at 12.

substantial compliance with the Consent Decree's provisions, and California's failure to follow the process for resolving disputes under the Consent Decree.

Finally, California *cannot* meet its burden to demonstrate irreparable injury or lack of monetary damages, as the Consent Decree provides for stipulated penalties for its exact alleged noncompliance, and thus there is no basis for its requested injunction.

> 1. *The Consent Decree is not enforceable against Sable because Sable is not a party.*

California cannot show Sable "violated" the Consent Decree because Sable is not enjoined by the Consent Decree. The general rule, subject to limited exceptions, is that judicial orders like consent decrees are not enforceable against nonparties. *See Sierra Club*, 868 F.3d at 1067; *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir.1998); *Keith v. Volpe*, 118 F.3d 1386, 1392 n.9 (9th Cir. 1997). The reason for this is simple: when parties to a consent decree sign on the dotted line, they are voluntarily agreeing to be subject to the court's jurisdiction and supervision. Parties outside of that agreement have not made that same voluntary commitment. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 523 (1986); *Ass'n for Ret'd Citizens of Conn., Inc. v. Thorne*, 30 F.3d 367, 370 (2d Cir. 1994).

California fails to justify why this general rule should not apply here. Sable unequivocally did not "assume[] the role of enjoined defendant under the Consent Decree"—a false statement made by California without any legal or factual support. *See* ECF No. 55 at 20. Instead, Sable purchased pipeline infrastructure assets through a transaction with a third party, ExxonMobil (not Plains), and as part of that purchase contractually agreed to follow certain safety provisions of the Consent Decree. Flores ¶¶9–10; Yearwood ¶¶3, 5. Sable never agreed to substitute in as a party to the Consent Decree, never agreed to be joined in this action, and never

agreed to be bound by any of the dozens of Consent Decree provisions that do not specifically apply to pipeline segments CA-324 and CA-325 (such as the consent to jurisdiction).

### a.  Sable is not a successor or in privity with Plains.

In limited circumstances, the Ninth Circuit recognizes "two alternative standards under which a court may hold a nonparty in contempt." *See Am. Semiconductor, Inc. v. California Assignments LLC*, No. 12-CV-06138-LHK, 2013 WL 5937968, at *4 (N.D. Cal. Oct. 30, 2013).  Neither applies here.

First, "a nonparty may be held in contempt if the nonparty had notice of the order, and either aids or abets the defendant in violating the court's order or is 'legally identified' with the defendant." *Id.* (quoting *Peterson,* 140 F.3d at 1323).[5] Second, "a decree of injunction not only binds the [] defendant, but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Am. Semiconductor*, 2013 WL 5937968, at *4 (quoting *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1280 (9th Cir.1992)).

Neither applies here.  California does not contend that Sable aided and abetted any violation of Plains; it does not contend Plains violated the Consent Decree at all. And Sable is not legally identified with Plains because it is not a successor to Plains or in privity with Plains.  Sable simply purchased assets from a separate third party (not Plains), including pipeline segments addressed by the Consent Decree.

The law is clear that mere asset purchasers, like Sable, are not bound by predecessor injunctions:  "There is no Ninth Circuit case law holding that nonparties are deemed to be 'successors in interest' to a party bound by an injunction, and thus that the nonparties are bound by the injunction themselves for contempt purposes,

---

[5] "Legal identity" can be "based on either the non-party's close affiliation with the enjoined party prior to the injunction," "or its status as a successor to the enjoined party after the injunction issued." *CFPB v. Howard L.*, P.C., 671 F. App'x 954, 955 (9th Cir. 2016) (explaining that Fed. R. Civ. P. 65(d)(2) reflects the successor principles) (cleaned up).

when the nonparty purchases assets from an enjoined party." *Am. Semiconductor*, 2013 WL 5937968, at *7. Rather, courts have found asset-purchasers like Sable to be successors-in-interest only in rare circumstances that do not apply here; *e.g.*, if the purchaser is the "continuing business enterprise" of the seller company. *See Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 180 (1973). Even a direct transfer of *all* a predecessor company's assets to a successor company may not result in contempt for violating an injunction if the transfer of assets was not made to evade the injunction. *See Herrlein v. Kanakis*, 526 F.2d 252 (7th Cir. 1975).

Sable is not a successor to Plains and is not properly subject to a contempt motion because Sable is not the "continuing business enterprise" of the enjoined party, Plains. *See Am. Semiconductor*, 2013 WL 5937968, at *7. When Sable purchased the assets from ExxonMobil, Sable did not continue Plains' business operations, did not take on Plains' employees, and did not adopt any of Plains' procedures. Yearwood ¶3; Flores ¶¶9–10. Plains owns thousands of miles of active crude oil and natural gas pipelines and gathering systems, among other assets, and has an enterprise value exceeding $25 billion. Flores ¶9. The assets acquired initially by ExxonMobil and then by Sable represent only a small portion of Plains' overall portfolio—further showing that Sable is not a "successor" to Plains.

Sable is also not in privity with Plains. Privity requires "substantial identity between parties." *United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir. 1980). Or it may attach for "those whose interests are represented by one with authority to do so," or if the nonparty's interests are "so closely aligned" with a party's interests that the party is its "virtual representative." *Id.* None of these factors apply here. There is no substantial identity or virtual representation between Sable and Plains.

         **b.**    <u>The Consent Decree transfer provisions and the Assumption Agreement demonstrate that Sable is not a successor.</u>

California's successorship position hinges on the Assumption Agreement. But the Assumption Agreement does not change the conclusion that Sable is not a successor to or in privity with Plains, such that contempt would be proper. Paragraph 88 of the Consent Decree allows Plains to transfer the pipeline segments so long as the transferee assumes the obligations "specifically applicable to the asset(s) acquired." *See* Consent Decree, ECF No. 6-1 ¶88. Plains complied with this requirement when transferring the pipeline segments to ExxonMobil, which then did the same when transferring the assets to Sable, and Sable contractually agreed to follow the Consent Decree's safety measures. Yearwood ¶3; Flores ¶10. Sable's limited contractual agreement with *ExxonMobil*—another nonparty—does not somehow make Sable a successor-in-interest to *Plains*. *See Am. Semiconductor*, 2013 WL 5937968, at *6.

To the contrary, the Consent Decree's transfer provisions at Paragraphs 88–90 reflect a clear contractual approach for a party that purchases the pipeline segments. If California were correct that Sable is automatically a "successor" to Plains by virtue of acquiring the pipeline segments, then there would be no reason for the separate, detailed provisions on the requirements for transfer and the purchaser's agreement to be bound. That is because, in California's view, the purchaser would already be fully bound by the Consent Decree and subject to a motion for contempt like this one. But just like a contract, the Consent Decree should not be read to create superfluous, meaningless, or void language. *See United States v. PK Contractors Inc.*, 131 F.3d 150 (9th Cir. 1997) ("[A]n interpretation which gives a reasonable meaning to all parts of a contract will be preferred to one which leaves a portion of it inoperative or superfluous."); *Turlock Irrigation Dist. v.*

*FERC*, 903 F.3d 862, 872 (9th Cir. 2018) ("We will not interpret a contract so as to render one of its provisions meaningless.").

The Consent Decree could have provided for substitution of a transferee as a party to the Consent Decree, but it did not. And in fact other consent decrees do create that substitution process. *See* Consent Decree, *United States v. Consol Energy Inc.*, No. 11-cv-00028 (N.D. W. Va. June 5, 2011), ECF No. 53-2, Ex. A ¶6 (explicitly requiring a process for a transferee to agree "to be added as a Party under the Decree and thus *bound as a Defendant* by the terms thereof" (emphasis added)). This party-substitution approach stands in stark contrast to the contractual assumption agreement process required here. The Consent Decree's language—not California's buyer's remorse—is controlling.

The cases cited by California in support of its position are all inapposite because California assumes, without analysis, that Sable is a "successor" to and in privity with Plains. Both *Golden State Bottling* and *Bates* are employment discrimination cases where the new business purchased "the employing enterprise." *Golden State Bottling,* 414 U.S. at 180 (narrowly holding "that a bona fide purchaser, acquiring, with knowledge that the wrong remains unremedied, the employing enterprise which was the locus of the unfair labor practice" may be bound); *Bates v. Pac. Mar. Ass'n,* 744 F.2d 705, 709 (9th Cir. 1984) (emphasizing the "continuity in operations and work force"). But this is not an employment discrimination case and Sable only acquired some of the assets held by Plains. And as *Am. Semiconductor* makes clear, "[t]here is no Ninth Circuit case law holding that nonparties are deemed to be 'successors in interest' to a party bound by an injunction, . . . for contempt purposes, when the nonparty *purchases assets* from an enjoined party." 2013 WL 5937968, at *7 (emphasis added). California's position is inconsistent with the caselaw and inconsistent with the Consent Decree itself,

CASE NO. 2:20-cv-02415-SVW-SSCx
OPPOSITION TO MOTION TO ENFORCE AND
REPLY IN SUPPORT OF MOTION TO TERMINATE

which makes a clear distinction between successors (who may be bound by the judgment) and asset purchasers like Sable (who are not).

        c.    <u>Sable is not estopped from taking the position that it is not a party.</u>

The Court should likewise reject California's half-hearted argument that Sable is judicially estopped from denying its nonparty status. Judicial estoppel only occurs when (1) a party's "current position is 'clearly inconsistent' with its previous position," (2) a court "'accept[ed] that party's earlier position,'" and (3) the party could "'derive an unfair advantage or impose an unfair detriment on the opposing party.'" *Rana v. Jenkins*, 113 F.4th 1058, 1070 (9th Cir. 2024) (quoting *Perez v. Discover Bank*, 74 F.4th 1003, 1008 (9th Cir. 2023)). None are met here. Sable has consistently taken the position that it is not a party but that it contractually agreed to follow certain Consent Decree provisions and has diligently attempted to carry out Consent Decree-related activities over the past two years. California's attempt to bend and twist Sable's words from other filings is flat-out wrong.[6] Accordingly, there is no risk of a court "accepting" an argument Sable has not advanced. And California does not even attempt to claim harm or prejudice.

        2.  *California's motion to enforce the Consent Decree ignores changed circumstances.*

California also fails to demonstrate that Sable did not substantially comply with the Consent Decree "not based on a good faith and reasonable interpretation of the order," and it certainly does not do so by "clear and convincing evidence." *In re Dual-Deck Video*, 10 F.3d at 695. In addition to the evidence of Sable's substantial

---

[6] For example, California frivolously argues that Sable's statement that it has pursued repairs in accordance with the Consent Decree is somehow an admission that Sable is a party and subject to contempt proceedings. This statement is entirely consistent with Sable's position that it contractually agreed to follow certain provisions under the Decree. Other Sable quotes from California are similarly grasping at straws.

CASE NO. 2:20-cv-02415-SVW-SSCx
OPPOSITION TO MOTION TO ENFORCE AND
REPLY IN SUPPORT OF MOTION TO TERMINATE

compliance detailed above, a court considering a contempt motion like this one should also consider whether there are changed circumstances such that "applying [the judgment] prospectively is no longer equitable." *See* Fed. R. Civ. P. 60(b)(5).

There are at least two changed circumstances that undercut California's contempt motion: (1) Sable now owns and operates the Santa Ynez Pipeline as an integrated interstate pipeline—an entirely different operational configuration than Plains' approach at the time of the Consent Decree—which led PHMSA to assess the Santa Ynez Pipeline and conclude it is an interstate pipeline subject to PHMSA's exclusive regulatory authority; and (2) On March 13, 2026, the United States ordered Sable to resume flowing oil pursuant to the Defense Production Act ("DPA Order"). Each of these changed circumstances is reason to reject California's motion for contempt.

California argues that Sable cannot use self-created changed circumstances to defend against the contempt motion. *See* ECF No. 55 at 24. This is wrong and it misses the point. These are not self-created changes. The changed circumstances are factual, on-the-ground changes to the operational configuration of the pipeline and a legal change to PHMSA's regulatory classification of the pipeline. The Santa Ynez Pipeline, transporting crude oil from the Outer Continental Shelf to Pentland, California, is an interstate pipeline. An "interstate hazardous liquid pipeline facility" is one that is "used to transport hazardous liquid in interstate or foreign commerce." 49 U.S.C. § 60101(a)(7). The Pipeline Safety Act defines "interstate or foreign commerce" to include commerce "between a place in a State and a place outside that State." *Id.* § 60101(a)(8)(B)(i). By contrast, an "intrastate hazardous liquid pipeline facility" is one that does not meet the definition of an interstate pipeline facility. *Id.* § 60101(a)(10). Consistent with these provisions, PHMSA regulations provide that a pipeline originating on the Outer Continental Shelf (*i.e.*, outside a state) and entering a state is an interstate pipeline. *See* 49 C.F.R. pt. 195, app. A, Ex. 7.

Prior to 2016, the Santa Ynez Pipeline, as an operationally integrated pipeline, did not exist: Plains owned and operated only the onshore segments of the pipeline (segments CA-324 and CA-325). ExxonMobil operated the offshore pipeline segments (transporting crude oil from platforms in federal waters on the Outer Continental Shelf to the Las Flores Canyon midstream processing facility) and the facility itself. Under these facts (and in response to Plains' cancelling of federal tariffs with FERC), PHMSA determined that pipeline segments CA-324 and CA-325 were an intrastate pipeline subject to OSFM regulatory oversight.[7] But the entire pipeline system is now managed differently than it was in 2016. Sable now owns and operates the offshore pipeline segments, the midstream processing facility, and the onshore segments CA-324 and CA-325 together as a single system, which is fundamentally different from the landscape in 2020 when the Consent Decree was entered. These factual changed circumstances led to PHMSA's reconsideration of the intrastate designation for the pipeline.

The Santa Ynez Pipeline transports crude oil continuously from offshore platforms located in federal waters off the coast of Santa Barbara through offshore and onshore segments, to its delivery point at Pentland Station in California. Flores Declaration ¶¶3–4. Because the crude oil originates outside California and is transported into the State for delivery, it is in interstate commerce upon entry into the system and remains so until delivery. Accordingly, the pipeline is an "interstate hazardous liquid pipeline facility."

Sable agrees with California that this interstate vs. intrastate issue does not need to be decided here and instead will be decided in due course by the Ninth

---

[7] Sable does not concede that the 2016 classification of segments CA-324 and CA-325 as an "intrastate" pipeline was correct.

Circuit. *See* ECF No. 55 at 36.[8]  Importantly, a final decision on this issue is unnecessary to reject California's motion for contempt.  But the issue does not need to be *decided* here to be *relevant*:  it would be unjust to find Sable in contempt when two Consent Decree plaintiffs both claim to have exclusive authority over the pipeline and have given Sable conflicting orders.  *See United States v. Rylander*, 460 U.S. 752, 757 (1983) ("While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible.").  PHMSA has unequivocally told Sable that PHMSA is the exclusive regulator of the pipeline and that Sable *cannot* rely on the state waivers.  California claims that OSFM is the only proper regulator and that Sable *must* rely on the state waivers for restart.  Sable's inability to comply with these conflicting orders is a complete defense to a motion for contempt.  *See Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 781–82 (9th Cir. 1983).  Courts should take a "flexible rather than rigid" approach when "it would be unreasonable and unjust to hold in contempt a defendant who demonstrated that he was powerless to comply." *NRDC v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974) (cleaned up).

It is irrelevant that Sable asked PHMSA to weigh in on the question of jurisdiction.  The true regulatory status of the pipeline is a factual and legal question.  And, as California acknowledges, there will be a final answer from the courts.  PHMSA did not "create [a] change in law" by simply recognizing the interstate nature of the Santa Ynez Pipeline.  *Flores v. Rosen,* 984 F.3d 720, 741 (9th Cir. 2020).  Nor did Sable "create" the impossibility of compliance by purchasing the pipeline assets and operating the entire system as a single continuous pipeline, which triggered reconsideration of the interstate status.

---

[8] California suggests that the intrastate nature of the pipeline (in the State's view) is reason to decline to terminate the Consent Decree.  The opposite is true.  California will have its chance to fight for jurisdiction over the pipeline, outside of the Consent Decree.

The Court can also reject California's contempt motion on the separate basis that the changed circumstances warrant a modification. *See Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990); *Movie Sys., Inc. v. MAD Minneapolis Audio Distributors, a Div. of Smoliak & Sons, Inc.*, 717 F.2d 427, 430–431 (8th Cir. 1983) (explaining that a district court may find that a "motion for contempt could best be dealt with" by modifying an injunction for equitable reasons, even if no modification motion is made, especially in situations of changed circumstances). In *Thompson*, the Ninth Circuit affirmed the District Court's determination that petitioner inmates' motion for contempt should be denied, and the consent decree should be modified because it was impossible for prison officials to comply with the decree. The same principle would apply here.

The Supreme Court has recognized three circumstances that may warrant consent decree modification: (1) "when changed factual conditions make compliance with the decree substantially more onerous;" (2) "when the decree proves unworkable because of unforeseen obstacles;" and (3) "when enforcement of the decree without modification would be detrimental to the public interest." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384–85 (1992). All three categories apply here: the changed operational configuration and classification of the pipeline makes compliance impossible, much less unworkable.

California incorrectly argues that any modification of the Consent Decree should be foreclosed because of the United States' and Sable's own actions. Importantly, the United States is a *plaintiff*, not a *defendant* directed to take some action that it now refuses to take. California's cases are squarely distinguishable for this reason. Both *Flores* and *Nehmer* involved consent decrees obligating the United States to take certain actions in its capacity as a defendant. The United States was then barred from creating new laws that directly conflicted with the obligations it had assumed under the consent decrees. California seems to suggest that the Consent

20

Decree here imposes an affirmative duty on the United States to defer to California's preferred legal interpretation of pipeline laws. Not so. Unlike in *Flores* and *Nehmer*, the United States is a plaintiff in this case and thus did not assume any affirmative compliance obligations. The United States and Sable simply ask that the Court recognize the changed circumstances of the pipeline's reclassification, following the changed factual circumstances of Sable's operational structure.[9]

The DPA Order is an additional changed circumstance that forecloses California's contempt motion. It is impossible for Sable to comply with both the DPA Order (directing Sable to immediately operate the pipeline) and California's view of the Consent Decree (prohibiting Sable from operating the pipeline). *See Coleman v. Newsom*, 131 F.4th 948, 960 (9th Cir. 2025) ("If the record establishes that there in fact is a present inability to comply with an order, the civil contempt inquiry is at an end.") (cleaned up). Although California argues that a "party" to a consent decree cannot be responsible for the circumstances preventing performance, Sable did not issue the DPA Order—nor did Plains. Instead, the President and the Secretary of Energy exercised their own independent judgment and plenary executive authority to issue the DPA Order to address energy shortages and reduce the national security risks posed by adversarial dependence on imported oil. ECF No. 43-1, Ex. Q at 1–2. According to the United States, an entity subject to a DPA order must comply with that order or risk criminal penalties. ECF No. 45 at 25.

___

[9]The Court should also reject California's disingenuous argument that the United States and Sable should have run to this court in 2025 for a modification reflecting the jurisdictional change. In fact, until California sued PHMSA much later, PHMSA and Sable had no indication of OSFM's conflicting view of the interstate status of the pipeline. Shortly after PHMSA sent its interstate determination letter, Jim Hosler, Assistant Deputy Director of Pipeline Safety for OSFM, indicated in a public statement that OSFM would not be challenging PHMSA's jurisdiction, stating, "they [Sable and PPC] don't have to tell us anything anymore now . . . We're not going to court. Anything like that would be up to the Governor's Office or the Department of Justice." Nick Welsh, *Sable Offshore Gets Green Light to Restart Pipeline from Feds*, Santa Barbara Indep. (Dec. 23, 2025), https://www.independent.com/2025/12/23/sable-offshore-gets-green-light-to-restart-pipeline-from-feds/

California cannot credibly argue that it is possible for Sable to comply with these conflicting orders. "Courts cannot blind themselves to reality. The array of conflicting orders to which a party is subject is a material circumstance in a contempt proceeding." *Chairs v. Burgess*, 143 F.3d 1432, 1436–38 (11th Cir. 1998).

Importantly, the Ninth Circuit has explained that "[i]t is clear that inability [to comply]—*whether or not self-induced*—is a complete defense to a charge of coercive civil contempt." *Falstaff Brewing*, 702 F.2d at 782 n.7 (emphasis added). So even if California were to prevail in its motion for contempt against nonparty Sable, compensatory civil contempt (*i.e.*, damages, not an injunction) would be the only remedy.

### 3. The Defense Production Act Order independently warrants denial of injunctive relief.

The Court does not need to address the effect of the DPA Order on the Consent Decree. As the United States and Sable have explained, all conditions for termination have been met. And Sable is a nonparty not properly subject to contempt, so there is no need for Sable to rely on the DPA Order to defeat California's contempt motion. In these circumstances, the legal consequences of the DPA Order are better resolved in other litigation, including the separate action that California initiated for that purpose. *See* Compl., *California v. Wright*, Case No. 2:26-cv-3396 (C.D. Cal. Mar. 31, 2026), ECF No. 1. If, however, the Court analyzes the ramifications of the DPA Order, it should reject California's arguments.

First, California's argument that the DPA Order is invalid because it was not issued in compliance with § 101 of the DPA and Department of Energy regulations is a red herring. ECF No. 55 at 26–28. The DPA's exculpatory clause, § 707, confers immunity regardless of whether the DPA Order is later held to be *ultra vires*. 50 U.S.C. § 4557. The validity of the DPA Order is thus irrelevant to whether Sable is subject to penalties or sanctions under the Consent Decree.

Second, California errs in contending that the DPA cannot displace state pipeline safety law because the Pipeline Safety Act reserves to the states the authority to regulate intrastate pipelines. As has been explained, the Santa Ynez Pipeline is an interstate pipeline, so this argument is dead on arrival. But California is also wrong about the DPA Order's preemptive effect.

A presidential directive authorized by statute operates with the force of federal law and, as a consequence, may have preemptive effect. *See Ass'n for Women in Sci. v. Califano*, 566 F.2d 339, 344 (D.C. Cir. 1977); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974). So too for valid delegations of statutorily grounded authority, such as those embodied by Executive Orders 13603 (2012) and 14391 (2026) in the realm of the DPA, that the President makes to his Cabinet officials. *Cf. NRDC v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 111 (D.D.C. 2009). Indeed, an executive agency's power to preempt state law is well-established. *Cf. Chrysler Corp. v. Brown*, 441 U.S. 281, 295–96 (1979).

Here, the Secretary of Energy, pursuant to authority directly delegated to him by the President, has compelled Sable "to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the [Santa Ynez Unit] through the [Santa Ynez Pipeline]." DPA Ord. at 3. Sable cannot abide by the Secretary's command and also accede to California's demand that it obtain state regulatory approval to flow oil through the Santa Ynez Pipeline. Sable thus finds itself in a state of compliance impossibility. *Cf. PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (finding preemption where it was impossible for the regulated parties "to comply with both their state-law duty" and "their federal law duty").

This "irreconcilable conflict" between federal and state law is the hallmark of impossibility preemption. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963). Under

the Supremacy Clause, the result of the tug-of-war is preordained: the DPA Order displaces any conflicting state measures. *See Johnson v. Tyson Foods, Inc.,* 580 F. Supp. 3d 382, 388–89 (N.D. Tex. 2022) (holding that a COVID-19-era DPA order requiring operation of meat and poultry processing plants preempted plaintiffs' claims based on "state-law standards").

Third, California is wrong that § 707 cannot afford Sable immunity from any penalties or sanctions issued under the Consent Decree. Congress expressly barred any liability for a private party's compliance with federal directives—like the DPA Order—founded on the authority of the DPA: "No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." 50 U.S.C. § 4557; *see Hercules, Inc. v. United States*, 516 U.S. 417, 429 (1996) ("*Hercules II*") (noting that this provision "plainly provides immunity"). This immunity applies to Sable on its face: the Consent Decree itself sets stipulated "penalties" as the consequence for noncompliance. *See* ECF No. 6-1 ¶26. The Court can end its analysis there.

California urges the Court to disregard the plain language of § 707 in favor of a judicial limitation first applied in *Hercules, Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir. 1994) ("*Hercules I*"), and then adopted with limited discussion in *United States v. Vertac Chemical Corp.*, 46 F.3d 803, 812–13 (8th Cir. 1995). But those courts held only that companies are not entitled to *indemnification* from the federal government for liability and costs associated with DPA compliance. Both courts expressly left open the possibility that § 707 might provide immunity in other contexts. *See Hercules I*, 24 F.3d at 203 n.15; *Vertac*, 46 F.3d at 812 n.11. The Supreme Court subsequently declined to adopt the limitation on § 707 immunity that underpins both cases, noting that it "need not decide the scope of § 707 . . . because

it clearly functions only as an immunity, and provides no hint of a further agreement to indemnify." *Hercules II*, 516 U.S. at 430 n.14.

Finally, California is wrong when it asserts that the DPA Order cannot qualify as a force majeure event under the Consent Decree. The DPA Order is event that prevents Sable from obtaining the state approvals that California contends are required under the Consent Decree. And the executive actions of the President and the Secretary of Energy are not actions within "the control of" Sable. *See* ECF No. 6-1 ¶44 (force majeure provision). This creates a straightforward force majeure situation.[10]

### 4. California cannot meet its burden to prove lack of "substantial compliance" with the Consent Decree.

As explained above, there are myriad reasons to reject California's motion. But even if the Court decides to entertain California's motion to enforce against a nonparty, and even if the Court determines that Sable's pipeline is still somehow subject to California's authority despite the interstate classification, California's motion still fails because Sable has performed the required safety measures and California's interpretation of the state waivers is wrong.

When evaluating whether a party has met its burden in a motion for contempt, courts apply the same "substantial compliance" standard used in the termination context. *See Labor/Community Strategy Center*, 564 F.3d at 1123. A party can meet the substantial compliance standard with "something less than a strict and literal compliance." *Wells Benz*, 333 F.2d at 92.

Sable undeniably complied in full with the state waiver requirements until PHMSA preempted them. Further, as explained above, California is wrong about

---

[10] The Court does not need to reach a final decision on whether the PHMSA interstate classification or the DPA Order are force majeure events. Instead, if the Court does not reject California's contempt motion for other reasons, the Court should defer to the ongoing dispute resolution process under the Consent Decree before weighing in on force majeure.

the waiver requirements themselves, and California's premise for refusing restart approval is incorrect; thus its only basis for Consent Decree noncompliance is also unjustified. It cannot meet its burden to prove by clear and convincing evidence that Sable has not substantially complied with the Consent Decree.

*Labor/Community Strategy* is again a solid guide for the Court's substantial compliance inquiry, if deemed necessary. After declining the plaintiff's motion to extend the Decree, the court examined the claims of rampant Consent Decree noncompliance. The court noted that there were disagreements about what the requirements meant and how to measure compliance. It went on to hold that a "holistic view of all the available information" was necessary to establish whether "compliance with the Decree overall was substantial, notwithstanding some minimal level of noncompliance." *Id.* at 1122. Just like the plaintiff in *Labor/Community Strategy,* California "focuses narrowly" on a single, disputed requirement to buttress its entire argument that Sable has not complied with the Consent Decree. And it does so "at the expense of giving due weight to the various other requirements under the decree" that Sable has met and exceeded, ensuring safe operation of the pipeline. *Id.* Not only that, but California presses a view on compliance that is directly contradicted by the federal co-plaintiff to the Consent Decree. The Court should reject California's narrow focus and accept PHMSA's and Sable's view that compliance has been achieved.

Finally, the competent regulation and oversight of PHMSA—the federal agency specifically commissioned to keep pipelines safe—is another reason to find substantial compliance here, and, independently, to deny injunctive relief. California wholly fails to demonstrate *any* irreparable injury—let alone one that would override the interests of the United States, PHMSA, and Sable. *eBay*, 547 U.S. at 391. The pipeline is operating safely. PHMSA reviewed Sable's restart plans and authorized restart, examined and issued a special permit with safety

CASE NO. 2:20-cv-02415-SVW-SSCx
OPPOSITION TO MOTION TO ENFORCE AND
REPLY IN SUPPORT OF MOTION TO TERMINATE

conditions that mirror those in the state waivers (which California concedes, *see* ECF 43 at 17–18), and has actively monitored the pipeline restart process on-site. Prior to restart, Sable carried out all the necessary measures to make the pipeline safe. Now that operations have resumed, Sable will comply with its special permit conditions, including conducting inspections and carrying out the exact repairs that are the only basis for California's motion to enforce. *See Jeff D.,* 643 F.3d at 284 (finding substantial compliance when the consent decree's goals have been achieved). California presents no evidence that Sable's restart is unsafe or a danger to public health or the environment, and it has waived any argument along those lines. *See Zango*, 568 F.3d at 1177 n.8.

> 5. *If Sable is subject to potential enforcement under the Consent Decree, then Sable must be afforded the due process for compliance disputes rather than an immediate contempt motion.*

California's requested relief—a contempt order and an injunction "enforcing" OSFM's authority and enjoining the pipeline's operations—are also wholly inconsistent with the Consent Decree itself. The Consent Decree includes extensive provisions for how to address alleged noncompliance with its terms. These include provisions for claims of force majeure to excuse noncompliance, a dispute resolution process to resolve disagreements about compliance, and stipulated penalties for noncompliance—all of which California ignores.

**Force Majeure**. The Consent Decree expressly provides that even clear noncompliance may be excused or delayed due to force majeure events. *See* ECF No. 6-1 ¶44. Out of an abundance of caution, Sable submitted timely notice to the State that, to the extent restart would be considered noncompliance, the DPA Order and PHMSA's interstate reclassification of the pipeline constitute force majeure events. Flores ¶25. Sable then submitted a follow-up report, as contemplated by the Consent Decree process, further expanding on the force majeure claim and

explaining that pipeline operation would not "cause or contribute to an endangerment to public health, welfare or the environment." Flores ¶26; ECF No. 6-1 ¶45.  On April 14, 2026, California responded, disagreeing with the force majeure claim but not disputing Sable's position that there was no danger to the public or environment.  Flores ¶27.

**Dispute Resolution**.  If Sable were a party to the Consent Decree, then Sable would now have 30 days from California's April 14 letter to invoke the dispute resolution procedures of the Decree.  ECF No. 6-1 ¶48.  "[T]he Dispute Resolution procedures [are] *the exclusive mechanism* to resolve disputes arising under or with respect to this Consent Decree."  *Id.* ¶49 (emphasis added).  California has given no reason—and certainly no public safety reason—why this dispute resolution process should be bypassed in favor of its immediate contempt motion.

**Stipulated Penalties**.  Finally, and most fundamentally, the stipulated penalties provisions of the Consent Decree wholly render California's requested relief inappropriate and impossible.  The Consent Decree's terms expressly contemplated scenarios when Plains might be out of compliance with the Consent Decree.  The Consent Decree sets negotiated, agreed-to stipulated penalty amounts for such noncompliance.  *Id.* ¶26 ("Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below.").  Most relevant here, the Consent Decree includes a stipulated penalty for the exact noncompliance alleged by California.  *Id.* ¶29.a, d (applying a per day penalty amount for "operation of [CA-324 and CA-325] in violation of" the provision of Appendix D providing for OSFM approval of Plains' restart).  These stipulated penalties foreclose California's argument that civil contempt and injunctive relief is necessary to "enforce" the decree.  California agreed six years ago that operating CA-324 and CA-325 out of compliance with the

Consent Decree was compensable with monetary damages; it thus cannot demand an injunction now.[11]

The Consent Decree squarely addresses how to handle alleged noncompliance and claims of force majeure. A party is afforded the right to claim force majeure, dispute resolution follows if the parties cannot agree on compliance, and stipulated penalties apply at the end of that process if a party is found to be out of compliance. California ignores all of this. Even if the Court is persuaded by the State's position, its motion should be rejected because the State has not followed these provisions. And stipulated penalties, rather than an immediate injunction, would be the appropriate remedy at the end of the process, if applicable.

**C.   All forward-looking safety measures are captured by the Pipeline Safety Act, the Special Permit, and PHMSA's continued regulatory oversight.**

Sable is operating the pipeline safely and will continue to operate it safely into the future, after the Consent Decree is terminated. California presents no evidence or argument to support its position that the Consent Decree must be extended beyond its termination date. *See Labor/Community Strategy Center*, 564 F.3d at 1121 (declining to extend consent decree because decree was no longer necessary).

As explained in Sable's opening brief, the special permit captures *all* safety-related Consent Decree provisions that have yet to be carried out. *See* ECF No. 53 at 16–17. California cannot dispute this fact. So, the Santa Ynez Pipeline will continue to be held to a higher standard and more rigorous safety requirements than other pipelines and terminating the Consent Decree will not create any safety or environmental risk.

---

[11] Stipulated penalties are especially relevant, given that compensatory civil contempt is California's only remedy, due to the conflicting orders. *See Falstaff Brewing*, 702 F.2d at 782 n. 7.

CASE NO. 2:20-cv-02415-SVW-SSCx
OPPOSITION TO MOTION TO ENFORCE AND
REPLY IN SUPPORT OF MOTION TO TERMINATE

For example, Appendix D of the Consent Decree contemplates an in-line inspection of the pipeline segments after the segments have restarted and achieved "steady-state operation." ECF No. 6-1 Appendix D.1.b.9. An in-line inspection uses a sensor-equipped tool to run through the pipeline and collect data on wall thickness, cracks, dents, and metal loss. This inspection requirement is carried over into the special permit. Sable's inspections will identify any additional anomalies to be repaired, according to the heightened extra-protective criteria set forth in the special permit. Flores ¶¶13, 43. The special permit is an enforceable instrument that will continue to apply to Sable after Consent Decree termination.[12]

In fact, Sable already submitted its plan to perform inspections of CA-324 (the segment that experienced the 2015 spill) beginning in early May 2026, well before the deadline set out by the special permit.[13] *Id.* ¶¶50, 54. Later, with PHMSA's review and approval, Sable will inspect CA-325, analyze inspection reports, and carry out all required repairs on the pipeline segments on an expedited basis. *Id.* ¶¶51–52

California's supposed urgency in bringing its contempt motion is based entirely on its claimed loss of regulatory authority, rather than any substantiated pipeline safety risk. This self-centered focus on state authority, with only lip service to safety, gives the game away. The State does not want safe, compliant resumption of oil flows (as allowed by the Consent Decree). The State wants to retain its supposed veto authority to keep this pipeline shelved forever.

Sable's diligent inspection schedule and ongoing compliance work shows that California's position is unfounded. It is unmistakable proof that the regulatory

---

[12] Sable's emergency special permit has expired, and its regular special permit application is pending with PHMSA. Sable has committed to following the special permit conditions in this interim period.

[13] "Steady state operations" will be achieved sometime later this year, after production completes its ramp-up and flow rate fluctuations decrease. Flores ¶¶45–47.

system is working as intended and the public and environment are being protected. *See Jeff D.*, 643 F.3d at 284 (termination appropriate when Consent Decree has fulfilled its purpose).

**D.     The Consent Decree is not the appropriate vehicle for California to pursue its all-out effort to stop the Santa Ynez Pipeline.**

As this court is aware, California and Sable have other litigation pending, including (1) California's challenge to PHMSA's jurisdiction; (2) litigation regarding an easement dispute with the California Department of Parks and Recreation; and (3) litigation relating to California's new law SB 237, which was enacted with the specific intent to make it harder for Sable to operate. California has also brought a lawsuit against the Department of Energy challenging the DPA Order.

After this Court terminates the Consent Decree, California will still be free to pursue its legal arguments in other litigation. But the Consent Decree cannot be used as a backdoor attempt to block pipeline operation in perpetuity.

**E.     The Court should not find Sable in contempt without an evidentiary hearing and opportunity to present evidence countering California's claim of noncompliance.**

If the Court entertains California's motion and is persuaded that California may have met its contempt burden, then at a minimum, the Court should allow Sable the opportunity to develop and present evidence in support of its position. *See Chairs*, 143 F.3d at 1436 (explaining that a party subject to potential contempt is allowed to produce evidence, including at a show cause hearing); *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998) ("[A] district court ordinarily should not impose contempt sanctions solely on the basis of affidavits . . . [unless] the affidavits offered in support of a finding of contempt are uncontroverted.").

At a minimum, California's motion includes disputed facts about the applicability of the force majeure standard; whether restart and operation under PHMSA oversight is safe and constitutes substantial compliance; and whether OSFM's withholding of restart approval is justified or reasonable.  If the Court is inclined to entertain California's motion against Sable and not reject it for the reasons in this opposition brief, Sable requests the opportunity to present evidence on these issues at an evidentiary hearing.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should terminate the Consent Decree and deny California's motion to enforce against Sable.

Dated:  April 27, 2026                                  Respectfully submitted,

By: /s/ <u>Nicholas McDaniel</u>

BABST CALLAND
Nicholas McDaniel (*pro hac vice*)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone:  +1 202.853.3455
Facsimile:  +1 202.853.3491

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone:  +1 424.653.5500
Facsimile:  +1 424.653.5501

HOLLAND & KNIGHT LLP
James W. Noe (*pro hac vice forthcoming*)
*jim.noe@hklaw.com*
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Telephone:  +1 202.469.5525

*Attorneys for Nonparties Sable Offshore Corp. and Pacific Pipeline Company*

CASE NO. 2:20-cv-02415-SVW-SSCx
OPPOSITION TO MOTION TO ENFORCE AND
REPLY IN SUPPORT OF MOTION TO TERMINATE

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Nonparties Sable Offshore Corp. and Pacific Pipeline Company, hereby certifies that this Combined Opposition to Motion to Enforce and Reply in Support of the United States' Motion to Terminate contains 9,995 words, which complies with the word limit for L.R. 11-6-1.

Dated: April 27, 2026               /s/ *Nicholas McDaniel*

                                     Nicholas McDaniel