ROB BONTA
Attorney General of California
MYUNG J. PARK
SUPERVISING DEPUTY ATTORNEY GENERAL
MICHAEL S. DORSI (CA BAR NUMBER: 281865)
E-mail: Michael.Dorsi@doj.ca.gov
MATTHEW G. BULLOCK (CA BAR NUMBER: 243377)
E-mail: Matthew.Bullock@doj.ca.gov
DEPUTY ATTORNEY GENERAL
  455 Golden Gate Avenue, Suite 11000
  San Francisco, California 94102
  P.O. Box 85266
  Tel: (415) 510-4400
  Fax:  (619) 645-2581

ERIC M. KATZ
SUPERVISING DEPUTY ATTORNEY GENERAL
MICHAEL T. ZARRO (CA BAR NUMBER: 110171)
E-mail: Michael.Zarro@doj.ca.gov
JAKE GOLD (CA BAR NUMBER: 347131)
E-mail: Jake.Gold@doj.ca.gov
DEPUTY ATTORNEYS GENERAL
  300 S. Spring Street, Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6347
  Fax: (916) 731-2128

*Counsel for Plaintiffs California Department of
Parks and Recreation, California State Lands
Commission, California Department of Forestry
and Fire Protection's Office of State Fire Marshal*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>Defendants. | Case No. 2:20-cv-02415-SVW-SSCx<br><br>**CALIFORNIA PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ENFORCE CONSENT DECREE AND OPPOSITION TO UNITED STATES' MOTION TO TERMINATE CONSENT DECREE**<br><br>Date: June 1, 2026<br>Dept. 10A<br>Time: 1:30 pm<br>Judge: Hon. Stephen V. Wilson<br>Action Filed: March 13, 2020 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

DEVELOPMENTS SINCE OPENING BRIEF .........................................................1

    A.    The Santa Barbara County Superior Court Denied Sable's Motion to Lift the State Court Preliminary Injunction ..............1

    B.    Two Additional Motions by California are Pending in this Court ...................................................................................2

ARGUMENT.......................................................................................................2

    I.    The United States and Sable are Bound by the Text of the Consent Decree .................................................................2

        A.    Regardless of Whether Sable is a "Successor-in-Interest," Paragraph 4 of the Consent Decree Binds Sable as an "Assign" or a "Person Otherwise Bound By Law" ...................2

        B.    Principles of Privity and Assignment Compel Enforcement of the Consent Decree Against Sable....................4

        C.    The Consent Decree is Enforceable Against Sable as an Injunction .................................................................7

        D.    California's Position Regarding Plains Does Not Concede Termination...............................................................9

    II.    The Court Should Deny the Motion to Modify or Terminate the Consent Decree Because the United States and Sable Violated the Decree ...................................................................10

    III.    Neither the United States Nor Sable Identify Changed Circumstances that would Justify Modifying the Consent Decree .....11

        A.    The United States Cannot Escape Scrutiny of its Orders Because the 2025 Supreme Court Decision in *McLaughlin* Establishes a Right to Collateral Review................................11

        B.    Sable's Pipeline Safety Act Arguments Do Not Excuse their Non-Compliance With the Consent Decree ....................13

        C.    The Defense Production Act Does Not Excuse Compliance with the Consent Decree or State Law .................15

    IV.    Sable Cannot Rely On the Doctrine of Substantial Compliance to Excuse Its Refusal to Comply with the Consent Decree ................17

        A.    Sable Has Violated Specific Terms of the Consent Decree .....18

        B.    Sable's Case Authority Supports California's Position That Substantial Compliance Relief is Unavailable To Sable ...................................................................19

    V.    California Asks for an Appropriate but Limited Remedy: Ordering Compliance.................................................................20

CONCLUSION .................................................................................................21

i

# TABLE OF AUTHORITIES

**Page**

CASES

*American Semiconductor, Inc. v. California Assignments LLC*
No. 12-CV-06138-LHK, 2013 WL 5937968 (N.D. Cal. Oct. 30, 2013) .................................................................................................5, 6

*Ass'n for Retarded Citizens of Connecticut, Inc. v. Thorne*
30 F.3d 367 (2d Cir. 1994) ...................................................................8, 9

*Bates v. Pacific Maritime Ass'n*
744 F.2d 705 (9th Cir. 1984) ........................................................5, 6, 7, 8

*Bond v. United States*
572 U.S. 844 (2014) ...............................................................................17

*Davis v. San Francisco*
890 F.2d 1438 (9th Cir. 1989) ..................................................................7

*eBay Inc. v. MercExchange, L.L.C.*
547 U.S. 388 (2006) ...............................................................................20

*Flores v. Bondi*
803 F.Supp.3d 1018 (C.D. Cal. 2025)......................................................20

*Flores v. Rosen*
984 F.3d 720 (9th Cir. 2020)............................................................10, 15

*Gates v. Shinn*
98 F.3d 463 (9th Cir. 1996)......................................................................7

*Golden State Bottling Co. v. NLRB*
414 U.S. 168 (1973) ........................................................................5, 6, 8

*Harmon v. San Diego County*
477 F. Supp. 1084 (S.D. Cal. 1979) ..........................................................6

*Hercules Inc. v. United States*
516 U.S. 417 (1996) ...............................................................................16

*Hercules, Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994) ........................................................1, 16, 17

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Johnson v. Tyson Foods, Inc.*
580 F. Supp. 3d 382 (N.D. Tex. 2022) ........................................................16, 17

*Labor/Community Strategy Center. v. Los Angeles County Metropolitan Transportation Authority*
564 F.3d 1115 (9th Cir. 2009) ...............................................................19

*Local Number 93, Int'l Ass'n of Firefighters v. Cleveland*
478 U.S. 501 (1986) .........................................................................4, 6, 8

*Martin v. Wilks*
490 U.S. 755 (1989) ...............................................................................6

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*
606 U.S. 146 (2025) ..........................................................11, 12, 13, 15

*Mi Familia Vota v. Fontes*
111 F.4th 976 (9th Cir. 2024) ...............................................................6

*Nehmer v. U.S. Dep't of Veterans Affs.*
494 F.3d 846 (9th Cir. 2007) ............................................................13, 20

*New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*
434 U.S. 1345 (1977) ............................................................................21

*Rock Island A. & L.R. Co. v. United States*
254 U.S. 141 (1920) ...............................................................................17

*Rouser v. White*
825 F.3d 1076 (9th Cir. 2016) ..........................................................19, 20

*Southern Pacific Pipe Lines Inc. v. U.S. Department of Transpiration*
796 F.2d 539 (D.C. Cir. 1986) ..........................................................14, 18

*United States v. Vertac Chem. Corp.*
46 F.3d 803 (8th Cir. 1995) ............................................................1, 16, 17

*Walker v. City of Birmingham*
388 U.S. 307 (1967) .........................................................................10, 20

## TABLE OF AUTHORITIES
### (continued)

Page

*Wells Benz, Inc. v. United States*
   333 F.2d 89 (9th Cir. 1964) ....................................................................................19, 20

**STATUTES**

5 U.S.C. § 703 ....................................................................................................................13

49 U.S.C.
   § 60105(a) .................................................................................................................18
   § 60118(b) .................................................................................................................10
   § 60118(c) .................................................................................................................10
   § 60119(a)(2) ............................................................................................................13

**COURT RULES**

Fed. R. Civ. P.
   65 ..........................................................................................................................5, 7, 8
   65(d) .........................................................................................................................6, 7
   71 ..........................................................................................................................5, 7, 8

**OTHER AUTHORITIES**

49 C.F.R. § 195.452(h)(4)(iii)(H) .........................................................................................10

Restatement (Second) of Torts § 433B(3) ..............................................................................9

**INTRODUCTION**

Six years ago, the United States entered into an agreement, along with California's state agencies, that gave California the power to impose the safety conditions for restart of the onshore pipelines designated CA-324/325. Two years ago, Sable agreed to be bound by those conditions. But when California's State Fire Marshal told Sable that it had not satisfied those conditions, Sable asked the federal government to excuse—and even command—its non-compliance.

In their most recent briefs, the U.S. and Sable ask this Court, on every key question, to adopt the interpretations of relevant agreements and laws that would render the agreements meaningless and the laws unenforceable. But the presumptions of federal and state law are the opposite: contracts are construed to be effective, and laws are understood to be enforceable. Sable and the U.S. agreed to be bound by terms that assign the power over restart of CA-324/325 to California's State Fire Marshal. The Court should reject Sable and the U.S.' brazen attempt to circumvent this agreement.

**DEVELOPMENTS SINCE OPENING BRIEF**

Although the background to this dispute was discussed in the State's earlier brief, notable events have occurred since then.

### A.   The Santa Barbara County Superior Court Denied Sable's Motion to Lift the State Court Preliminary Injunction

On April 17, 2026, after briefing and hearing, the Santa Barbara County Superior Court rejected Sable's motion to lift its earlier preliminary injunction that prohibited Sable from restarting CA-324/325 until after it received its permits and gave notice of intent to restart. The Superior Court rejected Sable's interpretation of the Defense Production Act, and instead followed the federal appellate court decisions in *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995), and *Hercules, Inc. v. United States*, 24 F.3d 188, 203–04 (Fed. Cir. 1994), *aff'd on other grounds*, 516 U.S. 417 (1996). The Superior Court set a hearing on May 22,

1

2026, to address the associated motion by Center for Biological Diversity and Environmental Defense Center to enforce that court's preliminary injunction.

**B.  Two Additional Motions by California are Pending in this Court**

In the related case of *California Department of Parks and Recreation v. Sable Offshore Corp*, C.D. Cal. case no. 2:26-cv-2946, this Court has now received complete briefing on State Parks' Motion for Preliminary Injunction, and, on April 27, 2026, held oral argument. The motions in this case do not resolve that case— Sable is separately responsible for compliance with state law. Consent Decree (ECF 6-1) at 50-51,[1] ¶ 78.[2] As of this filing, that motion is under submission.

In another related case, *California v. Wright*, C.D. Cal. case no. 2:26-cv-03396, California moved for preliminary relief on May 1, 2026, setting hearing on June 1, 2026—the same day as hearing on this Motion. The U.S. sought to continue that hearing, which this Court denied. As a result, all three of California's motions will be fully briefed before the June 1, 2026 hearing date. *See* Declaration of Michael S. Dorsi, ¶ 10 (chart of cases related to CA-324/325).

## ARGUMENT

**I.  THE UNITED STATES AND SABLE ARE BOUND BY THE TEXT OF THE CONSENT DECREE**

**A.  Regardless of Whether Sable is a "Successor-in-Interest," Paragraph 4 of the Consent Decree Binds Sable as an "Assign" or a "Person Otherwise Bound By Law"**

Paragraph 4 states that "the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or person *otherwise bound by law* to comply with this Decree." ECF 6-1 at

---

[1] ECF page citations refer to the blue page numbers at the page imposed by the ECF system.

[2] The conditions in the Consent Decree are not all legal conditions that a pipeline operator would need to comply with to restart the pipelines. Defendants remain "responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein." ECF 6-1 at 50-51, ¶ 78. For example, a pipeline operator would need to ensure it had all property entitlements and environmental permits before restarting.

2

11:9-12 (emphasis added). In their most recent briefs, Sable and the U.S. contend that Sable is not in fact a successor-in-interest. That is contrary to law and contrary to Sable's representations as recent as November 2025.[3] But the Consent Decree drafters recognized the potential for such shell games and made the Consent Decree apply also to "assigns, as well as any other entities or person otherwise bound by law."

At a minimum, Sable is an assign, having accepted rights and responsibilities when it acquired the Pipelines. In the aptly named "Consent Decree Assumption Agreement" of February 14, 2024, Sable states that the purchase of assets was effectuated by "certain instruments of sale, *assignment*, transfer and conveyance . . ." ECF 55-1 at 119 (emphasis added). And in any event, Sable is also *otherwise bound by law* to comply with the Consent Decree.

Paragraphs 88 through 91 of the Consent Decree  (ECF 6-1 at 53-54) conditioned any transfer of the pipeline on "documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree." ECF 6-1 at 54:7-9. These provisions rule out Sable's argument that enforcement is not available against an entity that "simply purchased assets." ECF 61 at 21:19. Paragraph 88 binds Sable to the terms of the Decree that are applicable to the assets (CA-324/325). ECF 6-1 at  53:8-24. The U.S. asks why Paragraph 4 is not listed in Paragraph 88's enumeration of obligations. But Paragraph 4 addresses *who* is bound, and Paragraph 88 addresses *what* obligations bind a buyer of CA-324/325. *Compare* ECF 6-1 at 11:9-12 *with* ECF 6-1 at 53:8-24. Paragraph 88 explains that a buyer of CA-324/325 must assume the obligations related to safe operation of CA-324/325 but not other obligations in the Consent Decree (*e.g.*, the

---

[3] On November 5, 2026, Sable sought relief in the California Court of Appeal on the basis that Plains was Sable's "predecessor-in-interest." *See* Declaration of Michael S. Dorsi, Exh. 3 ("Petitioners' predecessor-in-interest [Plains] entered into a consent decree with the U.S. and the State of California . . . . The consent decree imposes a series of prerequisites the operator must satisfy before resuming petroleum transportation . . . ."); *see also* Dorsi Decl., Exhs. 4-9.

obligations specific to Plains or to Line 2000—the other pipeline subject to the Consent Decree). Sable's Assumption Agreement confirms this. ECF 55-1 at 119-123. Paragraph 89 sets a procedure for a transferee to "request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions" of the Consent Decree. ECF 6-1 at 54:5-6. Sable has not used this procedure. These provisions show that Sable knew exactly what it was getting into when it agreed to be bound by the Consent Decree.

More, the U.S., as a co-plaintiff to the Consent Decree, voluntarily agreed to be bound by these terms. ECF 6-1 at 11, 13. *See Local Number 93, Int'l Ass'n of Firefighters v. Cleveland*, 478 U.S. 501, 522 (1986) ("t is the agreement of the parties . . . that creates the obligations embodied in a consent decree"). Consequently, the Court may impose relief against the U.S.

### B. Principles of Privity and Assignment Compel Enforcement of the Consent Decree Against Sable

The U.S.' position may be reduced to this disingenuous syllogism: (a) it has been 5 years and 3 months since the Court ordered Plains to properly repair Lines CA-324/325;[4] (b) as required by the Consent Decree, Plains assured that Sable, as assignee of the lines, assumed the Consent Decree's obligations; (c) but the Court has no power to hold Sable to that duty and must terminate the Consent Decree as "expired." That argument misses the point.

First, as to the timeframe, the Consent Decree may be terminated "[a]fter Defendants have: (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree . . . ." ECF 6-1 at 59, ¶ 100. "And" means *both*, not "one *or* the other." Paragraph 88 and Appendices B and D were included to assure the Court's jurisdiction to enforce the Consent Decree's safety-promoting requirements, as a key part of settling claims over the pipelines' rupture and

_____

[4] The Consent Decree refers to CA-324/325 by their designations at the time, Lines 901 and 903.

4

despoliation of the Gaviota Coast. The Consent Decree requires compliance with these requirements prior to termination. ECF 6-1 at 96-102. Appendices B and D require OSFM approval to ensure that the pipeline would not restart unless the pipeline owner complied with pipeline safety laws and the additional safety requirements. It would make no sense for the Consent Decree to have required a restart to comply with Appendices B and D if it occurred within 5 years 3 months, but to allow a noncompliant restart at any point thereafter.

Second, Sable is bound by the Consent Decree. Whether it is a successor-in-interest, an assign, or otherwise bound, Sable is in privity with Plains on notice of the safety obligations ordered by the Court, so Sable falls within this category of responsible persons under FRCP 65 and 71. Tellingly, the U.S. concedes that Sable is bound to the Consent Decree under *Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973) and *Bates v. Pacific Maritime Ass'n,* 744 F.2d 705 (9th Cir. 1984) if Sable maintains "tight operational [] continuity with a bound party equivalent to a continuing business enterprise[.]" ECF 60 at 29:4-5. This is exactly what has happened. Sable acquired Pacific Pipeline Company to operate Lines CA-324/325 in place of Plains to achieve the same purpose using the same equipment to transport oil from Las Flores Canyon to Pentland by pipeline.

Sable relies heavily on the unreported District Court ruling in *American Semiconductor, Inc. v. California Assignments LLC*, No. 12-CV-06138-LHK, 2013 WL 5937968, at *7 (N.D. Cal. Oct. 30, 2013), to argue that the Court may not enforce the plain language of the Consent Decree. Sable's reliance is misplaced. In *American Semiconductor*, there was an injunction against the party, in contrast to this case, with a consent decree and an assumption provision. There, unlike Sable, the asset purchaser did not receive a copy of a decree or expressly agree to be bound. Most importantly, in *American Semiconductor* the District Court concluded that there was insufficient evidence presented regarding the nature of the assets and who acquired them at auction to impose injunctive relief against the buyer. *Id.* at *7

5

("[T]here was no transfer of assets from a company that actually used the assets to a successor company that would also use the assets in a similar business capacity"). By contrast, here, Lines CA 324/325 were transferred in their entirety from one pipeline operator to another for use in the same business capacity.

Sable's attempt to discount *Bates* and *Golden State Bottling* based on dicta in *American Semiconductor* misses the point. There is nothing in *American Semiconductor* (or any other case cited by Sable or the U.S.) that excludes a party like Sable, who agreed to be bound, from being subject to the terms of the Consent Decree. Two key principles established in *Golden State Bottling* make clear that Sable is subject to the Consent Decree. First, the Supreme Court determined that Rule 65(d) allows for enforcement of injunctions against "successors and assigns" who are not themselves parties to the litigation. *Golden State Bottling,* 414 U.S. at 179. Second, the Supreme Court applied the common-law concept of privity, holding that a party acquiring property that is subject to litigation, with knowledge of unfulfilled obligations, is in privity with its predecessor for purposes of Rule 65(d). *Id.* The Consent Decree is consistent with these principles. It applies to "successors and assigns," and provides detail on the obligations to be assumed. It also recognizes that a transfer could be limited to the subject pipelines, and provided for enforcement of its obligations upon such a transferee. Furthermore, Sable is afforded the same procedural safeguards as the acquiring entity in *Golden State Bottling*: an opportunity to be heard regarding the nature and scope of its obligations.[5] *Id.* at 181.

---

[5] The U.S.' reliance on *Mi Familia Vota v. Fontes*, 111 F.4th 976 (9th Cir. 2024), *Martin v. Wilks*, 490 U.S. 755 (1989) and *Harmon v. San Diego County*, 477 F. Supp. 1084 (S.D. Cal. 1979) on the issue of nonparty enforcement is inapt. Sable has no viable due process objection because it *agreed* to be bound. The court in *Mi Familia* refers to *Martin v. Wilks* as not applicable to the case before it. *Martin v. Wilks* and the earlier *Harmon* case involve the ability of a non-agreeing nonparty impacted by a consent decree to assert his right to challenge discrimination he allegedly suffered from the enforcement of that order. Like *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO v. City of Cleveland*, 478 U.S. 501 (1986), these cases have no bearing on the successor doctrine articulated in *Bates* and *Golden State Bottling.*

The U.S. claims that California "wish[es] that the Consent Decree made Sable a party." ECF 60 at 15. But the safety provisions of the Consent Decree are enforceable against Sable even as a *non*party under Rules 65(d) and 71. *See Bates,* 744 F.2d at 709 (that a successor "is not a party to the consent decree is of course irrelevant, for that is the whole point of the successorship doctrine.").

The U.S.' attempt to distinguish *Bates* in fact shows the analogy between that case and this one. As explained by the U.S., *Bates* concerned "a new company [formed] to perform the identical stevedoring services previously provided by a bound" party. ECF 60 at 28:23-24. *Bates* concerned employment discrimination, and found successorship based on hiring the bound party's employees. Here, a new company, Sable, was formed to perform the same transportation of oil by pipeline that Plains had performed. The Plains Consent Decree here concerns pipeline safety, and this Court should find successorship based on Sable's acquisition of the same pipelines.

Of course, this case is easier than *Bates*. In *Bates*, while the new company was aware of the Consent Decree, it did not sign an assumption agreement. *Bates*, 744 F.2d at 710. Here, Sable not only had knowledge, but agreed to be bound in the Assumption Agreement.

### C. The Consent Decree is Enforceable Against Sable as an Injunction

The U.S. attempts to facilitate Sable's violation of the Consent Decree by erroneously claiming that the "Consent Decree is not the type of injunction, restraining order, or other order that should be enforced against a nonparty under Rules 65 and 71." ECF 60 at 25:5-7. The Ninth Circuit has routinely held that a "consent decree is an injunction." *Gates v. Shinn* 98 F.3d 463, 468 (9th Cir. 1996); *see Davis v. San Francisco,* 890 F.2d 1438, 1452 (9th Cir. 1989) (binding non-parties to a consent decree pursuant to Rule 65(d)). The U.S. admits that whether Rules 65 and 71 are applicable only depends on whether the Consent Decree is an

7

"injunction, restraining order, or other order that should be enforced against a nonparty." ECF 60 at 25:6-7. Since it is, this Court need not consider their remaining applicability arguments.

The U.S. ignores that Sable is in privity with Plains as an assignee with notice by virtue of the Consent Decree's applicability provisions in Paragraph 4, and therefore may not claim exempt status under Rules 65 and 71. The U.S.' reliance on *Local No. 93*, 478 U.S. at 522, 525, to support Sable's ability to violate the Consent Decree, is misplaced. *Local No. 93* involved the rights of an intervenor to formulate the terms of a consent decree and has no bearing on the "successor doctrine" applied in *Bates* and *Golden State Bottling. Id.* at 528-29.

Sable acquired Lines CA-324/325 with full knowledge of the Consent Decree's binding requirements. *See Golden State Bottling*, 414 U.S. at 171 n.2. "Persons acquiring an interest in property that is a subject of litigation are bound by, or entitled to the benefit of, a subsequent judgment." *Id.* at 179. A contrary rule would significantly diminish the relief in the consent decree and directly undermine court authority to "enforce[] against those to whom the business may have been transferred, whether as a means of evading the judgment or for other reasons." *Id.* at 176 (citing *Regal Knitwear Co.* v. *NLRB*, 324 U.S. 9, 14 (1945)).

Regarding FRCP 71, the U.S. raises two arguments that the Court should readily dismiss. First, there is no basis for the U.S.' assertion that "Plains has complied with the Decree, so there is no violation for Sable to abet." ECF 60 at 29:13-14. Instead, the terms of the Consent Decree requiring OSFM approval before restart have not been satisfied. Furthermore, Sable's assumption of Plain's obligations pursuant to the Consent Decree makes it "legally identified with a bound party." ECF 60 at 29:10. Legal identity applies to both a nonparty's close affiliation with the enjoined party and its status as a successor to the enjoined party after the consent decree issues. *Golden State Bottling,* 414 U.S. at 179. Second, the U.S. incorrectly relies on *Association for Retarded Citizens of Connecticut, Inc. v.*

8

*Thorne,* 30 F.3d 367, 370 (2d Cir. 1994), for the proposition that there is "no basis to extend terms of a consent decree to a nonparty, even if the nonparty's actions may frustrate the court's order." On the cited page, the court indicates that parties and nonparties who "bargain for" or "agree to" a consent decree's terms *are* bound to it. *Id.* That is what happened here, as evidenced by Sable's Assumption Agreement, Sable's statements to courts, and the Consent Decree's language.

### D. California's Position Regarding Plains Does Not Concede Termination.

The U.S. makes much of the fact that California does not allege Plains has violated the Consent Decree. But Plains has completed its obligations only if it transferred the pipeline on terms making Sable subject to the Consent Decree's requirements. Because the U.S. and Sable claim that Sable answers not to the Court's orders but only contractually to Exxon, who acquired CA-324/325 from Plains, Plains' own continuing obligations are unsettled.

Accepting both the arguments for termination advanced by Plains and the arguments for non-assignment advanced by Sable would defeat the purpose of the Consent Decree. Plains asserts that it should be released from the Consent Decree because it has no ongoing obligations after it transferred the pipelines to Sable. ECF 59 at 3:19-4:13. Meanwhile, Sable claims that its obligations to comply with the Consent Decree are purely contractual in nature and are owed to the party from whom Sable purchased the pipelines (Exxon Mobil), who similarly owes only an obligation to Plains. ECF 61 at 20:20-21:3, 23:8-14, 25:11-13. But the obligations to the State did not simply evaporate. If the obligations to comply with the Consent Decree did not transfer to Sable, then they still reside with Plains. Plains and Sable cannot both escape responsibility by pointing across the table at each other to defeat the purpose of the Consent Decree. *Cf.* Restatement (Second) of Torts § 433B(3) ("Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to

which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.'). Either those obligations to California passed to Sable with transfer of the property, or the obligations remain with Plains to enforce them against Sable. Until the Court sorts out the obligations, neither Plains nor Sable should be released.

## II. THE COURT SHOULD DENY THE MOTION TO MODIFY OR TERMINATE THE CONSENT DECREE BECAUSE THE UNITED STATES AND SABLE VIOLATED THE DECREE

The U.S.' unilateral actions circumvented the Consent Decree. At Sable's request, the Secretary of Energy claims to have directed Sable to begin operating Lines CA-324/325 notwithstanding the Consent Decree. They knew the proper course of action was to first petition the Court for relief, not act unilaterally and pray for forgiveness later. Put another way, the U.S. and Sable attempt to "be judge in [their] own case . . . ." *Walker v. City of Birmingham*, 388 U.S. 307, 320 (1967). Courts of this Circuit have rejected such actions as a basis to modify or terminate existing orders. *See, e.g.*, *Flores v. Rosen*, 984 F.3d 720, 726-27 (9th Cir. 2020).

The U.S. claims that its position is supported by the presumption of regularity. ECF 60 at 30:27-31:5. It is unclear as to what actions the U.S. thinks should be presumed to be regular, and there is nothing regular about openly violating a federal court order. More, Sable is out of compliance with federal regulations for cathodic protection against growing corrosion of the pipeline walls. ECF 55-1 at 21 (PHMSA Emergency Special Permit, now-expired, identifying Sable as needing waiver of compliance with 49 C.F.R. § 195.452(h)(4)(iii)(H)). Federal law provides that such non-compliance may be addressed by a compliance order, or by formally waiving the requirements if certain conditions are met. 49 U.S.C. § 60118(b), (c). The U.S. did neither. Instead, the U.S. opted not to enforce the law. Dorsi Decl., Exh. 2 (Non-Enforcement Policy). The Court should not presume that declining to follow the law is regular.

10

**III.   NEITHER THE UNITED STATES NOR SABLE IDENTIFY CHANGED CIRCUMSTANCES THAT WOULD JUSTIFY MODIFYING THE CONSENT DECREE**

The U.S. and Sable contend that if they have violated the Consent Decree, this Court's response should be to modify the decree. That is, they ask the Court not only to end the Consent Decree, but to impose terms that California never agreed to. But neither the U.S. nor Sable offers a lawful basis to modify the Consent Decree.

In the initial moving papers, the U.S. relied on orders by the federal government as purported "changed circumstances" justifying a change to the Consent Decree. ECF 49 at 23:20-22 ("the Segments have been reclassified as part of a single interstate pipeline system [and t]he Department of Energy has also issued a Defense Production Act order . . . ."). In its next brief, the U.S. shifted its argument, alleging that the underlying changes that the federal orders responded to formed the basis for changing the Consent Decree. ECF 60 at 20:17-21 ("The question is whether the altered factual circumstances those decisions responded to created significant and unanticipated changes to justify modification" (emphasis original)). Despite correctly acknowledging that changed circumstances supporting modification of a consent decree must be changes to underlying facts, not the federal government's own orders, the U.S. fails in its application to both orders.

**A.   The United States Cannot Escape Scrutiny of its Orders Because the 2025 Supreme Court Decision in *McLaughlin* Establishes a Right to Collateral Review**

As a threshold issue, the U.S. asserts that California's efforts to enforce this Court's decree involves impermissible collateral attacks on the Pipeline Safety Act (PSA) and Defense Production Act (DPA) orders. ECF 60 at 30-31. First, the relevant inquiry for modifying a consent decree is into the underlying changes in fact, not the orders themselves, so this argument makes no difference. But more importantly, the U.S. opened the door to as-applied challenges by bringing the PSA and DPA orders into this case. Under the Supreme Court's decision in *McLaughlin*

11

*Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 156 (2025), California is entitled to respond. California pointed this out in its opening brief. ECF 55 at 35:26-27. The U.S. relies on Ninth Circuit cases predating *McLaughlin*. But the Supreme Court's pronouncement controls over prior circuit cases—especially since *McLaughlin* reversed the Ninth Circuit. As the Supreme Court explained, "Fundamental principles of administrative law establish the proper default rule: In an enforcement proceeding, a district court must independently determine for itself whether the agency's interpretation of a statute is correct." *McLaughlin*, 606 U.S. at 155. In *McLaughlin*, the defendants sought summary judgment, contending that the relevant federal agency decision created a defense and the agency decision could not be collaterally attacked; the Supreme Court disagreed. *Id.* at 150-52. The U.S. adopts the same position here as it did as amicus in *McLaughlin*, without reference to the Supreme Court's rejection of that position. And the posture is the same: a defendant opening the door to as-applied challenges by relying on federal agency decisions to oppose relief.

In *McLaughlin*, the Supreme Court noted an exception to the default rule of reviewability: certain federal statutes provide, in clear and unmistakable language, that a specialized review is exclusive. *Id.* at 153-54 (discussing Clean Water Act, CERCLA, and Clean Air Act). But the requirements for that exception are high. The Supreme Court concluded that the exception did not apply to the Hobbs Act, even though that statute gave the Court of Appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" the relevant agency orders. *Id.* at 152 (citing 28 U.S.C. §2342), 168 (reversing Ninth Circuit). Instead, the Court held that the plaintiff could collaterally contest the agency's adjudication. The Supreme Court concluded that even the language in the Hobbs Act was insufficient to foreclose a plaintiff's as-applied challenge. The same rule applies here—to both the DPA and the PSA.

The DPA contains no judicial review provision at all; challenges to DPA orders are governed by the Administrative Procedure Act. As explained in *McLaughlin*, the right to bring a collateral challenge once a party opens the door "is codified in the Administrative Procedure Act, 5 U.S.C. § 703[, which] provides: 'Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, *agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.*'" *Id.* at 156 (emphasis original).

The PSA contains a judicial review provision for facial challenges, but provides that "[a] remedy under paragraph (1) [facial challenge in a circuit court of appeal] is in addition to any other remedies provided by law." 49 U.S.C. § 60119(a)(2). This provision makes clear that Congress preserved the right to bring an as-applied challenge in a case like this. Accordingly, California may contest the validity of the December 2025 PHMSA Orders. And in any event, a party to a consent decree cannot, by its own action, eliminate the jurisdiction of the court enforcing the consent decree. *Nehmer v. U.S. Dep't of Veterans Affs.*, 494 F.3d 846, 861 (9th Cir. 2007).

### B.    Sable's Pipeline Safety Act Arguments Do Not Excuse their Non-Compliance With the Consent Decree

As explained in California's opening brief, a pipeline's status as either interstate or intrastate depends entirely on the pipeline's location, not its uses, the origin of the products in the pipeline, or the owners' intentions. ECF 55 at 37:17-26 (citing 49 U.S.C. §60101). Ordinarily this is a simple inquiry: locate the pipeline on a map and determine whether it is within one state. The dispute here arises because the U.S. and Sable changed their view about what constitutes a single pipeline.

The U.S. and Sable now contend that Sable's[6] unification of ownership of three assets—the offshore Oil Emulsion Pipeline, the Las Flores Canyon processing facility, and onshore Lines CA-324/325—is a change in circumstances that

---

[6] In fact, Exxon unified ownership of the three assets in 2022. PHMSA (correctly) did not allege, in 2022, that this changed CA-324/325's intrastate status.

transforms these three facilities into a single pipeline facility. ECF 60 at 21:3-10, ECF 61 at 26-27. This allegation matters because the offshore Oil Emulsion Pipeline reaches federal waters offshore, and itself is an interstate pipeline subject to PHMSA's jurisdiction. The question is whether the other facilities are also part of that pipeline. Prior to December 2025, PHMSA's answer was no.

The problem with the "unification of ownership" theory is that it has no grounding in the PSA. ECF 55 at 38:13-21. Neither the U.S. nor Sable point to any statute, regulation, or precedent indicating that unified ownership means a unified pipeline. In what appears to be the only case considering this argument, the D.C. Circuit rejected unity of ownership and combined operation as a basis to categorize multiple pipelines as a single pipeline facility. In *Southern Pacific Pipe Lines Inc. v. U.S. Department of Transpiration*, 796 F.2d 539, 541 (D.C. Cir. 1986), petitioner Southern Pacific owned two pipeline systems containing main trunk lines that crossed into other states, and lateral lines entirely within California. Southern Pacific "claim[ed that] the statutory definition of interstate pipeline facilities includes all facilities used as an integral part of an interstate *system* . . . ." *Id.* at 542 (emphasis original). The D.C. Circuit rejected this argument, noting that *most* intrastate pipelines connect to interstate pipelines, so relying on such connections would undermine Congress' intent, "which has always recognized a major role for the states in pipeline safety." *Id.* (quoting 50 Fed.Reg. 39,011 (1985)).

This case is easier than *Southern Pacific*. Southern Pacific's lateral lines connected directly to the main trunk lines. But here, the interstate offshore Oil Emulsion Pipeline does not directly connect to the intrastate CA-324/325. Instead, the Emulsion Pipeline delivers an emulsion to the Las Flores Canyon treatment plant, where hydrocarbons are separated and treated, before treated and stabilized crude is delivered to CA-324/325. The treatment plant is not, itself, a pipeline, and CA-324/325 is a separate pipeline on the opposite side of the treatment plant.

14

Unified ownership is not a changed circumstance that justifies modifying the Consent Decree.

### C.    The Defense Production Act Does Not Excuse Compliance with the Consent Decree or State Law

As with the PSA, the U.S.' opening brief pointed to the DPA order itself as the basis for finding changed circumstances. The U.S. now concedes that "changed circumstances" would have to be not the order itself, but the "the facts underlying the national security determination by the Secretary of Energy." ECF 60 at 7:24-25, 21:22-22:18. But the U.S. still does not identify such facts or explain how they represent change. Instead, the U.S. simply rests on the Secretary of Energy's Order and the President's Energy Emergency Executive Order. *Id.* at 21:25-28, 22:8-11. Neither of these are changed facts; they are just additional references to federal government actions. And, of course, this Circuit has foreclosed the possibility that the Executive Branch can create changed circumstances with its lawmaking power. *Flores v. Rosen*, 984 F.3d 720, 741 (9th Cir. 2020) ("We reject the notion that the executive branch of the government can unilaterally create the change in law that it then offers as the reason it should be excused from compliance with a consent decree.").

As to the DPA Order itself, California explained that the order is invalid because, among other failings, (1) it does not allocate or prioritize, and (2) it fails to comply with Department of Energy regulations which require, among other things, end dates for DPA orders. ECF 55 at 34:23-36:2. Neither Sable nor the U.S. respond to these specific arguments. The only argument that can reasonably be understood to respond is the challenge to collateral attacks. ECF 60 at 30-31. But those arguments are foreclosed by *McLaughlin*. 606 U.S. at 156, *see supra* Part III.A.

Finally, the DPA simply doesn't authorize preemption of state law beyond two narrow areas: liability for contracts rendered impossible by DPA orders, and

15

antitrust violations. Sable tries to distinguish two appellate decisions reaching this conclusion, *Hercules, Inc. v. United States*, 24 F.3d 188, 203–04 (Fed. Cir. 1994), and *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995), by claiming that "those courts held only that companies are not entitled to *indemnification* from the federal government for liability and costs associated with DPA compliance." ECF 61 at 33:20-22. As to *Hercules*, Sable misses the point. There, the Federal Circuit explained that, for the court to determine the scope of the alleged indemnity, that court had to also determine the "nature of the liability against which the contractor is shielded." *Hercules*, 24 F.3d at 204. The Federal Circuit then concluded that the liability shield protects only against contract liability. And Sable's claim that *Vertac* is "only" about "indemnification" is wrong. In *Vertac*, the U.S. held manufacturers of Agent Orange liable for the cost of environmental cleanup. One of Vertac's co-defendants argued that it was "immune from CERCLA liability" and "base[d] its immunity argument on § 707 of the DPA." *Vertac*, 46 F.3d at 811–12. After rejecting the immunity argument, the Eighth Circuit explained that Vertac's co-defendant "separately argues that it is entitled to indemnity," and rejected that argument as well. *Id.* at 812-13.

Before changing its position in this year, the U.S. urged courts to adopt the position that prevailed in *Hercules* and *Vertac*, rejecting interpretations of the DPA that "would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." *Vertac*, 46 F.3d at 812; *see also, e.g.*, *Hercules Inc. v. United States*, 516 U.S. 417, 430 n.14 (1996) (noting U.S.' position that § 707 "only bar[s] liability to customers whose orders are delayed or displaced on account of the priority accorded Government orders under § 101 of the DPA"). Recipients of DPA orders must take state law as they find it.[7]

_____

[7] Sable cites to *Johnson v. Tyson Foods, Inc.,* 580 F. Supp. 3d 382, 388–89

(continued…)

16

The U.S.' new interpretation of the DPA would authorize the President, without any oversight by Congress, to command private parties to violate state and federal law with impunity. The U.S.' new position has no limiting principle; its interpretation would grant to the Executive the power to reshape federal-state relations in the regulation of any industry engaged in production of commodities that touch on national defense (*i.e.*, nearly all industrially-produced commodities). But a law that upsets the balance of federal and state power requires a clear statement *in the statute*. "[W]hen legislation 'affect[s] the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.'" *Bond v. United States*, 572 U.S. 844, 858 (2014) (quoting *United States v. Bass*, 404 U.S. 336, 349 (1971)). The DPA lacks such a clear statement, and this Court should reject this new, expansive interpretation.

## IV. SABLE CANNOT RELY ON THE DOCTRINE OF SUBSTANTIAL COMPLIANCE TO EXCUSE ITS REFUSAL TO COMPLY WITH THE CONSENT DECREE

Sable seeks to cut corners of the Consent Decree by alleging "substantial compliance." But Sable's failures are material, and Sable could have complied. *See Rock Island A. & L.R. Co. v. United States*, 254 U.S. 141, 143 (1920) ("Men must turn square corners when they deal with the Government."). Sable's declarants Flores and Yearwood make clear in their declarations that Sable has the capacity to fulfill the terms of the Consent Decree. *See* Flores Decl. (ECF 61-1 at 10), ¶ 43 ("Sable plans to take additional protective measures, beyond those required by the Consent Decree"). They claim that it would simply be "difficult and costly" to complete the safety requirements imposed by OSFM. *See* Yearwood Decl. (ECF 61-2 at 4), ¶ 10. So Sable chose instead to violate the Court's order.

---

(N.D. Tex. 2022) for a contrary result. But at the District Court in *Johnson*, no party cited *Hercules* or *Vertac* in their briefs. *Johnson et al v. Tyson Foods Inc.*, No. 2:21-cv-00156 (N.D. Tx.), ECF 6, 12, 14.

## A.    Sable Has Violated Specific Terms of the Consent Decree

Sable failed to comply with the Consent Decree in two material ways: first, it refused to complete remediation requirements imposed by OSFM; second, it ignored the jurisdictional provisions that afford California, not the federal government, final approval and implementation of the Restart Plan.

The Consent Decree requires compliance with State Waivers. ECF 6-1 at 80-81, 96-102. The relevant requirement of the State Waiver imposed by OSFM, paragraph 9, requires remediation to 40% metal loss including tool tolerance "prior to restarting." ECF  55-1 at 140 (State Waiver for CA-324, ¶ 9), 156 (State Waiver for CA-325, ¶ 9). Sable's arguments to the contrary cannot re-write the words "prior to restarting." Sable's argument that such terms are immaterial is belied by the lengths to which Sable has avoided complying with them, and its decision to violate them prior to seeking judicial relief to do so. Sable's considerable efforts to circumvent the Court and avoid remediation of the anomalies demonstrates that it views this requirement as material.

Rather than seek to adjudicate its dispute with OSFM, Sable sent OSFM a letter stating that it "relinquishes, surrenders and abandons the State Waivers." ECF 55-1 at 125. Sable cannot materially comply with the State Waivers while abandoning and surrendering them prior to restart approval. And it is material to the State that it has authority over conduct within its borders. Here, California seeks to regulate an area of traditional state power, enshrined by federal legislation preserving that power. *See* 49 U.S.C. § 60105(a) (prohibiting federal interference in state regulation of intrastate pipelines); *Southern Pacific*, 796 F.2d at 542. The Consent Decree is consistent with this preservation of state power. It grants authority to California (through OSFM) power to issue the State Waivers and to maintain regulatory oversight. The terms of the State Waiver extend beyond the expiration of the Consent Decree, including the right to continue monitoring and gathering reporting data on Sable's activities. For instance, the State Waivers

18

require comprehensive recordkeeping of all pipeline activities "for the life of the pipeline[, which] must be submitted to the OSFM." ECF 55-1 at 148-49, ¶ 57. This includes direct reporting to OSFM of details regarding [1] "any release", [2] pipeline exposure, and [3] annual activities. *Id.* at 149-50, ¶¶ 59-61. Thus, requiring Sable to restart only pursuant to the Consent Decree relates to more than just the timing of remediation.

### B. Sable's Case Authority Supports California's Position That Substantial Compliance Relief is Unavailable To Sable

*Labor/Community Strategy Center. v. Los Angeles County Metropolitan Transportation Authority,* 564 F.3d 1115 (9th Cir. 2009) is the centerpiece of Sable's "substantial compliance" argument. But the consent decree in that case merely required the MTA to show "to the Court's satisfaction that it has substantially complied with the Consent Decree . . ." *Id*. at 1118. Appendices B and D to the Consent Decree set out with specificity what Sable must do with no "substantial compliance" safety-valve, and Sable clearly has not obtained OSFM's approval to restart Lines CA 324/325. *Wells Benz, Inc. v. United States*, 333 F.2d 89 (9th Cir. 1964) is a straightforward application of substantial compliance in the context of a construction case requiring the deviation be both "unintentional and so minor or trivial" that it does not defeat object of the contract. *Id*. at 92-93. Here, the object of the Consent Decree is strict oversight of Sable's operations by both OSFM and the Court. Sable's unauthorized restart is hardly trivial. Similarly, Sable's actions are inapposite to the court's ruling in *Rouser v. White*, 825 F.3d 1076 (9th Cir. 2016) that "merely taking significant steps toward compliance comes nowhere near satisfying this exacting standard." *Id*. at 1081-82. Sable does not meet the standard cited in *Rouser* for "substantial compliance" since Sable has not yet "complied with *each of the decree's terms* for a substantial period before terminating the decree." *Id*. (emphasis added).

19

Sable's reliance on *Flores v. Bondi,* 803 F.Supp.3d 1018 (C.D. Cal. 2025) is curious as it supports California's position. In *Flores v. Bondi*, this Court applied the principles of *Rouser* and *Wells Benz* to an injunction that only required substantial compliance. Nonetheless, this Court denied a motion to terminate on the basis that Department of Homeland Security failed to, *inter alia*, follow specific directives relating to the release of unaccompanied minors. *Id*. at 1031-32. Similarly, this Court has ordered Sable to comply with specific procedures regarding regulatory oversight. The Court should follow the principles as applied in *Flores* and order Sable to comply.

## V. CALIFORNIA ASKS FOR AN APPROPRIATE BUT LIMITED REMEDY: ORDERING COMPLIANCE

An order compelling compliance is an appropriate remedy. It directs the parties with clear obligations and sets the stage for future proceedings, if necessary. *See Nehmer*, 494 F.3d at 855.

Sable repeatedly characterizes the enforcement motion as seeking a contempt order. ECF 61 at 12:1-18, 19:1-20:6, 31:15-32:5. But California's Motion does not ask the Court to issue a fine for past contempt or a coercive forward-looking contempt. *Cf. Walker v. City of Birmingham*, 388 U.S. 307, 320 (1967). Instead, California asks the Court simply to reiterate that Sable is bound by the Consent Decree's existing obligations and must comply. *Cf. Nehmer*, 494 F.3d at 855 (court converting plaintiffs' motion for contempt "into a motion for clarification and enforcement of the Consent Decree").

Lastly, Sable relies on *eBay Inc. v. MercExchange, L.L.C*., 547 U.S. 388 (2006), to argue that California has not shown injury justifying injunctive relief. ECF 61 at 35. *eBay* addressed whether to impose an injunction or if damages would suffice in a patent dispute. *Id.* at 391. There is no plausible damages remedy that could compensate California for the displacement of its sovereign power. Rather, excusing Sable's violation of law would deprive California of its sovereign power

and irreparably injure the State. *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

**CONCLUSION**

This Court should order Sable to come into immediate compliance with the Consent Decree, including the State Waiver requirement, and deny the motion to modify or terminate the Consent Decree.

Dated:  May 11, 2026                          Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
ERIC M. KATZ
Supervising Deputy Attorneys
General

*/s/ Michael S. Dorsi*
MICHAEL DORSI
Deputy Attorney General
*Counsel for Plaintiffs State of California, et al.*

LA2015500901
45070280.docx

21

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs State of California, et al., certifies that this brief contains 6,989 words, which complies with the word limit of L.R. 11-6.1.


Dated:  May 11, 2026                    Respectfully submitted,

                                        ROB BONTA
                                        Attorney General of California
                                        MYUNG J. PARK
                                        ERIC M. KATZ
                                        Supervising Deputy Attorneys
                                        General

                                        */s/ Michael S. Dorsi*
                                        MICHAEL DORSI
                                        Deputy Attorney General
                                        *Counsel for Plaintiffs State of*
                                        *California, et al.*