ROB BONTA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL S. DORSI (State Bar No. 281865)
Deputy Attorney General
E-mail: Michael.Dorsi@doj.ca.gov
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 510-3802
 Fax: (415) 703-1107


ERIC M. KATZ
SUPERVISING DEPUTY ATTORNEY GENERAL
MICHAEL T. ZARRO (State Bar No. 110171)
Deputy Attorney General
E-mail: Michael.Zarro@doj.ca.gov
 300 S. Spring Street, Suite 1702
 Los Angeles, CA 90013
 Telephone: (213) 269-6347
 Fax: (916) 731-2128

*Attorneys for Plaintiffs*
*California Department of Parks and Recreation,*
*California State Lands Commission, and California*
*Department of Forestry and Fire Protection's Office of*
*State Fire Marshal*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, et al.,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>　　　　　　　　　Defendants. | Case No. 2:20-cv-02415-SVW-SSCx<br><br>**PLAINTIFFS' JOINT REPLY TO DEFENDANTS' AND INTERVENORS' JOINT POST-HEARING BRIEF FILED PURSUANT TO INSTRUCTION AT JUNE 8, 2026 HEARING**<br><br>Courtroom:　10A, 10th Floor<br>Judge:　　　Hon. Stephen V. Wilson<br>Trial Date:　Not Set<br>Action Filed: March 31, 2026 |

**INTRODUCTION**

In their post-hearing brief, as in their earlier briefing, the U.S. and Sable advance a theory of the Defense Production Act (DPA) that exceeds the bounds of the Act, departs from decades of precedent, and shifts the balance of power between the state and federal governments as well as between the executive and judicial branches. California urges the Court to reject this theory by granting the requested preliminary injunction and enforcing its Consent Decree.

**ARGUMENT**

**I.    THE PRELIMINARY INJUNCTION IN *WRIGHT* SHOULD BE GRANTED.**

**A. Without the Injunction, California Will Continue To Suffer Irreparable Harm as a Result of the Wright Order.**

The U.S. and Sable admit that the Wright Order displaces California's sovereign authority. *Wright* ECF 23 at 14-15; ECF 24-4 at 18-19.[1] This displacement of state law constitutes irreparable harm, and the U.S. and Sable do not cite any authority that suggests otherwise. The U.S. and Sable also repeat their argument that California's harm is speculative because "California [] has not identified what law the Order prevents [California] from enforcing." *Wright* ECF 63 at 2. But they have already identified that the Wright Order effectively prevents California from enforcing Senate Bill 237, which updated the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act of 1990, the Elder California Pipeline Safety Act of 1981, and the California Coastal Act of 1976, among other laws; waivers from the California Office of State Fire Marshal (OSFM); California Department of Parks and Recreation's (State Parks) rights and obligations as a landowner of Gaviota State Park; and requirements of the Consent Decree.[2] *See*

---

[1] Because this brief is filed in two cases, we refer to record documents by case short name (*Wright* or *Plains*) followed by ECF number and pincite.

[2] The U.S. and Sable's recognition that the Wright Order displaces state law also undermines their repeated claim that the Pipeline and Hazardous Materials Safety Administration's (PHMSA) 2025 determination that Lines CA-324/325 are (continued…)

1

*Wright* ECF 23-1, Attach. 1 at 2; *see also id.*, Attach. 2 at 10, & Attach. 3 at 12 n.53. And California has also identified specific examples of state law that the Wright Order seeks to displace, including additional provisions of the Elder California Pipeline Safety Act and the Coastal Act. *See Wright* ECF 62 at 12-13.

The State's basis for irreparable harm in *Wright* is distinct from that in *State Parks*; thus, the Court's decision in *State Parks* does not preclude preliminary injunctive relief here. *See id.* at 13 (identifying in *Wright*, among other things, sovereign constitutional injury by the federal government, which is distinct from the injury caused by Sable in *State Parks*). Lastly, the U.S. and Sable repeat Sable's claim that federal preemption itself does not constitute irreparable harm. *See Wright* ECF 24 at 18; ECF 63 at 3 n.3. However, the case they cite did not find irreparable harm from federal preemption, because the federal government there acted within the scope of its express statutory authority. *Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1287 (11th Cir. 2021). Here, in contrast, the Wright Order exceeds the Department of Energy's (DOE) authority under the DPA (*see infra* I.C.3.), and thus its preemption of state law irreparably harms California.

### B. Equitable Factors Weigh in Favor of the Preliminary Injunction.

U.S. and Sable's sole argument on the "public interest and equities" is that "no governmental interest is more compelling than the security of the Nation." *Wright* ECF 63 at 2-3. But the Executive's assertion of a national security interest cannot be a blank check to act in violation of a statute and the constitution. *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) (citation omitted) ("National-security concerns must not become a talisman used to ward off inconvenient claims."). This Court may defer to DOE's representation of national security interest while avoiding

---

interstate, and not the Wright Order, displaced California's authority to regulate the pipelines' safety. *Wright* ECF 63 at 2. Regardless, the effect of the federal Pipeline Safety Act is separate from that of the Wright Order and does not impact California's ability to seek an injunction against the Wright Order.

using deference to create a judicial exemption from Congressional laws. *See Nat. Res. Def. Council v. Winter*, 527 F. Supp. 2d 1216, 1237 (C.D. Cal. 2008) ("Deference therefore does not mean a court must abjure judicial review whenever a party raises the specter of national security."). The U.S. and Sable "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And there "is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

### C.  California Is Likely To Succeed on the Merits.

#### 1.    The Wright Order Is a Reviewable Agency Action.

U.S. and Sable argue that the Wright Order is unreviewable because it was issued following a presidential delegation (*see Wright* ECF 63 at 4), but agency actions taken pursuant to presidential delegations of authority are reviewable. *See, e.g.*, *Protect Our Communities Fdn. v. Chu*, 2014 WL 1289444 at *6 (S.D. Cal. Mar. 27, 2014) (DOE's issuance of transmission facilities permits pursuant to delegated presidential authority was a reviewable agency action); *Indigenous Env't Network v. U.S. Dep't of State*, 2017 WL 5632435 at *4 (D. Mont. Nov. 22, 2017) (State Department's issuance of a pipeline permit pursuant to delegated presidential authority was reviewable agency action). U.S. and Sable's reliance on *Jensen v. National Marine Fisheries Services*, 512 F.2d 1189 (9th Cir. 1975), is unavailing. *See Wright* ECF 63 at 4. The relevant "agency" in *Jensen* was a commission created under a binational treaty. *See* 512 F.2d at 1191 (reasoning that "presidential action in the field of foreign affairs" presents non-justiciable political questions). DOE, in contrast, is subject to the standard rules of administrative procedure and the Wright Order has solely domestic economic implications. An agency cannot avoid judicial review simply by invoking its consideration of "foreign policy" or "security"

factors. *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015) (citation omitted) ("it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance").

### 2.    The Wright Order Is Not Valid.

The Wright Order is not a valid prioritization and allocations order under the DPA. *See* 50 U.S.C. § 4511(a), (c). The pipelines were shut down so there were no contracts to "prioritize" under Section 101(a). Section 101(a) makes it clear that the purpose of the statute is to authorize the President to dictate that preference be given to government contracts necessary to promote the national defense." *Hercules Inc. v. United States*, 24 F.3d 188, 203 (Fed. Cir. 1994), aff'd on other grounds, 516 U.S. 417 (1996). In contrast to the Wright Order, past DPA prioritization orders required companies to prioritize supply orders to ensure that federal contracts addressing an emergency or national defense were fulfilled first. *Id*. Past energy uses of the DPA include: prioritizing natural gas supply contracts to California utilities; funding domestic manufacture of solar, batteries, and heat pumps; and funding the domestic manufacture of critical minerals—all via Title I allocations and priorities for producing energy companies with contracts guaranteeing domestic supply, or funding though Title III loans.[3] When a company is not operating and has *no* contracts to shuffle and prioritize, the use of the DPA's prioritization and allocations authority order is nonsensical. The U.S. and Sable can cite to no other prior DPA order or legal authority that supports this novel use of the DPA. Moreover, none of these prior DPA orders involved broad preemption of state law or violation of court orders.

Nor is the Wright Order a valid allocation order. The U.S. and Sable claim the Wright Order orders the allocation of oil from an offshore oil field to meet national

---

[3] 87 Fed. Reg. 19775 (April 6, 2022); *The California Energy Crisis and Use of the Defense Production Act, Hearing Before the S. Com. on Banking, Hous., & Urb. Affs.*, 107th Cong. 215 at 62-63 (2001) (PG&E DPA Order); 90 Fed. Reg. 13673, (March 20, 2025).

security needs. *Wright* ECF 63 at 6. This mischaracterizes the Wright Order and the DPA. The U.S. is using the Wright Order to *begin* new production from a dormant pipeline—not to allocate or "*diver[t]* … materials and facilities from ordinary use to national defense purposes." 50 U.S.C. § 4502(a)(3)(D) (emphasis added). The DOE's use of the Wright Order unlawfully expands the DPA's allocation power by compelling the start of energy production.

The U.S. and Sable's reliance on *Johnson v. Tyson Foods Inc.*, 580 F. Supp. 3d 382, 388-89 (N.D. Tex. 2022), is misplaced because *Johnson* does not address what constitutes a valid allocation order under the DPA. *See Wright* ECF 63 at 6. Indeed, there was no DPA Order at all in *Johnson:* Instead, the President issued Executive Order 13917 during Covid-19 and made a determination under DPA Section 101(b) that it was important for existing meat suppliers to "*continue* operating and fulfilling orders to ensure a *continued* supply of protein for Americans" during a global health epidemic. 85 Fed. Reg. 26313 (May 1, 2020) (emphasis added). Similarly, the DPA was previously used to ensure the *continued* supply of natural gas contracts to avoid a supply disruption in California. *See* PG&E DPA Order. The Wright Order, however, does not continue the status quo; it upends it by compelling new energy production.

### 3. The DPA Does Not Authorize the Broad Preemption Claimed Here.

The U.S. maintains that the Order "direct[s]" Sable to "immediately operate the pipeline" and "preempts any California law that conflicts with [that] directive[]." *Wright* ECF 23 at 15. Thus, contrary to the U.S. and Sable's assertions otherwise, whether the DPA authorizes broad preemption of state laws is directly at issue. *See Cohen v. Apple Inc.*, 46 F.4th 1012, 1027-29 (9th Cir. 2022) ("for a federal law to have preemptive force, it must fall within the scope of the [federal

agency's] delegated authority, . . . it must be "statutorily authorized") (citations and internal quotation marks omitted).[4]

U.S. and Sable's claim of preemptive authority fails. Their interpretation rests entirely on conflict preemption principles, asserting that following state law would "'frustrate [Congress's] purposes" making it "'impossible to comply with both state and federal requirements[.]'" *Wright* ECF 63 at 8. But the purpose of Section 101(a) is to require contractors to prioritize defense consumption over non-defense consumption, notwithstanding existing private contracts. *Wright* ECF 16-2 at 8-9, 13-15. California's enforcement of state laws here does not interfere with the goal of prioritizing some contracts over others. Further, construing the DPA to give the Executive Branch broad preemptive power constitutes a major change in state-federal relations without a clear statement of intent from Congress. *See Bond v. United States*, 572 U.S. 844, 858 (2014). The DPA contains no such statement, and such a conclusion requires adopting a novel interpretation of the DPA, contrary to two federal circuits. *Hercules*, 24 F.3d at 204; *Vertac*, 46 F.3d at 812.

Finally, the U.S. interprets the DPA in a manner that runs afoul of separation of powers principles and the anti-commandeering doctrine. *Wright* ECF 63 at 11-12. Its interpretation of the Wright Order as automatically displacing this Court's Consent Decree (as opposed to first seeking modification) encroaches on the Judicial Branch's power. It is for this Court to say if its judicial order need not be followed. *See generally Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19 (1995). Likewise, the U.S. interprets the Wright Order to require that California essentially dedicate state-owned property to Sable's immediate restart of the pipelines. The Wright Order thereby commandeers state government in the same way as if the federal government made California the owner of Sable's undesirable

---

[4] U.S. and Sable claim that California is inconsistently arguing that the Wright Order cannot preempt California law under the DPA while stating that its actual terms do not support the preemptive effect that U.S. and Sable claim. But those views are entirely consistent.

assets without California's consent. *Cf. New York v. United States*, 505 U.S. 144, 176 (1992) (invalidating federal statute that offered States choice between accepting nuclear waste and regulating according to federal instructions).

### 4. The Wright Order Fails To Comply with DOE Regulations.

The U.S. asks the Court to excuse its failure to provide an end date by deeming it harmless error. *Wright* ECF 63 at 7. But the requirement that allocation orders include a specific "calendar end date" limits the federal government's power and protects those whose rights are adversely affected by the order. 10 C.F.R. § 217.54. This is consistent with prior DPA energy orders, such as an order under Section 101 securing the continuous supply of natural gas from January 19, 2001, to January 24, 2001. *See* PG&E DPA Order. Yet even this limited order was such an extraordinary use of the DPA that Congress conducted a hearing to review the executive's potential misuse of the DPA's authority to address an energy crisis. PG&E DPA Order at 1-2. Here, the U.S. asserts that the DPA allows for broad preemption of state law for an unlimited time in direct contravention of DOE's regulations. This is not "harmless error."

## II.   THE CONSENT DECREE SHOULD BE ENFORCED.

### A.  The Consent Decree Binds the U.S. and Sable.

Sable is bound by the Consent Decree because it knowingly entered privity with Plains pursuant to the Court Order. Based on the principles established in *Golden State Bottling Co., v. NLRB*, 414 U.S. 168, 176 (1973), Sable must comply with the Consent Decree's injunction under FRCP 65 and Paragraph 4 of the Consent Decree. *Plains* ECF 6-1 at ¶ 4 ("the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree"). A consent decree is enforceable against a "bona fide purchaser" with knowledge of the obligations, thereby being in privity for purposes of Rule 65(d). *Golden State Bottling Co.*, 414 U.S. at 180. Sable acquired Lines CA-324/325 to

7

achieve the same purpose, using the same equipment, and with full knowledge of the Consent Decree's requirements as set out in the Assumption Agreement.

The safety provisions of the Consent Decree are enforceable against Sable even as a non-party under Rules 65(d) and 71. Enforcement against nonparties "is the whole point of the successorship doctrine." *See Bates v. Pacific Maritime Ass'n*, 744 F.2d 705, 709. By entering into the assumption agreement required by the Consent Decree, Sable assured it would comply. *Plains* ECF 55-1, RJ N Exh. E. The U.S. and Sable wrongly contend that paragraph 88 of the Consent Decree limits the scope of Sable's obligations. Paragraph 4 expressly binds Sable as an "Assign" or a "Person Otherwise Bound By Law" to the Consent Decree's obligations. Paragraphs 88 through 91 set forth the obligations specifically applicable to the pipelines. *Plains* ECF 6-1 at 49-50. Paragraph 4 addresses *who* is bound, and Paragraph 88 addresses *what* obligations bind a buyer of Lines CA-324/325. These provisions run with the pipeline and rule out Sable's argument that enforcement is not available against an entity that "simply purchased assets." *Plains* ECF 78 at 10; ECF 6-1 at 49:8-24.[5]

### B.  Sable Cannot Claim Substantial Compliance.

Sable defied two agency orders by restarting Lines CA-324/325 in violation of the provisions of both the State Waiver and Federal Special Permit which the U.S. and Sable concede include "all forward-looking Consent Decree safety provisions." *Plains* ECF 61 at 29. Sable refused to complete remediation requirements imposed by the OSFM and ignored jurisdictional provisions that afford California final approval and implementation of the Restart Plan.[6]

_____

[5] Termination of the Consent Decree may only occur once both temporal and compliance conditions are satisfied, not one of the other. *Plains* ECF 62 at 4; ECF 6-1 at 55, ¶ 100. Sable does not comply.

[6] The U.S. and Sable assert that California's motion to enforce the Consent Decree fails if the Court determines that California lacks the irreparable harm necessary for a new preliminary injunction. *Wright* ECF 63 at 2. But the immediacy requirement for preliminary relief is inapplicable here because there is no future trial date after which the court would revisit the question of relief.

Sable seeks to cut corners of the Consent Decree by alleging "substantial compliance." But Consent Decree Appendices B and D specifically itemize what Sable must do—notably to obtain approval from OSFM prior to restart. It does not allow for "substantial compliance." Even if it did, Sable has not substantially complied. Substantial compliance is limited to "unintentional and so minor or trivial" deviations that do not impact the object of the contract. *Wells Benz, Inc. v. United States*, 333 F.2d 89, 92 (9th Cir. 1964). Importantly, Sable has not obtained OSFM's approval to restart Lines CA 324/325, and the U.S.'s statements otherwise are false. *Plains* ECF 45-1 at 4-5. Sable's failures are neither minor nor trivial. Sable has not "complied with *each of the decree's terms* for a substantial period before terminating the decree." *Rouser v. White*, 825 F.3d 1076, 1082 (9th Cir. 2016) (*emphasis added*). No authority supports the position that a party may rely on Federal approval to avoid the explicit terms of the Consent Decree requiring state approval. *Flores v. Bondi*, 803 F. Supp. 3d 1018, 1031-32 (C.D. Cal. 2025). There is no reason to deviate from the specific directives of the Court's order.

### C.  The U.S. and Sable Fail to Justify Modifying the Consent Decree.

The U.S. and Sable assert that the DPA order and PHMSA's assumption of jurisdiction are changed circumstances requiring modification of the Consent Decree.[7] Thus, to satisfy their burden to identify changed factual circumstances, they rely on the Executive's own orders—a position foreclosed by Ninth Circuit precedent. *Flores v. Rosen* 984 F.3d 720, 741 (9th Cir. 2020); *Nehmer v. VA* 494 F.3d 846, 860 (9th Cir. 2007). In addition, their reliance on the Wright Order is foreclosed given that order's numerous shortcomings and its lack of any legal preemptive effect. *Plains* ECF 77 at 4.

---

[7] Given evidence that PHMSA did not consider the rationale it offers in its Answering Brief, the Ninth Circuit in *California v. PHMSA* may remand to the agency without reaching the *intra*state versus *inter*state question. Case No. 26-508, ECF 93.1 at 20-22.

9

U.S. and Sable's reliance on PHMSA's position is similarly flawed.[8] The PSA defines interstate and intrastate pipelines. 49 U.S.C. § 60101(a)(8)(B), (10). It does not delegate, to PHMSA or to any other agency, any discretion to make that determination. *Id*.; *see Wyeth v. Levine*, 555 U.S. 555, 576 & n.9 (2009) (comparing absence of delegation in that case with examples of statutes with delegations to grant and waive preemption). The relevant "pipeline facility" are Lines CA-324/325, which are intrastate pipelines because they run from Las Flores Canyon, California, to Pentland, California, and, under the PSA, intrastate status is determined by the *location* of the pipeline. 49 U.S.C. § 60101(a)(8)(B), (10); *Southern Pacific Pipe Lines Inc. v. U.S. Dep't of Transp.*, 796 F.2d 539, 542 (D.C. Cir. 1986). PHMSA's rationale for *inter*state status, stated in its December 17, 2025 Federalization Order, is Sable's unified ownership and operation, which argues that the onshore pipelines, Lines CA-324/325, the processing facility at Las Flores Canyon, and the undersea pipeline are one pipeline facility. This approximates the argument made by Southern Pacific, which the D.C. Circuit rejected. *Id*. The U.S. and Sable do not mention *Southern Pacific*—in any of the four briefs in *Plains*, two briefs at the Ninth Circuit in *California v. PHMSA*, or their joint supplemental brief—let alone explain why this Court should not follow it.[9]

## CONCLUSION

The Court should: (1) preliminarily enjoin DOE from enforcing the Wright Order, (2) grant California's motion to enforce the Consent Decree, and (3) deny the U.S.'s motion to modify or terminate the Consent Decree.

---

[8] The U.S. and PHMSA incorrectly state that the Ninth Circuit "declined to stay" PHMSA's order asserting jurisdiction over CA-324/325. *Plains* ECF 78 at 2. The Ninth Circuit issued an order denying a stay of two subsequent orders, challenged by environmental nonprofits in a related case and the petitioners did not seek a stay of the December 17, 2025 Federalization Order.

[9] The U.S. and Sable now suggest that pipelines CA-324/325 were *intra*state when inactive but became *inter*state when reactivated. *Plains* ECF 71 at 48; ECF 78 at 12:3-6. But there is no basis in the text of the PSA to treat a pipeline as *intra*state when turned off but *inter*state when turned on.

Dated:  June 25, 2026

Respectfully submitted,

RESPECTFULLY SUBMITTED,
ROB BONTA
ATTORNEY GENERAL OF CALIFORNIA
MYUNG J. PARK
ERIC M. KATZ
SUPERVISING DEPUTY ATTORNEYS GENERAL

*/S/ MICHAEL T. ZARRO*


MICHAEL T. ZARRO
DEPUTY ATTORNEY GENERAL
*COUNSEL FOR PLAINTIFFS STATE OF CALIFORNIA, ET AL.*

11

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff State of California, certifies that this brief is 10 pages in length, which complies with the page limit set by the Court.

Dated:  June 25, 2026                          Respectfully submitted,

RESPECTFULLY SUBMITTED,
ROB BONTA
ATTORNEY GENERAL OF CALIFORNIA
MYUNG J. PARK
ERIC M. KATZ
SUPERVISING DEPUTY ATTORNEYS
GENERAL

*/S/ MICHAEL T. ZARRO*

MICHAEL T. ZARRO
DEPUTY ATTORNEY GENERAL
*COUNSEL FOR PLAINTIFFS STATE OF CALIFORNIA, ET AL.*

---

12